# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

ABG INTERMEDIATE HOLDINGS 2, LLC and ABG-SPG ES, LLC,

                              Plaintiffs,

                -against-

BOLT FINANCIAL, INC.,

                            Defendant.

Index No. _____

**COMPLAINT**

---

        Plaintiffs ABG Intermediate Holdings 2, LLC ("**ABG**") and ABG-SPG ES, LLC ("**ABG-SPG**") (together, "**Plaintiffs**"), through their undersigned counsel, as and for their complaint against Defendant Bolt Financial, Inc. ("**Bolt**" or "**Defendant**"), and upon personal knowledge as to their own actions and upon information and belief as to the acts of others, allege as follows:

### OVERVIEW

        1.      Plaintiffs bring this action against Defendant Bolt seeking damages and injunctive relief in response to Bolt's repeated disregard and breaches of the parties' written agreements and subversion of the meaning and intent of those agreements, thereby depriving Plaintiffs of the value of the parties' contracts.  As set forth herein, Plaintiff ABG-SPG is a joint venture between ABG (short for Authentic Brands Group), on the one hand, and a wholly owned subsidiary of Simon Property Group, Inc. ("**Simon**"), on the other.

        2.      Authentic Brand Group is a brand development, marketing, and entertainment company, which owns a portfolio of global media, entertainment, and lifestyle brands.  ABG elevates and builds the long-term value of more than thirty (30) consumer brands and properties by partnering with best-in-class manufacturers, wholesalers, and retailers.

3.      Simon is a real estate investment trust engaged in the ownership of premier shopping, dining, entertainment and mixed-use destinations and an S&P 100 company (NYSE: SPG).  Its properties across North America, Europe, and Asia provide community gathering and market places for millions of people every day and generate billions in annual sales.

4.      Together, Authentic Brand Group and Simon jointly own SPARC Group Holdings II LLC (together with its subsidiaries, "**SPARC**").  SPARC is ABG's largest licensee and a multi-brand operator of the Nautica, Forever 21, Aéropostale, Lucky Brand, and Brooks Brothers brands.

5.      ABG assigned certain of the contractual rights at issue in this suit to ABG-SPG.

6.      In October 2020, ABG entered into a series of integrated contracts with Bolt, pursuant to which Bolt, *inter alia*, represented and promised that it would develop and deliver a new online checkout and customer loyalty platform known as "AllPass" as soon as reasonably possible, and in any event, by a date certain—January 15, 2021.  ABG was induced to enter into these agreements largely as the result of Bolt's representations that it had experience and capability superior to others, including the technological expertise and know-how to launch AllPass on (or earlier than) the agreed timeline, and that integration of Bolt's software with the websites used by ABG's brand partners could be seamlessly and competently achieved in a matter of a few short weeks.

7.      This arrangement was designed and intended to be mutually beneficial to both parties to the agreements.  For its part, Bolt would gain access to ABG's extensive brand network of over thirty (30) well-known retail brands that ABG either owns or to which it licenses valuable intellectual property, allowing Bolt to expand much faster (and with more desirable and

well-known brands) than it otherwise could.  Notably, this included access to the highly desirable and visible brands operated by ABG's licensee, SPARC.  At the same time, ABG was promised a new and useful technology platform to deploy on the e-commerce platforms of its numerous brands, thus enhancing its customers' experience and satisfaction in the competitive e-commerce retail space, and thereby helping ABG's brand partners grow and succeed.  In addition, a key aspect of the parties' agreements, which was designed to incentivize and reward ABG's efforts, was the promise by Bolt that ABG could exercise a Warrant (defined below) to purchase up to 5% of Bolt's equity in the event ABG was able to deliver substantial growth to Bolt through new retailer users of Bolt's products.

8.     ABG has satisfied its obligations under the parties' agreements, but Bolt has utterly failed to deliver on the technological capabilities that it held itself out as possessing, including the ability to seamlessly integrate Bolt's products into brand partners' websites and the ability to deliver a viable AllPass product by the agreed deadline—or indeed, in some cases, at all.

9.     To the contrary, the attempted rollout of Bolt's existing products on three of ABG's partner brands to date has been plagued by Bolt's repeated failures to deliver on the technological expertise and ability that it had held itself out as possessing.  As a result, Bolt's products are deployed on only two of ABG's partner brands—Forever 21 and Lucky Brand.  Forever 21, in particular, has experienced significant and recurring technical problems caused by Bolt.  A third ABG brand partner—Brooks Brothers—was forced to abandon, at least temporarily, its integration with Bolt in June 2021 due to Bolt's action or inaction which resulted, *inter alia*, in persistent technical product defects.

10.     As to the new AllPass product that Bolt had promised to deliver, while Bolt claimed to ABG that it "delivered" and was ready to launch AllPass in February 2021,

Bolt's own contemporaneous documents reveal something quite different.  Bolt did not even project to have a functioning minimum viable product ("**MVP**") until mid-July 2021, with testing extending through September 2021 and a "launch" planned in October (which has come and gone) and November 2021, months after the contractual deadline.  In reality, Bolt did not deliver even a MVP of AllPass until November 2021.  Thus, Bolt failed to meet even the substantially delayed and contractually non-compliant mark that Bolt itself had projected (and later tried to deny).

        11.     Adding the proverbial "insult to injury," Bolt has violated the concrete and explicit confidentiality provisions of the parties' agreements, repeatedly disclosing to the public and potential investors details of ABG's business and the parties' business relationship that were confidential, and in some cases, materially false and misleading to investors.  In addition to the misrepresentations it has made to ABG, over the course of its quest to raise hundreds of millions of dollars from investors over the past two years (in the process touting increasingly stratospheric valuations, most recently reported to be approaching $11 *billion*), Bolt has consistently overstated the extent of its integration with ABG's brand partners, and has tried to piggyback on the success of ABG, despite ABG's repeated demands that Bolt cease disseminating false information and despite Bolt's efforts to unjustly enrich itself and deprive ABG of the compensation which it is rightfully owed.  In particular, Bolt has affirmatively misled investors by showcasing all of ABG's brands as customers in investor presentations (including, in one instance, a brand, Reebok, that ABG had not even acquired yet), despite the fact that ABG's brands were not using Bolt's product, thereby unjustly enriching itself by raising capital off ABG's (and its brands') good name while simultaneously deceiving investors.  Bolt has also repeatedly represented to actual and potential investors that its products are actively deployed on the Brooks Brothers website—a representation which, as noted above, was materially false and

misleading, particularly after of June 2021.  Bolt was on several occasions directed to remove ABG and its brands from Bolt's marketing materials but has failed to comply.

12.      Further, it has come to light that Bolt, while (i) publicly touting its connection with ABG in order to enhance its reputation and facilitate the raising of capital, including through false or misleading statements, and (ii) failing to deliver to ABG the technological ability and products that it represented and promised that it would, has gone behind ABG's back to develop a competing product for a third party in secret.  Specifically, while never disclosed directly to ABG, Bolt revealed on a November 2021 call with potential investors that it had built "Bolt+"—a subscription product to be offered to retailers that use Bolt—which appears to be materially identical to the AllPass product that Bolt was supposed to be focused on, and committed to, developing for ABG.  Bolt has taken no steps to inform ABG about its development of Bolt+, despite the facts that (i) such notice is required under the parties' agreements, (ii) ABG is Bolt's partner in developing the underlying technology being deployed, and (iii) it appears to have diverted substantial time and resources from the development of AllPass.

13.      Bolt's secretive efforts to launch Bolt+ are yet another bad-faith tactic by Bolt designed to deprive ABG of the bargained-for benefit of the parties' agreements.  Indeed, Based on the information available to ABG to date, it appears that Bolt, after missing critical deadlines under its agreements with ABG and failing to ever properly deploy AllPass for ABG's brand partners, effectively abandoned its obligations to timely enable the AllPass launch, and instead took the AllPass technology that it developed in partnership with ABG (with ABG's considerable patience, information, and support) and actively made plans to launch a competitor product with a third party without even notifying ABG (as it was fully required to do under the

parties' agreements), which it then touted to potential investors in yet another attempt to unjustly enrich itself and raise millions of dollars on the back of ABG.

14.     Perhaps most egregiously, Bolt has further breached the parties' agreements and demonstrated its bad faith by denying ABG its bargained-for right to exercise a Warrant to purchase up to 5% of Bolt's equity, a right currently valued at over $500 million. While ABG's right to exercise the Warrant is conditioned on attainting a certain threshold level of "Gross Merchandise Value Contribution" (or "**GMV**") through ABG's brand partners or other referrals within a two-year period after the contracts were signed (specifically, ABG must contribute $750 million in e-commerce transaction through Bolt products), Bolt has repeatedly represented to ABG, including in writing as recently as September 3, 2021, that it was making substantial progress towards that goal through Forever 21's and Lucky Brand's use of Bolt's products.  Given Bolt's abject failure to timely enable the launch of AllPass, ABG reasonably relied on Bolt's representations.  Yet, in October 2021, Bolt inexplicably and abruptly changed its position—claiming for the first time that ABG's Gross Merchandise Value Contribution was *zero*.  Outrageously, the purported explanation offered by Bolt for its conclusion that none of the millions of dollars of e-commerce processed through Bolt's products by ABG brand partners "counted" towards the Warrant was that only e-commerce processed through *AllPass*—the product that Bolt itself had promised but failed to deliver by January 2021—qualified under the parties' agreements.

15.     Bolt's self-serving and newly minted argument is contrary to the terms and intent of the parties' agreements, which is further confirmed by the parties' course of dealing (including with respect to a predecessor Referral Agreement executed by the parties in 2019), as well as Bolt's express, written admissions that ABG has already attained substantial GMV Contribution despite Bolt's failure to launch AllPass on the agreed-upon schedule (which failure

itself constitutes a separate breach of the Project Agreement by Bolt, for which Plaintiffs are entitled to damages).

16.     Collectively and individually, Bolt's breaches of the parties' agreements and other bad-faith conduct have caused Plaintiffs significant harm and deprived them of the value of the parties' agreements.  Indeed, Bolt's breaches, and in particular its recent machinations with respect to the Warrant, appear calculated to squeeze every drop of value out of the ABG-Bolt relationship for Bolt's benefit—including in driving Bolt's ever increasing multi-billion-dollar valuations—while simultaneously depriving ABG of nearly all of the benefit of the parties' bargain, including the bargained-for right under the Warrant to purchase the stake in Bolt that ABG has earned through its direct contributions to Bolt's growth.

17.     ABG has acted in good faith, and like a good partner, has repeatedly sought to work with Bolt, in light of Bolt's failure to deliver AllPass as promised, to extend the two-year window to allow (i) Bolt to properly roll-out the AllPass product and (ii)  ABG to attain the GMV Contribution necessary for it to exercise the Warrant.  Bolt, recognizing its own failure to timely deliver AllPass, initially engaged in these discussions, seemingly in good faith.  But in light of Bolt's recent and unexplained about-face and the other material breaches of the parties' agreements set forth herein, ABG was left with no choice but to bring this action against Bolt for damages and injunctive relief to enforce its contractual rights.

## PARTIES

### A.     Plaintiffs ABG and ABG-SPG, and Non-Parties Simon and SPARC

18.     Plaintiff ABG is a limited liability company organized under the laws of Delaware with its principal place of business at 1411 Broadway, 21st Floor, New York, NY 10018.

19.     Authentic Brand Group is a brand development, marketing, and entertainment company, which owns a portfolio of global media, entertainment, and lifestyle brands.  Authentic Brand Group elevates and builds the long-term value of more than thirty (30) consumer brands and properties by partnering with best-in-class manufacturers, wholesalers, and retailers.  Its brands have a global retail footprint in more than 100,000 points of sale across the luxury, specialty, department store, mid-tier, mass, and e-commerce channels, and more than 6,000 freestanding stores and shop-in-shops around the world.

20.     Authentic Brand Group's portfolio of iconic and world-renowned brands generates more than $14 billion in annual retail sales and includes Marilyn Monroe®, Elvis Presley®, Muhammad Ali®, Shaquille O'Neal®, Sports Illustrated®, Dr. J®, Greg Norman®, Neil Lane®, Thalia®, Nautica®, Aéropostale®, Forever 21®, Juicy Couture®, Vince Camuto®, Herve Leger®, Judith Leiber®, Barneys New York®, Brooks Brothers ®, Frye®, Lucky Brand®, Nine West®, Jones New York®, Frederick's of Hollywood®, Louise et Cie®, Sole Society®, Enzo Angiolini®, CC Corso Como®, Hickey Freeman®, Hart Schaffner Marx®, Adrienne Vittadini®, Taryn Rose®, Bandolino®, Misook®, Spyder®, Tretorn®, Tapout®, Prince®, Volcom®, Airwalk®, Vision Street Wear®, Above The Rim®, Hind®, Thomasville®, Drexel®, and Henredon®.

21.     Authentic Brand Group's largest licensee is SPARC, a multi-brand operator of the Nautica, Forever 21, Aéropostale, Lucky Brand, and Brooks Brothers brands.

22.     Authentic Brand Group jointly owns SPARC with Simon, SPARC's largest landlord.  Through this partnership, Authentic Brand Group owns 50% of SPARC, with Simon owning the remaining 50%.

23.     Simon is a real estate investment trust engaged in the ownership of premier shopping, dining, entertainment, and mixed-use destinations and an S&P 100 company

(Simon Property Group, NYSE: SPG).  Its properties across North America, Europe, and Asia provide community gathering places for millions of people every day and generate billions in annual sales.

24.     Subsequent to ABG's entry into the Program Agreement, the Warrant, and the Operating Agreement (each as defined below), ABG assigned all of its right, title, and interest to the Program Agreement and the Operating Agreement to ABG-SPG, a limited liability company organized under the laws of Delaware, which is a joint venture between ABG and a wholly owned subsidiary of Simon.  ABG has also contributed the economics of the Warrant to ABG-SPG.

**B.     Defendant Bolt**

25.     Defendant Bolt is a Delaware corporation with its principal place of business at 77 Geary St., San Francisco, CA 94108.

26.     Founded in 2014 by its founder and current CEO, non-party Ryan Breslow ("**Breslow**"), Bolt bills itself as "the world's first Checkout Experience Platform," promising that it "solves the complicated technological challenges involved in checkout, fraud detection, and digital wallets."  By its own account, Bolt launched its first checkout product to "one tiny merchant" about five years ago.

27.     Since then, Bolt has embarked on a number of back-to-back capital-raising efforts at rapidly increasing valuations, despite a lack, on information and belief, of significant positive cash flow or profits.  Most recently, Bolt is reportedly raising a new $777 million Series E round of funding at a pre-money valuation of $10 billion to $11 billion.  This latest capital raising effort follows closely on the heels of Bolt's previous Series D funding round only a few weeks prior, in which the startup reportedly received up to $393 million at a valuation of

approximately $6 billion—*18 times* the company's valuation only 18 months earlier.  In only a few years, Bolt has raised hundreds of millions of dollars from investors.

28.     By Bolt's own admission, ABG has been critical to Bolt's success to date in expanding its customer base and raising capital.  As described below, ABG has, in addition to partnering with Bolt in connection with AllPass, assisted Bolt to clench key deals with third parties, including Casper and Shopify, that have been critical to its valuation.  Indeed, up until when ABG facilitated a deal between Bolt and Shopify, Bolt had no way of integrating any of its products with Shopify, which is the largest e-commerce platform in the world.  ABG used its influence and brand volume with Shopify to convince the company over many months to allow Bolt to take over Shopify checkout for ABG brands for the purpose of rolling out AllPass.  This was a huge milestone for Bolt and one which Bolt featured prominently in its investor presentations.  In fact, in those presentations, Bolt admitted that Shopify only approved Bolt because of its relationship to ABG through AllPass.

### C.      Non-Party ABG-AP, LLC

29.     Non-party ABG-AP, LLC (the "**AllPass LLC**" or "**NewCo**") is a Delaware limited liability company with its principal address at 1411 Broadway, 21st Floor, New York, NY 10018.

30.     As described below, pursuant to the Operating Agreement (defined below), AllPass LLC was established to assist in offering AllPass to the public.  The members of AllPass LLC are ABG and Bolt.

### JURISDICTION AND VENUE

31.     This Court has jurisdiction over this matter because Bolt, by agreement, has irrevocably consented to the jurisdiction of the Courts of the State of New York sitting in

New York County with respect to any action brought by ABG concerning the subject matter of this lawsuit.

32.     Venue properly lies in this Court pursuant to CPLR 501 based upon the written agreement between the parties.

## FACTS

## I.     ABG AND BOLT ENTER INTO THE PROGRAM AGREEMENT, THE WARRANT, AND THE OPERATING AGREEMENT

33.     On or about October 9, 2020, ABG entered into a series of three integrated contracts: (1) the Program Agreement, (2) the Warrant, and (3) the Operating Agreement (each as defined below).   Collectively, these agreements provided the framework for an ongoing relationship between ABG and Bolt that was intended to be mutually beneficial.

34.     As more specifically detailed below, ABG agreed, subject to the terms and conditions of the parties' agreements, to use its commercially reasonable efforts to induce a group of ABG brand partners, as well as unaffiliated merchant referrals, to enroll in AllPass.   In return, Bolt agreed, among other obligations, that it would develop AllPass in time to launch on January 15, 2021, and further agreed to grant ABG the Warrant to purchase up to approximately 5% of Bolt's equity.

35.     Finally, the parties also entered into the Operating Agreement, pursuant to which Bolt was admitted, along with ABG, as a member of the AllPass LLC, which in turn would collect AllPass subscription fees from AllPass Members (i.e., consumers), assist in providing customer support, and maintain an AllPass website.

36.     As set forth below, the parties' agreements also contained detailed provisions governing confidentiality (including press releases), providing for injunctive relief to

enforce those provisions, and designating New York as the forum for disputes arising out of the parties' contractual arrangement.

### A.   The Program Agreement

37.   On October 9, 2020, ABG, Bolt, and AllPass LLC entered into the AllPass Loyaly Program Agreement (the "**Program Agreement**").

38.   Section 3 of the Program Agreement sets forth the "Bolt Rights and Responsibilities." As relevant here, Section 3.1 required Bolt to have AllPass fully operational by January 15, 2021. Specifically, Section 3.1 states:

> **Development of Bolt Underlying Technology.** Bolt will begin development of the Bolt Underlying Technology immediately upon execution of this Agreement and complete development as soon as commercially reasonable. ***Bolt will complete the development of AllPass Checkout to permit NewCo to achieve*** (i) the AllPass Checkout Launch on or before the Target Checkout Launch Date [defined as October 20, 2020], and (ii) ***the AllPass Subscription Launch on or before the Target Subscription Launch Date [defined as January 15, 2021]***.

(emphasis added)

39.   The Program Agreement defines "AllPass Checkout Launch" as "the date NewCo makes AllPass Checkout available to Participating ABG Brand Partners and their end users," while "AllPass Subscription Launch" is defined as "***the date NewCo makes AllPass available to Participating ABG Brand Partners and their end users***" (emphasis added).

40.   "AllPass" is further defined as "the loyalty and related program(s) offered by Newco, as the initial features are described in Exhibit A and as such program(s) may change from time to time." As set forth in Exhibit A to the Program Agreement ("AllPass Loyalty Program Features"), those features include the following:

> a. AllPass-enabled and branded checkout, powered by Bolt, integrated directly into websites and/or ecommerce websites and/or mobile applications of Participating ABG Brand Partners and

Merchant Referrals (in each case, who are participating and/or enrolled in AllPass) where technically practicable, and in each case, subject to the terms and conditions of the agreement(s) between ABG (including its affiliates) and each of the ABG Brand Partners, as applicable.

b. AllPass.com Portal for AllPass Members to view savings, manage their account, and search for Participating ABG Brand Partners and Merchant Referrals.

c. Ability for AllPass Members to apply AllPass discounts directly to purchases on the websites and/or mobile applications Participating ABG Brands Partners and Merchant Referrals.

d. Ability for shoppers to preview AllPass discounted prices on the websites and/or mobile applications of Participating ABG Brand Partners and Merchant Referrals.

e. Marketing of AllPass directly to shoppers on the websites and/or mobile applications of Participating ABG Brand Partners and Merchant Referrals.

f. A paid membership subscription, currently contemplated to be $60 per year, collected directly from AllPass Members by NewCo via Bolt checkout.

41.     In addition to Bolt's obligations to develop AllPass, Bolt agreed in the Program Agreement to abide by strict confidentiality provisions and other contractual agreements regarding the use of ABG's intellectual property.

42.     Section 9.1.1 of the Program Agreement provides that ABG retains the rights to all of its intellectual property, including with respect to the use of the names and marks of its brand partners:

As between Bolt on the one hand, and ABG and NewCo on the other, ABG (and its Affiliates, as applicable) shall own and retain all right, title and interest to: (a) the ABG Brands and all associated Intellectual Property and websites, (b) all Intellectual Property of ABG (and its Affiliates, as applicable), the ABG Brands, and the websites relating to the ABG Brands, and all derivations, improvements, and variations of all of the foregoing, (c) the AllPass Marks and all derivations, improvements, and variations thereof and (d) the domain names used for AllPass (e.g., allpass.com) and all derivations, improvements, and variations

-13-

thereof (items 9.1.1(c) and 9.1.1(d) are the "ABG IP"). No provision of this Agreement effects any transfer to the other Parties of any ownership interest therein.

43.     Further, Section 9.1.2 of the Program Agreement provides that "ABG shall grant to NewCo a non-exclusive license to use the necessary rights to the ABG IP *for the sole purpose of operating AllPass and otherwise performing under this Agreement*" (emphasis added).   Thus, no license to use ABG's intellectual property was granted to Bolt, except as explicitly provided for in the Program Agreement.

44.     Section 9.7.3 of the Program Agreement further clarifies that, even to the extent authorized by the Program Agreement, the use by one party of another party's marks is subject to tight controls, stating in relevant part:

> **Standards for Use**. Each party's use of such other party's Marks shall be consistent with any reasonable instructions provided by the other party in writing.  In the case such instructions are silent as to or are inconsistent with a party's use of the other party's Mark, the use of the other party's Marks must be approved in writing prior to any such use.

45.     In addition to these provisions regarding intellectual property, the Program Agreement provided for strict confidentiality.   In Particular, Section 10.2 of the Program Agreement provides in relevant part that "each of the Parties agrees: (a) to use and reproduce the Confidential Information of the other Parties only as permitted under this Agreement and as needed to perform its duties hereunder; and (b) not to disclose or otherwise permit access to the Confidential Information of the other Parties to any third party, without such Party's prior written consent."

46.     "Confidential Information" is defined as including "*any non-public information about the disclosing Party's business or activities*, which shall include, without limitation, . . . all information which, by the nature of the circumstances surrounding the

disclosure, should be reasonably considered to be confidential or proprietary by the receiving Party." (Program Agreement § 10.1 (emphasis added).) With respect to ABG in particular, the Program Agreement provides an expansive (but non-exhaustive) list of ABG's Confidential Information:

> ABG's Confidential Information shall, to the extent non-public, include, without limitation, the following: ***any and all non-public or proprietary information related to ABG's or any of its Affiliate's business or operations***, which information may be written, oral or maintained in electronic or any other form, including, without limitation: (i) finances, technology or other technical data, trade secrets, inventions, processes, software, hardware, configurations, infrastructures, systems, processes, formulas and know-how, (ii) designs, drawings, services, products, product plans, product development, marketing, marketing plans and information, customers, business partners, potential business partners, market information, suppliers, vendors, retailers, manufacturers, factories, (iii) all documents, analyses, reports, research, business plans, studies, diagrams, marketing plans, marketing information, product development plans, and other materials that contain information, (iv) the terms of this Agreement, and (v) all other non-public business, financial, technical or other information relating to ABG or any of its parents, subsidiaries, Affiliates, partners, and vendors.

(Program Agreement § 10.1 (emphasis added).)

47.    The Program Agreement also regulates publicity regarding, *inter alia*, the agreement, stating in Section 11: "Any press release regarding this Agreement or the contents hereof will be mutually agreed to in advance by the Parties in writing with respect to content and timing."

48.    Section 18.10 of the Program Agreement provides that these confidentiality provisions may be enforced through specific performance:

> **Equitable Relief**. Each Party hereby acknowledges and agrees that a breach or threatened breach by such Party of any of its obligations hereunder in Sections 9 or 10 would cause the other Party irreparable harm for which monetary damages would not be

an adequate remedy and agrees that, in the event of such breach or threatened breach, the other Party will be entitled to seek equitable relief, including a restraining order, an injunction, specific performance and any other relief that may be available from any court, without any requirement to post a bond or other security, or to prove actual damages or that monetary damages are not an adequate remedy.  Such remedies are not exclusive and are in addition to all other remedies that may be available at law, in equity or otherwise.

49.     Finally, Section 16.2 of the Program Agreement provides that while ABG and AllPass LLC may, at their election, bring suit against Bolt in another forum with jurisdiction, any other action "which in any way involves the rights, duties and obligations of any Party hereto under this Agreement shall be brought in courts located in New York County, New York, and the Parties hereby submit to the personal jurisdiction of such courts."  Further, Section 16.2 provides that "[e]ach of the Parties waives any objection that it may have based on improper venue or forum non conveniens to the conduct of any such suit or action in any such court."

### B.     The Warrant

50.     The Program Agreement expressly incorporates a separate agreement, also dated October 9, 2020, titled "Bolt Financial, Inc. Warrant to Purchase Class A Common Stock" (the "**Warrant**").

51.     Pursuant to the Warrant, ABG (defined under the Warrant as the "Holder") is entitled, subject to certain conditions and potential adjustments stated therein, to purchase at least 3,720,030 shares of Bolt Stock at an exercise price of $3.86423 per share.  In addition, ABG has the right to purchase, for the same price per share, an additional 248,002 shares for each $50,000,000 of "GMV Contribution" accrued pursuant to the terms of the Program Agreement, subject to a total cap of 7,440,060 shares (the "**Shares**").  Given the current valuation of Bolt, these Shares, which ABG is entitled to acquire at an aggregate purchase price of approximately $29 million, are estimated to be worth in excess of $500 million.

52.     "GMV Contribution" (short for "Gross Merchandise Value Contribution") is defined in Section 1.23 of the Program Agreement to mean "the total financial amount of ecommerce transactions that are processed ***through any of the Bolt Products*** (which, for the avoidance of doubt, for purposes hereof, include AllPass Checkout) of those ABG Participating Brand Partners and Merchant Referrals who have enrolled in AllPass" (emphasis added).

53.     "Bolt Products," in turn, is defined in Section 1.10 of the Program Agreement as "all current and future Bolt products and services other than the Bolt Underlying Technology, including without limitation those certain products and services known as of the Effective Date as Bolt Checkout/Bolt Convert, Bolt Fraud Scoring, Bolt Fraud Protection/Bolt Approve, and Bolt Payments/Bolt Collect, as well as upsell features such as sales tax estimation, post-purchase services, delivery estimation, and shipping notifications."

54.     Section 10.4 of the Warrant (Further Assurances) provides: "The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Warrant."

### C.     The Operating Agreement

55.     In connection with the Program Agreement and the Warrant, ABG, Bolt, and the AllPass LLC also entered into the Amended and Restated Operating Agreement of ABG-AP, LLC, dated October 9 (the "**Operating Agreement**").

56.     Like the Program Agreement, the Operating Agreement binds the parties to strict confidentiality obligations.  In particular, Section 10.12 of the Operating Agreement states:

> **Publicity**. Neither Bolt nor the Company shall, either itself or through any agents or representatives, make, issue, distribute or disseminate any information or statements, whether written or

verbal, to the press regarding ABG, the Company, and/or any other matters pertaining to or arising out of this Operating Agreement (each, a "**Press Release**") unless and until ABG has approved such Press Release.

57.     Further, Section 10.13 of the Operating Agreement states:

**Confidentiality**. Each Member agrees that such Member shall keep confidential, and shall not disclose to any third party or use for its own benefit, without the consent of the Company, any non-public information with respect to the Company . . .  that is in such Member's possession on the Effective Date or thereafter disclosed to such Member by or on behalf of the Company; provided, that a Member may (subject to any other confidentiality agreements or arrangements agreed to by such Member with the Company or any of its Affiliates) disclose any such information (a) as has become generally available to the public other than by virtue of a breach of any obligation of confidentiality owed to the Company by such Member or its Affiliates or other related parties, (b) to its owners, lenders under contractual confidentiality obligations, directors, employees, and professional advisers who need to know such information and agree to keep it confidential and not use it for any purpose other than to advise such Member, (c) in connection with any bona fide financing for, or acquisition of, such Member, to its future investors, lenders, acquirors or underwriters, in each case, who are under confidentiality obligations to such Member; provided, that ABG must be provided with prior written notice and the opportunity to reject such disclosure before such Member may make any such disclosure contemplated by this clause (c) to an ABG Competitor, (d) to the extent required in order to comply with reporting obligations to its investors who have agreed to keep such information confidential, (e) to any proposed purchaser of such Member's Membership Interests if such purchase would be permitted under this Operating Agreement so long as such proposed purchaser agrees in writing to keep any information received confidential on the terms set forth herein . . . .

58.     Further, Section 10.15 of the Operating Agreement, like the Program Agreement, provides for injunctive relief to enforce Bolt's obligations thereunder:

**Specific Performance**. Each party recognizes and acknowledges that a breach of Section 10.13 [Confidentiality] will cause irreparable damage, the exact amount of which will be difficult or impossible to ascertain, and that remedies at law for any such breach will be inadequate. Accordingly, each party agrees that in the event of a breach or threatened breach of Section 10.13, in

-18-

addition to any other remedy which may be available at law or in equity, the non-breaching parties may apply to a court of competent jurisdiction for injunctive relief and specific performance to prevent or prohibit such breach. Each party agrees not to raise as a defense or objection to the request or granting of such relief that any breach of Section 10.13 is or would be compensable by an award of money damages, and each party agrees to waive any requirements for the securing or posting of any bond in connection with such remedy.

59.     Finally, Section 10.3 of the Operating Agreement contains an exclusive

New York forum provision, which states in relevant part:

> **Consent to Jurisdiction.**  Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the courts located in New York, New York, to the extent such courts have subject matter jurisdiction, or of the federal court of the United States of America sitting in New York, New York and any appellate court thereof (collectively, the "Applicable Courts"), in any action or proceeding arising out of or relating to this Operating Agreement or for recognition or enforcement of any judgment relating thereto, and each party hereto hereby irrevocably and unconditionally (a) agrees not to commence any such action or proceeding except in an Applicable Court; (b) agrees that any claim in respect of any such action or proceeding may, to the extent permitted by law, be heard and determined in such an Applicable Court; (c) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any such action or proceeding in any Applicable Court; and (d) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in Applicable Court.

## II.     BOLT BREACHES ITS OBLIGATIONS UNDER THE PROGRAM AGREEMENT TO DELIVER A VIABLE ALLPASS PRODUCT BY JANUARY 15, 2021

60.     Bolt breached the express terms of the Program Agreement by failing to deliver a fully functional AllPass platform by January 15, 2021.  In fact, Bolt did not deliver a functioning AllPass MVP until November 2021. While Bolt initially claimed that it had delivered this MVP for AllPass by February 2021, contemporaneous documents created by Bolt,

including development timelines, directly contradict Bolt's claim and demonstrate that Bolt failed to meet even its unilaterally extended MVP deadline of July 2021, months after the contractual deadline.  Even today, the AllPass product that Bolt has delivered is not fully deployed.

61.     For example, an email sent to ABG from Greg Greiner, Bolt's Head of Product, on July 20, 2021—six months *after* the January 2021 contractual deadline—attached a timeline showing that Bolt anticipated that an MVP would not be available until mid-July 2021, with testing extending through September 2021 and a "launch" in October and November 2021.

62.     Thus, months after it failed to honor its contractual obligations under the Program Agreement, Bolt admitted this failure in writing, and further predicted that it would be unable to provide a viable product until roughly eleven months after the contractual deadline.

63.     But Bolt failed to meet even this grossly extended development timeline. Indeed, a September 23, 2021 email from Mr. Greiner at Bolt similarly admits that testing was not completed in September 2021, and was anticipated to continue into October 2021.  Mr. Greiner's September 23 email provided a link to "a ***first draft*** of the user flows for AllPass and SSO on Lucky Brand," noting that the draft "doesn't cover all edge cases and the checkout flow won't be fully customized to Lucky [Brand]'s existing checkout as these are just designs" (emphasis added).

64.     Mr. Greiner's September 23, 2021 email also attached "an initial set of Allpass [sic] test cases."  As shown in the attachment, Bolt had failed, even as of September 2021, to run at least nineteen separate tests.  These included such basic items as confirming that a Bolt user or AllPass member would be able to successfully log in to use the service.  He further noted that Bolt's "current testing plans" would extend through at least October 4, 2021.

| User Type | Action | Expected Result | Status |
|---|---|---|---|
| Non Bolt Account User | Clicks Checkout | Shows Registration Option | Untested |
| Non Bolt Account User | Clicks Add AllPass button (Shipping Info Screen) | 1.) Hides Registration Option2.) Adds 10% discount3.) Adds membership item to Cart | Untested |
| Non Bolt Account User | After the above step, Shopper proceeds to Payment Screen | 1.) Hides Registration2.) Adds Shipping discount on top of 10% discount3.) Adds membership item to Cart | Untested |
| Non Bolt Account User | Clicks Add AllPass button | 1.) Hides Registration Option2.) Adds BOTH discounts3.) Adds membership item to Cart | Untested |
| Bolt Account User | Enters Email/Phone | Hides Registration Option | Untested |
| Bolt Account User | Enters OTP code to login | Shows Registration Option | Untested |
| Bolt Account User | Clicks Add AllPass button | 1.) Hides Registration Option2.) Adds BOTH discounts3.) Adds membership item to Cart | Untested |
| Bolt Account User | Decides to Guest Checkout | Hides Registration Option | Untested |
| AllPass Member | Enters Email/Phone | 1.) Hides Registration Option2.) Shows Verification OTP view with custom AllPass text | Untested |
| AllPass Member | Enters OTP to login | 1.) Hides Registration Option2.) Adds BOTH discounts | Untested |
| AllPass Member | Decides to Guest Checkout | 1.) Removes BOTH discounts2.) Hides Registration | Untested |
| AllPass Member | Device logged in user clicks checkout | 1.) Hides Registration Option2.) Adds BOTH discounts | Untested |
| Non-creatable Bolt Account | Enters Email/Phone | Hides Registration Option | Untested |
| Non Bolt Account User/Bolt Account User | Clicks on "Full Program Details" Button | Displays Full Program Details SideSection | Untested |
| Registered Shopper | Deletes AllPassMembership item from Cart | Removes BOTH discounts | Untested |
| Registered Shopper / AllPass Member | Clicks on any APM option on Payment Screen | Displays APM Selection Screen | Untested |
| Registered Shopper / AllPass Member | After the above step, if the click on "Use <APM.>" | Removes BOTH discounts | Untested |

| Any user | Enters "secret" discount code (Use ALLPASS10 discount code) within Bolt checkout | Fails discount validation | Untested |
| Any user | Enters "secret" discount code (Use ALLPASS10 discount code) within Cart Page | Fails authorization | Untested |

65.     Bolt's failure to deliver AllPass in a timely manner has made it impossible to launch AllPass for ABG's brand partners.

66.     Bolt's efforts to integrate Bolt's products into the website of ABG Brand partner Forever 21 were similarly plagued from the outset with major critical issues.  Despite launching in Q4 of 2020, there were still issues being addressed in Q3 of 2021, including the inability to deliver a Salesforce Cartridge that can interact with Salesforce OMS.  Additionally, Bolt led a disastrous integration of Bolt checkout onto the Forever 21 mobile app, which drives approximately 23% of sales.  The app saw a significant drop in conversion, resulting in the loss of millions of dollars.  The botched Forever 21 integration made SPARC extremely cautious about rolling Bolt out across additional brands. ABG—in the name of being a good partner to Bolt—obtained an accommodation from SPARC to forbear on pursuing termination of the Bolt contract with the Forever 21 brand.

67.     Notably, Forever 21's online business has experienced material diminution in gross sales estimated to be in excess of $150 million during the period of Bolt integration and immediately thereafter.

68.     Some of these deficiencies with Bolt's Forever 21 launch were summarized in an October 11, 2021 email from Forever 21, which detailed the "blockers" that needed "immediate attention to get to All Pass."  Forever 21 provided the following chart, summarizing some of the issues encountered with Bolt that prevented an AllPass launch:

|  | Q4, 2020 | Q1, 2021 | Q2, 2021 | Q3, 2021 |
|---|---|---|---|---|
| **Issues** | 1) Unable to capture alternate payment method<br><br>2) Unable to do "round up for charity" – Trevor Project<br><br>3) Order Confirmation Page would not load for approx. 10% of orders<br><br>4) Bolt input fields allowed emojis for Name, Address, etc. | 1) Missing Quantum Metric replay code<br><br>2) Ship to home products delivered to store<br><br>3) Customers with over 30 items in their cart could not check out<br><br>4) Bolt unable to send device information associated with order | 1) Bolt siphoning customer account information from F21. We did not get almost a million customer records and our CRM / Marketing suffered significantly<br><br>2) Forever 21 Marketing Opt-in never displayed at checkout | 1) Bolt Team unable to deliver Salesforce Commerce Cloud Cartridge that can interact with Salesforce OMS<br><br>2) Bolt cartridge could not perform successful BOPIS order placement at checkout – took 8 weeks to fix |
| **Impact** | 1) Did not go live with Amazon Pay/PayPal which 15% of digital payments for our customer base<br><br>2) Could not meet legal obligation with Trevor Project to delivery by November 2020<br><br>3) Could not get accurate analytics on conversion<br><br>4) Customer orders were delayed due to invalid address or names | 1) Could not measure cart abandonment<br><br>2) Enraged customers who were charged for delivery but never received package at home<br><br>3) Customers abandoned high AOV carts<br><br>4) Analytics unable to distinguish orders from iOS vs. Android vs. Mobile Web Browser | 1) F21 saw a drastic drop in newly registered accounts on website which in-turn prevented marketing efforts to our customers<br><br>2) F21 prevented from sending promotional materials to customers | 1) Delays in code delivery resulted in $200k in T&M charges from Born Group and almost 8 weeks in timelines<br><br>2) BOPIS launch was delayed to 2022, significant revenue impact |

69.     In addition to Forever 21, Bolt failed to deliver the key components required to integrate Bolt Checkout with the website for Brooks Brothers, another ABG brand partner.  In fact, the problems encountered with Bolt Checkout to date have made it necessary for Brooks Brokers to temporarily abandon its launch of Bolt products entirely, due to persistent technical defects caused by Bolt, which threatened to materially harm Brooks Brothers during the critical holiday shopping season.  Issues encountered with the Brooks Brothers website included user authentication, single sign on, and buy-now-pay-later integrations.

70.     Accordingly, on June 9, 2021, SPARC informed ABG that SPARC had been forced to pause any work being done to further the Bolt integration for Brooks Brothers due

to a series of material deficiencies in Bolt's performance.  In particular, SPARC noted the following deficiencies:

- "Existing user authentication – ensuring a smooth transition for existing Brooks Brothers customers once we transition to SFRA/Bolt has been a core requirement[] from the beginning (especially in light of our experiences of F21 [i.e., Forever 21]

- Single Sign-on – ensuring users are not confused by site registration/login, loyalty registration/login, Bolt registration/login

- Klarna – recently uncovered that – in order to move to 'full' Klarna integration (which we're obligated to do) will now require significant additional work and likely a direct Manhattan $\rightarrow$ Bolt integration that we had NOT counted on"[1]

71.     According to SPARC, "[t]hese factors, combined with our ongoing struggles with Bolt on F21 (omni channel pilot delays, Klarna challenges) lead [SPARC] to recommend the pause/timeout while we assess our options moving forward."  Nonetheless, SPARC (like ABG) continued to operate in good faith, noting that SPARC was "continuing to move forward with troubleshooting on F21, and we're (as of now) proceeding with the Lucky [Brand] launch (including Bolt integration)."  Bolt was advised the same day of the pause in the Brooks Brothers launch.

72.     The necessity of obtaining replacement third-party products which possess some of the functionality of Bolt's products just before the 2021 holiday shopping season has already cost SPARC damages of, at minimum, hundreds of thousands of dollars, if not more, because SPARC had to pay its third party system integrations partner to find a new checkout solution.  Bolt—recognizing its failures—agreed in May and June of 2021 to amend certain commercial terms to mitigate some of the damages to SPARC due to the issues and delays that

---

[1] Klarna is a company whose offering to consumers and retailers include payments, social shopping and personal finances.  ABG partners with enterprise solutions such as Klarna to offer customers convenient, efficient and flexible payment options.

Bolt had caused.  Still, it was only because of ABG's efforts that SPARC has tentatively agreed to attempt integration with Bolt again after the busy holiday shopping season is complete.

### III.   BOLT ATTEMPTS TO DEPRIVE ABG OF THE OPPORTUNITY TO EXERCISE THE WARRANT

#### A.   For Months, Bolt Acknowledged That ABG Was Earning Credit Towards Its GMV Contribution

73.     For months following the parties' execution of the Program Agreement and Warrant in October 2020, Bolt repeatedly acknowledged—explicitly and in writing—that ABG was earning credit towards the $750 million GMV Contribution needed to exercise the Warrant.  Indeed, Bolt continuously commented, in a congratulatory tone in writing and over the phone, that ABG was earning GMV Contribution towards the Warrant based on the existing e-commerce volume through Bolt products and that there was no need to extend the two-year earnings window because ABG was going to meet the required $750 million in GMV Contribution regardless of Bolt's delays.  Nonetheless, in recognition of Bolt's failure to meet the contractual timeline for delivery of AllPass, Justin Grooms, the Bolt VP and senior account executive working on the ABG account (who also led the negotiations with ABG for the original deal), and ABG's Chief Digital Officer agreed to put together a clarifying amendment for the extension on the earnings window.  As discussed below, it was only later that Bolt abruptly changed its position and put the parties on the course towards litigation by repudiating its contractual obligations.

74.     On December 10, 2020, shortly after execution of the agreements, Mr. Grooms sent a text message to ABG's Chief Digital Officer, Adam Kronengold, regarding Bolt's then-current valuation of $825 million in connection with its latest fundraising effort.  In light of this news, Mr. Grooms commented, "Your warrant play was a good move it seems."  Mr. Grooms did not caveat this statement with any suggestion that ABG's ability to exercise the

Warrant was subject to Bolt's ability to deliver AllPass on time, nor that the Warrant was otherwise in doubt.

75.     Later that month, on December 21, 2020, Mr. Grooms texted Mr. Kronengold with an update regarding Bolt's plans for integration with Shopify, commenting that Shopify may view Bolt as an "emerging competitor," "[w]hich is great for your warrants and my equity, but not great for Shopify cooperating w/us on ABG brands."  Again, the clear implication of Mr. Grooms' statement was that ABG was well on its way to earning the right to exercise the Warrant and purchase up to a 5% stake in Bolt.

76.     Similarly, on January 21, 2021, Mr. Grooms sent a text message acknowledging that ABG would earn credit towards its GMV Contribution if it was able to onboard JC Penny.  Notably, this message was sent a week after the contractual deadline for Bolt to deliver AllPass (January 15, 2021) had come and gone without Bolt's delivery of a viable product.  Nonetheless, Mr. Grooms stated:

> A big concern that keeps surfacing on our side is that you folks are going to focus on JC Penny and lose focus on other GMV.  We think JC Penny pricing might require very aggressive pricing, so you might crush your GMV target, but our revenue per $ of GMV will be a lot lower than expected.
>
> One idea I have is that we exclude JC Penny from the warrant calculation in exchange for modifying the MDA stuff for F21.  This lets me put the JC Penney [sic] worry to bed and resolves your 2021 revenue question.

77.     Roughly six months later, in July 2021, Bolt made a presentation to investors in which it represented that there was "$2.5B+ GMV Live with Bolt," listing, among other brands, Forever 21 as a contributor to that GMV figure.  An alternate version of the July 2021 Bolt investor presentation, which was published in a November 2021 Business Insider

article, identified ABG brand partner Lucky Brand, as well as Forever 21, as contributing to

"$XB GMV Live with Bolt."

78.     On August 23, 2021, Mr. Grooms reaffirmed privately that ABG was

making progress towards its GMV Contribution, notwithstanding Bolt's continuing failure to

deliver AllPass.  Specifically, Mr. Grooms stated that Bolt's "accounting group is pulling a

GMV-to-date report together for you," consistent with the parties' mutual understanding that

ABG had been earning credit towards its GMV Contribution for months.

79.     Despite Mr. Grooms' August 23, 2021 email, Bolt failed to deliver the

promised report in a timely manner.  On September 3, 2021, however, Mr. Kronengold asked

Mr. Grooms again to send him a calculation of "warrants earned so far."  In response, Mr.

Grooms stated, "I think we were at $245.4m at the end of July, which was before Lucky [Brand]

launched."  Thus, Bolt has acknowledged that, as of July 2021, ABG had accrued at least $245.4

million in GMV Contribution.

### B.     Bolt Abruptly Repudiates Its Obligations Under the Program Agreement and the Warrant, Asserting That ABG's GMV Contribution Is "Zero"

80.     Despite these repeated and explicit representations and admissions, Bolt

has recently attempted an abrupt about-face, contending for the first time that ABG's GMV

Contribution to date is *zero* dollars.  In support of this highly specious, self-serving claim, Bolt

has asserted that the Program Agreement and Warrant only afford ABG credit for GMV

Contribution that is delivered "through" AllPass.

81.     Besides being inconsistent with Bolt's own written admissions (including

the examples detailed above), Bolt's argument is squarely foreclosed by the plain terms of the

parties' agreements, the parties' course of dealing, and applicable law.

> **i.    Under the Plain Terms of the Program Agreement and the Warrant, GMV Contribution Is Based on the Use of "Bolt Products" and Does Not Require Use of AllPass**

82.    By its terms, the Warrant is exercisable once the GMV Contribution reaches $750,000,000, provided this milestone is reached by the end of the two-year period following execution.  (Warrant §§ 1.4, 2, 3.1.)

83.    GMV Contribution is defined in Section 1.23 of the Program Agreement to mean "the total financial amount of ecommerce transactions that are processed ***through any of the Bolt Products*** (which, for the avoidance of doubt, for purposes hereof, include AllPass Checkout) of those ABG Participating Brand Partners and Merchant Referrals who have enrolled in AllPass."

84.    "Bolt Products"[2] includes "***all current and future Bold products and services***," and by definition, is <u>not</u> limited to AllPass.  In fact, the definition of "Bolt Products" expressly <u>excludes</u> "the Bolt Underlying Technology," which in turn is defined as "the technology necessary or otherwise used to enable the AllPass features, as such technology and features are described in Exhibit A."  (Program Agreement § 1.11.)

85.    Thus, the Warrant contemplates that the calculation of GMV Contribution will be based on all Bolt Products.  Bolt's proposed interpretation of the definition of GMV Contribution turns the contract's language on its head—reading "Bolt Products" to mean "only" AllPass, when in reality, the definition of Bolt Products excludes the very technology underlying AllPass.  Bolt's strained reading is illogical and untenable.

---

[2] "**Bolt Products**" means "all current and future Bolt products and services other than the Bolt Underlying Technology, including without limitation those certain products and services known as of the Effective Date as Bolt Checkout/Bolt Convert, Bolt Fraud Scoring, Bolt Fraud Protection/Bolt Approve, and Bolt Payments/Bolt Collect, as well as upsell features such as sales tax estimation, post-purchase services, delivery estimation, and shipping notifications."  (Program Agreement § 1.10.)

86.     Moreover, "AllPass Checkout," which is expressly <u>included</u> in the definition of GMV Contribution, is defined as "Bolt Checkout, ***white-labeled*** as AllPass Checkout." (Program Agreement § 1.4 (emphasis added).)  In other words, just a Bolt Product under a different name.   In fact, the definition of Bolt Products expressly includes "Bolt Checkout/Bolt Convert."   (Program Agreement § 1.10.)   This further confirms the parties' intention that all Bolt Products, not just AllPass, would be counted.

87.     Further, while the definition of GMV Contribution includes language referencing partners and referrals "who have enrolled in AllPass," the financial contribution at issue is not limited to contributions  that come <u>through</u> AllPass.

88.     By its plain text, the definition of GMV Contribution refers to economic contributions "through any of the Bolt Products"—which, as noted above, is not limited to AllPass.   Accordingly, the parties' clear intention was to give ABG credit for all economic contributions delivered through any Bolt Product.

89.     Indeed, it would make no sense for the parties to make ABG's ability to exercise the Warrant contingent upon Bolt's delivery of the AllPass technology—an event which was exclusively in Bolt's control.

90.     That the parties intended for GMV Contribution to be calculated based on all Bolt products, and not just AllPass, is further confirmed by the reference in the definition of GMV Contribution to "ABG Participating Brand Partners[3] and Merchant Referrals"—each of which refers to "Bolt Products," not just AllPass.   Specifically, "**Participating ABG Brand Partner**" is defined as "an ABG Brand Partner who has executed an agreement <u>to use the Bolt</u>

---

[3] This appears to be a typographical error in the definition of GMV Contribution.  There is no defined term "ABG Participating Brand Partners" in any of the parties' agreements.  Rather, the defined term is "Participating ABG Brand Partner."

Products with Bolt and/or an AllPass enrollment agreement with NewCo." (Program Agreement § 1.16 (emphasis added).)   Similarly, "**Merchant Referral(s)**" is defined as "any third-party merchant (other than a Participating ABG Brand Partner) that ABG sources and refers to Bolt that Bolt accepts in accordance with Section 2.3 [of the Program Agreement], and who thereafter enters into a written agreement with Bolt to obtain or otherwise use or implement any Bolt Product." (Program Agreement: § 1.15 (emphasis added).)

91.     Under these definitions, both Forever 21 and Lucky Brand qualify as a "Participating Brand Partner" whose GMV Contributions count towards the $750 million threshold for exercise of the Warrant.  To date, despite Bolt's failure to deliver a viable AllPass product, the total GMV Contributions for Forever 21 and Lucky Brand total approximately $290 million and $15 million, respectively.

92.     This reading of the Program Agreement is also confirmed by its provisions regarding a predecessor agreement between ABG and Bolt—the Bolt Financial, Inc. Referral Agreement, dated December 12, 2019 (the "**Referral Agreement**").  Similar to the Program Agreement, the Referral Agreement provided ABG with the ability to earn warrants to purchase equity in Bolt.  Specifically, Section 4 of the Referral Agreement (Potential Warrant) provided: "Subject to the terms and conditions of this Agreement, upon execution of a Bolt Customer Contract, and execution of the first corresponding side letter described in Section 3.4, Bolt shall grant and deliver to ABG a warrant to purchase shares of Bolt's common stock with the terms set forth herein in the form or substantially the same form set forth on Exhibit B, attached hereto (the 'Warrant')."

93.     Further, Section 3.1 of the Referral Agreement defined "Merchant Referral" as "any prospective Merchant that ABG sources, identifies or otherwise refers to Bolt

that Bolt accepts in accordance with Section 3.3 below, and who thereafter enters into a written

agreement with Bolt."

94.     Notably, the 2019 Referral Agreement makes no mention of AllPass.

Rather, the ability of ABG to earn warrants under the Referral Agreement was based on the entry

of referrals into any "written agreement with Bolt" to use any Bolt products.

95.     The parties agreed to terminate the Referral Agreement in connection with

their entry into the Program Agreement, the Warrant, and the Operating Agreement.  However,

Section 18.1 of the Program Agreement provides that upon termination of the Program

Agreement, ABG's rights under the Referral Agreement will be reinstated—including the right

to earn warrants.   Section 18.1 of the Program Agreement (Entire Agreement) provides in

relevant part:

> For clarity and without limitation, ABG and Bolt agree that the
> Referral Agreement … [is] hereby superseded by this Agreement
> and all rights and obligations under such Agreement are null and
> void; provided, however, that in the event that this Agreement is
> terminated for any reason other than the AllPass Shutdown, ***the***
> ***Referral Agreement shall, effective immediately, be reinstated***
> such that all rights and obligations under the Referral Agreement
> shall be of full force and effect (and, for the avoidance of doubt,
> ***each Participating ABG Brand Partner and Merchant Referral***
> ***under this Agreement shall be deemed to be a 'Merchant***
> ***Referral' under the Referral Agreement retroactively***, effective as
> of the date each entered into a Bolt Customer Contract [as such
> term is defined under the Referral Agreement], and without the
> need for ABG and Bolt to enter into any side letter contemplated
> by Section 3.4 of the Referral Agreement, ABG shall receive the
> accrued benefit under the Referral Agreement of the Bolt Revenue
> [as such term is defined in the Referral Agreement] derived
> therefrom).

(emphasis added)

96.     The parties' express agreement that economic contributions by ABG

Brand Partners and Merchant referrals would serve as a basis for earning warrants under the

earlier Referral Agreement—which was based on the use of any Bolt products, and did not even mention AllPass—further confirms the parties' intent to award ABG credit for its brand partners' and referrals' use of all Bolt products under the Warrant.  The reasonable interpretation is that the Warrant effectively functions as a continuation of the warrant rights under the Referral Agreement (albeit on modified terms), and accordingly there is no requirement that GMV Contribution be calculated based on AllPass products that were not even contemplated by the Referral Agreement.

> **ii.   Alternatively, Even If GMV Contribution Required the Use of AllPass, Any Such Requirement Is Excused Due to Bolt's Failure to Integrate Its Products and Make AllPass Operational by January 2021, in Breach of the Program Agreement**

97.     Section 2(d) of the Warrant provides that it will expire "at 11.59 p.m. Pacific Time on the day before the Exercise Period Start Date if the GMV Contribution on the Exercise Period Start Date is less than $750,000,000."

98.     Under Section 1.4 of the Warrant, "Exercise Period Start Date" is defined as "either (i) the earlier of (a) the second anniversary of the issue date of this Warrant, and (b) such time as the GMV Contribution equals or exceeds $750,000,000 or (ii) in accordance with Section 5.3 of the Program Agreement, the effective date of a Qualifying Transaction (as defined in the Program Agreement)."  The Warrant is dated October 9, 2020 and therefore (assuming that a Qualifying Transaction has not occurred) the Exercise Period Start date is no later than October 9, 2022 (though it could be earlier if the GMV Contribution requirement is met earlier).  As discussed in greater detail below, the Warrant's expiration provision does not apply if there is a Qualifying Transaction.

99.     At the same time, Section 3.1 of the Program Agreement—which forms part of the same integrated series of contracts—provided that Bolt was required to have AllPass fully operational by January 15, 2021.

100.    Reading the agreements as a whole, the parties effectively agreed that ABG would have at least twenty-one months from the date on which AllPass was up and running to earn the Warrant through GMV Contributions (i.e., January 15, 2021 – October 9, 2022).

101.    But, as shown above, Bolt has breached the Program Agreement by failing to deliver AllPass by the agreed-upon date.  Indeed, it was only in November 2021 that Bolt delivered what could plausibly be considered an MVP for AllPass.

102.    Under basic principles of contract law and the clear terms of the parties' agreements, AllPass's material breach of the Program Agreement cannot deprive ABG of the benefit of its bargain—including its bargained-for right to earn the right to exercise the Warrant.

103.    Moreover, Section 10.4 of the Warrant (Further Assurances) expressly provides: "The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to *carry out the purposes and intent of this Warrant*" (emphasis added).  As is plain from the text of the Program Agreement and the Warrant, the parties' purpose and intent in entering into these integrated contracts was that ABG would have a reasonably adequate period of time from the date on which AllPass was launched to earn the Warrant through GMV Contributions.  At an absolute minimum (and without limiting any of ABG's other claims, rights, or remedies), Bolt's failure to timely deliver a functioning AllPass product requires that Bolt enter into an instrument acknowledging the resulting extension of the two-year earnings window, as such an extension is necessary to "carry out the purposes and intent" of the Warrant.

104.     In addition to the express terms of the parties' agreements, the implied covenant of good faith and fair dealing requires that the two-year earnings window for the Warrant must be extended to account for Bolt's failure to deliver AllPass by the agreed upon date.  Notably, during the negotiations for these three agreements, Bolt materially misrepresented the timeline and complexities involved in integrating Bolt's products into the websites utilized by ABG's brand partners, claiming that Bolt Checkout integration should take no longer than six weeks, with the ability to work on multiple brands at once.  Had ABG known that integrations and troubleshooting could take nearly a year (as has proven to be the case with Forever 21), it would not have agreed to the two-year earnings window.  Certainly the parties never contemplated that the two-year earnings window under the Warrant could be manipulated by Bolt's failure to deliver AllPass on the agreed upon schedule so as to deprive ABG of a right it was entitled to and had earned.

105.     Accordingly, interpreting the parties' agreement as a whole, the two-year window to earn the Warrant must be equitably "tolled" at least until Bolt makes AllPass fully available and properly functioning and successfully integrates its Bolt products in ABG's brand partner websites.  Failure to extend the two-year window would vitiate one of the primary benefits promised to ABG—the ability to exercise the Warrant—which served as a key inducement for ABG's entry into the Program Agreement and the Operating Agreement.  A party should not benefit from its breach of contractual obligations that it was unequivocally obligated to perform.

        iii.    **On Information and Belief, the GMV Contribution Requirement May Already Have Been Excused (or Shortly Will Be) Due to Bolt's Entry into a "Qualifying Transaction"**

106.    While Bolt has attempted to deprive ABG of the benefit of the Warrant through its bad-faith manipulation of the GMV Contribution requirement, ABG has also recently learned of facts indicating that the GMV Contribution requirement may already have been (or shortly will be) deemed satisfied in light of Bolt's entry into a "Qualifying Transaction" with a competitor.  Specifically, and as further explained below, the parties agreed in the Program Agreement and Warrant that in the event that Bolt entered into an agreement with a third party to offer a product similar to AllPass—in other words, if Bolt were to offer the technological know-how developed in partnership with, and with the support of, ABG to a third party—then ABG would be appropriately compensated for its contributions to developing that underlying technology by deeming the Warrant to be immediately exercisable, regardless of ABG's GMV Contribution to date.  While Bolt was contractually obligated to notify ABG of any such Qualifying Transaction, it now appears that Bolt has operated in secret in its further attempts to deny ABG the benefit of the Warrant.

107.    The provision calling for expiration of the Warrant if the $750 million GMV Contribution threshold is not achieved within two years is expressly "subject to Section 5.3 of the Program Agreement."  (Warrant § 2(d).)  Section 5.3 of the Program Agreement, in turn, states that if Bolt enters into a "Qualifying Transaction" then, among other consequences, "item (d) in Section 2 of the Warrant shall automatically be deleted and shall be deemed to not apply" and "the 'Exercise Period Start Date' (as such term is used and defined in [the Warrant]) shall be deemed to be the effective date of the Qualifying Transaction."  In other words, if a

Qualifying Transaction occurs, ABG is permitted to exercise the Warrant regardless of the level of GMV Contribution it has attained.

108.   A Qualifying Transaction is defined in Section 5.3 of the Program Agreement as occurring "if Bolt enters into"

> any agreement or arrangement whereby it develops a bespoke technology platform similar to the AllPass Portal for any one or more third party(ies) who offers a loyalty, membership, or subscription program with, for, or to any unaffiliated third party retailers, brand owners (including, without limitation, any brand portfolio company), or brand licensees, in which consumers pay a fee in exchange for discounts, special offers, or perks relating to any retailers, brand owners, or brand licensees (including on any participating brands, goods, or services).

109.   Section 5.3 of the Program Agreement further provides that "Bolt will inform ABG in writing of the Qualifying Transaction and the effective date of the Qualifying Transaction as soon as is commercially reasonable."

110.   To date, Bolt has not provided any such notice of a Qualifying Transaction.  However, Bolt revealed on a November 2021 call with potential investors that it had built "Bolt+"—a subscription product to be offered to retailers that use Bolt.  Bolt+ appears to be materially identical to AllPass.  For example, Bolt stated during the investor call that customers would pay $5 per month in exchange for discounts and free shipping, similar to AllPass.

111.   Disturbingly, Bolt has taken no steps to inform ABG about its development of Bolt+, despite the fact that ABG is Bolt's partner in developing the underlying technology being deployed.  Indeed, Bolt's failure to notify ABG of this development appears to be yet another bad-faith tactic by Bolt intended to deprive ABG of the benefit of the parties' agreements.

112.    Based on the information available to ABG to date, it appears that Bolt, after missing critical deadlines under the Program Agreement and failing to ever properly deploy AllPass for ABG's brand partners, effectively abandoned the AllPass launch, and instead took the AllPass technology that it developed in partnership with ABG (with ABG's considerable patience and support) and launched a competitor product with a third party without even notifying ABG (as it was also required to do under the Program Agreement).

113.    Perhaps most egregiously, Bolt is now attempting to use its own failure to launch AllPass for ABG's brand partners as an excuse for denying ABG its contractual right to exercise the Warrant, all the while siphoning Bolt's efforts into a secret competing side project.

114.    Thus, on information and belief, Bolt has entered into a contract with respect to Bolt+ that constitutes a Qualifying Transaction, such that the GMV Contribution requirement is excused and/or deemed satisfied.  In the alternative, to the extent that Bolt enters into such an agreement in the future, the GMV Contribution will be excused and/or deemed satisfied.  Moreover, to the extent that ABG has already entered into such a contract and has failed to inform ABG of this fact, Bolt's conduct constitutes yet another material breach of the Program Agreement and the Warrant.

## IV.    BOLT BREACHES ITS CONFIDENTIALITY OBLIGATIONS UNDER THE PROGRAM AGREEMENT AND THE OPERATING AGREEMENT

115.    In addition to Bolt's failure to deliver AllPass on the agreed-upon schedule and its bad-faith efforts to deprive ABG of the right to exercise the Warrant, Bolt has further breached the clear confidentiality provisions that it agreed to in both the Program Agreement and the Operating Agreement, despite ABG's repeated demands for compliance with those provisions.  In particular, Bolt has repeatedly made reference to non-public aspects of its relationship with ABG, including by referencing a partnership with ABG before the parties had

even announced AllPass to the public and by using the names of ABG brand partners to market

Bolt's products and raise capital without ABG's authorization.  Not only have these disclosures

by Bolt breached the terms of the parties' agreements, they have also resulted in materially false

and misleading statements to Bolt's potential and/or actual investors regarding the nature and

extent of Bolt's relationship with ABG and ABG's brand partners, as well as the state of

technological achievement that Bolt has actually attained in deploying its products on the

websites of ABG's brand partners.

116.    Perhaps most egregiously, Bolt has affirmatively misled investors by

showcasing all of ABG's brands as customers in investor presentations (including, in one

instance, a brand that ABG had not even acquired yet), despite the fact that ABG's brands were

not using Bolt's product, thereby unjustly enriching itself by raising capital off ABG's (and its

brands') good name while simultaneously deceiving investors.  Bolt was on several occasions

directed to remove ABG and its brands from Bolt's marketing materials but has failed to comply.

117.    Bolt's improper exploitation of ABG's intellectual property and good will

began even before the Program Agreement was signed in October 2020.[4]  For instance, in an

April 2020 presentation to potential investors, Bolt heavily touted an anticipated "partnership"

with a "Partner A" identified as a "private brand development and licensing company" that

"owns and operate[s] 50 leading consumer brands," including "various apparel, athletics, and

entertainment brands, for which it partners with other companies to license and merchandise."

The presentation also noted that the partner's "brands' annual online GMV is $1B, making them

a major player in e-commerce."

---

[4] These pre-Program Agreement unauthorized disclosures by Bolt violated the terms of a mutual Non-Disclosure Agreement between ABG and Bolt dated August 27, 2019.

118.    In the event that this description was not sufficient to identify the "partner" as ABG, on page 5 of the presentation, Bolt explicitly identified "Forever 21"—well known publicly to be one of ABG's brand partners—as part of the presentation's "Key Partnership Milestones."  Specifically, Bolt's April 2020 investor presentation stated that Bolt would "[l]aunch membership product pilot on Forever 21" in October 2020.  Bolt also provided potential investors with a Summary Income Statement that explicitly identified ABG as "Partner A," under the heading "Big Wins," thus removing any doubt.  These disclosures and use of ABG's intellectual property were not authorized by ABG.

119.    Bolt continued to misuse ABG's name, confidential information, and intellectual property after the parties' signed the Program Agreement.  Specifically, Bolt's July 2021 investor presentation (the "**July 2021 Deck**") again heavily touted Bolt's relationship with ABG, and also with SPARC, without either company's permission.  Not only did these disclosures violate ABG's contractual rights under the Program Agreement and Operating Agreement, they also disseminated materially false and misleading information to potential investors.

120.    In particular, the July 2021 Deck represented to investors that between $25 billion and $100 billion in GMV was "Booked & Coming Live," due in substantial part to the contributions of ABG and its brand partners, including Barney's New York, Brooks Brothers, Eddie Bauer, Frederick's of Hollywood, Hart Schaffner Marx, Herve Leger, Jones New York, Judith Leiber, Lucky Brand, Nautica, Nine West, Prince, Thomasville, Aéropostale, and Volcom.  Yet, many of these brands do not even use e-commerce or are on platforms that are not compatible with Bolt.  In fact, the only two ABG brand partners that have agreed to use Bolt's products or AllPass are Forever 21 and Lucky Brand.  (As noted above, Brooks Brothers attempted to implement Bolt's products, but was forced to abandon the effort due to technical

-39-

issues caused by Bolt.)  Bolt even went so far as to imply (through the use of protected marks) that Reebok—which ABG had not yet even entered into an agreement to acquire—was one of the brands that would be using Bolt's products.  Thus, Bolt's statement to potential investors that a dozen ABG brands were "Booked & Coming Live" was materially false and misleading.

121.    Bolt's November 2021 investor memorandum (the "**November 2021 Memo**") continued its pattern of breaching the parties' agreements and making material misrepresentations to investors.

122.    In the November 2021 Memo, Bolt stated: "Since March, Bolt sales has completely evolved our selling approach with eCommerce merchants," which had purportedly "dramatically accelerated the sales cycle and helped [Bolt] secure major wins in record time with name brands, such as Casper, Aeropostale, Nautica, Eddie Bauer, Brooks Brothers, Lucky [Brand], Playboy, RugsUSA, and many others."  Again, this statement by Bolt was materially false and misleading to investors because the only ABG brand partners actually using Bolt as of November 2021 were Forever 21 and Lucky Brand.  The integration attempt with Brooks Brothers was disastrous, and neither Aeropostale nor Nautica have integrated with Bolt.[5]

123.    In addition to Bolt's improper disclosures and use of ABG's intellectual property in Bolt's investor presentations, Bolt has also issued press releases and made public disclosures to news outlets that directly violate the terms of the Program Agreement and the Operating Agreement.

---

[5] The November 2021 Memo is also indicative of the extent to which Bolt has already benefited from ABG's good-faith efforts.  For example, the November 2021 Memo highlights Bolt's partnerships with Casper and Shopify, which were both facilitated by ABG.

124.    For instance, an October 12, 2021 Bloomberg article titled "Fintech Startup Bolt Sees Valuation Surge to $6 Billion" (the "**October 2021 Article**") stated the following:

> Bolt, which makes money by getting a 2% cut of purchases made through its one-click checkout, will use the funding to expand overseas, add more features and boost brand advertising.  Some of the biggest retailers in Europe will be debuting Bolt in the first half of next year, *Breslow said* without providing the brands.  *Current customers include* Forever 21 and *Brooks Brothers.*

(emphasis added)

125.    As noted above, the reference in the October 2021 Article to Brooks Brothers was materially false and misleading, as the launch of Bolt products on the Brooks Brothers website had to be abandoned months earlier, in June 2021, due to technical issues caused by Bolt.  Based on the October 2021 Article's attribution to Bolt founder Ryan Breslow, it appears that this false information came directly from Bolt.  In addition to being inaccurate, Bolt's statements to Bloomberg were unauthorized, as neither ABG nor the AllPass LLC had granted permission for such public statements.

126.    Similarly, a July 20, 2021 article titled "Online Checkout Startup bolt Valued at $4 Billion," which appeared on the website theinformation.com (the "**July 2021 Article**"), stated that "Six-year-old Bolt has six million registered users and next year expects 50 million people to use Bolt's one-click checkout service through merchants such as Forever 21 and Brooks Brothers, according to a person familiar with the business."  While the article did not identify the "person familiar with the business" who provided this information, the misleading disclosure did not come from ABG, and therefore, on information and belief, originated with Bolt.  Indeed, the article elsewhere quotes statements made by Mr. Breslow, Bolt's founder and CEO, during an interview with the publication.

127.   Similar misstatements regarding Bolt's involvement with Brooks Brothers and other unauthorized and/or inaccurate disclosures regarding ABG and its brand partners have appeared on Bolt's website.  To take just one example, the Bolt website (bolt.com) has displayed the Brooks Brothers logo (along with marks for Forever 21 and Lucky Brand) adjacent to a discussion of why retailers should "Grow with Bolt," which asserted that "nine out of ten Bolt retailers have seen new customers come from across the [Bolt] network"—falsely implying, once again, that Brooks Brothers was one of those brands.

## V.   BOLT'S ACTIONS HAVE AND WILL CONTINUE TO IRREPARABLY HARM PLAINTIFFS ABSENT INJUNCTIVE RELIEF

128.   Due to Bolt's breaches of the Program Agreement, the Warrant, and the Operating Agreement, as well as Bolt's infringement of Plaintiffs' intellectual property rights, Plaintiffs have been, and will continue to be, irreparably harmed in the following respects, among others, absent injunctive relief:

(a)   Plaintiffs are being irreparably harmed because their confidential information, as well as confidential information regarding ABG's brand partners, the AllPass LLC, SPARC, and Simon, is being disseminated by Bolt to the public and to actual and potential investors in Bolt without authorization and in breach of the express terms of the Program Agreement and the Operating Agreement.

(b)   Plaintiffs are being irreparable harmed because Bolt, without authorization or consent, has used in commerce one or more of the ABG Marks (defined below), including but not limited to ABG, Authentic Brands Group, Forever 21, and Brooks Brothers, in such a manner as to be likely to cause confusion regarding (i) the affiliation, connection, or association between one or more of these ABG brands, ABG, and Bolt, and (ii) the sponsorship or approval of Bolt and Bolt's products and services by ABG.

(c)      Plaintiffs are being irreparably harmed because Bolt has used in interstate commerce materially false or misleading statements regarding its relationship with ABG and the brands owned by ABG.  Bolt's actions misrepresent the nature, characteristics, and quality of Bolt's goods and services because consumers are likely to confuse Bolt or Bolt's services with ABG or ABG's goods and services.  Plaintiffs will be irreparably harmed because consumers may be less likely to purchase goods associated with ABG or ABG's brands due to perceived association with Bolt's technical issues, and because third parties may be less likely to enter into agreements with ABG for ABG brands due to perceived association with Bolt's technical issues..

(d)      Plaintiffs will be irreparably harmed if they are deprived of the right to exercise the Warrant to purchase the Bolt Shares at the agreed exercise price.  The Shares are unique and are not publicly available for purchase.  Additionally, if Plaintiffs are deprived of the right to purchase the Shares under the Warrant, they will not be able to exercise any of the voting rights or other rights attendant to the Shares after exercise of the Warrant.

## FIRST CAUSE OF ACTION

### (Breach of Contract – Program Agreement)

129.    Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

130.    The Program Agreement constitutes a valid and enforceable contract between ABG and Bolt.

131.    ABG has performed its obligations under the Program Agreement.

132.    As set forth herein, Bolt has materially breached its obligation to perform these core obligations under the Program Agreement.

133.    First, Bolt has breached Section 3.1 of the Program Agreement by failing to deliver a fully functional AllPass product by January 15, 2021.

134.    Second, Bolt has breached Section 9 of the Program Agreement (including without limitation subsections 9.1.1, 9.1.2, and 9.7.3) by using the intellectual property of ABG and is brand partners without ABG's authorization.

135.    Third, Bolt had breached Section 10.2 of the Program Agreement by using and reproducing the Confidential Information of ABG and its brand partners in a manner not permitted under the Program Agreement, including by disclosing such Confidential Information to third parties, including actual and potential investors in Bolt, without the consent of ABG and/or its brand partners.

136.    Fourth, Bolt has breached Section 11 of the Program Agreement by issuing one or more press release regarding the Program Agreement and/or the contents hereof that was not mutually agreed to in advance by the Parties in writing with respect to content and timing.

137.    Bolt's material breaches of the Program Agreement have caused harm to Plaintiffs, for which Plaintiffs are entitled to recover damages in an amount to be shown at trial.

138.    Additionally, Section 18.10 of the Program Agreement provides that the Program Agreement's intellectual property and confidentiality provisions may be enforced through equitable relief, and expresses the parties' acknowledgement and agreement that the breach of those provisions constitutes irreparable harm:

> **Equitable Relief**. Each Party hereby acknowledges and agrees that a breach or threatened breach by such Party of any of its obligations hereunder in Sections 9 or 10 would cause the other Party irreparable harm for which monetary damages would not be an adequate remedy and agrees that, in the event of such breach or threatened breach, the other Party will be entitled to seek equitable

relief, including a restraining order, an injunction, specific performance and any other relief that may be available from any court, without any requirement to post a bond or other security, or to prove actual damages or that monetary damages are not an adequate remedy.  Such remedies are not exclusive and are in addition to all other remedies that may be available at law, in equity or otherwise.

139.    Further, separate and apart from Section 18.10 of the Program Agreement, Plaintiffs are being irreparably harmed because ABG's confidential information, as well as confidential information regarding ABG's brand partners, the AllPass LLC, SPARC, and Simon, is being disseminated by Bolt to the public and to actual and potential investors in Bolt without authorization and in breach of the express terms of the Program Agreement.

140.    Accordingly, under the terms of the Program Agreement, Plaintiffs are entitled to injunctive relief restraining Bolt from any further or continuing violations of the Program Agreement, including its provisions concerning intellectual property and confidentiality.

## SECOND CAUSE OF ACTION

### (Breach of Contract – Operating Agreement)

141.    Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

142.    The Operating Agreement constitutes a valid and enforceable contract between ABG and Bolt.

143.    ABG has performed its obligations under the Operating Agreement.

144.    As set forth herein, Bolt has materially breached its obligation to perform these core obligations under the Operating Agreement.

145.     First, Bolt has breached Section 10.12 of the Operating Agreement by disseminating information and statements to the press regarding ABG, NewCo, and other matters pertaining to or arising out of the Operating Agreement without ABG's approval.

146.     Second, Bolt has breached Section 10.13 of the Operating Agreement by failing to keep confidential, disclosing to third parties, and using for its own benefit non-public information concerning NewCo without its consent.

147.     Bolt's material breaches of the Operating Agreement have caused harm to Plaintiffs, for which Plaintiffs are entitled to recover damages in an amount to be shown at trial.

148.     Additionally, Section 10.15 of the Operating Agreement provides for injunctive relief to enforce Bolt's obligations thereunder:

> **Specific Performance**. Each party recognizes and acknowledges that a breach of Section 10.13 [Confidentiality] will cause irreparable damage, the exact amount of which will be difficult or impossible to ascertain, and that remedies at law for any such breach will be inadequate. Accordingly, each party agrees that in the event of a breach or threatened breach of Section 10.13, in addition to any other remedy which may be available at law or in equity, the non-breaching parties may apply to a court of competent jurisdiction for injunctive relief and specific performance to prevent or prohibit such breach. Each party agrees not to raise as a defense or objection to the request or granting of such relief that any breach of Section 10.13 is or would be compensable by an award of money damages, and each party agrees to waive any requirements for the securing or posting of any bond in connection with such remedy.

149.     Further, separate and apart from Section 10.15 of the Operating Agreement, Plaintiffs are being irreparably harmed because ABG's confidential information, as well as confidential information regarding ABG's brand partners, the AllPass LLC, SPARC, and Simon, is being disseminated by Bolt to the public and to actual and potential investors in Bolt without authorization and in breach of the express terms of the Operating Agreement.

150.     Accordingly, under the terms of the Operating Agreement, Plaintiffs are entitled to injunctive relief restraining Bolt from any further or continuing violations of the Operating Agreement, including its provisions concerning confidentiality.

### THIRD CAUSE OF ACTION

### (Declaration of Right to Exercise Warrant and Specific Performance of the Warrant – or Alternatively Damages for Breach of the Warrant)

151.     Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

152.     The Warrant is a valid and enforceable contract between ABG and Bolt.

153.     Under the terms of Warrant and the Program Agreement, ABG is entitled to exercise the Warrant to purchase the Shares, provided it attains a threshold level of GMV Contribution within two years following execution of the Warrant.  ABG believes it has made substantial progress towards this GMV Contribution through the use of Bolt Products by certain Participating ABG Brand Partners and/or other referrals, regardless of Bolt's failure to enable a timely launch of AllPass, as the parties' agreements provide that all GMV related to Bolt products counts towards the Warrant's GMV Contribution threshold.  Alternatively, in light of Bolt's failure to meet the January 15, 2021 contractual deadline under the Program Agreement for Bolt to deliver AllPass, ABG believes that the two-year earnings window under the Warrant must be extended to permit ABG the contractually contemplated period of time to achieve its GMV Contribution following the launch of AllPass.  Finally, ABG believes that the GMV Contribution requirement may also be excused by Bolt's actual or imminent (but undisclosed) entry into a Qualifying Transaction.

154.     Bolt has rejected each of ABG's positions on these issues.  In particular, Bolt has taken the positions that (i) ABG has earned "zero" credit towards its GMV

Contribution, (ii) the two-year period to achieve the necessary GMV Contribution is not tolled or extended, and (iii) that no Qualifying Transaction has occurred.

155.    Thus, a live and justiciable controversy exists between the parties with respect to ABG's right to exercise the Warrant.

156.    Accordingly, Plaintiffs seek a declaration that (i) the definition of GMV Contribution under the Warrant calls for a calculation based on the use of all Bolt Products, not limited to AllPass; (ii) the two-year window for achieving the required GMV Contribution under the Warrant was effectively tolled for a period to be determined at trial, but at least November 2021, the earliest date on which Bolt delivered an MVP, and/or (iii) any requirement under the Warrant with respect to GMV Contribution is excused and deemed satisfied, and accordingly ABG may exercise the Warrant at any time.

157.    Additionally, ABG has been and remains ready, willing, and able to perform pursuant to each of the parties' agreements, including with respect to the purchase of the Shares under the Warrant.  In particular, ABG has the financial wherewithal to purchase the Shares pursuant to the Warrant.  Accordingly, Plaintiffs seek specific performance of Bolt's obligation to transfers the Shares under the Warrant.

158.    Alternatively, Section 10.4 of the Warrant (Further Assurances) expressly provides: "The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Warrant."  As is plain from the text of the Program Agreement and the Warrant, the parties' purpose and intent in entering into these integrated contracts was that ABG would have an adequate period of time from the date on which AllPass was launched to earn the Warrant through GMV Contributions.  In light of Bolt's failure to timely deliver a functioning AllPass product, Plaintiffs seek specific performance of Bolt's obligation to enter into an instrument

acknowledging the resulting extension of the two-year earnings window, as such an extension is necessary to "carry out the purposes and intent" of the Warrant.

159.    Finally, as an alternative to declaratory relief and/or specific performance, Plaintiffs seek damages for Bolt's breach of the Warrant in an amount to proven at trial, including but not limited to damages equal to the fair market value of the Shares.

## FOURTH CAUSE OF ACTION

### (In the Alternative, Breach of Covenant of Good Faith and Fair Dealing in the Program Agreement, the Warrant, and the Operating Agreement)

160.    Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

161.    In the alternative to Plaintiffs' claims for Bolt's breaches of the express terms of the Program Agreement, the Warrant, and the Operating Agreement, Plaintiffs seek damages and declaratory and injunctive relief based on Bolt's breach of the implied covenant of good faith and fair dealing implied in each of (i) the Program Agreement, (ii) the Warrant, and (iii) the Operating Agreement.

162.    At all times relevant to this action, ABG and Bolt were parties to the Program Agreement, the Warrant, and the Operating Agreement.

163.    At all times relevant to this action, ABG performed pursuant to the Program Agreement, the Warrant, and the Operating Agreement, as described above.

164.    At all times relevant to this action, Bolt was under an obligation of good faith and fair dealing in the performance of its obligations under the Program Agreement, the Warrant, and the Operating Agreement.

165.    Bolt breached its obligation of good faith and fair dealing to ABG by, among other things:

(a)      Intentionally delaying the delivery of a fully functional AllPass product;

(b)      Misrepresenting to ABG the time and resources needed to develop and deliver AllPass and the status of those efforts at various points throughout the project;

(c)      Failing to devote adequate time, personnel, and other resources to the development of AllPass;

(d)      Attempting to deprive ABG of the benefits of the parties' contractual relationship by denying ABG the right to exercise the Warrant;

(e)      Taking the position, contrary to the text and the intent of the parties' agreements, and demonstrating an absence of good faith, that GMV Contribution is limited to economic contributions through AllPass as opposed to all Bolt Products;

(f)      Inducing ABG to continue its performance under the Program Agreement by representing to ABG that it was making progress towards ABG's GMV Contribution, only to later deny that ABG had made any progress towards its GMV Contribution;

(g)      Disseminating confidential information regarding ABG, its brand partners, AllPass, and the partnership between ABG and Bolt to third parties in order to enrich itself without ABG's consent;

(h)      Disseminating materially false and/or misleading information regarding ABG, its brand partners, AllPass, and the partnership between ABG and Bolt to third parties in order to enrich itself and without ABG's consent;

(i)      Devoting its time, personnel, and other resources to the development of Bolt+ instead of AllPass;

(j)      Failing to disclose to ABG (and instead concealing) the development or existence of Bolt+; and

(k)     Attempting to conceal from ABG Bolt's actual or potential entry into a Qualifying Transaction under the Warrant and Program Agreement.

166.    By reason of the foregoing, Plaintiffs have been harmed by Bolt's breaches of the implied covenant of good faith and fair dealing, for which Plaintiffs are entitled to recover damages in an amount to be shown at trial.

167.    Additionally, Plaintiffs are entitled to declaratory and injunctive relief restraining Bolt from any further or continuing breaches of the implied covenant of good faith and fair dealing and permitting Plaintiffs to exercise the Warrant.

## FIFTH CAUSE OF ACTION

### (In the Alternative, Unjust Enrichment)

168.    Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

169.    Bolt unjustly enriched itself at Plaintiffs' expense by, among other things:

(a)     Accepting the benefits conferred by ABG's performance of the Program Agreement and Operating Agreement, including ABG's successful efforts to gain Bolt additional business with (for example) Casper and Shopify, while delaying the delivery of a fully functional AllPass product and attempting subsequently to deny ABG the right to exercise the Warrant;

(b)     Misrepresenting to ABG the time and resources needed to develop and deliver AllPass and the status of those efforts at various points throughout the project in order to induce ABG to enter into and continue to perform its obligations under the parties' agreements;

(c)     Inducing ABG to continue its performance under the Program Agreement by representing to ABG that it was making progress towards ABG's GMV Contribution, only to later deny that ABG had made any progress towards its GMV Contribution;

(d)      Disseminating confidential information regarding ABG, its brand partners, AllPass, and the partnership between ABG and Bolt to third parties without ABG's consent, in order to induce third parties to invest in Bolt;

(e)      Disseminating materially false and/or misleading information regarding ABG, its brand partners, AllPass, and the partnership between ABG and Bolt to third parties, in order to induce third parties to invest in Bolt and to unjustly enrich Bolt without ABG's consent;

(f)      Applying the technical know-how and other resources developed pursuant to the Program Agreement and the Operating Agreement to the development of Bolt+ and related agreements with third parties, instead of to AllPass; and

(g)      Attempting to conceal from ABG Bolt's actual or potential entry into a Qualifying Transaction under the Warrant and Program Agreement in order to retain the benefits provided by ABG under the Program Agreement and Operating Agreement without paying ABG the agreed compensation, including under the Warrant.

170.     It is against equity and good conscience to permit Bolt to retain these benefits.

171.     By reason of the foregoing, Bolt is liable to Plaintiffs in an amount to be shown at trial.

## SIXTH CAUSE OF ACTION

### (In the Alternative, Quantum Meruit)

172.     Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

173.    As alleged above, ABG performed its obligations under the parties' agreements in good faith, including under the Program Agreement, the Warrant, and the Operating Agreement, and Bolt accepted ABG's services.

174.    Among other services, ABG has used its reasonable efforts to induce its brand partners (such as Lucky Brand and Forever 21) and other third parties (such as Casper and Shopify) to purchase, integrate, or enroll in Bolt's products and services.

175.    In performing its services under the parties' agreements, ABG acted with the expectation of compensation therefor.

176.    Accordingly, Plaintiffs are entitled to the reasonable value of the services they have rendered to Bolt, in an amount to be proven at trial.

### SEVENTH CAUSE OF ACTION

### (Trademark Infringement/Unfair Competition Under 15 U.S. § 1125)

177.    Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

178.    Plaintiff is the owner of common-law trademarks including ABG, AUTHENTIC BRANDS GROUP, and similar marks.

179.    ABG's portfolio of iconic and world-renowned brands includes ABG, Authentic Brands Group, Marilyn Monroe®, Elvis Presley®, Muhammad Ali®, Shaquille O'Neal®, Sports Illustrated®, Dr. J®, Greg Norman®, Neil Lane®, Thalia®, Nautica®, Aéropostale®, Forever 21®, Juicy Couture®, Vince Camuto®, Herve Leger®, Judith Leiber®, Barneys New York®, Brooks Brothers ®, Frye®, Lucky Brand®, Nine West®, Jones New York®, Frederick's of Hollywood®, Louise et Cie®, Sole Society®, Enzo Angiolini®, CC Corso Como®, Hickey Freeman®, Hart Schaffner Marx®, Adrienne Vittadini®, Taryn Rose®,

Bandolino®, Misook®, Spyder®, Tretorn®, Tapout®, Prince®, Volcom®, Airwalk®, Vision Street Wear®, Above The Rim®, Hind®, Thomasville®, Drexel®, and Henredon® (collectively, the "**ABG Marks**").

      180.    The ABG Marks are valid and are used in interstate commerce.

      181.    Without authorization or consent, Bolt has used in commerce one or more of the ABG Marks, including but not limited to ABG, Authentic Brands Group, Forever 21, and Brooks Brothers in such a manner as to be likely to cause confusion regarding the affiliation, connection, or association between one or more of these ABG brands, ABG, and Bolt.

      182.    Without authorization or consent, Bolt has used in commerce one or more of the ABG Marks, including but not limited to ABG, Authentic Brands Group, Forever 21, and Brooks Brothers in such a manner as to be likely to cause confusion regarding the sponsorship or approval of Bolt and Bolt's services by ABG.

      183.    Bolt's use of the ABG Marks in commerce is likely to confuse consumers as to the actual relationship between ABG and Bolt.

      184.    ABG has been and is likely to continue to be damaged by Bolt's infringing and unlawful acts.

      185.    Bolt's improper use of the ABG Marks has been intentional, willful, and in bad faith, and is intended to use the goodwill accumulated by ABG  to enrich Bolt.

      186.    The acts of Bolt complained of herein have caused irreparable harm to ABG, and are likely to continue to cause such irreparable harm unless enjoined by this Court.

      187.    ABG has no adequate remedy at law and is entitled to and seeks injunctive relief as a result thereof.

## EIGHTH CAUSE OF ACTION

### (False Advertising)

188.    Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

189.    Bolt has used in interstate commerce false or misleading statements regarding its relationship with ABG and the brands owned by ABG.

190.    For example, Bolt falsely represented to investors that GMV was "Booked & Coming Live" from ABG brand partners, including Barney's New York, Brooks Brothers, Eddie Bauer, Frederick's of Hollywood, Hart Schaffner Marx, Herve Leger, Jones New York, Judith Leiber, Lucky Brand, Nautica, Nine West, Prince, Thomasville, Aéropostale, and Volcom.

191.    Yet, many of these brands do not even use e-commerce or are on platforms that are not compatible with Bolt.  In fact, the only two ABG brand partners that have agreed to use Bolt's products or AllPass are Forever 21 and Lucky Brand.  These other brands were not "booked" and were not "coming live."

192.    As a result, the above statements are literally false or implicitly false.

193.    Similarly, Bolt represented that it had "secure[d] major wins" with brands including Casper, Reebok, Aeropostale, Nautica, Eddie Bauer, Brooks Brothers, and Lucky Brand.  Again, this statement by Bolt was materially false and misleading to investors, as Aéropostale, Nautica, Eddie Bauer, Brooks Brothers, and Lucky Brand are all ABG brands, but the only ABG brand partners actually using Bolt as of November 2021 were Forever 21 and Lucky Brand.

194.    Bolt further asserted in a Bloomberg article that its "current customers include Forever 21 and Brooks Brothers," when in fact Brooks Brothers had ceased its integration with Bolt due to Bolt's technical deficiencies.

195. Bolt repeatedly made the assertion that it was associated with Brooks Brothers, despite Brooks Brothers being unable to successfully integrate Bolt due to Bolt's technical issues.

196. The above statements are literally false or implicitly false.

197. The above statements include statements made directly to the relevant consuming public.

198. Bolt's actions described herein misrepresent the nature, characteristics, and quality of Bolt's goods and services because consumers are likely to confuse Bolt or Bolt's services with ABG or ABG's services.

199. Bolt's actions described herein misrepresent the nature, characteristics, and quality of ABG's goods and services because consumers are likely to confuse Bolt or Bolt's services with ABG or ABG's services.

200. Bolt's misrepresentation of its relationship with ABG and ABG's brands is literally false and is therefore material.

201. Moreover, the misrepresentation is material because consumers may be less likely to purchase goods associated with ABG or ABG's brands due to Bolt's technical issues.

202. ABG has been and will continue to be damaged by Bolt's misrepresentations and unlawful acts.  In particularly, Plaintiffs are being irreparably harmed because Bolt has used in interstate commerce materially false or misleading statements regarding its relationship with ABG and the brands owned by ABG.  Bolt's actions misrepresent the nature, characteristics, and quality of Bolt's goods and services because consumers are likely to confuse Bolt or Bolt's services with ABG or ABG's goods and services.  Plaintiffs will be irreparably harmed because consumers may be less likely to purchase goods associated with

ABG or ABG's brands due to perceived association with Bolt's technical issues, and because third parties may be less likely to enter into agreements with ABG for ABG brands due to perceived association with Bolt's technical issues..

203.    ABG is entitled to recover from Bolt all damages it has sustained from Bolt's unlawful conduct, as well as the profits Bolt has obtained from such conduct, in an amount to be proven at trial and trebled pursuant to 15 U.S.C. § 1117.

204.    Bolt's willful, deliberate, and malicious conduct  amounts to exceptional circumstances, justifying an award of reasonable attorneys' fees and costs to ABG pursuant to 15 U.S.C. § 1117.

205.    The acts of Bolt complained of herein have caused irreparable harm to ABG, and are likely to continue to cause such irreparable harm unless enjoined by this Court.

206.    ABG has no adequate remedy at law and is entitled to and seeks injunctive relief as a result thereof.

WHEREFORE, Plaintiffs demand judgment in their favor against Defendant:

a)  Awarding Plaintiffs damages in amounts to be determined at trial;

b)  Awarding Plaintiffs pre-judgment and post-judgment interest;

c)  Declaring that (i) the definition of GMV Contribution under the Warrant calls for a calculation based on the use of all Bolt Products, not limited to AllPass; or alternatively, (ii) the two-year window for achieving the required GMV Contribution under the Warrant was effectively tolled for a period to be determined at trial, but at least until November 2021, the earliest date on which Bolt delivered an MVP, and/or alternatively, (iii) any requirement under the Warrant with respect to GMV Contribution is

excused and deemed satisfied, and accordingly Plaintiffs may exercise the Warrant at any time;

d) Awarding Plaintiffs specific performance of Defendant's obligation to transfer shares to Plaintiffs under the Warrant;

e) Awarding Plaintiffs injunctive relief restraining Bolt from further or continuing breaches of the Program Agreement, the Operating Agreement, and the Warrant, including with respect to the confidentiality, intellectual property, and publicity provisions of those agreements;

f) Awarding Plaintiffs injunctive relief restraining Bolt from further or continuing unauthorized use or exploitation of intellectual property belonging to Plaintiffs;

g) Awarding Plaintiffs the costs of this action, including attorneys' fees; and

h) Awarding Plaintiffs such other and further relief as the Court deems just and proper.

Dated:     November 29, 2021          Respectfully submitted,
           New York, New York

**CADWALADER, WICKERSHAM & TAFT LLP**

By:   */s/ Nicholas A. Gravante, Jr.*
      Nicholas A. Gravante, Jr.
      Karen C. Dyer (*pro hac vice* forthcoming)
      Matthew M. Karlan

200 Liberty Street
New York, NY 10281
Tel.:  (212) 504-6000
Fax:  (212) 504-6666
nicholas.gravante@cwt.com
karen.dyer@cwt.com
matthew.karlan@cwt.com

*Counsel for Plaintiffs ABG Intermediate Holdings 2,
LLC and ABG-SPG ES, LLC*

# EXHIBIT A

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

## ALLPASS LOYALTY PROGRAM AGREEMENT

This AllPass Loyalty Program Agreement (this "**Agreement**") is made as of October 9th, 2020 ("**Effective Date**") by and among Bolt Financial, Inc., a Delaware corporation with its principal address at 77 Geary St., San Francisco, CA 94108 ("**Bolt**"), ABG Intermediate Holdings 2 LLC, a Delaware limited liability company with its principal address at 1411 Broadway, 21st Floor, New York, NY 10018  ("**ABG**"), and ABG-AP, LLC, a Delaware limited liability company with its principal address at 1411 Broadway, 21st Floor, New York, NY 10018 ("**NewCo**"). This Agreement constitutes a binding agreement with respect to the transactions set forth herein. ABG, Bolt, and NewCo each are referred to as a "**Party**" and together, the "**Parties**."

## RECITALS

WHEREAS, ABG owns or controls intellectual property relating to certain retail brands ("**ABG Brands**") used by third-party licensees and partners who are contractually authorized by ABG (or its affiliates) to use ABG Brands for the sale of products on ecommerce websites and/or mobile applications ("**ABG Brand Partners**");

WHEREAS, Bolt builds and provides products and services to e-commerce companies including a proprietary checkout platform, fraud scoring, fraud protection, payments processing, and other services;

WHEREAS, ABG and Bolt entered into a "Referral Agreement" dated as of December 12, 2019 ("**Referral Agreement**");

WHEREAS, NewCo will amend and restate its operating agreement (the "**NewCo Operating Agreement**") and admit Bolt as a member thereof concurrently with execution of this Agreement.

NOW, THEREFORE, in consideration of the obligations, terms and conditions set forth below and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.      **DEFINITIONS**.

Capitalized terms not defined elsewhere in the Agreement shall have the following meanings:

1.1.      "**Affiliate**" means any entity that, directly or indirectly, controls, is controlled by, or is under common control with such entity, including any entity in which a party holds at least a Fifty Percent (50%) voting equity interest.

1.2.      "**Agreement**" shall have the meaning set forth in the opening paragraph.

1.3.      "**AllPass**" means the loyalty program(s) offered by Newco, as the initial features are described in Exhibit A and as such program(s) may change from time to time.

1.4.      "**AllPass Checkout**" means Bolt Checkout, white-labeled as AllPass Checkout.

1.5.      "**AllPass Checkout Launch**" means the date NewCo makes AllPass Checkout available to Participating ABG Brand Partners and their end users.

1.6.      "**AllPass Subscription Launch**" means the date NewCo makes AllPass available to Participating ABG Brand Partners and their end users.

1.7.      "**AllPass Members**" means those end-users (e.g., consumers) who enroll in AllPass and pay AllPass Subscription Fees.

1.8.      "**AllPass Subscription Fees**" means the fees paid by AllPass Members to participate in AllPass.

1.9.      "**Applicable Laws**" means all applicable federal, state, and local laws, statutes, regulations, rules, orders, supervisory requirements, directions, circulars, opinions, interpretive letters, and other official releases of or by any federal, state, or local governmental authority or entity, and any other applicable regulations and/or operating rules relating to a Party, or its users, as the case may be, and/or its products and/or services.

1.10.      "**Bolt Products**" means all current and future Bolt products and services other than the Bolt Underlying Technology, including without limitation those certain products and services known as of the Effective Date as Bolt Checkout/Bolt Convert, Bolt Fraud Scoring, Bolt Fraud Protection/Bolt Approve, and Bolt Payments/Bolt Collect, as well as upsell features such as sales tax estimation, post-purchase services, delivery estimation, and shipping notifications.

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

1.11.   "**Bolt Underlying Technology**" means the technology necessary or otherwise used to enable the AllPass features, as such technology and features are described in Exhibit A.

1.12.   "**Change of Control**" means (a) a merger, consolidation or other reorganization of a Person, if the individuals and entities who were stockholders (or partners or members or others that hold an ownership interest) of the Person immediately prior to the effective date of the transaction have "beneficial ownership" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) of less than  fifty percent (50%) of the total combined voting power for election of directors (or their equivalent) of the surviving entity following the effective date of the transaction, (b) the acquisition by any entity or group of direct or indirect beneficial ownership in the aggregate of the then issued and outstanding securities (or other ownership interests) of a Person in a single transaction or a series of transactions representing in the aggregate  fifty percent (50%) or more of the total combined voting power of a Person, or (c) a sale of all or substantially all of a Person's assets.

1.13.   "**Intellectual Property**" means any patent, copyright, trademark, trade secret, proprietary knowhow and other intellectual property right of any kind (and any application or registration relating thereto), including without limitation, any intellectual property or other proprietary right in any of the following, anywhere in the world, however designated: Marks, content, software (in both source code and object code form), program materials, flow charts, technical and functional specifications, technical data, production data, data formats, database structures, file formats, data compilations, program summaries, program listings, program logic, programming tools, specifications, screen designs, templates, drawings, manuals, reports, user guides, operation guides, installation guides, technical designs, detailed designs, test data and results, drawings, designs, graphs, diagrams, notes, outlines, formulas, processes, algorithms, ideas, inventions, techniques, Internet domain names, and the classification, selection, coordination and arrangement of data, images, copy, and collateral materials.

1.14.   "**Mark**" means a trademark, service mark, certification mark, or other designation of origin, including associated goodwill.

1.15.   "**Merchant Referral(s)**" means any third-party merchant (other than a Participating ABG Brand Partner) that ABG sources and refers to Bolt that Bolt accepts in accordance with Section 2.3 below, and who thereafter enters into a written agreement with Bolt to obtain or otherwise use or implement any Bolt Product.

1.16.   "**Participating ABG Brand Partner**" means an ABG Brand Partner who has executed an agreement to use the Bolt Products with Bolt and/or an AllPass enrollment agreement with NewCo.

1.17.   "**Person**" means an individual, partnership, limited liability company, corporation, trust, estate, real estate investment trust, association, unincorporated organization, government or any department, agency or authority thereof, or any other entity or organization

1.18.   "**Standard Implementation**" means the implementation of the Bolt Underlying Technology as described in Exhibit B.

1.19.   "**Exhibits**" means all Exhibits attached to and made a part of this Agreement now or in the future.

1.20.   "**Target Checkout Launch Date**" means October 20, 2020.

1.21.   "**Target Subscription Launch Date**" means January 15, 2021.

1.22.   "**Term**" shall have the meaning set forth in Section 8.

1.23.   "**Gross Merchandise Value Contribution**" or "**GMV Contribution**" means the total financial amount of ecommerce transactions that are processed through any of the Bolt Products (which, for the avoidance of doubt, for purposes hereof, include AllPass Checkout) of those ABG Participating Brand Partners and Merchant Referrals who have enrolled in AllPass.

1.24.   "**Reasonable Cooperation**", as such phrase is used herein and applicable to a Party, means taking reasonable efforts in furtherance of the relevant task or objective to the extent such Party can reasonably do so within the bounds of matters under such Party's control.

2.       **ABG RIGHTS AND RESPONSIBILITIES.**

2.1.    **ABG Brand Enrollment**. Subject to Reasonable Cooperation (as hereinafter defined) from Bolt, ABG will use its commercially reasonable efforts to induce a group of ABG Brand Partners representing at least 75% of ABG Brand Partners' collective online gross merchandise volume for the ABG Brands to enroll in AllPass within eighteen (18) months of the date of the AllPass Subscription Launch, subject to technology platform compatibility and implementation cost, and in each case, subject to the terms and conditions of the ABG Brand Partners' other agreements with ABG and/or its Affiliates and third parties;

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

provided, however, that it shall not be a breach of this Agreement by ABG if ABG fails to do so. ABG acknowledges that the ABG Brand Partners will be responsible, with Bolt's assistance, for integrating AllPass and Bolt into their websites and/or mobile applications at their respective own expense.

2.2. **Joint Promotion to Top 3 ABG Brand Partners**. In addition to the obligations in Section 2.1, ABG will use its commercially reasonable efforts to facilitate introductions between Bolt and and, and work jointly with Bolt promote AllPass to, the management teams of the core U.S. apparel ABG Brand Partners for Nautica, Aeropostale, and Forever 21 within thirty (30) days of the Effective Date.

2.3. **Merchant Referrals.** During the term of this Agreement, ABG will use its commercially reasonable efforts to identify and submit the identity of prospective Merchant Referrals in accordance with the terms and conditions of this Agreement to Bolt via email, along with reasonable available information related to such prospective Merchant Referral as reasonably requested by Bolt from time to time in writing. Bolt may, in its reasonable discretion, choose to not accept any Merchant Referral submitted by ABG for the following reasons: (a) Bolt reasonably believes that product or technology considerations would prevent Bolt from effectively and economically servicing such Merchant Referral or (b) such Merchant Referral is in a high-risk category (e.g., ammunition, cannabis) or Bolt otherwise reasonably determines that the particular Merchant Referral is otherwise too risky to service (e.g., due to extraordinary fraud risk and/or chargeback rate, "Know Your Customer" compliance issues, etc.). Bolt will provide ABG with written acceptance or rejection of any applicable Merchant Referral by email within five (5) business days following the receipt thereof by Bolt, and in the event of any such rejection, Bolt will also provide ABG with the reason(s) for such rejection.

2.4. **AllPass Launch and Implementation**. Subject to Reasonable Cooperation from Bolt, ABG will use commercially reasonable efforts to facilitate the AllPass Subscription Launch on or before the Target Subscription Launch Date; provided, however, that ABG shall not be required to incur any costs or expenses, or spend any money out-of-pocket, to effect the AllPass Subscription Launch.

3.  **BOLT RIGHTS AND RESPONSIBILITIES.**

3.1. **Development of Bolt Underlying Technology**. Bolt will begin development of the Bolt Underlying Technology immediately upon execution of this Agreement and complete development as soon as commercially reasonable. Bolt will complete the development of AllPass Checkout to permit NewCo to achieve (i) the AllPass Checkout Launch on or before the Target Checkout Launch Date, and (ii) the AllPass Subscription Launch on or before the Target Subscription Launch Date.

3.2. **Data Privacy Compliance**. Subject to Reasonable Cooperation from ABG and the Participating ABG Brand Partners, as applicable, Bolt will be responsible for the Standard Implementations, the AllPass Portal, and Bolt Products (a) complying with all applicable data privacy and protection laws, including but not limited to, data collection, PCI requirements, GDPR compliance, CCPA (and other similar state and federal privacy laws, as applicable) compliance, tokenization and secure storage, and for providing that the Standard Implementations and Bolt Products permit NewCo and, as applicable, ABG, to comply with all of the foregoing at no additional cost or expense to NewCo or ABG, and (b) permitting AllPass Members, NewCo, Participating ABG Brand Partners, and Merchant Referrals to transact cross-network within Participating ABG Brand Partner and Merchant Referral websites (mobile and desktop) and agreed-upon similar selling venues, in a PCI, GDPR, and CCPA (and other similar state and federal privacy laws, as applicable) compliant fashion, including the ability to request deletion of personal information or personal data. The Parties acknowledge that non-Standard Implementations may impose compliance obligations on the Participating ABG Brand Partner, Merchant Referral, or NewCo as necessary, and business operations may impose compliance obligations that may not be fulfilled only through a technology implementation. ABG and Bolt shall provide Reasonable Cooperation to NewCo to implement a privacy policy page and a terms of use page for the AllPass Portal that complies with all Applicable Laws. The Data Processing Addendum ("**DPA**") attached as Exhibit C, which will govern the collection, handling, and use of personal information and personal data (each as defined under Applicable Laws) with respect to AllPass and the use of the Bolt Underlying Technology, the AllPass Portal, and other Bolt Products by Bolt and by NewCo, as applicable, is incorporated herein by reference and made a part hereof.

3.3. **Bolt Products**. Bolt shall develop, maintain and make available for license the Bolt Products to each Participating ABG Brand Partner, provided that the functionality of the Bolt Products shall be determined, developed and modified by or on behalf of Bolt, in Bolt's reasonable discretion (subject to the terms and

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

conditions of this Agreement and, as applicable, the agreements between Bolt and each Participating ABG Brand Partner). The Bolt Products are subject to the Participating ABG Brand Partner(s) agreeing to Bolt's Merchant Agreement as generally updated by Bolt, in each case as may be negotiated between Bolt and each Participating ABG Brand Partner, from time to time, and Bolt's Standard Transaction Costs (subject to the Market Development Assistance), subject to adjustment in situations (i) with extraordinary fraud risk or (ii) based on market pricing requirements. As between the parties, Bolt will be responsible for facilitating implementation of Bolt checkout and fraud protection on the Participating ABG Brand Partners' websites, in accordance with the terms of its agreement with each Participating ABG Brand Partner, and will use commercially reasonable efforts to develop a detailed implementation plan (that includes frequent executive check-ins) and providing a dedicated Project & Success Manager to assist Participating ABG Brand Partners with technical implementation, all at the expense of the Participating ABG Brand Partners.

3.4.    **Support**. Bolt will be responsible for providing Bolt Underlying Technology support and Bolt Products support to NewCo, Participating ABG Brand Partners, and Merchant Referrals, at no additional cost or expense to ABG or NewCo. Bolt will not be obligated to provide support to AllPass end-users or Participating ABG Brand Partners' end-users but will provide NewCo (including, as applicable, any third party(ies) designated by NewCo to provide such support) with appropriate training, documentation, and access to end-user support regarding those aspects of AllPass for which Bolt is responsible (including, by way of example and not limitation, regarding AllPass Checkout, Bolt Underlying Technology, and Bolt Products). Bolt will be responsible for hosting the AllPass Portal with secure encryption technology in accordance with the terms and conditions of this Agreement, at Bolt's sole cost and expense, but may transfer hosting and operations to NewCo upon mutual agreement by the Parties. In addition, Bolt shall comply with and provide the services, service levels, and support set forth in the Service Level Agreement attached as Exhibit E ("**SLA**").

3.5.    **Bolt Customer Contracts.** Notwithstanding anything to the contrary in this Agreement, but subject to the considerations set forth in Section 2.3 above, Bolt has sole reasonable discretion to determine whether or not to enter into an agreement with an ABG Brand Partner or Merchant Referral, and the terms and conditions of each such agreement (provided that the foregoing shall not conflict with any of the terms or conditions of this Agreement) and subject to each such third party's approval. ABG may, but shall have no obligation to, involve itself in such negotiations to the extent requested by Bolt to support maintenance of Bolt's standard pricing and terms; provided, however, that ABG shall have no liability to Bolt, any ABG Brand Partner, any Merchant Referral, or otherwise if Bolt so requests that ABG get involved, and ABG shall have no obligation to negotiate, maintain, or obtain any such terms (and any failure to do so shall not be deemed a breach of this Agreement by ABG). Except as otherwise explicitly agreed herein, nothing in this Agreement will be deemed to limit or restrict Bolt's right to determine, in its sole discretion, the prices, fees, and other terms and conditions pursuant to which it provides its products and services; provided that the foregoing shall not conflict with any of the terms or conditions of this Agreement and shall be subject to the approval of the party to which Bolt is providing such products and services. Except as otherwise agreed to in writing by Bolt, ABG will have no right to license, sublicense, sell, resell or distribute the Bolt Products to any customer or to accept payments for Bolt Products from any Bolt customer. Bolt will be free to amend (subject to such third party's approval), renew, terminate, or otherwise deal with its customers as it deems appropriate in its sole discretion; provided that the foregoing shall not conflict with any of the terms or conditions of this Agreement.

3.6.    **Bolt Customer Enrollment**. Subject to Reasonable Cooperation from Newco and Bolt's existing customers, Bolt will use its commercially reasonable efforts to induce Bolt's existing customers to enroll in AllPass, subject to technology platform compatibility and implementation cost.

3.7.    **Savings Clause**. In the event a Party's performance of any particular obligation under this Agreement is conditioned upon another Party providing Reasonable Cooperation, then the right of the Party obligated to provide such Reasonable Cooperation to enforce its rights with respect to the other Party's performance of such particular obligation is subject to that Party providing such Reasonable Cooperation.

4.    **NEWCO RIGHTS AND RESPONSIBILITIES.**

4.1.    **Collections.** NewCo will collect (A) the AllPass Subscription Fees either (i) directly from AllPass Members, via AllPass Checkout or Bolt Checkout, as applicable, (ii) indirectly from Bolt which may process collections from AllPass Members, or (iii) from the Participating ABG Brand Partners who sell

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

AllPass memberships on their websites ("**AllPass Transactions**"), and (B) the Market Development Assistance from Bolt as described in Section 6.3 (unless and until AllPass is shut down as described in Section 6.4).

4.2. **Engagement.** NewCo will use its commercially reasonable efforts to engage relevant third parties (e.g., Shopify) to facilitate implementation of the Bolt Underlying Technology on the Participating ABG Brand Partners websites and mobile applications; provided, however, that any failure to do so shall not constitute a breach of this Agreement.

4.3. **Reserved.**

4.4. **Support.** Subject to Bolt's ongoing compliance with the terms and conditions of this Agreement and Bolt's Reasonable Cooperation, NewCo (or its designated third party service provider) will be responsible for AllPass Member customer support, including being the point of contact for both AllPass end-users and Participating ABG Brand Partners' end-users. For the avoidance of doubt, Bolt shall provide appropriate relevant support in accordance with Section 3.4.

4.5. **AllPass Portal**. Subject to Bolt's Reasonable Cooperation, NewCo will be responsible for the design, creative development, and day-to-day front-end operation (e.g., content creation and updates, community interactions) (other than as expressly provided in this Agreement as the responsibility of Bolt) of the primary AllPass website ("**AllPass Portal**"), with ABG allocating a reasonable amount of creative, operational, and design resources to do so, and Bolt allocating sufficient engineering and development resources to build, service, maintain, update, and support (as provided in Section 3.4) the Bolt Underlying Technology and such other software, hardware, technology, functionality, and features comprising the AllPass Portal. The content, design, look and feel, and functionality of the AllPass Portal will be subject to ABG's prior written approval. For the avoidance of doubt, Bolt shall be responsible for building, servicing, maintaining, updating, and supporting, and shall build, service, maintain, update, and support, the AllPass Portal. The technical features, software, and requirements of the AllPass Portal will be subject to Bolt's and ABG's prior written approval, not to be unreasonably withheld or denied.

5. **EXCLUSIVITY.**

5.1. During the Term, Bolt will be the exclusive technology provider to NewCo for any software used on or in connection with AllPass. During the Term, NewCo will not use any outside technology for AllPass software without first obtaining Bolt's prior written consent.

5.2. Nothing contained in this Agreement shall prohibit Bolt from offering the Bolt Products to any third party or using the Bolt Underlying Technology in the ordinary course of its business, subject to Applicable Laws.

5.3. During the Term, so long as there is no Disqualifying Circumstance present at such time, if Bolt enters into any agreement or arrangement whereby it develops a bespoke technology platform similar to the AllPass Portal for any one or more third party(ies) who offers a loyalty, membership, or subscription program with, for, or to any unaffiliated third party retailers, brand owners (including, without limitation, any brand portfolio company), or brand licensees, in which consumers pay a fee in exchange for discounts, special offers, or perks relating to any retailers, brand owners, or brand licensees (including on any participating brands, goods, or services) ("a **Qualifying Transaction**"), then (i) Bolt will inform ABG in writing of the Qualifying Transaction and the effective date of the Qualifying Transaction as soon as is commercially reasonable, (ii) item (d) in Section 2 of the Warrant shall automatically be deleted and shall be deemed to not apply, (iii) the 'Exercise Period Start Date' (as such term is used and defined in the Bolt Financial Inc. Warrant to Purchase Class A Common Stock issued to ABG on October 9th, 2020 (the "**Warrant**")) shall be deemed to be the effective date of the Qualifying Transaction, and (iv) Bolt shall automatically forfeit on the effective date of the Qualifying Transaction, for no consideration, 100 Units of Bolt's Units (as such term is defined in the Operating Agreement) in NewCo. "**Disqualifying Circumstance**" means a) The AllPass Subscription Launch fails to occur within nine (9) months after the date the on which Bolt completes and ABG approves all technical development that is necessary and advisable for the AllPass Subscription Launch (including, by way of example and not limitation, the features described in Exhibit A and for the Standard Implementations), Bolt is without fault (including, by way of example and not limitation, in compliance with the terms and conditions of this Agreement), and such failure is directly the fault of ABG, b) AllPass has been permanently discontinued in its entirety and Bolt is without fault (including, by way of example and not limitation, in compliance with the terms and conditions of this Agreement), and/or c) ABG has ceased using its commercially reasonable efforts

5

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

to induce any ABG Brand Partners or Merchant Referrals to enroll in AllPass during the ninety (90) consecutive days immediately prior to the effective date of the Qualifying Transaction.

6. **FEES AND PAYMENT**.

6.1. **AllPass Transactions Revenue Share**. During the Term, NewCo will calculate the AllPass Transactions Revenue Share on a quarterly basis and pay Bolt the AllPass Transactions Revenue Share within sixty (60) days of the end of the preceding quarter. "**AllPass Transactions Revenue Share**" means 2.2% of all AllPass Transactions, consisting of: i) Bolt's Standard Transaction Costs of 0.6% for checkout and 0.6% for fraud chargeback indemnification, and ii) a 1% subscriptions platform fee, in each case, subject to the Market Development Assistance. For the avoidance of doubt, the AllPass Transactions Revenue Share excludes any applicable Bolt fees for payments processing in connection with AllPass Transactions. Where Bolt Checkout, AllPass Checkout, or any other Bolt Products are used in connection with an AllPass Transaction, Bolt will withhold the AllPass Transactions Revenue Share directly from the applicable transaction and NewCo may deduct this amount from the applicable quarterly AllPass Transactions Revenue Share payment (and need not pay such amount to Bolt).

6.2. **Participating ABG Brand Partners Use of Bolt Products**. ABG acknowledges that AllPass enrollment must include Bolt Checkout and/or Fraud Protection implementation, which requires the Participating ABG Brand Partners and Merchant Referrals to agree to certain of Bolt's standard terms and conditions, including Bolt's Standard Transaction Costs (in each case, subject to the Market Development Assistance), subject to adjustment in situations with extraordinary (a) fraud risk or (b) market pricing requirements. The Participating ABG Brand Partners may also elect to use Bolt for payments processing for an additional fee, or retain their existing processing provider. If a Participating ABG Brand Partner or Merchant Referral does not want to use such Bolt Products but wishes to enroll in AllPass, Bolt, ABG, and Newco will meet and confer in good faith to determine how best to enroll such party in AllPass but also afford each Party the benefits contemplated by this Agreement.

6.3. **Market Development Assistance**. Subject to Section 6.4 ("**AllPass Shutdown**") Bolt will calculate the Market Development Assistance on a quarterly basis and pay NewCo the Market Development Assistance within sixty (60) days of the end of the preceding calendar quarter. "**Market Development Assistance**" has the meaning set forth in Exhibit D. Within sixty (60) days of the end of each calendar quarter, Bolt shall deliver to NewCo (or ABG, as applicable, pursuant to Section 6.4 below) a complete and accurate statement detailing the calculation of the Market Development Assistance for such quarter, including any deductions of the AllPass Transactions Revenue Share therefrom (each a "**Statement**").

6.4. **AllPass Shutdown.** The Parties acknowledge that, despite their best efforts, AllPass may prove unviable. If, at any time following the one year anniversary of the date of the AllPass Launch, AllPass is shut down by NewCo because it is not viable and pursuant to and in accordance with the Operating Agreement (the "**AllPass Shutdown**"), Bolt will pay ABG (using the wire transfer instructions for ABG set forth in Section 7.1 of this Agreement) (instead of NewCo, as applicable), in perpetuity, the Market Development Assistance for all (x) Participating ABG Brand Partners who implemented Bolt Product(s) or became Bolt customers prior to the AllPass shut down date, and remain Bolt customers thereafter and (y) all Merchant Referrals which (A) implemented any Bolt Products or became Bolt customers at any point prior to or during the Term, who remain Bolt customers thereafter, or (B) implemented any Bolt Products or became Bolt customers within 18 months following the date of the AllPass Shutdown, as applicable (those parties identified in items (x) and (y) are individually and collectively, "**Qualifying Merchants**"). For the avoidance of doubt, Bolt's obligations under this Section shall survive any expiration or termination of this Agreement.

6.5. **New Product Lines.** Bolt may develop new product lines in the future unrelated to AllPass, at which point Bolt will provide standard transaction costs associated with those product lines.

7. **PAYMENT INSTRUCTIONS**.

7.1. <u>Wire Instructions</u>. Each Party shall be responsible for any costs and/or fees associated with making any and all payments to any other Party as required under this Agreement, including, without limitation, wire transfer fees. Each Party shall pay all sums due to any other party in United States Dollars by wire transfer to the following account for each Party, unless otherwise instructed by the Party to be paid and

DocuSign Envelope ID: 7D2EF2D3-13CA-4750-9594-BFC547A80C7C

memorialized in a written amendment to this Agreement, duly executed by authorized signatories of, and delivered by, each of the Parties hereto:

> Payee:  ABG Intermediate Holdings 2 LLC
> Bank of America
> One Bryant Park
> New York, NY 10036
> Account Number: 4427792434
> ABA Routing Number (for domestic transfers):
> Wire: 026009593 / ACH: 021000322
> Swift Code (for international transfers): BOFAUS3N

> Payee:  Bolt Financial, Inc.
> JP Morgan Chase
> New York, NY 10017
> Account Number: 579616191
> ABA Routing Number (for domestic transfers):
> Wire: 021000021 / ACH: 322271627
> Swift Code (for international transfers): CHASUS33

> Payee:  ABG-AP, LLC
> Bank of America
> One Bryant Park
> New York, NY 10036
> Account # 483075027376
> ABA Routing Number (for domestic transfers):
> Wire: 026009593 / ACH: 021000322
> Swift Code (for International transfers): BOFAUS3N

8. **TERM AND TERMINATION.**

8.1.  **Term**.  The term of this Agreement ("**Term**") will commence on the Effective Date and remain in effect until the earliest of the following occurs: (a) Bolt is no longer a party to the NewCo Operating Agreement, (b) this Agreement is terminated pursuant to Section 8.2 or 8.3, or (c) AllPass is shut down pursuant to and in accordance with the Operating Agreement.

8.2.  **Termination by Bolt**.  Bolt acknowledges and agrees that the assurance of the continued services and afforded under this Agreement are material consideration for ABG and NewCo entering into this Agreement and amending the NewCo Operating Agreement to admit Bolt as a member thereof concurrently with execution of this Agreement, as contemplated herein. Accordingly, Bolt acknowledges and agrees that Bolt may only terminate this Agreement (in addition to any other remedies available to it, in law or equity), upon written notice to the other Parties: (A) upon any material breach by ABG or NewCo of any of its material representations, warranties, covenants or obligations herein, and such material breach, to the extent curable, is not cured within thirty (30) days of its receipt of written notice from such Party of the same; or (B) if either of the other Parties: (i) becomes insolvent, (ii) commits an act of bankruptcy, (iii) becomes subject to any voluntary or involuntary bankruptcy proceedings, (iv) makes an assignment for the benefit of creditors, (v) appoints or submits to the appointment of a receiver for all or any of its assets, (vi) admits in writing its inability to pay its debts as they become due, or (vii) enters into any type of voluntary or involuntary liquidation.  Otherwise, notwithstanding, in the event of any breach of this Agreement by ABG or NewCo, Bolt will not be entitled to: (A) terminate this Agreement, (B) cease performance, or (C) restrain any enjoyment of any other rights vested in or granted to ABG and NewCo under this Agreement.

8.3.  **Termination by ABG or NewCo**.  In addition to any other remedies available to it, either in law or in equity: each of ABG and NewCo may terminate this Agreement upon written notice to Bolt as follows: (a) in the event of any material breach by Bolt of any of its representations, warranties, covenants or obligations herein, or any failure of Bolt to comply with any of the other terms of this Agreement or to

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

otherwise discharge any its duties hereunder, and such breach or failure, to the extent curable, is not cured within thirty (30) days of Bolt's receipt of written notice from such party of the same; (b) in the event of the failure of Bolt to materially comply with any of the terms of this Agreement with respect to the provision of services three (3) or more times during any twelve (12) month period; (c) in the event of any act, by omission or commission, of gross negligence or wanton misconduct by Bolt, which is not cured within thirty (30) days after receiving written notice of the same; (d) within twelve (12) months of receipt of written notice from any ABG Brand Partner or Merchant Referral (i) of any material breach or default by Bolt under any agreement between Bolt (on the one hand) and any ABG Brand Partner or Merchant Referral (on the other hand) that remains uncured after the expiration of any applicable cure period (if any) under such agreement, or (ii) that any ABG Brand Partner or Merchant Referral has terminated any agreement with Bolt in accordance with the terms thereof, excluding terminations without cause or due to expirations; or (e) if Bolt: (i) becomes insolvent, (ii) commits an act of bankruptcy, (iii) becomes subject to any voluntary or involuntary bankruptcy proceedings, (iv) makes an assignment for the benefit of creditors, (v) appoints or submits to the appointment of a receiver for all or any of its assets, (vi) admits in writing its inability to pay its debts as they become due, or (vii) enters into any type of voluntary or involuntary liquidation, or (viii) ceases operations or fails to provide any of the services contemplated hereunder for a continuous period of twenty (20) days.

8.4.    **Effect of Expiration and Termination.**  Upon termination of this Agreement, but subject to the next sentence: (a) except as otherwise provided in this Agreement, all rights granted to the Parties shall immediately terminate; (b) except as otherwise provided in this Agreement, each Party shall cease all use and access to and use of the other Party's Intellectual Property; and (c) upon request, each Party shall return or destroy any other Party's Confidential Information; provided that, subject to the obligations set forth in Section 10, the Parties may retain copies of this Agreement or other documents that such Party is legally obligated to preserve.  For a period of up to twelve (12) months following termination of this Agreement by ABG or NewCo, unless otherwise requested by ABG or NewCo (the "**Transition Period**"), Bolt shall continue to provide services and perform its obligations under this Agreement under and as contemplated by Sections 3.2-3.5, 4.1, 4.4, 4.5, 6.1-6.4, as applicable with respect to the versions of the Bolt Underlying Technology then-currently used in AllPass.  For avoidance of doubt, during the Transition Period but only for so long as Bolt is actually providing the services and performing its obligations under this Agreement pursuant to the immediately preceding sentence and in accordance with all other applicable terms and conditions of this Agreement, Bolt will continue to receive compensation as expressly provided under this Agreement. Furthermore, upon termination of this Agreement by NewCo or ABG (or on such date(s) thereafter during the twelve (12) month period following such termination) Bolt shall use commercially reasonable efforts to assist NewCo and ABG in the transition of all services and operations provided by or on behalf of Bolt under this Agreement, including, without limitation, using reasonable efforts to assist NewCo to prevent any blackout period of the AllPass Portal, providing NewCo or its subsequent web developer(s), service provider(s), and/or designee(s), as directed by NewCo, with all data, technology, software, and other materials reasonably necessary or advisable for the AllPass transition as reasonably requested by NewCo that Bolt owns and/or controls, and reasonable support for and relating to the transfer of the AllPass Portal to such entity(ies).  To the extent that Bolt is providing any of the foregoing to any third party, Bolt shall have the right to charge its then-current reasonable hourly rates, along with reasonable costs incurred, in connection therewith.

8.5.    **Survival**.  Sections 1, 6.4, 6.5, 8.4, 8.5, 9 (excluding 9.2.2, 9.3.2, and 9.7.1), 10-14, and 16-18 shall survive any expiration or termination of this Agreement.

9.    **INTELLECTUAL PROPERTY.**

9.1.    **ABG IP**.

9.1.1.    As between Bolt on the one hand, and ABG and NewCo on the other, ABG (and its Affiliates, as applicable) shall own and retain all right, title and interest to: (a) the ABG Brands and all associated Intellectual Property and websites, (b) all Intellectual Property of ABG (and its Affiliates, as applicable), the ABG Brands, and the websites relating to the ABG Brands, and all derivations, improvements, and variations of all of the foregoing, (c) the AllPass Marks and all derivations, improvements, and variations thereof and (d) the domain names used for AllPass (e.g., allpass.com) and all derivations, improvements, and

DocuSign Envelope ID: 7D2EF2D3-13CA-47F0-9F94-BFC547A80C7C

variations thereof (items 9.1.1(c) and 9.1.1(d) are the "**ABG IP**"). No provision of this Agreement effects any transfer to the other Parties of any ownership interest therein.

9.1.2. ABG shall grant to NewCo a non-exclusive license to use the necessary rights to the ABG IP for the sole purpose of operating AllPass and otherwise performing under this Agreement. Such license may be further documented by ABG in a separate document to be entered into by ABG (or its designee) and NewCo following the execution of this Agreement, in a form to be determined by ABG and approved by Newco in its sole discretion.

9.2. **Bolt IP**.

9.2.1. As between Bolt on the one hand, and ABG and NewCo on the other, Bolt shall own and retain all right, title, and interest in and to: (a) the Bolt Products, (b) the Bolt Marks (which, for the avoidance of doubt, exclude the ABG IP), (c) the Bolt Underlying Technology, and (d) the technical elements (which exclude, by way of example and not limitation, the "look and feel") of the AllPass Portal that are not ABG IP ("**Technical Elements**"), and (e) any and all other software, inventions, works of authorship, technology, materials, data or information that Bolt develops, authors, conceives, reduces to practice, furnishes or creates in whole or in part that are derivations, improvements, or variations of the Bolt Products, the Bolt Underlying Technology, or the Technical Elements, but in each case excluding the ABG IP and the NewCo IP (items (a)-(e) above are, individually and collectively, the "**Bolt IP**"). No provision of this Agreement effects any transfer to the other Parties of any ownership interest therein.

9.2.2. Subject to all terms and conditions of this Agreement, Bolt hereby grants to NewCo, and NewCo hereby accepts, a non-exclusive, royalty-free, fully-paid, perpetual, irrevocable, worldwide, non-transferable (other than a permitted assignment of this Agreement) right to use Bolt Underlying Technology, the Technical Elements, and the AllPass Portal (to the extent owned by Bolt) as necessary or reasonably necessary to provide the AllPass Portal (but not the Bolt Products) to Participating ABG Brand Partners, Merchant Referrals (but only to the extent they are enrolled in AllPass), and other licensees approved by Bolt in writing, and to consumers pursuant to mutually agreed upon Terms of Service.

9.3. **NewCo IP**.

9.3.1. As between NewCo on the one hand, and ABG and Bolt on the other, NewCo shall own and will retain all right, title, and interest in and to the AllPass Portal, including the "look and feel" thereof and all derivations, improvements, and variations thereof, but excluding the Technical Elements thereof and excluding the ABG IP (collectively, the "**NewCo IP**"). No provision of this Agreement effects any transfer to ABG or Bolt of any ownership interest therein.

9.3.2. NewCo hereby grants each of ABG and Bolt a revocable, nonexclusive license to use the NewCo IP for the sole purpose of fulfilling their obligations in connection with this Agreement. Any and all use of the NewCo IP by Bolt shall be subject to ABG's prior written approval, in each instance.

9.4. **Notice of Infringement**. If a Party suspects any infringing third party use of any Intellectual Property of another Party, the Party suspecting such infringing third party use shall provide reasonably prompt written notice to the Party who owns such Intellectual Property detailing all known information that the notifying Party has about the alleged infringement. The Party who owns the Intellectual Property may proceed with respect to such infringement in any way that it sees fit.

9.5. **Reservation of Rights**. Each Party reserves all rights not expressly granted by this Agreement and no rights are granted by implication, estoppel, or otherwise. For purposes of clarity, all licenses granted

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

hereunder are to object code versions of software only. Except to the extent expressly set forth in this Agreement, nothing herein authorizes ABG or NewCo to: (i) copy, distribute, rent, lease, lend, sublicense or transfer the Bolt IP, or otherwise make the Bolt IP available to any third party; (ii) modify or the Bolt IP; (iii) reverse engineer, decompile, disassemble or otherwise attempt to discover the source code of any Bolt IP or the modification or preparation of derivative works of any Bolt IP; (iv) modify, remove, or obscure any copyright, trademark or patent notices or legends that appear on or within the Bolt IP, or (v) cause the Bolt IP to become subject to the terms of any version of the General Public License or Lesser General Public License, or any other Open Source License that requires as a condition of use, modification, or distribution of Open Source Code subject to such Open Source License that other software combined or distributed with that Open Source Code be disclosed or distributed in source code form, licensed for the purpose of making derivative works, or redistributable at no charge.

9.6.    **Account Ownership**.  Subject to Applicable Laws and the privacy policy(ies) and other terms under which the following were/are collected, as between ABG (and ABG Brand Partners), Bolt and NewCo:

    9.6.1.    ABG and the ABG Brand Partners (or their designee(s)), as applicable, shall own and retain access to and control of consumer accounts on the respective ABG Brand Partners' websites.

    9.6.2.    To facilitate compliance with finance-related regulatory and security obligations, Bolt will own and retain access to and control of Bolt user accounts (which exclude AllPass member accounts); and

    9.6.3.    NewCo will own and retain access to and control of the AllPass member accounts.

9.7.    **Marks**.  The license grants above, to the extent that they grant rights to Marks of a Party, will be subject to the following:

    9.7.1.    **License**.  Each party hereby grants to the other parties a limited, worldwide, nonexclusive, nontransferable, royalty-free license to use the its respective Marks (but with respect to ABG, solely the AllPass Marks and no other Marks) solely as necessary to accomplish their obligations under this Agreement.  Any and all use of the AllPass Marks by Bolt shall be subject to ABG's prior written approval, in each instance.

    9.7.2.    **Ownership**.  None of the parties shall in any way dispute, impugn or in any way damage the validity of, or the owner's right to use and control the use of, any or all of such owner's Marks. Each party acknowledges that its use of the Marks of the other party shall not create in it any right, title or interest in such Marks but rather each party's use of the other party's Marks shall inure to the benefit of the other party.

    9.7.3.    **Standards for Use**.  Each party's use of such other party's Marks shall be consistent with any reasonable instructions provided by the other party in writing. In the case such instructions are silent as to or are inconsistent with a party's use of the other party's Mark, the use of the other party's Marks must be approved in writing prior to any such use. Without limiting the foregoing provisions of this Section, each party will use appropriate notification of the trademark rights or registration on all visual displays of the other party's Marks, including use of the encircled "R" symbol ("®") and/or the letters TM or SM, as appropriate, in conjunction with publication of the Marks.  Except as may be set forth in a separate written agreement between the parties, under no circumstances may ABG or NewCo use any Bolt Marks on or in connection with any products or services that are not directly provided by Bolt.

    9.7.4.    **Quality Monitoring**.  Each party has the right to monitor the quality of the other parties' use of its Marks, and to inspect such use on its own or, upon reasonable advance notice, on the premises of the other party.  Each party has the right to request from time to time samples of the other party's use of the licensing party's Marks.  Should a party find objectionable any use of its Marks by the other party, such party shall have the right to revoke, with respect to the objectionable use, the rights granted to the other party under this Agreement to use the applicable Marks, and such other party shall immediately cease using the Marks in the manner found objectionable by the Mark's owner.

DocuSign Envelope ID: 7D2EF2D3-13CA-47F0-9594-BFC547A80G7C

10.    **CONFIDENTIALITY.**

10.1.    **Confidential Information**.  The Parties acknowledge that it shall be necessary for each of them to disclose or make available to the other Confidential Information and that some such Confidential Information may already have been disclosed to the other Parties prior to the Effective Date.  For these purposes, "Confidential Information" means the terms of (but not the existence of) this Agreement and any non-public information about the disclosing Party's business or activities, which shall include, without limitation, all information of a Party that is either marked or designated by such Party as "confidential" or "proprietary" and all information which, by the nature of the circumstances surrounding the disclosure, should be reasonably considered to be confidential or proprietary by the receiving Party.  ABG's Confidential Information shall, to the extent non-public, include, without limitation, the following: any and all non-public or proprietary information related to ABG's or any of its Affiliate's business or operations, which information may be written, oral or maintained in electronic or any other form, including, without limitation: (i) finances, technology or other technical data, trade secrets, inventions, processes, software, hardware, configurations, infrastructures, systems, processes, formulas and know-how, (ii) designs, drawings, services, products, product plans, product development, marketing, marketing plans and information, customers, business partners, potential business partners, market information, suppliers, vendors, retailers, manufacturers, factories, (iii) all documents, analyses, reports, research, business plans, studies, diagrams, marketing plans, marketing information, product development plans, and other materials that contain information, (iv) the terms of this Agreement, and (v) all other non-public business,  financial, technical or other information relating to ABG or any of its parents, subsidiaries, Affiliates, partners, and vendors.  Bolt's Confidential Information shall, to the extent non-public, include, without limitation, the following: (i) any  software, hardware, configurations, infrastructures, technology, systems, know-how, processes, reporting, marketing plans, product development plans, and inventions that constitute Bolt IP, and (ii) all other non-public business,  financial, technical or other information relating to  Bolt or its subsidiaries, partners,  and  vendors.  NewCo's Confidential Information shall, to the extent non-public, include, without limitation, the following:   (i) any software, hardware, configurations, infrastructures, technology, systems, know-how, processes, reporting, marketing plans, product development plans, and inventions other than the Underlying Technologies, and (ii) all other non-public or proprietary business, financial, technical or other information.

10.2.    **Non-Disclosure**.  Both during and after the Term, each of the Parties agrees: (a) to use and reproduce the Confidential Information of the other Parties only as permitted under this Agreement and as needed to perform its duties hereunder; and (b) not to disclose or otherwise permit access to the Confidential Information of the other Parties to any third party, without such Party's prior written consent.  Each Party will be deemed to have met its obligations hereunder if it treats the other Parties' Confidential Information with the same degree of confidentiality it affords its own sensitive business information, provided that it is no less than a reasonable degree of confidentiality. Notwithstanding the foregoing, each party may disclose the other parties'  Confidential Information: (i) to its officers, directors, advisors, employees, agents, consultants, and contractors ("**Representatives**") solely on a need to know basis, (ii) to Affiliates on a need-to-know basis,  and (iii) as required by law, regulation, or court order; provided, however that, if permitted by law, the Party required to so disclose Confidential Information of any other Party shall notify such other Party of such requirement and will reasonably assist the other Party, at such other Party's expense, to minimize such disclosure.  Each Party shall take reasonable steps to ensure that its Representatives are subject to obligations sufficient to comply with this Section and shall be responsible for any breach of this Section by its Representatives.

10.3.    **Exceptions**.  Information shall not be considered to be Confidential Information hereunder if it: (a) is already, or otherwise becomes, generally known by third parties, other than as a result of an act or omission of the receiving Party in violation of this Agreement; (b) is lawfully received, after disclosure hereunder, from a third party having the right to disseminate the information without restriction on disclosure; ; or (c) can be reasonably shown by the receiving Party to have been independently developed by such Party without any use of Confidential Information.  Furthermore, it is understood that each Party shall be free to use any ideas, know-how, and techniques related to the scope of its business, provided they contain no specific or identifiable Confidential Information of the other Parties or any elements unique to the other Parties or their operations.

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

11.      **PUBLICITY.** Any press release regarding this Agreement or the contents hereof will be mutually agreed to in advance by the Parties in writing with respect to content and timing.

12.          **REPRESENTATIONS AND WARRANTIES.**

12.1.     **ABG.**  ABG hereby represents and warrants to the other Parties that ABG is the owner of or otherwise has or will have all necessary and sufficient rights to grant rights to Bolt and NewCo the rights set forth herein with respect to (a) the ABG IP and (b) the AllPass Marks, in each case as necessary to permit each of Bolt and NewCo to perform its obligations and exercise its rights under this Agreement.

12.2.     **Bolt.**  Bolt hereby represents and warrants that to the other parties that Bolt is the owner of or otherwise has all necessary and sufficient rights to grant to ABG and NewCo the rights set forth herein with respect to (a) the Bolt IP and (b) the Bolt Marks to permit each of ABG and NewCo to exercise its rights and perform its obligations under this Agreement.  Bolt further represents and warrants that the Bolt Underlying Technology, the Bolt IP, the Bolt Products, the Bolt Marks, and Bolt's provision of services under this Agreement (including, without limitation, with respect to AllPass and the NewCo Personal Data (as defined in Exhibit C)) do not and shall not: (i) violate or infringe any common law, statutory, or other rights of any person or other entity, including, without limitation, any Intellectual Property rights or (ii) violate any Applicable Law.

12.3.     **NewCo.** NewCo hereby represents and warrants to the other parties that NewCo is the owner of or otherwise has all necessary and sufficient rights to grant to the other parties the rights set forth herein with respect to the NewCo IP as necessary to permit each of Bolt and ABG to perform its obligations and exercise its rights under this Agreement.

12.4.     **Mutual.**  Each of the Parties represents and warrants to the other Parties that: (a) such Party has the full rights, power and authority to enter into this Agreement and to perform the acts required of it hereunder; (b) when executed and delivered by such Party, this Agreement shall constitute the legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms (except as may be limited by bankruptcy or any similar procedure); and (c) the execution, delivery and performance of this Agreement by such Party does not (i) require any consent of or filing with and governmental body or other third party, (ii) violate, conflict with or result in a breach or default under such Party's organizational documents or any other agreement to which such Party is a party, (iii) violate any law, judgment, order, decree, rule or regulation applicable to such Party or (iv) result in or require the creation or imposition of a lien upon any of such Party's assets.

12.5.     **DISCLAIMERS.**  EXCEPT AS EXPRESSLY  PROVIDED IN THIS AGREEMENT, NO PARTY MAKES ANY WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, AND EACH PARTY EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND OTHER TERMS ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE.  EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT OR IN ANY OTHER AGREEMENT BY, BETWEEN, OR AMONG BOLT, ON THE ONE HAND, AND ANY ONE OR MORE OF ABG, NEWCO, OR ANY ABG BRAND PARTNER(S) OR MERCHANT REFERRAL(S), ON THE OTHER HAND, BOLT DOES NOT REPRESENT OR WARRANT THAT THE BOLT IP, BOLT PRODUCTS, OR BOLT UNDERLYING TECHNOLOGY WILL MEET ABG'S, NEWCO'S OR ANY ABG BRAND PARTNERS' OR MERCHANT REFERRALS' REQUIREMENTS.

13.        **INDEMNIFICATION.**

13.1.     **ABG Indemnification**.  ABG agrees to defend, indemnify and hold harmless Bolt, its subsidiaries, and their respective members, directors, officers, employees, and agents (individually and collectively, "**Bolt Parties**") against any third party claim, demand, cause of action, debt or liability, including reasonable attorneys' fees, to the extent that it arises out of or is based on: (a) a breach of any representations, warranties, or agreements by ABG under this Agreement; (b) any gross negligence or willful misconduct on the part of ABG; (c) a breach by ABG of any agreement between ABG and any ABG Brand Partner; or (d) it arises out of a claim that the ABG IP when used strictly as authorized by ABG: (i)  violates or infringes any common law or statutory rights of any person or other entity, including, without limitation, proprietary rights, copyright rights, trademarks, service marks, patent rights, or any rights of privacy or

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

publicity; (ii) violates any law, rule or regulation; (iii) contains any material or information that is obscene, pornographic, libelous, defamatory, slanderous; or (iv) contains false or deceptive material, or otherwise results in consumer fraud.

13.2. **Bolt Indemnification**. Bolt agrees to defend, indemnify and hold harmless ABG, its parents, subsidiaries, affiliates, and each of their respective members, directors, officers, employees, and agents (individually and collectively, "**ABG Parties**"), as well as NewCo and its directors, officers, employees, and agents (individually and collectively, "**NewCo Parties**"), against any third party (which, for the avoidance of doubt, includes ABG Brand Partners and Merchant Referrals, even if the same are affiliates of ABG or NewCo) claim, demand, cause of action, debt or liability, including reasonable attorneys' fees, arising out of or based on any one or more of the following: (a) a breach of any representations, warranties, or agreements by Bolt under this Agreement (including, by way of example and not limitation, any breach under the DPA or the SLA); (b) any gross negligence or willful misconduct by or on behalf of Bolt; (c) any claim that any of the Bolt IP, the Bolt Products, the Bolt Underlying Technology, or the conduct of Bolt in connection with AllPass: (i) violates or infringes any common law, statutory or other rights of any person or other entity, including, without limitation, proprietary rights, copyright rights, trademarks, service marks, patent rights, or any rights of privacy or publicity; (ii) violates any Applicable Law; (iii) contains any material or information that is obscene, pornographic, libelous, defamatory, slanderous; (iv) contains false or deceptive material, or otherwise results in consumer fraud; or (v) breaches any agreement between Bolt (on the one hand) and any ABG Brand Partner or Merchant Referral (on the other hand); (d) any breach or default by Bolt under any agreement between Bolt (on the one hand) and any ABG Brand Partner or Merchant Referral (on the other hand); or (e) any Security Incident (as defined in the DPA) including, by way of example and not limitation, any notification costs associated therewith).

13.3. **NewCo Indemnification**. NewCo agrees to defend, indemnify and hold harmless ABG, Bolt, and their respective affiliates, and their respective members, directors, officers, employees, and agents against any third party claim, demand, cause of action, debt or liability, including reasonable attorneys' fees, to the extent that it arises out of or is based on: (a) a breach of any representations, warranties, or agreements by NewCo under this Agreement; (b) the gross negligence or willful misconduct of NewCo; (c) any claim that the conduct of NewCo or the NewCo IP used in connection with AllPass: (i) violates or infringes any common law or statutory rights of any person or other entity, including, without limitation, proprietary rights, copyright rights, trademarks, service marks, patent rights, or any rights of privacy or publicity; (ii) violates any law, rule or regulation; (iii) contains any material or information that is obscene, pornographic, libelous, defamatory, slanderous; or (iv) contains false or deceptive material, or otherwise results in consumer fraud, in each case, unless and to the extent that ABG or Bolt is required to indemnify any one or more of the NewCo Parties under Section 13.1 or 13.2 above.

13.4. **Notice of Claim**. In claiming any indemnification hereunder, the Party claiming indemnification (the "**Indemnified Party**") shall promptly provide the Party expected to provide indemnification (the "**Indemnifying Party**") with written notice of any claim which the Indemnified Party believes falls within the scope of the foregoing paragraphs; provided, however, that failure to provide such prompt notice will not relieve the Indemnifying Party of its indemnification obligations (except to the extent that the Indemnifying Party has suffered actual material prejudice as a result of such failure). The Indemnifying Party thereafter shall have sole control of the defense of any such claim and all negotiations for settlement; provided, however, that the Indemnified Party may, at its own expense, participate in the defense if it so chooses. The Indemnifying Party shall control such defense and all negotiations relative to the settlement of any such claim and, notwithstanding the foregoing, any settlement intended to bind the Indemnified Party shall not in any way be final without the Indemnified Party's prior written consent, which shall not be unreasonably withheld.

14. <u>**LIMITATION OF LIABILITY.**</u>

EXCEPT FOR ANY (I) AMOUNTS PAYABLE PURSUANT TO THE INDEMNIFICATION OBLIGATIONS OF SECTION 13, (II) BREACH OF SECTION 9, (III) BREACH OF SECTION 5, (IV) DAMAGES ARISING FROM A PARTY'S GROSS NEGLIGENCE, INTENTIONAL MISCONDUCT, AND (V) BREACH BY A PARTY OF ITS CONFIDENTIALITY OR NON-DISCLOSURE OBLIGATIONS UNDER SECTION 10, NO PARTY SHALL HAVE ANY LIABILITY WHATSOEVER TO ANY OTHER PARTY FOR ANY INDIRECT, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES, INCLUDING, WITHOUT LIMITATION, LOST PROFITS AND

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

LOST REVENUES, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

15.    **INSURANCE.**

15.1.    Bolt ("**Insured**") shall maintain at its own expense, at least the forms, policies, and amounts of insurance set forth on Exhibit F.

15.2.    Insured will affect all required insurance hereunder by valid and enforceable policies issued by insurer(s) of responsibility and authorized to do business in the state where the services are to be provided, which insurers shall have a Best's rating of not less than B+, VII. All insurance policies described in Section 15.1 shall name the other Parties each as an additional insured to at least the extent of the Insured's indemnity obligations set forth in Section 13 and as additionally permitted by such policies. Within thirty (30) days of the Effective Date, the Insured shall provide the other Parties with certificate(s) of insurance for the insurance required from Insured under this Agreement. In the event that any insurance policy required hereunder includes or permits a waiver of subrogation, such waiver shall apply to NewCo and ABG. NewCo (and ABG, as applicable) shall be entitled to its proportionate share of any insurance proceeds received by Bolt in respect to the Market Development Assistance, and Bolt shall report the same on Bolt's Statement for the calendar quarter in which any such insurance proceeds are received. The Insured's insurance obligations hereunder shall not be limited by the amount of insurance required hereunder.

16.    **GOVERNING LAW; VENUE.**

16.1.    **Applicable Law**. This Agreement and the legal relations among the Parties hereto shall be governed by and construed in accordance with the laws of the State of New York applicable to such agreements wholly made and to be performed within New York, notwithstanding any conflict of law provisions to the contrary. The United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

16.2.    **Jurisdiction**. Except that ABG and NewCo may bring: (i) an equitable proceeding in any jurisdiction where appropriate by reason of its subject matter, and/or (ii) any proceeding related to any claims made by ABG or NewCo for amounts payable from Bolt hereunder in any jurisdiction where appropriate by reason of Bolt's domicile and/or minimum contacts with such jurisdiction, the Parties hereby agree that: any other action which in any way involves the rights, duties and obligations of any Party hereto under this Agreement shall be brought in courts located in New York County, New York, and the Parties hereby submit to the personal jurisdiction of such courts. Each of the Parties waives any objection that it may have based on improper venue or forum non conveniens to the conduct of any such suit or action in any such court. The Parties agree that service of process deposited in certified or registered mail addressed to the other Party at the address for the other Party set forth in this Agreement shall be deemed valid service of process for all purposes.

16.3.    **Waiver of Trial by Jury**. Each of the Parties hereby waives the right to trial by jury in any and all actions or proceedings in any court, whether the same is between them or to which they may be Parties, and whether arising out of, under, or by reason of this Agreement, or any acts or transactions hereunder or the interpretation or validity thereof, or out of, under or by reason of any other contract, agreement or transaction of any kind, nature or description whatsoever, whether between them or to which they may be Parties.

17.    **RESERVED.**

18.    **MISCELLANEOUS.**

18.1.    **Entire Agreement**.  This Agreement, including all Exhibits attached hereto, together with the NewCo Operating Agreement, the Warrant, and the Holder Voting Agreement by and among Bolt, ABG, and Ryan Breslow, sets forth the entire agreement between the parties on this subject and supersedes all prior

14

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

and contemporaneous negotiations and agreements, oral and written, between the parties concerning the subject matter hereof. For clarity and without limitation, ABG and Bolt agree that the Referral Agreement and that certain Mutual Non-Disclosure Agreement between ABG and Bolt dated August 27, 2019 are hereby superseded by this Agreement and all rights and obligations under such Agreement are null and void; provided, however, that in the event that this Agreement is terminated for any reason other than the AllPass Shutdown, the Referral Agreement shall, effective immediately, be reinstated such that all rights and obligations under the Referral Agreement shall be of full force and effect (and, for the avoidance of doubt, each Participating ABG Brand Partner and Merchant Referral under this Agreement shall be deemed to be a 'Merchant Referral' under the Referral Agreement retroactively, effective as of the date each entered into a Bolt Customer Contract [as such term is defined under the Referral Agreement], and without the need for ABG and Bolt to enter into any side letter contemplated by Section 3.4 of the Referral Agreement, ABG shall receive the accrued benefit under the Referral Agreement of the Bolt Revenue [as such term is defined in the Referral Agreement] derived therefrom). In the event of a conflict between this Agreement and any Exhibit, the language in the main body of the Agreement shall be controlling. In the event of a conflict between this Agreement and the NewCo Operating Agreement, the language in the Agreement shall be controlling.

18.2.   **Records Maintenance.** During the Term and for two (2) years thereafter, each Party shall maintain accurate books and records pertaining to its rights and obligations under this Agreement, including required support and payment related obligations. Upon at least thirty (30) days' prior notice, either of Bolt and ABG, or that Party's independent auditor (who is subject to reasonable confidentiality to the audited Party), may inspect the specific records necessary to confirm another Party's compliance with this Agreement. However, neither ABG nor Bolt may conduct an audit more than once in any twelve (12) month period.

18.3.   **Force Majeure**. Excluding each Party's payment obligations under this Agreement, in the event that a party's performance of any of its obligations is prevented (such party, an "**Impacted Party**") directly by reason of acts of God, natural disasters, epidemic or pandemic, acts of terrorism, acts of government that directly restrict or prevent a party from operating its business under this Agreement, in each case which are not the fault of the Impacted Party and which no party nor any reasonable person could have foreseen at the time of execution of this Agreement ("**Force Majeure**"), provided that such Impacted Party gives the other parties written notice thereof within five (5) days of discovery thereof (which notice must specify the nature of the Force Majeure and the particular obligations the Impacted Party is prevented from performing, and the particular reasons why the Impacted Party is prevented from performing those particular obligations under this Agreement) (the "**FM Notice**"), then provided the Impacted Party reasonable cooperates with the other parties to cure the failure and uses diligent efforts to end the failure to perform the impacted obligations specified in the FM Notice and ensure the effects of such Force Majeure are minimized, the Impacted Party will not be deemed to be in breach of this Agreement for any failure or delay in fulfilling or performing those certain impacted obligations under this Agreement specified in the FM Notice during the period of such Force Majeure for up to a maximum of sixty (60) days.

18.4.   **Partial Invalidity**. If any part of this Agreement shall be adjudged by any court of competent jurisdiction to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not be affected or impaired thereby and shall be enforced to the maximum extent permitted by Applicable Laws. The parties agree to replace any invalid provision with a valid provision which most closely approximates the intent and economic effect of the invalid provision. If any remedy set forth in this Agreement is determined to have failed of its essential purpose, then all other provisions of this Agreement, including the limitations of liability and exclusion of damages, shall remain in full force and effect.

18.5.   **No Waiver**. The failure of any party to partially or fully exercise any right with respect to this Agreement, or the waiver by any party of any breach of this Agreement, shall not prevent a subsequent exercise of such right or be deemed a waiver of any subsequent breach of the same or any other term of this Agreement. Except as expressly set forth herein, the remedies herein provided are cumulative and not exclusive of any remedies provided by law.

18.6.   **Notices**. Any notice required or permitted hereunder to the parties hereto shall be deemed to have been duly given only if in writing and delivered by certified U.S. mail postage prepaid, return receipt requested, or via overnight courier, to the address of the receiving party as set forth below or such other address as

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

may be specified by such party in a notice delivered to the other party in accordance with this Section. Notices shall be deemed delivered when received by the party being notified.

Addresses for notice:

**ABG**

c/o Authentic Brands Group
1411 Broadway, 21st Floor
New York, NY 10018
Attn: Legal Department

copy to:  []

**Bolt**

Bolt Financial, Inc.
Attn: Legal Notices
77 Geary St., 4th Fl.
San Francisco, CA 94108

copies to:        Fenwick & West
                  Attn: Andrew Klungness
                   228 Santa Monica Blvd #300
                   Santa Monica, CA 90401

**NewCo**

c/o Authentic Brands Group
1411 Broadway, 21st Floor
New York, NY 10018
Attn: Legal Department

copy to:  []

18.7.   **Binding Effect; Assignment; Change of Control**.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, and their permitted successors and assigns.  Bolt may not assign or transfer this Agreement or any portion thereof without the prior written consent of ABG, except that Bolt may assign this Agreement in connection with a merger, acquisition, stock or asset sale, or other Change of Control transaction.  ABG may not assign or transfer this Agreement or any portion thereof without the prior written consent of Bolt, except that ABG may assign this Agreement to an Affiliate or in connection with a merger, acquisition, stock or asset sale or other Change of Control transaction. NewCo may not assign or transfer this Agreement or any portion thereof without the prior written consent of ABG and Bolt, except that NewCo may assign this Agreement in connection with a merger, acquisition, stock or asset sale or other Change of Control transaction.  A Change of Control is an assignment for purposes of this Agreement.

18.8.   **No Third Party Benefit**.  The provisions of this Agreement are for the sole benefit of the Parties.  This Agreement confers no rights, benefits or claims upon any person or entity not a Party.

18.9.   **Amendment**.  No amendment or modification of this Agreement shall be made unless recorded in a writing signed by an authorized representative of each Party.

18.10.  **Equitable Relief**. Each Party hereby acknowledges and agrees that a breach or threatened breach by such Party of any of its obligations hereunder in Sections 9 or 10 would cause the other Party irreparable harm for which monetary damages would not be an adequate remedy and agrees that, in the event of such breach or threatened breach, the other Party will be entitled to seek equitable relief, including a restraining order, an injunction, specific performance and any other relief that may be available from any court, without any requirement to post a bond or other security, or to prove actual damages or that monetary damages are

DocuSign Envelope ID: 7D2EF2D3-13CA-4750-9F94-BFG5A7A80G7C

not an adequate remedy. Such remedies are not exclusive and are in addition to all other remedies that may be available at law, in equity or otherwise.

18.11.   **Subcontracting**.  Each Party may use subcontractors, vendors and other third-party providers in connection with the performance of its obligations hereunder as it deems appropriate; provided that such Party remains responsible for the performance of each such subcontractor, vendor or third-party provider and its compliance with the terms of this Agreement.

18.12.   **Interpretation**.  For purposes of this Agreement (i) the words "include," "includes" and "including" are deemed to be followed by the words "without limitation"; (ii) the word "or" is not exclusive; (iii) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole; and (iv) words denoting the singular have a comparable meaning when used in the plural, and vice versa. Unless the context otherwise requires, references in this Agreement (x) to Sections and Exhibits mean the Sections and Exhibits of this Agreement and (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof.  All Exhibits attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit but not otherwise defined therein, will have the meaning as defined in this Agreement. References to any Person include the permitted successors and permitted assigns of that Person. "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. The headings in this Agreement are for reference only and do not affect the interpretation of this Agreement.

18.13.   **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall be taken together and deemed to be one instrument.  Electronic signatures will have the same weight and effect as originals.

18.14.   **No Joint Venture**.  Nothing in this Agreement shall be  deemed or construed to create any partnership, joint venture, or agency relationship between ABG and Bolt or between any ABG Brand Partner and Bolt or be deemed or construed to constitute or appoint either Party as the agent or representative of the other Party for any purpose whatsoever, or to grant to either Party any right or authority to assume or create any obligation or responsibility, express or implied, for or on behalf of or in the name of the other, or to bind the other in any way or manner whatsoever.

18.15.   **No Construction Against Drafter**. If an ambiguity or question of intent arises with respect to any provision of this Agreement, the Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring either party by virtue of authorship of any of the provisions of this Agreement.

18.16.   **Parties to Bear Own Expenses**.  Each of the Parties will pay all of their own expenses (including legal, accounting, and other advisory fees and expenses) incurred in connection with the negotiation and execution of this Agreement.

[SIGNATURES APPEAR ON THE NEXT PAGE]

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the Effective Date.

**ABG Intermediate Holdings 2 LLC**

By: _____

Name: _____

Title: _____

**Bolt Financial, Inc.**

By: *Ryan Breslow* _____
       F3E5E63245F0479...

Name: Ryan Breslow _____

Title: CEO _____

**ABG-AP, LLC**

By: _____

Name: _____

Title: _____

**List of Exhibits**

1. Exhibit A -- AllPass Loyalty Program Features
2. Exhibit B -- Standard Implementation
3. Exhibit C -- Bolt Data Processing Addendum
4. Exhibit D -- Market Development Assistance
5. Exhibit E -- Bolt Service Level Agreement
6. Exhibit F -- Bolt Insurance

**Exhibit A**
**AllPass Loyalty Program Features**

a.       AllPass-enabled and branded checkout, powered by Bolt, integrated directly into websites and/or ecommerce websites and/or mobile applications of Participating ABG Brand Partners and Merchant Referrals (in each case, who are participating and/or enrolled in AllPass) where technically practicable, and in each case, subject to the terms and conditions of the agreement(s) between ABG (including its affiliates) and each of the ABG Brand Partners, as applicable.

b.       AllPass.com Portal for AllPass Members to view savings, manage their account, and search for Participating ABG Brand Partners and Merchant Referrals.

c.       Ability for AllPass Members to apply AllPass discounts directly to purchases on the websites and/or mobile applications Participating ABG Brands Partners and Merchant Referrals.

d.       Ability for shoppers to preview AllPass discounted prices on the websites and/or mobile applications of Participating ABG Brand Partners and Merchant Referrals.

e.       Marketing of AllPass directly to shoppers on the websites and/or mobile applications of Participating ABG Brand Partners and Merchant Referrals.

f.       A paid membership subscription, currently contemplated to be $60 per year, collected directly from AllPass Members by NewCo via Bolt checkout.

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

**Exhibit B**
**Standard Implementation**


**Shopping Cart Platforms:**
Bolt supports merchants built on the following platforms:
1. Magento 2
2. BigCommerce
3. Salesforce Commerce Cloud
4. WooCommerce

**Payment Processors:**
Bolt integrates with the following payments processors, and also offers Bolt Collect payments processing:
1. Bolt Payments
2. Adyen
3. Stripe
4. Cybersource
5. Braintree
6. NMI
7. Auth.net

**3rd party integrations:**
Bolt integrates with the following third-party applications:
1. Netsuite ERP
2. Apple Pay
3. PayPal
4. Afterpay
5. Avalara
6. ShipHero
7. Taxjar

**Markets**

Bolt services merchants in the following territories:
1. United States
2. Australia
3. European Union / EEA (Market coming in 2021)

**Localized Languages:**

Bolt services merchant websites in the following languages:

1. English (US)
2. French (Canada)
3. German (Germany)
4. Portuguese (Portugal)
5. Spanish (Spain)

**Prohibited Categories**

Bolt cannot service merchants in the following categories:

1. Any categories reasonably designated by Bolt as prohibited in the ordinary course of business because the merchant is in a high-risk category (e.g., ammunition, cannabis) or because Bolt reasonably determines that

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

the particular merchant is otherwise too risky to service (e.g., due to extraordinary fraud risk and/or chargeback rate, "Know Your Customer" compliance issues, etc.).

2. Any categories reasonably designated by Bolt as restricted in the ordinary course of business, as described above, where Bolt is unable to obtain an exemption from its financial partners.

3. Any category of goods prohibited by the applicable law of the market

**Other Restrictions**

1. Standard implementations exclude any and all Merchant-specific custom features, integrations, and solutions

DocuSign Envelope ID: 7D2EF2D3-13CA-4750-9594-BFG547A80G7C

**Exhibit C**
**Bolt Data Processing Addendum**

This Data Processing Addendum ("**Addendum**") forms part of the AllPass Loyalty Program Agreement (the "**Agreement**") by and among ABG-AP, LLC ("**NewCo**"), ABG Intermediate Holdings 2 LLC ("**ABG**") and Bolt Financial, Inc. ("**Bolt**").

1. **Subject Matter.** This Addendum reflects the parties' commitment to abide by Data Protection Laws concerning the Processing of NewCo Personal Data in connection with Bolt's execution of the Agreement. This Addendum will become legally binding upon the effective date of the Agreement or upon the date that the parties sign this Addendum if it is completed after the effective date of the Agreement. If and to the extent language in this Addendum conflicts with the Agreement, this Addendum shall control.

2. **Definitions.**

   For the purposes of this Addendum, the following terms and those defined within the body of this Addendum apply.

   a) "**NewCo Personal Data**" means Personal Data Processed by Bolt on behalf of NewCo in providing the Services.

   b) "**Data Protection Laws**" means all applicable data privacy, data protection, and cybersecurity laws, rules and regulations to which the NewCo Personal Data are subject. "Data Protection Laws" shall include, but not be limited to, the California Consumer Privacy Act of 2018 ("**CCPA**") and the EU General Data Protection Regulation 2016/679 ("**GDPR**").

   c) "**Personal Data**" has the meaning assigned to the term "personal data" or "personal information" under applicable Data Protection Laws.

   d) "**Process**" or "**Processing**" means any operation or set of operations which is performed on Personal Data or sets of Personal Data, whether or not by automated means, such as collection, recording, organization, structuring, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination, or otherwise making available, alignment or combination, restriction, erasure, or destruction.

   e) "**Security Incident(s)**" means the breach of security, confidentiality, or integrity of, or any other incident leading to the accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or access to, any NewCo Personal Data or AllPass Tech, except as a result of any acts of ABG, its employees, contractors, or agents that were not authorized by Bolt.

   f) "**Services**" means the Bolt Convert checkout service, the Bolt Approve fraud protection service, the Bolt Collect payments processing service, and the Bolt Enhance integrations, analytics, personalization, and support product, the AllPass Tech, as well as the services that Bolt is responsible for providing under the Agreement, including, without limitation, payment processing, hosting, maintaining, updating, supporting, and servicing in connection with AllPass.

   g) "**Subprocessor(s)**" means Bolt's authorized vendors and third party service providers that Process NewCo Personal Data.

3. **Data Use and Processing.**

   a) <u>Documented Instructions</u>. Bolt shall Process NewCo Personal Data solely to provide the Services in accordance with the Agreement, this Addendum, and any instructions agreed upon by the parties in writing, during the periods contemplated thereby. Bolt will, unless legally prohibited from doing so, inform NewCo in writing if it reasonably believes that there is a conflict between NewCo's instructions and applicable law or otherwise seeks to Process NewCo Personal Data in a manner that is inconsistent with NewCo's instructions.

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

b) <u>Subprocessor Requirements</u>. To the extent necessary to fulfill Bolt's contractual obligations under the Agreement, NewCo hereby authorizes Bolt to engage Subprocessors, in each case subject to NewCo's prior written consent, not to be unreasonably withheld, conditioned or delayed; and Bolt agrees to inform NewCo before it makes any changes to its Subprocessors. Bolt agrees to (i) enter into a written agreement with Subprocessors that imposes on such Subprocessors data protection requirements for NewCo Personal Data that are consistent with, and at least as protective of the NewCo Personal Data as, this Addendum and the Agreement; and (ii) remain responsible to NewCo for Bolt's Subprocessors' failure to perform their obligations with respect to the Processing of NewCo Personal Data to the extent required by applicable Data Protection Laws, or any other acts or omissions by or on behalf of any such Subprocessor, as though such acts or omissions were those of Bolt.

c) <u>Confidentiality</u>. Any person authorized to Process NewCo Personal Data must contractually agree in writing to maintain the confidentiality of such information to a degree at least as protective as Bolt under the Agreement or be under an appropriate statutory obligation of confidentiality.

d) <u>Personal Data Inquiries and Requests</u>. Where required by Data Protection Laws, and as may otherwise be reasonably requested by NewCo (including for purposes of enabling NewCo to comply with Data Protection Laws), Bolt agrees to promptly respond to and provide reasonable assistance and comply with reasonable instructions from NewCo related to any requests from individuals exercising their rights in NewCo Personal Data granted to them under Data Protection Laws (or any other applicable privacy policies or other terms under which such NewCo Personal Data is collected), and to provide NewCo with the ability to validate the identity of, delete, access or copy the NewCo Personal Data and/or promptly validate the identity of, delete, access or copy the NewCo Personal Data at the request of NewCo.

e) <u>Data Protection Impact Assessment and Prior Consultation</u>. Where required by Data Protection Laws, and as may otherwise be reasonably requested by NewCo, Bolt agrees to provide reasonable assistance to NewCo, at Bolt's sole cost and expense, where, in NewCo's reasonable judgement, the type of Processing performed by Bolt requires a data protection impact assessment and/or prior consultation with the relevant data protection authorities.

f) <u>Demonstrable Compliance</u>. Bolt agrees to provide information reasonably necessary to demonstrate compliance with this Addendum upon NewCo's reasonable request.

**4. Cross-Border Transfers of Personal Data.**

a) <u>Cross-Border Transfers of Personal Data</u>. Subject to applicable Data Protection Laws and any other applicable terms and conditions (and any other applicable privacy policies or other terms under which such NewCo Personal Data was collected), NewCo may authorize Bolt to transfer NewCo Personal Data across international borders, including from the European Economic Area to the United States. Bolt shall not transfer any NewCo Personal Data across international borders without NewCo's prior written permission; provided that, subject to applicable Laws, Bolt may transfer NewCo Personal Data between Bolt's offices located in the United States and Bolt's offices located in Canada.

b) <u>Standard Contractual Clauses</u>. Where required, NewCo and Bolt will use the European Commission Decision C(2010)593 Standard Contractual Clauses for Controllers to Processors ("**Model Clauses**") to support the transfer of NewCo Personal Data originating in the European Economic Area, Switzerland, and/or the United Kingdom, the terms of which are herein incorporated by reference. The parties agree that: (i) the audits described in Clause 5(f) and Clause 12(2) of the Model Clauses shall be carried out in accordance with Section 7 of this Addendum; (ii) pursuant to Clause 5(h) of the Model Clauses, Bolt may engage new Subprocessors in accordance with Section 3(b) of this Addendum; (iii) the Subprocessor agreements referenced in Clause 5(j) and certification of deletion referenced in Clause 12(1) of the Model Clauses shall be provided only upon NewCo's written request; and (iv) the optional clauses are expressly not included. Each party's signature to this Addendum shall be considered a signature to the Model Clauses to the extent that the Model Clauses apply hereunder. If required by the laws or regulatory procedures of any jurisdiction, the parties shall execute or re-execute the Model Clauses as separate documents.

DocuSign Envelope ID: 7D2EF2D3-13CA-47F0-9F94-BFC547A80C7C

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

**5.  Information Security Program.**

**a)**  <u>Security Measures</u>.  Bolt will use commercially reasonable best efforts to ensure the security confidentiality, and integrity of the NewCo Personal Data and the AllPass Tech, including to implement and maintain an information security program ("**Information Security Program**") that: (i) is consistent with or objectively better than industry standard practices taking into consideration the sensitivity of the relevant NewCo Personal Data and AllPass Tech, and the nature and scope of the Services to be provided; and (ii) includes reasonable and appropriate administrative, technical, organizational, and physical safeguards designed to protect NewCo Personal Data and the AllPass Tech, and to prevent Security Incidents. At a minimum, the Information Security Program shall include:

**i)**  <u>Information Security Policy</u>. Bolt shall maintain a written information security policy applicable to all authorized personnel.

**ii)**  <u>Training</u>. Bolt will provide role-based information security training, including to all personnel who have or are reasonably likely to have any contact with any of the NewCo Personal Data or the AllPass Tech.

**iii)**  <u>Access Control</u>. Bolt will maintain and enforce an access control policy, procedures, and controls consistent with or objectively better than industry standard practices, including with respect to physical building security, use of identity access management software (e.g., user name and password), and use of reasonable firewalls, anti-virus, anti-spyware, and intrusion detection systems. Bolt will limit access to NewCo Personal Data to those employees and Subprocessors with a need-to-know who are bound by appropriate confidentiality obligations.

**iv)**  <u>Logical Separation</u>. Bolt will ensure NewCo Personal Data is logically separated from other Bolt client data.

**v)**  <u>Encryption</u>. Bolt will utilize at least industry standard encryption technologies with respect to NewCo Personal Data, including to protect NewCo Personal Data from any network attacks and other malicious, harmful or disabling data work code or programs, including adware, spyware, spam, phishing, viruses, key locks, back doors, trap doors, timers, malware or other disabling devices which could disrupt the use of any of the AllPass Tech or any other data, software or hardware or destroy, damage or make inaccessible data, software or hardware.

**vi)**  <u>Incident Response Plan</u>. Bolt will maintain an incident response plan that addresses Security Incident handling in a manner intended to minimize the adverse impact of any such Security Incident.

**vii)**  <u>Backups of NewCo Personal Data</u>. Bolt will maintain an industry standard backup system and backup of NewCo Personal Data to facilitate continuity and timely recovery in the event of a service interruption or Security Incident.

**viii)**  <u>Disaster Recovery and Business Continuity Plans</u>. Bolt will maintain disaster recovery and business continuity plans for NewCo Personal Data consistent with or objectively better than industry standard practices.

**ix)**  <u>Payment Security</u>. Bolt will ensure all credit card related data, including without limitation, any NewCo Personal Data is encrypted pursuant to the best practices of the PCI Data Security Standard and reduce fraud by validating credit card numbers in real-time at the time of checkout using bank data, expiration dates, zip codes, and credit card security codes and other information necessary for payment verification.

**6.  Security Incidents.**

**a)**  <u>Notice</u>. Bolt will use commercially reasonable best efforts to prevent Security Incidents.  Upon becoming aware of a Security Incident or any suspected Security Incident, Bolt agrees to provide prompt written notice without undue delay, as soon as is reasonably possible, and within the time frame required under Data Protection Laws to NewCo's Designated POC, at Bolt's sole cost and expense; and Bolt shall use best efforts to stop such Security Incident as soon as possible. Where possible, such notice will include all available details required under Data Protection Laws for

DocuSign Envelope ID: 7D2EF2D3-13CA-4750-9E94-BFC547A80C7C

NewCo to comply with its own notification obligations to regulatory authorities or individuals affected by the Security Incident. Where Bolt fails to stop any such Security Incident, Bolt shall notify NewCo of the same as soon as possible.  Bolt shall promptly restore security and cooperate fully with NewCo in the event of any Security Incident.

**7.  Audits.**

**a)**  <u>NewCo Audit</u>.  Where Data Protection Laws afford NewCo an audit right, NewCo (or its appointed representative) may carry out an audit of Bolt's policies, procedures, and records with respect to the Processing of NewCo Personal Data. Any audit must be: (i) conducted during Bolt's regular business hours; (ii) with sixty (60) days' advance notice to Bolt, unless Applicable Laws require sooner; (iii) carried out in a manner that prevents unnecessary disruption to Bolt's operations; and (iv) subject to reasonable confidentiality procedures. In addition, any audit shall be limited to once per year, unless an audit is carried out at the direction of a government authority having proper jurisdiction or is otherwise required by Applicable Laws.

**8.  Data Deletion.**

**a)**  <u>Data Deletion</u>. Except as is contemplated in the Agreement or is otherwise mutually agreed upon by the Parties, Bolt will make NewCo Personal Data available for retrieval by NewCo via the NewCo self-service dashboard for a period of ninety (90) days following termination of the Agreement. After this ninety (90) day period, Bolt delete all NewCo Personal Data (excluding any back-up or archival copies which shall be deleted in accordance with Bolt's data retention schedule), unless Bolt is required to retain copies under applicable laws, in which case Bolt will isolate that NewCo Personal Data from any further Processing except to the extent required by applicable laws.

**9.  Processing Details.**

**a)**  <u>Subject Matter</u>. The subject matter of the Processing is the Services pursuant to the Agreement.

**b)**  <u>Duration</u>. The Processing will continue until the expiration or termination of the Agreement (or the Services to be performed thereunder).

**c)**  <u>Categories of Data Subjects</u>. Data subjects whose NewCo Personal Data will be Processed pursuant to the Agreement.

**d)**  <u>Nature and Purpose of the Processing</u>. The purpose of the Processing of NewCo Personal Data by Bolt is the performance of the Services. Bolt shall not retain, use, or disclose NewCo Personal Data for any purpose other than for the specific purpose of providing the Services pursuant to and as permitted under the Agreement. Bolt hereby certifies that Bolt understands the requirements set forth in the preceding sentence, and that it agrees to comply with them. Processing NewCo Personal Data outside the scope of this Addendum or the Agreement will require prior written agreement between NewCo and Bolt on additional instructions for Processing.

**e)**  <u>Types of NewCo Personal Data</u>. NewCo Personal Data that is Processed pursuant to the Agreement.

**10.  Contact Information.**

**a)**  NewCo and Bolt agree to designate a point of contact for urgent privacy and security issues (a "**Designated POC**"). The Designated POC for both parties are:

- **NewCo Designated POC**:  Jay Dubiner, email:  jdubiner@abg-nyc.com; cc to: Adam Kronengold, email:  akronengold@abg-nyc.com

- **Bolt Designated POC**: Mike Cervantez, email:  mike.cervantez@bolt.com; cc  to: security@bolt.com

**Exhibit D**

**Market Development Assistance**

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

Subject to Section 6.4 ("AllPass Shutdown"), Bolt will calculate the Market Development Assistance on a quarterly basis, determined by the then-current Bolt's official quarterly calendar, and pay NewCo the Market Development Assistance within sixty (60) calendar days of the end of the preceding quarter.

"Market Development Assistance" will be calculated in the following manner, for all Participating ABG Brand Partners and Merchant Referrals, and all figures will be expressed as a percentage of the dollar value of each transaction:

1.  **Revenue = Bolt Checkout Fee + Bolt Fraud Chargeback Indemnification Fee + Bolt Payment Processing Fees + Bolt Other Fees**[1]
2.  **Excess Margin** = Revenue - **Total Standard Transaction Cost** (Excess Margin cannot be less than 0)
3.  **Base Margin** = Revenue - Excess Margin - **Bolt Actual Fraud Protection Costs - Bolt Actual Payment Processing Costs - Bolt Other Excluded Costs**[2] (cannot be greater than 1.2%)
4.  **Market Development Assistance =** Excess Margin + (31.25% x Base Margin)

For any given transaction, the applicable Total Standard Transaction Cost will be equal to the sum of the Standard Transaction Cost for each Bolt Product for which fees are being charged on such transaction, (i) as detailed in the table below, (ii) as amended from time to time, and (iii) as adjusted by the Fraud Adjustment then in place, if any, for the merchant on whose behalf Bolt is processing such transaction.

For the purposes of calculating Market Development Assistance, Bolt Checkout, as it exists on the Effective Date, is deemed to have a Bolt Actual Checkout Cost of $0.00, such that the entirety of the current iteration of Bolt Checkout Fee is considered margin.

**Example #1.**

Bolt sells Bolt Checkout and Bolt Fraud Chargeback Indemnification to Participating ABG Brand Partner A on the following terms:

Bolt Checkout Fee = 0.80%
Bolt Fraud Chargeback Indemnification Fee = 0.60%
Bolt's Actual Fraud Cost for Brand Partner A = 0.40%
Fraud Adjustment = n/a

Market Development Assistance = 0.45% of each transaction.

1.  **Revenue** = 0.80% + 0.60% = 1.40%
2.  **Excess Margin** = 1.40% – (0.60%+ 0.60%) =  0.20%
3.  **Base Margin** = 1.40% – 0.20% – 0.40% = 0.80%
4.  **Market Development Assistance** = .20% + (31.25% x 0.80%) = 0.45%

**Example #2.**

---

[1] For future products or services introduced by Bolt at a future date, Bolt will provide ABG and NewCo with written notice of its standard pricing and Standard Transaction Costs and such pricing and costs will be incorporated into this agreement.

[2] In the case of other products or services introduced by Bolt at a future date explicitly including, but not limited to, additional products or services integrated into Bolt Checkout, the Parties will agree on which actual costs incurred by Bolt in delivering such products or services to Merchants Referrals are to be excluded from the calculation of Base Margin.

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

Bolt sells Bolt Checkout and Bolt Fraud Chargeback Indemnification to Participating ABG Brand Partner B on the following terms:

Bolt Checkout Fee = 0.70%
Bolt Fraud Chargeback Indemnification Fee = 0.60%
Bolt's Actual Fraud Cost for Brand Partner B = 0.74%
Fraud Adjustment[3] = 0.14%

<u>Market Development Assistance = 0.175% of each transaction.</u>

1. **Revenue** = 0.70% + 0.60% = 1.30%
2. **Excess Margin = 1.30% − (0.60% + 0.60% + 0.14%) =  -0.04% → 0.00%[4]**
3. **Base Margin** = 1.30% - 0.00% - 0.74% = 0.56%
4. **Market Development Assistance** = 0.00% + (31.25% x 0.56%) = 0.175%

**Example #3.**

Bolt sells Bolt Checkout, Bolt Fraud Chargeback Indemnification, and Bolt Product X to Participating ABG Brand Partner C on the following terms:

Bolt Checkout Fee = 0.60%
Bolt Fraud Chargeback Indemnification Fee = 0.60%
Bolt's Actual Fraud Cost for Brand Partner C = 0.50%
Fraud Adjustment = n/a
Bolt Product X Fee = 0.25%[5]

<u>Market Development Assistance = 0.30% of each transaction.</u>

1. **Revenue** = 0.60% + 0.60% + 0.25% = 1.45%
2. **Excess Margin** = 1.45% − (0.60% + 0.60% + 0.20%) =  0.05%
3. **Base Margin** = 1.45% - 0.05% - (0.50% + 0.10%) = 0.80%
4. **Market Development Assistance** = 0.05% + (31.25% x 0.80%) = 0.30%

---

[3] The Fraud Adjustment is equal to the difference between Bolt's Actual Fraud Cost and the Standard Transaction Cost applicable to the Bolt Fraud Chargeback Indemnification product.

[4] Note: By definition, the Excess Margin cannot be negative.

[5] Assume that Bolt Product X has a Standard Transaction Cost of 0.20% and that the Parties have agreed that Bolt's actual cost of 0.10% will be fully excluded for purposes of the Market Development Assistance calculation.

DocuSign Envelope ID: 7D2EF2D3-13CA-47F0-9594-BFC547A80C7C

**Bolt Standard Transaction Cost**

| Bolt Product | Standard Transaction Cost (per transaction) |
|---|---|
| Bolt Checkout / AllPass Checkout | 0.60% |
| Bolt Fraud Chargeback Indemnification | 0.60% |
| Fraud Adjustment | If Bolt determines, in its sole discretion and using the same methods it uses for similar non-AllPass merchants, that Bolt's Actual Fraud Costs for any AllPass merchant exceed the Standard Transaction Cost for the Bolt Fraud Chargeback Indemnification product that is then in effect, then the Standard Transaction Cost for the Bolt Fraud Chargeback Indemnification product that is applicable to transactions processed for such merchant shall be increased by the difference between Bolt's Actual Fraud Cost for such merchant and the Standard Transaction Cost for the Bolt Fraud Chargeback Indemnification product. |
| Bolt Payment Processing | 2.90% + $0.30 for all credit cards excluding AMEX<br><br>3.40% + $0.30 for AMEX |
| Future Bolt Products | TBD - Bolt will update this chart from time to time and provide ABG and NewCo written notice of such changes. |

**Additional Treatment for Special Discounts to Bolt Standard Transaction Costs**

When agreed in writing by NewCo and Bolt or, before NewCo is operationally capable of entering into written agreements, ABG and Bolt, Bolt will receive an accumulable $1 reduction in MDA liability for each $1 in Bolt discounts provided directly to Merchant Referrals, excluding from such calculation any portion of a Bolt discount that would have otherwise been due to NewCo as an MDA liability ("Additional Treatment").[6] Bolt will calculate these discounts when calculating MDA liabilities, and provide details of the discount calculations to ABG and NewCo.

---

[6] ABG and Bolt have, for instance, agreed to apply this Additional Treatment on the Forever21 account and related accounts who enjoy substantially similar economic terms as Forever21, to the extent any discounting becomes necessary.

DocuSign Envelope ID: 7D2EF2D3-13CA-47F0-9594-BFC547A80C7C

**Exhibit E**
**Service Level Agreement**

For purposes hereof, "**Merchant**" or "**You**" means, individually and collectively, NewCo and ABG.

1. "**Bolt Services Uptime**" means all times other than unscheduled Down Time, Scheduled Maintenance, and beta product launches approved in advance by NewCo.

2. "**Down Time**" is a period during which any of AllPass, the AllPass Portal, AllPass Checkout, Bolt Underlying Technology, and Bolt Products (individually and collectively, the "**AllPass Tech**") are interrupted and not usable, except that Down Time does not include unavailability or interruptions due to (1) Scheduled Maintenance performed in accordance with the terms and conditions of this Agreement, (2) acts or omissions of third parties that are out of outside of Bolt's control and not caused by any acts, omissions, gross negligence, or willful misconduct of Bolt; (3) an event of a Force Majeure subject to Bolt's compliance with Section 18.3 of the Agreement; or (4) scheduled Down Time that is approved in advance by NewCo (e.g. in connection with a beta feature launch).

3. **Scheduled Maintenance**. Maintenance of the AllPass Tech that does not involve Down Time can take place daily.  Scheduled maintenance that involves Down Time ("**Scheduled Maintenance**") normally takes place on Saturday, Sunday or Monday between the hours of 00:01 and 06:00, Pacific Time and typically involves Down Time of less than 1 minute to 30 minutes, and shall not take place at any other time without Merchant's prior written approval, which shall not be unreasonably withheld.

4. **Support.**

   a. **Service Levels. Table 1** ("**Service Levels**") describes how Bolt categorizes incidents by severity level with respect to the AllPass Tech, and sets forth the service levels Bolt will meet for incidents of each severity level.

   *[continued on next page]*

30

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

**Table 1. Service Levels.**

| Incident Severity and Description | Bolt Response | Bolt Resolution |
|---|---|---|
| **Priority 0 (P0) (highest severity):** This is a severe incident resulting in Down Time, with no Merchant workaround. | Commercially reasonable efforts to promptly respond to P0 tickets twenty-four (24) hours per day, seven (7) days per week. | Commercially reasonable efforts to resolve, twenty-four (24) hours per day, seven (7) days per week. |
| **Priority 1 (P1):** This is a serious incident in a production environment in which a fundamental function is experiencing abnormal behavior causing major inconvenience or common operations to fail consistently, with no Merchant workaround. | Commercially reasonable efforts to respond to all bona fide helpdesk tickets and support inquiries within one (1) business day to acknowledge the issue and provide an update in accordance with the support hours specified in Section 3(b). | Commercially reasonable efforts to resolve, twenty-four (24) hours per day, seven (7) days per week. |
| **Priority 2 (P2):** This is an incident in a production environment, in which a fundamental function is experiencing abnormal behavior causing a common operation to sometimes fail or a less common operation to fail consistently. | | Commercially reasonable efforts to resolve during business hours. |
| **Priority 3 (P3):** This is an incident in a production environment in which a Merchant has a question about how to use the application or a minor issue that does not significantly impede operations, or a P0-P2 incident where Bolt has made a workaround available. | | Commercially reasonable efforts to resolve P3 issues in a future scheduled product release. P3 questions about how to use Bolt will be resolved in a commercially reasonable time frame. |
| **Feature Request (FR) (lowest severity):** This is a Merchant request for new feature functionality that does not currently exist. Feature requests are logged, prioritized and reviewed for input into future product design. | Commercially reasonable efforts to respond to all bona fide helpdesk tickets and support inquiries within one (1) business day to acknowledge the feature request in accordance with the support hours specified above.  All feature requests are logged with the Merchant account. | Feature requests will be addressed at Bolt's discretion. |

b.  **Support Hours**. In accordance with the service levels specified in Table 1, Bolt will be available to respond to Merchant regarding Priority 0 incidents twenty-four (24) hours per day, seven (7) days per week. For incidents of any other severity, Bolt will provide technical support to Merchant via email on weekdays between the hours of 05:30 to 18:00 Pacific Time, excluding federal holidays ("**Support Hours**").

c.  **Contacting Technical Support**. Merchant may contact Bolt Technical Support and report Down Time by going to the Company Help Center (also via the in-application support form) and initiating a helpdesk ticket. Merchant may also access self-service help through the Company Help Center.

5.  **Access to Merchant Account**. Merchant acknowledges and agrees that, subject to applicable Laws, Bolt may access Merchant's Bolt account and environment in the ordinary course of business for issue resolution purposes. Although Bolt Technical Support will attempt to obtain Merchant's written approval before making any changes to Merchant Data or account settings, Merchant agrees in the event of an emergency, subject to applicable Laws, Bolt may make take necessary or advisable action without

DocuSign Envelope ID: 7D8EF2D3-13CA-47F0-9594-BFG547A80C7C

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

Merchant's consent to prevent material harm to Merchant's or Bolt's businesses, prevent illegal activity (e.g. by unauthorized third parties), and prevent security incidents.

6. **Merchant's Obligations**.  In order to ensure that Bolt is able to meet the response times set forth above and provide support in the most efficient manner, Merchant agrees to use its reasonable efforts to provide Bolt with all relevant information reasonably necessary for Bolt to respond.

7. **Bolt's Obligations**.  Bolt will use all commercially reasonable efforts to maintain a Bolt Services Uptime of at least 99.9%. It will be a material breach of this Agreement if any of the following occurs:  (i) Bolt fails to meet a Bolt Services Uptime of at least 99% for the AllPass Tech over any 3-month period, (ii) Bolt fails to ensure that the AllPass Tech has sufficient bandwidth (as applicable) allocated to enable it to meet the usage demands for Participating ABG Brand Partners, Merchant Referrals, and customers using the AllPass Tech, or (iii) Bolt fails to ensure that sufficient data storage is provided to store the data generated by the AllPass Tech.  Upon NewCo's reasonable request, Bolt agrees to use its reasonable efforts to provide NewCo and ABG with all relevant, complete, and accurate information reasonably necessary for NewCo and ABG to evaluate whether Bolt is complying with its obligations under this SLA.

Execution Copy
ALLPASS LOYALTY PROGRAM AGREEMENT | CONFIDENTIAL

**Exhibit F**

**Bolt Insurance**

| Line of Business / Policy | Limits / Coverage |
|---|---|
| Management Liability | $5,000,000 (Directors and Officers) $1,000,000 (Employment Practices) $1,000,000 (Fiduciary) |
| Errors and Omissions/Cyber | $5,000,000 |
| Crime | $2,000,000 |
| Excess D&O | $5,000,000 |
| International | $1,000,000 |
| WC | $1,000,000 |
| GL/ Property | $1,000,000 ea occ GL |
| Umbrella | $6,000,000 |
| Business Auto | $1,000,000 |

# EXHIBIT B

*NEITHER THIS WARRANT NOR THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR UNDER THE SECURITIES LAWS OF APPLICABLE STATES. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION UNDER SUCH LAWS OR EXEMPTION FROM SUCH REGISTRATION REQUIREMENTS. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.*

## BOLT FINANCIAL, INC.

### WARRANT TO PURCHASE CLASS A COMMON STOCK

Issued on October 9th, 2020

This certifies that for good and valuable consideration, receipt of which is hereby acknowledged, ABG Intermediate Holdings 2 LLC, a Delaware limited liability company ("**Holder**") is entitled, subject to the terms and conditions of this Warrant (as defined below), to purchase from Bolt Financial, Inc., a Delaware corporation (the "**Company**"), the shares of Warrant Stock (as defined below) issuable under the terms and conditions of this Warrant, upon surrender of all or a portion of this Warrant at the principal offices of the Company, together with a duly executed Notice of Exercise in substantially the form attached hereto as Exhibit A and simultaneous payment of the full Warrant Price (as defined below) for the shares of Warrant Stock so purchased in lawful money of the United States. The Warrant Price and the number and character of shares of Warrant Stock purchasable under this Warrant are subject to adjustment as provided herein.

1. **DEFINITIONS.** The following definitions shall apply for purposes of this Warrant:

    1.1 "**Common Stock**" means the Company's Class A Common Stock, par value $0.0001 per share.

    1.2 "**Company**" means the "**Company**" as defined above and includes any corporation which shall succeed to or assume the obligations of the Company under this Warrant.

    1.3 "**Charter**" means the Company's Restated Certificate of Incorporation, as may be amended from time to time.

    1.4 "**Exercise Period Start Date**" means either (i) the earlier of (a) the second anniversary of the issue date of this Warrant, and (b) such time as the GMV Contribution equals or exceeds $750,000,000 or (ii) in accordance with Section 5.3 of the Program Agreement, the effective date of a Qualifying Transaction (as defined in the Program Agreement).

    1.5 "**GMV Contribution**" has the meaning ascribed to such term in the Program Agreement.

    1.6 "**Holder**" means any person who shall at the time be the registered holder of this Warrant (as defined below).

1.7    "**_Initial Public Offering_**" means the closing of the Company's first firm commitment underwritten public offering of the Common Stock registered under the Securities Act.

1.8    "**_Liquidation Event_**" means a "Liquidation Event" as defined in the Charter.

1.9    "**_NewCo_**" means ABG-AP, LLC.

1.10    "**_Program Agreement_**" means that certain AllPass Loyalty Program Agreement dated October 9th, 2020 by and among the Company, Holder and NewCo.

1.11    "**_Rule 144_**" means Rule 144 promulgated under the Securities Act.

1.12    "**_Rule 145_**" means Rule 145 promulgated under the Securities Act.

1.13    "**_SEC_**" means the Securities and Exchange Commission.

1.14    "**_Securities Act_**" means the Securities Act of 1933, as amended.

1.15    "**_Shares_**" means a number of shares of Warrant Stock equal to (a) 3,720,030 shares, _plus_ (b) an additional 248,002 shares for each full $50,000,000 of GMV Contribution accrued pursuant to the terms of the Program Agreement; provided; however; that in no circumstance will the aggregate number of Shares exercised or exercisable pursuant to this Warrant exceed 7,440,060 shares, with all numbers stated in this Section 1.15 subject to adjustment as provided herein.

1.16    "**_Warrant_**" means this Warrant and any warrant(s) delivered in substitution or exchange therefor, as provided herein.

1.17    "**_Warrant Price_**" means $3.86423 per share. The Warrant Price is subject to adjustments as provided herein.

1.18    "**_Warrant Stock_**" means Common Stock and shall include stock and other securities and property at any time receivable or issuable upon exercise of this Warrant in accordance with its terms.

Any other capitalized term used herein that is not defined herein shall have the meaning ascribed to such term in the Program Agreement.

2.    **EXPIRATION.**    This Warrant (and the right to purchase shares of Warrant Stock issuable upon exercise hereof) will terminate, expire and be of no further force or effect automatically and without further action by any person or party upon the earlier of: (a) at 5.00 p.m. Pacific Time on the third anniversary of the date this Warrant is issued (such time, the "**_Expiration Time_**"); (b) the consummation of a Liquidation Event or Initial Public Offering; (c) such time as either Holder or Newco commits gross negligence or willful misconduct in connection with their respective performance under the Program Agreement, or either Holder or Newco materially breaches their respective express obligations under the Program Agreement, subject to delivery of thirty (30) days' written notice of such breach and failure to cure during such thirty (30) day period, and (d) subject to Section 5.3 of the Program Agreement, at 11.59 p.m. Pacific Time on the day before the Exercise Period Start Date if the GMV Contribution on the Exercise Period Start Date is less than $750,000,000.

3.    **EXERCISE.**

**3.1**    **Method and Timing of Exercise**.  Subject to the terms and conditions of this Warrant, the Holder may exercise this Warrant, in whole or in part, for the Shares, by surrendering all or a portion of this Warrant at the principal offices of the Company, with the subscription form attached hereto as <u>Exhibit A</u> ("***Subscription Form***") and the Proxy Agreement (defined below), each duly executed by the Holder, and payment of an amount equal to the product obtained by multiplying (a) the number of shares of Warrant Stock to be purchased by the Holder by (b) the Warrant Price or adjusted Warrant Price therefor, if applicable, as determined in accordance with the terms hereof; <u>provided</u>, <u>however</u>, that the Warrant may not be exercised prior to the Exercise Period Start Date and may not be exercised more frequently than one (1) time per calendar quarter.

**3.2**    **Net Exercise Election**.  The Holder may elect to convert this Warrant, in whole or in part, without the payment by the Holder of any additional consideration, by the surrender of this Warrant to the Company, with the net exercise election selected in the Form of Subscription attached hereto as <u>Exhibit A</u> duly executed by the Holder, into the number of Shares (as defined below) that is obtained under the following formula:

$$X = \frac{Y\,(A - B)}{A}$$

Where:    X =  the number of shares of Warrant Stock to be issued to the Holder pursuant to this Section 3.2.

           Y =  the number of Shares then subject to this Warrant.

           A =  the fair market value of one share of Warrant Stock, as determined in good faith by the Company's Board of Directors, as at the time the net exercise election is made pursuant to this Section 3.2.

           B =  the Warrant Price.

For purposes of the above calculation, fair market value of one share of Warrant Stock shall be determined by the Company's Board of Directors in good faith; <u>provided</u>, <u>however</u>, that where there exists a public market for Common Stock at the time of such exercise, the fair market value per share shall be the average of the closing bid and asked prices of Common Stock quoted in the Over-The-Counter Market Summary or the last reported sale price of Common Stock or the closing price quoted on any exchange on which Common Stock is listed, whichever is applicable, as published in the Western Edition of *The Wall Street Journal* for the five (5) trading days prior to the date of determination of fair market value.  Notwithstanding the foregoing, in the event the Warrant is exercised in connection with the Company's Initial Public Offering of Common Stock, the fair market value per share shall be the per share offering price to the public of the Company's Initial Public Offering.  The Company will promptly respond in writing to an inquiry by the Holder as to the then current fair market value of one share.  In the event that the Holder has not exercised this Warrant in whole prior to the Expiration Time, if the fair market value of one share of Warrant Stock is then greater than the Warrant Price, then the Holder shall automatically, without further action by the Holder, be deemed to have exercised this Warrant effective as of immediately prior to the Expiration Time with respect to any Warrant Stock not so previously exercised as of the Expiration Time pursuant to the net exercise provisions set forth in this Section 3.2 and, in connection with such exercise, the Holder shall be deemed to have restated each of the representations and warranties set forth in Section 6 of this Warrant as of the time of such exercise.  If the fair market value of one share of Warrant Stock is then less than or equal to the Warrant Price at the Expiration Time, this Warrant will expire immediately pursuant to Section 2.

**3.3**     **Notice of Liquidation Event or IPO**.  In connection with any Liquidation Event or the Company's Initial Public Offering, the Company shall provide Holder with 20 business days prior written notice of the consummation thereof.

**3.4**     **Form of Payment**.   Payment may be made by (a) a check payable to the Company's order, (b) wire transfer of funds to the Company, (c) cancellation of indebtedness of the Company to the Holder, or (d) any combination of the foregoing.

**3.5**     **No Fractional Shares**.  No fractional shares may be issued upon any exercise of this Warrant, and any fractions shall be rounded down to the nearest whole number of shares.  If upon any exercise of this Warrant a fraction of a share results, the Company will pay the cash value of any such fractional share, calculated on the basis of the Warrant Price.

**3.6**     **Restrictions on Exercise**.  This Warrant may not be exercised if the issuance of the Warrant Stock upon such exercise would constitute a violation of any applicable federal or state securities laws or other laws or regulations.  As a condition to the exercise of this Warrant, Holder shall execute the Subscription Form, confirming and acknowledging that the representations and warranties set forth in Section 6 are true and complete as of the date of exercise.

**3.7**     **Voting Proxy**. In connection with, and as a condition to, the exercise of all or any portion of the Warrant, Holder will execute the Holder Voting Agreement (the "***Proxy Agreement***"), the form of which is attached hereto as Exhibit B, pursuant to which Holder shall appoint the Company's CEO as its irrevocable proxy to vote all Shares of Warrant Stock issuable upon exercise of this Warrant on all matters described therein.

**4.**     **ISSUANCE OF STOCK.**   This Warrant shall be deemed to have been exercised immediately prior to the close of business at the Company's principal executive office on the date of its surrender for exercise as provided above and delivery of the Warrant Price for the applicable shares of Warrant Stock, and the person entitled to receive the shares of Warrant Stock issuable upon such exercise shall be treated for all purposes as the holder of record of such shares as of the close of business on such date.  As soon as practicable on or after such date, the Company shall issue and deliver to the person or persons entitled to receive one or more certificates or book entry entitlements for the number of whole shares of Warrant Stock issuable upon such exercise; *provided*, *however*, that the Company will be under no obligation to issue such certificate or book entry entitlement until the Holder shall have surrendered all or a portion of this Warrant, as applicable, and delivered the Warrant Price for the applicable shares of Warrant Stock.

**5.**     **ADJUSTMENT PROVISIONS.**  The number and character of shares of Warrant Stock issuable upon exercise of this Warrant (or any shares of stock or other securities or property at the time receivable or issuable upon exercise of this Warrant) and the Warrant Price therefor, are subject to adjustment upon the occurrence of the following events between the date this Warrant is issued and the date it is exercised:

**5.1**     **Adjustment for Stock Splits and Stock Dividends.**  The Warrant Price of this Warrant and the number of shares of Warrant Stock issuable upon exercise of this Warrant (or any shares of stock or other securities at the time issuable upon exercise of this Warrant) shall each be proportionally adjusted to reflect any stock dividend, stock split or reverse stock split, or other similar event affecting the number of outstanding shares of Warrant Stock (or such other stock or securities).

**5.2**     **Adjustment for Other Dividends and Distributions.**   In case the Company shall make or issue, or shall fix a record date for the determination of eligible holders entitled to receive, a

dividend or other distribution payable respect to the Warrant Stock that is payable in (a) securities of the Company (other than issuances with respect to which adjustment is made under Sections 5.1 or 5.3) or (b) assets (other than cash dividends paid or payable solely out of retained earnings), then, and in each such case, the Holder, upon exercise of this Warrant at any time after the consummation, effective date or record date of such event, shall receive, in addition to the shares of Warrant Stock issuable upon such exercise prior to such date, the securities or such other assets of the Company to which the Holder would have been entitled upon such date if the Holder had exercised this Warrant immediately prior thereto (all subject to further adjustment as provided in this Warrant).

5.3 **Adjustment for Reorganization, Consolidation, Merger**.   In case of any recapitalization or reorganization of the Company after the date of this Warrant, or in case, after such date, the Company shall consolidate with or merge into another entity, then, and in each such case, the Holder, upon the exercise of this Warrant (as provided in Section 3), at any time after the consummation of such recapitalization, reorganization, consolidation or merger, shall be entitled to receive, in lieu of the stock or other securities and property receivable upon the exercise of this Warrant prior to such consummation, the stock or other securities or property to which the Holder would have been entitled upon the consummation of such recapitalization, reorganization, consolidation or merger if the Holder had exercised this Warrant immediately prior thereto, all subject to further adjustment as provided in this Warrant, and the successor or purchasing corporation in such reorganization, consolidation or merger (if other than the Company) shall duly execute and deliver to the Holder a supplement hereto acknowledging such corporation's obligations under this Warrant; and in each such case, the terms of this Warrant shall be applicable to the shares of stock or other securities or property receivable upon the exercise of this Warrant after the consummation of such reorganization, consolidation or merger.

5.4 **Notice of Adjustments**.   The Company shall promptly give written notice of each adjustment or readjustment of the Warrant Price or the number of shares of Warrant Stock or other securities issuable upon exercise of this Warrant.   The notice shall describe the adjustment or readjustment and show in reasonable detail the facts on which the adjustment or readjustment is based.

5.5 **No Change Necessary**.   The form of this Warrant need not be changed because of any adjustment in the Warrant Price or in the number of shares of Warrant Stock issuable upon its exercise.

5.6 **Reservation of Shares**.   If at any time the number of shares of Warrant Stock or other securities issuable upon exercise of this Warrant shall not be sufficient to effect the exercise of this Warrant, the Company will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Warrant Stock or other securities issuable upon exercise of this Warrant as shall be sufficient for such purpose.

6. **REPRESENTATIONS, WARRANTIES AND CERTAIN AGREEMENTS OF HOLDER.**   Holder hereby represents and warrants to, and agrees with, the Company, that:

6.1 **Authorization**.   Holder has the full power and authority to enter into this Warrant.   The Warrant constitutes Holder's valid and legally binding obligation, enforceable in accordance with its terms, except (a) as may be limited by applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (b) as may be limited by the effect of rules of law governing the availability of equitable remedies.

6.2 **Purchase for Own Account.**   The Warrant is being acquired for investment for Holder's own account, not as a nominee or agent, and not with a view to the public resale or distribution

thereof within the meaning of the Securities Act, and Holder has no present intention of selling, granting any participation in, or otherwise distributing the same. Holder does not have any contract, undertaking agreement or arrangement with any person to sell, transfer or grant participations to such person or any third person with respect to the Warrant. Holder has not been formed for the specific purpose of acquiring the Warrant.

6.3    **Disclosure of Information.**  At no time was Holder presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television or other form of general advertising or solicitation in connection with the offer, sale and purchase of the Warrant. Holder believes it has received or has had full access to all the information it considers necessary or appropriate to make an informed investment decision with respect to the Warrant. Holder has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Warrant and to obtain additional information (to the extent the Company possessed such information or could acquire it without unreasonable effort or expense) necessary to verify any information furnished to Holder or to which Holder had access.

6.4    **Investment Experience.**  Holder understands that the purchase of the Warrant involves substantial risk. Holder: (a) has experience as an investor in securities of companies in the development stage and acknowledges that Holder is able to fend for itself, can bear the economic risk of Holder investment in the Warrant and has such knowledge and experience in financial or business matters that Holder is capable of evaluating the merits and risks of its investment in the Warrant and protecting its own interests in connection with this investment and/or (b) has a preexisting personal or business relationship with the Company and certain of its officers, directors or controlling persons of a nature and duration that enables Holder to be aware of the character, business acumen and financial circumstances of such persons. Holder represents the office in which its investment decision was made is located at the address on the signature page hereto.

6.5    **Accredited Investor Status.**  Holder is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act (i.e. (a) a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his or her purchase exceeds $1,000,000 (excluding the value of such person's primary residence), (b) a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those two years and has a reasonable expectation of reaching the same income level in the current year, (c) a corporation, limited liability company or partnership having total assets in excess of $5,000,000 that was not formed for the purpose of purchasing the Warrant or (d) otherwise meets the requirements for an "accredited investor" under Regulation D promulgated by the SEC under the Securities Act).

6.6    **Restricted Securities.**  Holder understands that the Warrant and the Shares are characterized as "restricted securities" under the Securities Act inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under the Securities Act and applicable regulations thereunder such securities may be resold without registration under the Securities Act only in certain limited circumstances. In this connection, Holder represents that Holder is familiar with Rule 144 of the SEC, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act. Holder understands that the Company is under no obligation to register any of the securities sold hereunder. Holder understands that no public market now exists for any of the Warrant or the Shares and that it is uncertain whether a public market will ever exist for the Warrant or the Shares.

6.7    **Disqualification.**  Holder represents that neither Holder, nor any person or entity with whom Holder shares beneficial ownership of the Company securities, is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act.

6.8 **Legends**. Holder understands and agrees that the certificates or book-entry entitlements evidencing the Securities will bear legends substantially similar to those set forth below in addition to any other legend that may be required by applicable law, by the Restated Certificate or bylaws of the Company, or by any agreement between the Company and Holder:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

THE SECURITES REPRESENTED HEREBY ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING A LOCK-UP PERIOD IN THE EVENT OF A PUBLIC OFFERING, AS SET FORTH IN AN AGREEMENT WITH THE COMPANY, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE COMPANY.

The legend set forth above shall be removed by the Company from any certificate or book-entry entitlement evidencing the Securities upon delivery to the Company of an opinion of counsel, reasonably satisfactory to the Company, that a registration statement under the Securities Act is at that time in effect with respect to the legended security or that such security can be freely transferred in a public sale (other than pursuant to Rule 144 or Rule 145) without such a registration statement being in effect and that such transfer will not jeopardize the exemption or exemptions from registration pursuant to which the Company issued the Securities. No opinion shall be required for routine transactions under Rule 144.

6.9 **Transfer Restrictions and Market Stand-Off Agreement**. Holder hereby agrees to be bound by the Restrictions on Transfer and the Market Stand-Off Agreement set forth in Section 2.8 and Section 2.10, respectively, of the Company's Amended and Restated Investors' Rights Agreement, dated May 15, 2020, as may be amended from time to time (the "***Rights Agreement***"). Holder acknowledges receipt of a copy of the Rights Agreement as currently in effect on the date of this Warrant.

6.10 **Right of First Refusal**. Subject to the restrictions on transfer set forth in Section 6.9 above, before any Shares held by Holder or any transferee (which transferees shall be deemed to be a "Holder" for the purpose of this Section) of such Shares may be sold or otherwise transferred (including, without limitation, a transfer by gift or operation of law), the Company and/or its assignee(s) will have a right of first refusal to purchase the Shares to be sold or transferred (the "***Offered Shares***") on the terms and conditions set forth in this Section (the "***Right of First Refusal***").

(a) **Notice of Proposed Transfer**. The Holder of the Offered Shares will deliver to the Company a written notice (the "***Notice***") stating: (i) the Holder's bona fide intention to sell or otherwise transfer the Offered Shares; (ii) the name and address of each proposed purchaser or other transferee (the "***Proposed Transferee***"); (iii) the number of Offered Shares to be transferred to each Proposed Transferee; (iv) the bona fide cash price or other consideration for which the Holder proposes to transfer the Offered Shares (the "***Offered Price***"); and (v) that the Holder acknowledges this Notice is an

offer to sell the Offered Shares to the Company and/or its assignee(s) pursuant to the Company's Right of First Refusal at the Offered Price as provided for in this Agreement.

(b)  **Exercise of Right of First Refusal.**  At any time within thirty (30) days after the date of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all (or, with the consent of the Holder, less than all) the Offered Shares proposed to be transferred to any one or more of the Proposed Transferees named in the Notice, at the purchase price, determined as specified below.

(c)  **Purchase Price.**  The purchase price for the Offered Shares purchased under this Section will be the Offered Price, *provided* that if the Offered Price consists of no legal consideration (as, for example, in the case of a transfer by gift) then the purchase price will be the fair market value of the Offered Shares as determined in good faith by the Company's Board of Directors.  If the Offered Price includes consideration other than cash, then the value of the non-cash consideration, as determined in good faith by the Company's Board of Directors, will conclusively be deemed to be the cash equivalent value of such non-cash consideration.

(d)  **Payment.**  Payment of the purchase price for the Offered Shares will be payable, at the option of the Company and/or its assignee(s) (as applicable), by check or by cancellation of all or a portion of any outstanding purchase money indebtedness owed by the Holder to the Company (or to such assignee, in the case of a purchase of Offered Shares by such assignee) or by any combination thereof.  The purchase price will be paid without interest within sixty (60) days after the Company's receipt of the Notice, or, at the option of the Company and/or its assignee(s), in the manner and at the time(s) set forth in the Notice.

(e)  **Holder's Right to Transfer.**  If all of the Offered Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section, then the Holder may sell or otherwise transfer such Offered Shares to each Proposed Transferee at the Offered Price or at a higher price, *provided* that (i) such sale or other transfer is consummated within ninety (90) days after the date of the Notice, (ii) any such sale or other transfer is effected in compliance with all applicable securities laws, and (iii) each Proposed Transferee agrees in writing that the provisions of this Section will continue to apply to the Offered Shares in the hands of such Proposed Transferee.  If the Offered Shares described in the Notice are not transferred to each Proposed Transferee within such ninety (90) day period, then a new Notice must be given to the Company pursuant to which the Company will again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

(f)  **Exempt Transfers.**  The Right of First Refusal shall not apply to a transfer by Holder to an Affiliate for no consideration.  For the purpose hereof, "*Affiliate*" means any other person who directly or indirectly controls, is controlled by, or is under common control with Holder.

(g)  **Termination of Right of First Refusal.**  The Right of First Refusal will terminate as to all Shares: (i) on the effective date of the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the SEC under the Securities Act (other than a registration statement relating solely to the issuance of Common Stock pursuant to a business combination or an employee incentive or benefit plan); (ii) on any transfer or conversion of Shares made pursuant to a statutory merger or statutory consolidation of the Company with or into another corporation or corporations if  the common stock of the surviving corporation or any direct or indirect parent corporation thereof is registered under the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"); or (iii) on any transfer or conversion of Shares made pursuant to a statutory

DocuSign Envelope ID: 7D2EE2D3-13CA-47F0-8F04-BEC547A80C7C

conversion of the Company into another form of legal entity if the common equity (or comparable equity security) of entity resulting from such conversion is registered under the Exchange Act.

      **7.**     **REPRESENTATIONS, WARRANTIES OF THE COMPANY.**    The Company hereby represents and warrants that:

          **7.1**     **Authorization; Organization.**    The Company has the corporate power and authority to enter into this Warrant. The Warrant constitutes the Company's valid and legally binding obligation, enforceable in accordance with its terms, except (a) as may be limited by applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (b) as may be limited by the effect of rules of law governing the availability of equitable remedies. The Company is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, and has all requisite corporate power and authority to carry on its business as now conducted.

          **7.2**     **No Conflicts.**    Based in part on the accuracy of the Holder's representation and warranties set forth in Section 6, the issuance, execution, delivery and performance by the Company of this Warrant, and the consummation of the transactions contemplated hereby, will not (i) require any consent or approval of, or filing with, any governmental body, agency or official or of any other third party (other than securities law exemption or notification filings to be made by the Company following the issuance of this Warrant), (ii) require registration under applicable securities laws (other than securities law exemption or notification filings to be made by the Company following the issuance of this Warrant), or (iii) violate, conflict with or cause a breach or a default (whether after giving notice, lapse of time or both) under the Company's organizational documents or any agreement to which the Company or any of its subsidiaries is a party, (iv) violate any law, judgment, injunction, order, decree, statute, rule or regulation applicable to the Company, or (v) result in or require the creation or imposition of any lien upon any of the properties or assets of the Company or any of its subsidiaries.

          **7.3**     **Valid Issuance.**    The Shares when issued, sold and delivered in accordance with the terms hereof, will be duly authorized, validly issued, fully paid and nonassessable. This Warrant, when issued and delivered in accordance with the terms hereof, will be duly authorized and validly issued. Based in part on the accuracy of the Holder's representation and warranties set forth in Section 6, this Warrant and any Shares will be issued in compliance with all applicable federal and state securities laws. Upon execution of this Warrant, the Holder will receive good title to this Warrant, free and clear of any liens or encumbrances, subject to the terms and conditions hereof; and upon any issuance thereof, the Holder will receive good title to any Shares, free and clear of any liens or encumbrances, in each case, except for restrictions on transfer provided for herein or under applicable federal and state securities laws.

          **7.4**     **Warrant Price; Shares.**    The Warrant Price is equal to 1.15 times the original issue price of the Company's Series C Preferred Stock as set forth in the Charter, as in effect on the issue date of this Warrant. The Shares number identified in clause (a) of the definition of Shares set forth in Section 1.15 hereof represents 2.5% (rounded to the nearest whole Share) of the Company's fully diluted equity on the issue date of this Warrant.

      **8.**     **NO RIGHTS OR LIABILITIES AS STOCKHOLDER.**    This Warrant does not by itself entitle the Holder to any voting rights or other rights as a stockholder of the Company. In the absence of affirmative action by the Holder to purchase Warrant Stock by exercise of this Warrant, no provisions of this Warrant, and no enumeration herein of the rights or privileges of the Holder, shall cause the Holder to be a stockholder of the Company for any purpose.

DocuSign Envelope ID: 7D2EE2D3-13CA-47F0-8F04-BFC547A80C7C

      **9.**    **NO IMPAIRMENT.**  The Company will not, by amendment of its certificate of incorporation or bylaws, or through reorganization, consolidation, merger, dissolution, issue or sale of securities, sale of assets or any other voluntary action, willfully avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the holder against wrongful impairment.  Without limiting the generality of the foregoing, the Company will take all such action as may be necessary or appropriate in order that the Company may duly and validly issue fully paid and nonassessable shares of Warrant Stock upon the exercise of this Warrant.

      **10.**    **GENERAL PROVISIONS.**

      **10.1**    **Notices**.  Unless otherwise provided herein, any notice required or permitted under this Warrant shall be given in writing and shall be deemed effectively given (a) at the time of personal delivery, if delivery is in person; (b) one (1) Business Day after deposit with an express overnight courier for United States deliveries, or three (3) Business Days after deposit with an international express overnight air courier for deliveries outside of the United States, in each case with proof of delivery from the courier requested; or (c) four (4) Business Days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries, when addressed to the party to be notified at the address indicated for such party on the signature page hereto or, in the case of the Company, at principal offices of the Company located at 77 Geary Street, 4th Floor, San Francisco, California 94108, Attn: Chief Executive Officer, with a copy (which shall not constitute notice) to: Fenwick & West LLP, 555 California Street, 12th Floor, San Francisco, CA 94104, Attention: Michael A. Brown, or at such other address as any party hereto may designate by giving ten (10) days' advance written notice to all other parties in accordance with the provisions of this Section 10.1.

      **10.2**    **Governing Law**.  This Warrant shall be governed by and construed under the internal laws of the State of Delaware as applied to agreements among Delaware residents entered into and to be performed entirely within Delaware, without reference to principles of conflict of laws or choice of laws.

      **10.3**    **Transfer**.  Except as expressly provided hereunder, neither this Warrant nor any rights hereunder may be assigned, conveyed or transferred by Holder without the Company's prior written consent, which consent will not be unreasonable withheld.  The rights and obligations of the Company and the Holder under this Warrant shall be binding upon and benefit their respective permitted successors, assigns, heirs, administrators and transferees.

      **10.4**    **Further Assurances**.  The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Warrant.

      **10.5**    **Headings**.  The headings and captions used in this Warrant are used only for convenience and are not to be considered in construing or interpreting this Warrant.  All references in this Warrant to sections and exhibits shall, unless otherwise provided, refer to sections hereof and exhibits attached hereto, all of which exhibits are incorporated herein by this reference.

      **10.6**    **Severability**.  If one or more provisions of this Warrant are held to be unenforceable under applicable law, then such provision(s) shall be excluded from this Warrant to the extent they are unenforceable and the remainder of this Warrant shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

**10.7**    **Facsimile Signatures**.  This Warrant may be executed and delivered by facsimile and upon such delivery the facsimile signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

**10.8**    **Amendments and Waivers**.  This Warrant may be amended and provisions may be waived pursuant to the written agreement of the Company and Holder.

**10.9**    **Entire Agreement**.  This Warrant, the Program Agreement and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter of this Warrant, and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

**10.10**    **Severability**.  This Warrant and the documents referred to herein, together with all the exhibits and schedules hereto and thereto, constitute the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior negotiations, correspondence, warrants, agreements, understandings duties or obligations between the parties with respect to the subject matter hereof.

**10.11**    **Terms Binding**.  By acceptance of this Warrant, the Holder accepts and agrees to be bound by all the terms and conditions of this Warrant.

* * *

**IN WITNESS WHEREOF**, the parties hereto have executed this **Warrant to Purchase Class A Common Stock** as of the date first written above.

<u>THE COMPANY</u>:

**BOLT FINANCIAL, INC.**

By:  _Ryan Breslow_
Name:  Ryan Breslow
Title:  CEO


**AGREED AND ACKNOWLEDGED:**

<u>HOLDER</u>:

**ABG Intermediate Holdings 2 LLC,**
**a Delaware limited liability company**


By:  _____
Name:  _____
Title:  _____

Address:  _____
            _____
            _____
            _____


**[SIGNATURE PAGE TO WARRANT TO PURCHASE CLASS A COMMON STOCK]**

DocuSign Envelope ID: 7D2EE2D3-13CA-47F0-8F04-BEC547A80C7C

## EXHIBIT A

### Subscription Form


To Bolt Financial, Inc.:

The undersigned hereby elects to purchase _____ shares of Class A Common Stock (the "**Shares**") of Bolt Financial, Inc., a Delaware corporation, pursuant to the terms of that certain Warrant to Purchase Class A Common Stock with an issue date of _____, 20__ (the "**Warrant**"), as follows:

(Initial applicable method:)

_____ a. The undersigned tenders herewith payment of the total purchase price of such Shares in full, pursuant to a check or wire transfer, in the amount of $_____.

_____ b. The undersigned hereby elects to convert the Warrant into the Shares by the net exercise election pursuant to Section 3.3 of the Warrant. This conversion is exercised with respect to _____ of the Shares covered by the Warrant resulting in a net total of _____ shares of the Shares being issued to the undersigned.

In exercising this Warrant, the undersigned Holder hereby confirms and acknowledges that the representations and warranties set forth in Section 6 of the Warrant are true and complete as of this date. In the event that Holder delivers this Subscription Form and the Warrant subsequently terminates pursuant to the terms of the Warrant, this Subscription Form shall immediately be of no further force and effect.

Please issue one or more certificates or book-entry entitlements representing said Shares in the name of the undersigned. The undersigned represents that it is acquiring the shares solely for its own account and not as a nominee for any other party and not with a view toward the resale or distribution thereof except in compliance with applicable securities laws.


**HOLDER:**

**ABG Intermediate Holdings 2 LLC,**
**a Delaware limited liability company**


By: _____     Date: _____
Name: _____
Title: _____

**<u>EXHIBIT B</u>**

**Form of Proxy Agreement**

## HOLDER VOTING AGREEMENT

This Holder Voting Agreement (this "***Agreement***") is made as of _____, 2020, by and among Bolt Financial, Inc., a Delaware corporation (the "***Company***"), ABG Intermediate Holdings 2 LLC, a Delaware limited liability company (together with his successors, "***Stockholder***"), and Ryan Breslow ("***Proxyholder***").

## RECITALS

A.     Stockholder currently holds [_____] shares of Class A Common Stock of the Company (collectively, the "***Purchased Shares***") that were issued pursuant to the exercise of a Warrant to Purchase Class A Common Stock issued by the Company on _____, 2020 (the "***Warrant***").

B.     This Agreement, among other things, requires Stockholder to vote the Purchased Shares and any additional shares of capital stock of the Company which Stockholder hereafter acquires pursuant to further exercise of the Warrant, if not already exercised in full on the date hereof (together, all such shares referred to in this sentence and any securities of the Company issued with respect to, upon conversion of, or in exchange or substitution of such shares, the "***Shares***") in the manner set forth herein.

C.     This Agreement is being entered into in exchange for a payment of U.S. $10 in cash from Proxyholder to Stockholder and for other good and valuable consideration, the sufficiency of which is hereby acknowledged and agreed.

## AGREEMENT

The parties agree as follows:

1.     **Voting Arrangements.**  Stockholder hereby agrees that Proxyholder shall have the right to vote the Shares, in his sole discretion, on all matters submitted to a vote of stockholders of the Company at a meeting of stockholders or through the solicitation of a written consent of stockholders (whether of any individual class of stock or of multiple classes of stock voting together).

Notwithstanding the foregoing, Proxyholder shall not vote the Shares without Stockholder's prior written consent:

a.     In contravention of Stockholder's obligations under the Company's Amended and Restated Investors' Rights Agreement, dated May 15, 2020, or any other organizational document of the Company, including its Certificate of Incorporation and Bylaws, as they may be amended from time to time;

b.     To approve the entry into, modification or termination of any transaction involving the Company or any subsidiary thereof, on the one hand, and any stockholder or an affiliate, manager or equityholder thereof or any immediate family member of the foregoing on the other hand (any such transaction, a "***Related Party Transaction***"); or

c.    In any other manner which would be reasonably expected to be (i) adverse to Stockholder's rights under the Warrant or (ii) disproportionately adverse to Stockholder relative to other stockholders of the same class or series.

The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement, including, in connection with future financings of the Company, Stockholder shall execute all amendments and documents necessary to facilitate such future financings, including without limitation, executing and delivering any investors' rights agreement, voting agreement, and right of first refusal and co-sale agreement, and any subsequent amendments thereto.

2.    **Illustrative Examples.**  Subject to its compliance with the second paragraph of Section 1, matters on which Proxyholder shall be entitled to vote pursuant to this Section 2 include, but are not limited to, the following, which are presented here solely by way of example:

2.1    Election, replacement or removal of directors of the Company (each, a "**Director**");

2.2    Sale or other disposition of all or substantially all of the Company's assets, *provided*, that any distribution to Company stockholders of the proceeds of such sale or disposition are made in accordance with the Company's Certificate of Incorporation, as then in effect; and

2.3    Mergers of, or acquisitions by, the Company or its subsidiaries that are submitted for stockholder approval.

3.    **Stockholder to Abstain from Voting**.    Stockholder agrees that, unless Proxyholder provides explicit written instruction to vote the Shares under this Agreement or Proxyholder provides explicit written notice that Stockholder shall be permitted by Proxyholder to vote in a manner other than as Proxyholder instructs, Stockholder shall abstain from voting any of the Shares (in person, by proxy or by action by written consent, as applicable) on all matters.

4.    **Irrevocable Proxy and Power of Attorney**.  To secure Stockholder's obligations to vote the Shares in accordance with this Agreement and to comply with the other terms hereof, Stockholder hereby appoints Proxyholder, or his designees, as Stockholder's true and lawful proxy and attorney, with the power to act alone and with full power of substitution, to vote or act by written consent with respect to all the Shares in accordance with the provisions set forth in this Agreement, and to execute all appropriate instruments consistent with this Agreement on behalf of Stockholder. The proxy and power granted by Stockholder pursuant to this Section 4 are coupled with an interest and are given to secure the performance of Stockholder's duties under this Agreement. The proxy and power will be irrevocable for the term hereof. The proxy and power will survive the merger, consolidation, conversion or reorganization of Stockholder or any other entity holding the Shares.

5.    **Additional Representations, Covenants and Agreements**.

5.1    ***Transfers by Stockholder***.    Any transfer, assignment, pledge or other disposition of or encumbrance of the Shares (collectively, a "***Transfer***") shall not take effect until the pledgee, transferee or donee of such Shares (the "***Transferee***") furnishes Proxyholder and the

2

Company with a written agreement to be bound by the terms of this Agreement (an "***Assumption Agreement***") and any additional agreement required under any other applicable agreements between the parties hereto, it being understood and agreed that the Company shall be entitled to issue stop transfer instructions in respect of such Shares to preclude any transfer of Shares in contravention of the foregoing. Upon Satisfaction of the provisions of this Section 5.1, such pledgee, transferee or donee shall be treated as a "Stockholder" for purposes of this Agreement.

   5.2 ***Legends***.  The Company shall cause each certificate representing the Shares to bear the following legend, in addition to any legends that may be required by state or federal securities laws or the terms of any voting or other agreements that apply:

> *THE SHARES EVIDENCED HEREBY ARE SUBJECT TO A HOLDER VOTING AGREEMENT BY AND AMONG THE COMPANY AND CERTAIN STOCKHOLDERS OF THE COMPANY DATED AS OF _____, 2020 (COPIES OF WHICH MAY BE OBTAINED FROM THE COMPANY) WHICH INCLUDES PROVISIONS POTENTIALLY RESTRICTING THE STOCKHOLDER'S RIGHT TO VOTE OR TRANSFER AN INTEREST IN THE SHARES EVIDENCED HEREBY, AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON ACCEPTING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SAID HOLDER VOTING AGREEMENT.*

   5.3 ***Stock Splits, Dividends, Etc***.  In the event of any issuance of shares of the Company's voting securities hereafter to Stockholder (including, without limitation, in connection with any stock split, stock dividend, recapitalization, reorganization, or the like), such shares shall automatically become subject to this Agreement and shall be endorsed with the legend set forth in Section 5.2.

   5.4 ***Specific Enforcement***.  It is agreed and understood that monetary damages would not adequately compensate an injured party for the breach of this Agreement by any party, that this Agreement shall be specifically enforceable, and that any breach or threatened breach of this Agreement shall be the proper subject of a temporary or permanent injunction or restraining order. Further, each party hereto waives any claim or defense that there is an adequate remedy at law for such breach or threatened breach.

   5.5 ***Securities Laws, Rules and Regulations***.  Stockholder, the Company and Proxyholder agree and understand that Stockholder, the Company and/or Proxyholder may become subject to the registration and/or reporting requirements, rules and regulations of the Securities Exchange Act of 1934, as amended (the "***Exchange Act***"), the Securities Act of 1933, as amended (the "***Securities Act***") and/or any state and federal securities laws (collectively with the Exchange Act and the Securities Act, the "***Securities Laws***"). Stockholder, the Company and Proxyholder agree to use their respective commercially reasonable efforts to comply with the Securities Laws and to reasonably assist each other in complying with the Securities Laws in a timely and prompt manner. Such compliance may include, for example and without limiting the foregoing, the filing and updating and maintaining of Form 13G and/or Form 13D under the Exchange Act.

3

DocuSign Envelope ID: 7D2EE2D3-13CA-47F0-8F04-BEC547A80C7C

5.6   ***Other Arrangements.***   During the term of this Agreement Stockholder will not, without Proxyholder's prior written consent:

(a)   offer, seek or propose to acquire or cause to be acquired, any ownership of any assets or business of the Company or any of its subsidiaries, or seek to propose or propose, whether alone or in concert with other persons, any tender offer, exchange offer, merger, business combination, restructuring, liquidation, recapitalization or similar transaction involving the Company or any of its subsidiaries;

(b)   make, or in any way participate in, any "solicitation" of "proxies" (as such terms are defined in Rule 14a-1 under the Exchange Act) with respect to the voting of any securities of the Company or any of its subsidiaries or seek to advise or influence other stockholders the Company with regard to the voting of their securities of the Company;

(c)   form, join, or in any way become a member of a 13D Group with respect to any voting securities of the Company or any of its subsidiaries (where "***13D Group***" means any "group", within the meaning of Section 13(d) of the Exchange Act, formed for the purpose of acquiring, holding, voting or disposing of voting securities of the Company other than Stockholder and its "affiliates", as such term is defined in the Exchange Act);

(d)   nominate any person as a director of the Company who is not nominated by the then incumbent directors, propose any matter to be voted upon by the stockholders of the Company or initiate or vote in favor of a call for a special meeting of stockholders of the Company; or

(e)   publicly announce or disclose any intention, plan or arrangement inconsistent with the foregoing.

5.7   ***Proxyholder's Liability.***   In voting the Shares in accordance with Section 1 hereof, Proxyholder shall not be liable for any error of judgment nor for any act done or omitted, nor for any mistake of fact or law nor for anything which Proxyholder may do or refrain from doing in good faith, nor shall Proxyholder have any accountability hereunder, except for his own bad faith or willful misconduct.

5.8   ***Consideration.***   In connection with this Agreement and as partial consideration for the obligations of Stockholder hereunder, Proxyholder shall pay (by check, cash or other valid consideration) to Stockholder the sum of U.S. $10 in the aggregate.

6.   **Termination**.

6.1   ***Termination Events.***   This Agreement shall terminate:

(a)   upon the liquidation, dissolution or winding up of the business operations of the Company;

(b)   upon the execution by the Company of a general assignment for the benefit of creditors or the appointment of a receiver or trustee to take possession of the property and assets of the Company; or

4

(c)      in the sole discretion of Proxyholder, upon the express written consent of Proxyholder (which he shall be under no obligation to provide).

6.2      ***Legends Following Termination of Agreement***.   At any time after termination of any of the Agreement, any holder of a stock certificate may surrender such certificate to the Company for appropriate modifications to the legend, and the Company shall, as promptly as reasonably practicable, reissue a new certificate with any legends that may be required by state or federal securities laws or the terms of any voting or other agreements that remain applicable.

6.3      ***Survival.***  Section 6.2 shall survive the termination of this Agreement.

7.      **Miscellaneous**.

7.1      ***Successors and Assigns.***  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Company, Stockholder and Proxyholder. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or the respective successors and assigns of the Company, Stockholder and Proxyholder any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Except for an assignment by the Company (i) by operation of law, or (ii) in connection with an acquisition, consolidation or merger of the Company or sale of all or substantially all of the Company's assets (which shall be permitted with only the written consent and notice of the Company), this Agreement may not be assigned without the written consent of Proxyholder, the Company and Stockholder.

7.2      ***Amendments and Waivers.***  Any term hereof may be amended or waived only with the written consent of Stockholder and Proxyholder, except where such amendment or waiver shall materially negatively alter the rights or obligations of the Company hereunder, in which case any such amendment or waiver shall also require the written consent of the Company. Any amendment or waiver effected in accordance with this Section 7.2 shall be binding upon the Company, Proxyholder and Stockholder, and each of the respective successors and assigns to the Company or Proxyholder.

7.3      ***Notices.***  Notwithstanding anything to the contrary contained herein, any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient and received on the earlier of (a) the date of delivery, when delivered personally, by overnight mail, courier or sent by electronic mail (e-mail) or fax, or (b) forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, and addressed to the party to be notified at such party's address, e-mail address or fax number as set forth on the signature page hereto, or as subsequently modified by written notice. Any electronic mail (e-mail) communication shall be deemed to be "in writing" for purposes of this Agreement.

7.4      ***Severability.***  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of

5

the Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of the Agreement shall be enforceable in accordance with its terms.

7.5 **_Governing Law; Jurisdiction; Venue_**.

(a) This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to conflict of law principles. In addition, each of the parties hereto (i) consents to submit itself to the exclusive jurisdiction of the Court of Chancery or other courts of the State of Delaware in the event any dispute arises out of this Agreement or any of the transactions contemplated by this Agreement, (ii) agrees that it will not attempt to deny or defeat such jurisdiction by motion or other request for leave from such court, (iii) agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the Court of Chancery or other courts of the State of Delaware, and (iv) hereby waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

(b) Each party hereto, other than Stockholder, hereby consents to service of process being made through the notice procedures set forth in Section 7.3 and agrees that, to the fullest extent permitted by law, service of any process, summons, notice or document by U.S. registered mail to the parties' respective addresses set forth on the signature page hereto shall be effective service of process for any suit or proceeding in connection with this Agreement or the transactions contemplated hereby.

7.6 **_Counterparts; Electronic Signature._** This Agreement may be executed and delivered in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

7.7 **_Titles and Subtitles._** The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**_[Signature page follows]_**

514946.4
082420

IN WITNESS WHEREOF the parties have executed this Holder Voting Agreement as of the date first set forth above.

**THE COMPANY**

**Bolt Financial, Inc.**

By:_____

Name:

Title:

IN WITNESS WHEREOF the parties have executed this Holder Voting Agreement as of the date first set forth above.

**STOCKHOLDER**

**ABG Intermediate Holdings 2 LLC,**
**a Delaware limited liability company**

By: _____
Name: _____
Title: _____

**[SIGNATURE PAGE TO HOLDER VOTING AGREEMENT]**

IN WITNESS WHEREOF the parties have executed this Holder Voting Agreement as of the date first set forth above.

**PROXYHOLDER**

**Ryan Breslow**

_____

**[SIGNATURE PAGE TO HOLDER VOTING AGREEMENT]**

# EXHIBIT C

STRICTLY CONFIDENTIAL

## AMENDED AND RESTATED OPERATING AGREEMENT OF
## ABG-AP, LLC

This AMENDED AND RESTATED OPERATING AGREEMENT OF ABG-AP, LLC (the "**Company**") is made effective as of October 9th, 2020 (the "**Effective Date**"), by and among (i) ABG Intermediate Holdings 2, LLC, a Delaware limited liability company ("**ABG**") and (ii) Bolt Financial, Inc., a Delaware corporation ("**Bolt**"), together with each other Person who becomes a Member in accordance with the terms of this Operating Agreement from time to time.  Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in <u>Exhibit A</u> or in <u>Exhibit B</u> attached hereto.

### RECITALS

A.     The Company was formed as a Delaware limited liability company on August 27, 2020 (the "**Formation Date**"), and in connection therewith, ABG and the Company entered into that certain Operating Agreement of the Company, dated as of August 27, 2020 (the "**Original Agreement**").

B.     Simultaneous with entry into this Operating Agreement, ABG, Bolt and the Company have entered into that certain AllPass Loyalty Program Agreement, pursuant to which each of Bolt and ABG will provide certain services in connection with the development of AllPass (as defined therein) for the Company (the "**AllPass Loyalty Program Agreement**").

C.     In connection with entry into the AllPass Loyalty Program Agreement and the admittance of Bolt as a Member of the Company, the undersigned Members desire to amend and restate the Original Agreement to set forth the respective rights and obligations of the Members with respect to the ownership and operation of the Company.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein made and intending to be legally bound, the parties hereby agree as follows:

ARTICLE 1
ORGANIZATIONAL MATTERS

1.1     **Formation**.  The Members acknowledge, approve and ratify the formation of the Company on the Formation Date as a limited liability company under the provisions of the Act by virtue of the filing of the certificate of formation of the Company (as amended, the "**Certificate**").  This Operating Agreement is intended to be the Company's "Limited Liability Company Agreement" as that term is defined in Section 18-101(7) of the Act.

1.2     **Name**.  The name of the Company will be "ABG-AP, LLC".  The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Board deems appropriate or advisable.

1.3     **Purpose**.  The Company may engage in any lawful activity for which a limited liability company may be organized under the Act.  However, the primary purpose of the Company will be to operate AllPass (the "**Business**").  The Company will have the power to do any and all acts necessary or advisable for the furtherance of its business and activities.

1.4     **No Partnership**.  Except as set forth below, the Members intend that the Company will not be a partnership (including a limited partnership) or joint venture, and that no Member, assignee of a Member, director, manager or officer will be a partner or joint venturer of any other Member, assignee of a Member, director, manager or officer for any purposes, and this Operating Agreement will not be construed to the

contrary. The Members intend that the Company will be treated as a partnership or disregarded entity, as appropriate, for federal and, if applicable, state and local income tax purposes, and each Member and the Company will file all tax returns and will otherwise take all tax and financial reporting positions in a manner consistent with such treatment, and no Member shall take any action inconsistent with such treatment.

1.5     **Fiscal Year**. Except as may otherwise be required by the federal tax laws, the fiscal year of the Company for both financial and tax reporting purposes shall end on December 31 (the "**Fiscal Year**").

1.6     **Registered Office; Agent**. The registered office and registered agent required to be maintained by the Company pursuant to the Act shall be the office and the agent so designated in the Certificate. The Company may, upon compliance with the applicable provisions of the Act, change its registered office or registered agent from time to time in the discretion of the Board.

1.7     **Term**. The term of the Company shall continue indefinitely unless sooner terminated as provided herein. The existence of the Company as a separate legal entity shall continue until the termination of the Certificate as provided in the Act.

1.8     **Principal Office**. The principal executive office of the Company shall be located at such place as the Board shall establish from time to time within or without the State of Delaware. The Board may establish and maintain such additional offices and places of business of the Company, either within or without the State of Delaware, as it deems appropriate.

ARTICLE 2
MEMBERS

2.1     **Limited Liability**. Except as expressly set forth in this Operating Agreement or as required under the Act, no Member, manager, officer, employee or other Person associated with the Company will be personally liable for any debt, obligation or liability of the Company solely by reason of being a Member, manager, officer, employee or other Person associated with the Company.

2.2     **Voting Rights**. Each Member shall be entitled to one vote per Unit on all matters upon which the Members have the right to vote under this Operating Agreement or pursuant to the Act or other applicable law.

2.3     **Withdrawals or Resignations**. No Member may withdraw from, or resign as a Member of, the Company unless such Member has Transferred its entire membership interest in the Company to one or more Persons in accordance with this Operating Agreement and all such Persons have been admitted to the Company as substitute Members in accordance with this Operating Agreement.

2.4     **Members' Meetings; Written Consent**. Any Member may call for a meeting of the Members from time to time by reasonable advance written notice to all Members. Notice of a meeting need not be given to any Member who signs a waiver of notice or a consent to holding the meeting or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting the lack of notice to such Member (before its commencement). The Members may make use of telephones and other electronic devices to hold meetings if each Member may simultaneously participate with the other Members with respect to all discussions and votes of the Members. A quorum for the transaction of business at any meeting of the Members shall require the presence, participation, consent or ratification of all Members. Any action required or permitted to be taken by the Members may be taken by the Members without a meeting if all Members consent in writing to the taking of such action.

2

2.5     **Freedom of Activity of ABG Parties and Bolt Parties**.  The Company and the Members acknowledge, agree and understand that the ABG Parties are engaged in and own interests in a wide array of brand management and entertainment businesses and also that the Bolt Parties may do business with a wide array of brand management and entertainment businesses.  Under no circumstances shall any ABG Party or Bolt Party be (a) limited or constrained, in any way, in pursuing or engaging or investing in any other businesses, activities and operations of any nature, whether or not such activities are considered competitive with the Company or (b) required to contribute to the Company or provide to the Company any rights to participate in or otherwise exploit any other business opportunities (including opportunities that involve or relate to activities that would be considered competitive to the Business), and neither the Company nor any other Member or their respective Affiliates shall have any right by virtue of this Operating Agreement or the relationship created hereby to such other business opportunities.  As between the ABG Parties, on the one hand, and the Company and the other Members, on the other hand, the ABG Parties shall be free to pursue any other business interests, opportunities and projects, without any obligation to provide notice to, receive approval from, share with, or contribute to, the Company or any Member or their respective Affiliates any such business interests, opportunities or projects.  Further, as between the Bolt Parties, on the one hand, and the Company and the other Members, on the other hand, the Bolt Parties shall be free to pursue any other business interests, opportunities and projects, without any obligation to provide notice to, receive approval from, share with, or contribute to, the Company or any Member or their respective Affiliates any such business interests, opportunities or projects.  The legal doctrines of "corporate opportunity," "business opportunity" and similar doctrines shall not be applied to any such competitive venture or activity of any ABG Party or any Bolt Party and neither the ABG Parties nor the Bolt Parties shall (to the fullest extent permitted by law) be deemed to have breached their respective fiduciary duties, if any, to the Company or the other Members by reason of engaging in any such activity. Nothing in this Section 2.5 shall relieve the ABG Parties or the Bolt Parties of their respective obligations with respect to use or disclosure of the confidential information of the Company or of any other Member or a Member's Affiliates.

ARTICLE 3
MEMBERS, MEMBERSHIP INTERESTS AND INITIAL CAPITAL CONTRIBUTIONS

3.1     **Members**.  The Members shall consist of the Persons listed on Schedule 3.2 for so long as they each continue to hold Units or other equity interests in the Company.

3.2     **Capitalization; Initial Capital Contributions**

3.2.1     Bolt will be granted its Units in consideration for its entry into the AllPass Loyalty Program Agreement. After giving effect to such transactions, each Member has a Capital Account balance, and holds the Units and Percentage Interests, in each case, as of the Effective Date, as set forth on Schedule 3.2.

3.2.2     Membership Interests in the Company shall be represented by Units.  Each Member has been issued the number of Units set forth next to such Member's name on Schedule 3.2.  The Company may cause Schedule 3.2 to be amended or supplemented from time to time to reflect the receipt by the Company of notice of any change of address of a Member, the admission of a new Member, number of Units and Percentage Interest held by any Member, or the occurrence of any other event requiring that Schedule 3.2 be amended or supplemented; provided, that a copy of such amended or supplemented Schedule shall be delivered to all Members promptly.

3.3     **Capital Accounts**.  A separate Capital Account will be established and maintained for each Member in accordance with the terms set forth in Exhibit B hereto.  Each Member's Capital Account

3

balance as of the Effective Date is equal to such Member's Percentage Interest of the combined Capital Account balance of both Members.

3.4     **No Interest; No Return of Contributions**.  No interest shall be paid by the Company on any Capital Contributions by the Members.  No Member shall be entitled to have any Capital Contribution returned to it or to receive any distributions from the Company, except in accordance with the express provisions of this Operating Agreement.  An unrecouped Capital Contribution is not a liability of the Company or of any Member.  A Member is not required to contribute or lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

3.5     **Additional Capital Contributions**.  Without the prior written consent of the Board, no Member shall have the right or power to: (a) withdraw or reduce its Capital Contributions except as a result of the dissolution of the Company or as otherwise provided by the Act or in this Operating Agreement, or to the extent required by law, rule, regulation or court or other governmental order, (b) make voluntary Capital Contributions (other than as provided elsewhere herein) or contribute any property to the Company other than cash, (c) bring an action for partition against the Company or any of the Company's assets, (d) cause the dissolution of the Company, except as set forth in this Operating Agreement or as required by the Act or (e) require that property other than cash be distributed in accordance with Section 5.1.

3.6     **Cash Requirements**.  Notwithstanding Section 3.5, if the Board should reasonably determine in good faith, at any time and from time to time that the Company requires funds to pay any costs related to the Business (a "**Cash Requirement**"), then the Board shall send a notice to the Members setting forth the amount of such Cash Requirement.  ABG shall have the right to fulfill such Cash Requirement by making additional Capital Contributions or providing a loan to the Company; provided, that Bolt shall have the right to participate in the fulfillment of any such Cash Requirement that is structured as a Capital Contribution or loan pro rata (in proportion to their respective Percentage Interests) on the same terms and conditions.

ARTICLE 4
GOVERNANCE

4.1     **Management**.

        4.1.1   Board of Managers.  Except as specifically set forth in this Operating Agreement, the Members hereby delegate all power and authority to manage the business and affairs of the Company to the Board of Managers (the "Board"), and the Persons constituting the Board shall be the "managers" of the Company for all purposes of the Act (each, a "Manager", and collectively, the "Managers").  The number of Managers shall be three (3), or such greater or lesser number as the Board shall determine from time to time.  Each Manager shall, unless otherwise provided in this Operating Agreement or by law, hold office until such individual resigns, dies or is removed by the Member or Members who shall have the right to designate him or her in accordance with this Operating Agreement.  Any power not otherwise delegated pursuant to this Operating Agreement or by the Board in accordance with the terms of this Operating Agreement shall remain with the Board.

        4.1.2   Bolt Manager.  Subject to the Bolt Minimum Condition being satisfied, Bolt shall have the right to designate and elect one (1) Manager to the Board (the "Bolt Manager").  Bolt, by vote or written consent, shall have the right to designate and elect any Person to fill any vacancy resulting from the resignation or removal of the Bolt Manager pursuant to Section 4.1.5.  The Bolt Manager shall be an employee of Bolt or an Affiliate thereof.

4

4.1.3   <u>ABG Managers</u>.  Subject to the ABG Minimum Condition being satisfied, ABG shall have the right to designate and elect two (2) Managers to the Board (each an "<u>ABG Manager</u>" and collectively, the "<u>ABG Managers</u>").  ABG, by vote or written consent, shall have the right to designate and elect any Person to fill any vacancy resulting from the resignation or removal of an ABG Manager pursuant to <u>Section 4.1.5</u>.  The ABG Managers shall be employees of ABG or an Affiliate thereof.  For the avoidance of doubt, if the Bolt Minimum Condition is not satisfied and the ABG Minimum Condition is satisfied, ABG shall have the right to designate and elect all Managers to the Board.

4.1.4   <u>Initial Board</u>.  The Board as of the Effective Date shall consist of the following individuals:

>       Jamie Salter
>       Nick Woodhouse
>       Justin Grooms

4.1.5   <u>Observer Rights</u>.  As long as (i) with respect to ABG, the ABG Minimum Condition is satisfied and (ii) with respect to Bolt, the Bolt Minimum Condition is satisfied, the Board shall invite a representative of each of ABG and Bolt (and for the avoidance of doubt, each invitation is contingent only on ABG's and Bolt's respective conditions specified above being met and such representatives must be an employee of such Member of an Affiliate thereof) to attend all meetings of the Board in a nonvoting observer capacity and, in this respect, shall give such representative copies of all notices, minutes, consents, and other materials that it provides to its Managers at the same time and in the same manner as provided to such Managers; <u>provided</u>, that such representative shall agree to hold in confidence and trust and to act in a fiduciary manner with respect to all information so provided; <u>provided</u>, <u>further</u>, that the Board reserves the right to withhold any information and to exclude such representative from any meeting or portion thereof if access to such information or attendance at such meeting could adversely affect the attorney-client privilege between the Company and its counsel or result in disclosure of trade secrets or a conflict of interest or if the Board otherwise has a legitimate business reason for withholding such information in good faith.

4.1.6   <u>Removal</u>.  A Manager may be removed, with or without cause, only by the Member or Members that designated such Manager pursuant to this <u>Section 4.1</u>, as applicable, upon delivery of a written notice by such Member or Members of removal of such Manager to the Company.

4.1.7   <u>Meetings</u>.  Meetings of the Board may be held at any time and at any place within or without the State of Delaware designated in the notice of the meeting, when called by one (1) or more Managers, reasonable notice thereof being given to each Manager by the person or persons calling the meeting and which notice shall not be less than by overnight delivery or electronic mail given and received in accordance with Section 10.9 at least two (2) business days before the meeting.  Regular or special meetings of the Board shall be held at the Company's principal offices or at such other place and at such time as shall be determined by the Board.

4.1.8   <u>Notice of a Special Meeting</u>.  It shall be reasonable and sufficient notice to a Manager of a special meeting to send notice by overnight delivery or electronic mail given and received in accordance with Section 10.9 at least two (2) business days before the meeting addressed to such Manager at such Manager's usual or last known business or residence address or electronic mail address, as applicable, or to give notice to such Manager in person or by telephone at least one (1) business day before the meeting. Notice of a meeting need not be given to any Manager if a written waiver of notice, executed by such Manager before or after the meeting, is filed with the records of

DocuSign Envelope ID: 7D2EE2D3-13CA-47F0-8F04-BFC547A80C7C

the meeting, or is delivered to any Manager who attends the meeting. Neither notice of a meeting nor a waiver of a notice need specify the purposes of the meeting.

4.1.9   <u>Quorum</u>. Except as may be expressly set forth in this Operating Agreement, at any meeting of the Board, a majority of the Managers then in office shall constitute a quorum. Except as otherwise expressly set forth in this Operating Agreement, any action to be taken or approved by the Managers hereunder must be taken or approved by a vote of a majority of Managers present and voting in person or by proxy at a meeting at which a quorum is present (which majority shall include at least one (1) ABG Manager, to the extent there is an ABG Manager), and any action so taken or approved shall constitute the act of the Board. Any meeting may be adjourned from time to time by a majority of the votes cast upon the question, whether or not a quorum is present, and the meeting may be held as adjourned without further notice.

4.1.10   <u>Written Consent</u>. Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting if the requisite number of Managers needed to approve such action at such a meeting consent to such action in writing (such act, a "<u>Written Consent</u>"); <u>provided</u>, that the Company shall deliver notice of any such action to each Manager at least two (2) business days in accordance with Section 10.9 prior to the taking of any such action. Notwithstanding the foregoing, the Board may act by Written Consent without complying with the foregoing notice requirement if the requisite number of Managers needed to approve such action determines in good faith a shortened time period is in the best interests of the Company and necessary to preserve an opportunity for the Company, so long as any Manager who has not given consent to such action is given notice thereof as promptly as reasonably practicable. Such written consent or consents shall be filed with the records of the meetings of the Board and shall be treated for all purposes as the act of the Board.

4.1.11   <u>Telephonic Meetings</u>. Managers may participate in a meeting of the Board by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other or by any other means permitted by law. Such participation shall constitute presence in person at such meeting.

4.1.12   <u>Manager Reimbursement</u>. Each Manager shall be reimbursed by the Company for such Manager's reasonable and documented out-of-pocket costs and expenses incurred in attending Board meetings; <u>provided</u>, that the Company has approved such costs or expenses prior to their incurrence. Nothing contained in this Section shall be construed to preclude any Manager from serving the Company in any other capacity and receiving reasonable compensation therefore.

4.1.13   <u>Additional Rules</u>. The Board may adopt such other rules for the conduct of its business as it may from time to time deem necessary or appropriate.

4.1.14   <u>Authority of Board</u>. Subject to the other provisions of this Operating Agreement that require the consent or approval of one or more Members or other Persons, the Board shall have the exclusive power and authority to manage the business and affairs of the Company and to make all decisions with respect thereto. Except as otherwise expressly provided in this Operating Agreement, the Board or Persons designated by the Board, including individual Managers or officers and agents appointed by the Board, shall be the only Persons authorized to execute documents which shall be binding on the Company. Unless otherwise specified in this Operating Agreement or by approval of the Board, the Managers shall in all cases act as a group and shall have no authority to act individually on behalf of the Company. To the fullest extent permitted by Delaware law, but subject to any specific provisions hereof granting rights to Members, the Board shall have the power to perform any acts, statutory or otherwise, with respect to the Company or

6

511513.10
100620

this Operating Agreement, which would otherwise be possessed by the Members under Delaware law, and the Members shall have no power whatsoever with respect to the management of the business and affairs of the Company.  The power and authority granted to the Board hereunder shall include all those necessary, convenient or incidental for the accomplishment of the purposes of the Company and the exercise of the powers of the Company set forth in <u>Section 1.3</u> above and shall include the power to make all decisions with regard to the management, operations, assets, financing and capitalization of the Company.

4.2    **Approval Rights**.  Notwithstanding <u>Section 4.1</u>, so long as the Bolt Minimum Condition is satisfied, the Company shall not, without unanimous Board approval, do any of the following, directly or indirectly:

4.2.1    liquidate, dissolve or wind-up the business and affairs of the Company;

4.2.2    issue any debt securities or enter into any debt or lease transaction in an aggregate value in excess of $1,000,000 (taking into account all previous such issuances and transactions);

4.2.3    admit any Bolt Competitor as a Member;

4.2.4    admit any new Member if it would result in an adverse and disproportionate change to Bolt's Percentage Interest relative to ABG's Percentage Interest;

4.2.5    acquire or invest (whether by merger, consolidation or otherwise) in any Person or entity for an amount in excess of $1,000,000;

4.2.6    make any material acquisitions or divestitures in excess of $1,000,000;

4.2.7    enter into any transaction (excluding, for the avoidance of doubt, any issuance of New Units) with Affiliates, Members (or their Affiliates) or senior management, except for arms-length employment agreements;

4.2.8    make any change in size to the Board;

4.2.9    make any material change to the Business; or

4.2.10    authorize or enter into any agreement, contract or commitment to do any of the forgoing;

<u>provided</u>, that <u>Section 4.2.3</u> shall be disregarded following termination of the All Pass Loyalty Program Agreement, unless such termination is by Bolt in accordance with the terms therein.

4.3    **Officers**.  The Board may appoint officers of the Company at any time, and the officers may include a CEO, one or more vice presidents, a secretary, one or more assistant secretaries, a chief financial officer, a treasurer, one or more assistant treasurers, a brand activation manager, a customer success manager, one or more marketing managers, and any other officers that the Board deems appropriate.  Such officers will serve at the pleasure of the Board.  Notwithstanding the foregoing, ABG may permit employees of any ABG Party to provide services to the Company, which may include serving as an officer of the Company.  In such an event, ABG may make an allocation of any such individuals' salaries and benefits, which shall be deemed Capital Contributions, in ABG's sole discretion.  As of the Effective Date, the following individuals are hereby appointed to the following officer positions, to have the duties, authority and responsibilities associated with such positions for a Delaware corporation in accordance with applicable Delaware law (subject to <u>Section 4.2</u>):

7

Jamie Salter – Chief Executive Officer
Nick Woodhouse – President and Chief Marketing Officer
Kevin Clarke – Chief Financial Officer
Jay Dubiner – General Counsel

4.4     **Budgets**.  At least ninety (90) days prior to the end of each Fiscal Year, the Company shall submit for approval by the Board a proposed business plan setting forth strategic plans and an annual budget (listing anticipated income, expenses, capital expenditures and financing needs) for the future operation and management of the Company (the "**Annual Budget**") covering the upcoming Fiscal Year.  Each Annual Budget shall be subject to review, comment, change and approval by the Board.  Notwithstanding the foregoing, the Company shall submit for approval by the Board a proposed Annual Budget for the 2021 Fiscal Year no later than December 31, 2020.

ARTICLE 5
DISTRIBUTIONS, TAX MATTERS, AND ALLOCATIONS

5.1     **Distributions**.

    5.1.1   Regular Distributions. Subject to the provisions of 5.1.2, and 8.3, distributions of cash or other property (which property will be valued based on the Gross Asset Value for this purpose), if any, shall be distributed to the Members at such times and in such amounts as may be determined by the Board in accordance with the following:

        (a)     First, before any distribution shall be made to any other Member, to ABG, as reimbursement for Customer Acquisition Costs relating to the Business;

        (b)     Second, before any other distribution shall be made to any other Member, to any Member with Unreturned Invested Capital with respect to each Unit, pro rata in proportion to their respective Percentage Interests, until the Unreturned Invested Capital with respect to all outstanding Units is reduced to zero; and

        (c)     Third, to the Members pro rata in proportion to their respective Percentage Interests.

    5.1.2   Tax Distributions.  If the aggregate amount of distributions made to any Member in accordance with the provisions and requirements of clauses (b) and (c) of Section 5.1.1 during any Fiscal Year should be less than such Member's Minimum Tax Amount for such  Fiscal Year, then the Company shall, to the extent of its available cash as determined by the Board in good faith, make distributions (the "**Tax Liability Distributions**") to such Member no later than ninety (90) days following the end of such Fiscal Year, in an amount equal to the amount (if any) by which such Member's Minimum Tax Amount for such Fiscal Year exceeds the aggregate amount distributed to such Member pursuant to clauses (b) and (c) Section 5.1.1 during such Fiscal Year. Any Tax Liability Distributions shall be treated as an advance against, and shall reduce the amount of, the next distribution(s) that such Member would otherwise receive pursuant to clauses (b) and (c) of Section 5.1.1 on a dollar-for-dollar basis, but shall not result in an offset against or reduction in a subsequent required Tax Liability Distribution pursuant to this Section 5.1.2.

5.2     **Allocations of Net Income and Net Losses**.  Subject to the provisions of Exhibit B hereto, Net Income, Net Losses and any other items of income, gain, loss, deduction and credit of the Company, for any Fiscal Year or other period shall be allocated among the Members in a manner that the Board determines will cause the Capital Account of each Member to equal, as closely as possible immediately after such

8

allocations, the Target Capital Account Balance of each Member and otherwise gives economic effect to the other provisions of this Article 5, Article 8 and the other relevant provisions of this Operating Agreement.

5.3     **Partnership Representative**.

5.3.1     The Members hereby appoint ABG as the "partnership representative" as provided in Code Section 6223(a) (the "**Partnership Representative**"). The Partnership Representative shall appoint a "designated individual" (within the meaning of Treasury Regulation Section 301.6223-1(b)(3)) who is an employee of the Partnership Representative or one of its Affiliates, and if the designated individual so appointed ceases to be an employee of either the Partnership Representative or one of its Affiliates, the Partnership Representative shall remove such Person as the designated individual and appoint a new designated individual who is an employee of the Partnership Representative or one of its Affiliates. The Partnership Representative is authorized to represent the Company in connection with all examinations of the Company's affairs by tax authorities, including administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  Each Member agrees that such Member will not independently act with respect to tax audits or tax litigation of the Company, unless previously authorized to do so in writing by the Partnership Representative, which authorization may be withheld by the Partnership Representative in its sole and absolute discretion.  The Partnership Representative shall have sole discretion to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any taxing authority.  The Partnership Representative shall have the authority to make any elections or take any actions under the Partnership Audit Rules (including any election under Section 6226 of the Code), and each Member shall cooperate to the extent necessary in the making of any such election or the taking of any such action.  If an election under Section 6226 of the Code is made, the Company shall furnish to each Member for the year under audit a statement of the Member's share of any adjustment set forth in the notice of final partnership adjustment, and each Member shall take such adjustment into account as required under Section 6226(b) of the Code.  At least ten (10) days prior to the filing of any Company tax return, the Company shall submit a copy of such tax return to the Partnership Representative for its review and approval, which approval shall not be unreasonably withheld, conditioned or delayed.  The Partnership Representative shall keep the Members reasonably informed of the progress of any inquiry, claim, assessment, audit or similar event or proceedings with respect to taxes of the Company or any subsidiary of the Company.  Promptly following the written request of the Partnership Representative, the Company shall, to the fullest extent permitted by applicable law, reimburse and indemnify the Partnership Representative for all reasonable expenses, including reasonable legal and accounting fees, claims, liabilities, losses and damages incurred by the Partnership Representative in such capacity in connection with any administrative or judicial proceeding with respect to the tax liability of the Members.

5.3.2     Each Member shall be liable for and shall indemnify the Company against, and shall promptly upon demand by the Partnership Representative, pay to the Company, such Member's share (as determined by the Partnership Representative) of any imputed underpayment of tax and any interest and penalties relating thereto imposed on the Company as a result of any partnership adjustment or other proceeding with substantially similar effect under partnership tax audit rules. For avoidance of doubt, the immediately preceding sentence applies only to income taxes and related interest and penalties imposed under the Partnership Audit Rules.  The liability and obligations of a Member under this Section 5.3 shall survive any sale, exchange, liquidation, retirement or other disposition of such Member's interest in the Company.

5.4 **Withholding**. The Company may withhold distributions, allocations or portions thereof if it is required to do so by any applicable rule, regulation, or law, and each Member hereby authorizes the Company to withhold from or pay on behalf of or with respect to such Member any amount of federal, state, local or foreign taxes that the Company determines that the Company is required to withhold or pay with respect to any amount distributable or allocable to such Member pursuant to this Operating Agreement. Any amount paid on behalf of or with respect to a Member pursuant to this Article 5 shall be treated as having been distributed to such Member and, to the extent such amounts required to be withheld exceed the amounts otherwise currently distributable to such Member, as an advance against the next distributions that would otherwise be made to such Member, and such amount shall be satisfied by offset from such next distributions, but shall not result in an offset against or reduction in a subsequent required Tax Liability Distribution pursuant to Section 5.1.2.

ARTICLE 6
DUTIES; INDEMNIFICATION

6.1 **Performance of Duties; Liability of Members**. Except as provided in this Operating Agreement, and other than the duty of good faith and fair dealing imposed at common law on the performance of the express contractual obligations and liabilities undertaken by the Members pursuant to the terms of this Operating Agreement, all express or implied duties of the Members, including any duty of loyalty, duty of care or other fiduciary duty that may be imposed on a Member pursuant to the Act, any common law principle or otherwise, is hereby eliminated.

6.2 **Duties of Board**. Notwithstanding anything to the contrary contained herein, to the fullest extent permitted by law, no member of the Board (unless otherwise specified in another agreement) shall have any fiduciary or other duty to the Company or to any Member of the Company.

6.3 **Indemnification; Insurance**. The Company will indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that such Person is or was a Member, Manager, officer, employee or other agent of the Company or that, being or having been such a Member, Manager, officer, employee or agent, such Person is or was serving at the request of the Company as a Manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an "**Agent**") in respect of any and all expenses (which expenses shall be advanced on an unsecured and interest free basis upon receipt by the Company of an undertaking by or on behalf of such Agent to repay such amount if it is determined by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal that such Agent is not entitled to be indemnified therefor as authorized in this **Error! Reference source not found.**, and provided any advancement to an Agent in excess of $25,000 in the aggregate must be reasonably approved by the Board), judgments, penalties, fines and amounts paid in settlement, to the fullest extent permitted by applicable law in effect on the Effective Date and to such greater extent as applicable law may hereafter from time to time permit, except in the case of such Person's actually proven fraud, deceit, gross negligence, reckless or intentional misconduct or a knowing violation of law. The Company may purchase and maintain insurance on behalf of officers and Managers of the Company against any liability asserted against such Persons and incurred by such Persons in their respective capacity as an Agent of the Company, or arising out of such Person's status as an Agent of the Company.

ARTICLE 7
TRANSFER OF INTERESTS

7.1 **Voluntary Transfers**.

DocuSign Envelope ID: 7D2EE2D3-13CA-47F0-8F91-BEC547A80C7C

7.1.1    Except as otherwise permitted or contemplated by the provisions of this Article 7, without prior written Board approval, all Voluntary Transfers of Units are forbidden and, if attempted, shall be void *ab initio*.  The Company shall not have any obligation to respect or honor any attempted Voluntary Transfer of Units and may continue to treat the ownership of such Units that is the subject of such Voluntary Transfer in the same manner as before the attempted Voluntary Transfer.

7.1.2    If, notwithstanding the provisions of Section 7.1.1, the Company should ever be required to recognize a Voluntary Transfer or attempted Voluntary Transfer of Units on its books and records, then the transferee of such Units shall (a) be an assignee of only an Economic Interest and (b) not have the right to become a substitute Member without the consent of the Board; provided that a transfer pursuant to Section 7.1.3 shall not be subject to this Section 7.1.2.

7.1.3    Notwithstanding Section 7.1.1, the following Members may effect a Voluntary Transfer of its Units without the prior written approval of the Board as follows: (a) any Member may effect a Voluntary Transfer of its Units to any Affiliate of such Member or to any Permitted Acquiror of such Member without the consent of the Company or any other Member or any other party, so long as such transferee joins this Operating Agreement as a party hereto and assumes all of the obligations, if any, of the transferor to the Company; and (b) ABG and Bolt may, as a Voluntary Transfer, grant a security interest in its Units to any commercial lender providing financing to any ABG Party or Bolt Party, as applicable, as collateral to secure the obligations of such ABG Party or Bolt Party, as applicable, under any bona fide credit agreements or other secured debt obligations, now existing or hereafter entered into or created.

7.1.4    Nothing in this Operating Agreement is intended to restrict any Transfers of ownership interests in Bolt, ABG or any other Bolt Party or ABG Party, which shall be unrestricted and shall not require any consent or other compliance pursuant to this Article 7 other than Section 7.1.3.

7.2    **Involuntary Transfers**.  Involuntary Transfers of Units shall be permitted; provided, that the transferee of such Units shall (a) be an assignee of Units with only Economic Interests, (b) not have the right to become a substitute Member unless the Board consents and (c) not have any right to exercise any voting rights with respect to such Units.

7.3    **Drag-Along Right; Tag-Along Right**.  If ABG has agreed to accept a bona fide offer ("**Buy-Out Offer**") from a bona fide Third Party ("**Buy-Out Offeror**") to purchase or otherwise acquire for arm's length consideration ABG's Units such that it would result in a Change of Control of the Company, then the following provisions shall apply:

7.3.1    Drag-Along Right.  ABG shall have the right (the "**Drag-Along Right**") to require all other Members (the "**Drag-Along Members**") to sell or otherwise Transfer a percentage of such Member's respective Units (equal to the same percentage of Units being sold or otherwise Transferred by ABG compared to the total Units held by ABG immediately prior to any such transaction) to such Buy-Out Offeror in accordance with the following provisions:

(a)    In order to exercise the Drag-Along Right with respect to such Buy-Out Offer, ABG must deliver to each Drag-Along Member, promptly (and no later than fifteen (15) days) following acceptance of such Buy-Out Offer, a written notice (the "**Drag-Along Notice**") that contains (i) the name of the Person to whom such Units are proposed to be sold, (ii) a copy of such Buy-Out Offer, (iii) an indication that ABG is exercising the Drag-Along Right, (iv) the proposed date, time and location of the closing of the sale, (v) the quantity of Units to be sold by ABG, (vi) the proposed amount of consideration to be paid by the Buy-Out Offeror for the Units and the other material terms and conditions of the

DocuSign Envelope ID: 7D2EE2D3-13CA-47F0-8F94-BFC547A80C7C

Buy-Out Offer, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof, and (vii) in the event that such Buy-Out Offer is part of a broader transaction between ABG and the Buy-Out Offeror and no specific value has been allocated to the Units by the Buy-Out Offeror, a reasonable allocation to the Units of the consideration to be received by ABG in the broader transaction under the Buy-Out Offer, as determined by ABG in good faith.  All consideration from a Buy-Out Offer allocated to the Units shall be distributed to the Members in accordance with <u>Section 8.3</u>.

(b)     Following delivery of a Drag-Along Notice, (i) ABG shall promptly provide written notice to the Drag-Along Members of all material updates or changes to the terms, timing or status of such Buy-Out Offer and (ii) the Drag-Along Members shall be obligated to sell or otherwise Transfer a percentage of their respective Units (equal to the percentage of Units being sold or otherwise Transferred by ABG compared to the total Units held by ABG immediately prior to any sale contemplated by this <u>Section 7.3.1</u>) to such Buy-Out Offeror simultaneously with, and upon the same terms (on a proportionate basis and in accordance with their respective Percentage Interests) and conditions as apply to, the sale or other Transfer of ABG's Units to such Buy-Out Offeror.

(c)     The obligations of the Drag-Along Members in respect of a Buy-Out Offer are subject to the satisfaction of the following conditions (i) the consideration to be received by each Drag-Along Member shall be the same form and amount of consideration to be received by ABG on a pro rata basis with respect to the Units being sold by such Member, after deduction of each Member's proportionate share of the related expenses in accordance with <u>Section 7.3.1(d)</u>, and the terms and conditions of such sale shall be no less favorable than those upon which ABG sells its Units; (ii) if ABG or any Drag-Along Member is given an option as to the form and amount of consideration to be received, the same option shall be given to all Drag-Along Members; and (iii) each Drag-Along Member shall execute the applicable purchase agreement, if applicable, in the same form as executed by ABG, and make or provide the same representations, warranties, covenants, indemnities and agreements as ABG makes or provides in connection with the Buy-Out Offer; <u>provided</u>, that each Drag-Along Member shall only be obligated to make individual representations and warranties with respect to its title to and ownership of the applicable Units, authorization, execution and delivery of relevant documents by such Drag-Along Member, enforceability of such documents against such Drag-Along Member, and other customary matters solely relating to such Drag-Along Member, but not with respect to any of the foregoing as to any other Members or their Units or to the Company or its business generally; <u>provided</u>, <u>further</u>, that all representations, warranties, covenants and indemnities shall be made by ABG and each Drag-Along Member severally and not jointly, and any indemnification obligation shall be pro rata, based on the cash consideration received by ABG and each Drag-Along Member, as applicable, at closing, in each case, in an amount not to exceed such Drag-Along Member's or ABG's pro rata portion of the proceeds received by such Drag-Along Member or ABG, respectively, in connection with the Buy-Out Offer; <u>provided</u>, <u>further</u>, that no Drag-Along Member will be required to enter into any non-competition or non-solicitation covenant or agreement in connection with such Buy-Out Offer.

(d)     The fees and expenses of ABG actually incurred in connection with a Buy-Out Offer to the extent for the benefit of ABG and all Drag-Along Members collectively, and to the extent not paid or reimbursed by the Company or the Buy-Out Offeror, shall be shared by ABG and all the Drag-Along Members on a pro rata basis, based on the consideration received by each such Member; <u>provided</u>, that no Drag-Along Member shall

12

be obligated to make any out-of-pocket expenditure prior to the consummation of the Buy-Out Offer; provided, further, that each Drag-Along Member shall be responsible for its own fees and expenses incurred in connection with a Buy-Out Offer.

(e)　ABG shall have one hundred twenty (120) days following the date of the Drag-Along Notice in which to consummate the Buy-Out Offer, on the terms set forth in the Drag-Along Notice. If at the end of such period ABG has not consummated the Buy-Out Offer, ABG may not then exercise its rights under this Section 7.3.1 without again fully complying with the provisions of this Section 7.3.1.

7.3.2　Tag-Along Right. If ABG has agreed to a Buy-Out Offer, but does not exercise the Drag-Along Right, then each other Member (the "**Tag-Along Members**") shall have a right (the "**Tag-Along Right**") to require ABG to include in the sale or other Transfer to such Buy-Out Offerer a pro rata portion of such Member's respective Units (based on the number of Units held by such Member compared to the total number of Units held by ABG and each Member exercising the Tag-Along Right), in accordance with the following:

(a)　ABG shall deliver to each Tag-Along Member, promptly (and no later than fifteen (15) days) following acceptance of such Buy-Out Offer, a written notice ("**Tag-Along Notice**") that contains (i) the name of the Person to whom such Units are proposed to be sold, (ii) a copy of such Buy-Out Offer, (iii) the proposed date, time and location of the closing of the sale, (iv) the quantity of Units to be sold by ABG, (v) the proposed amount of consideration to be paid by the Buy-Out Offeror for the Units and the other material terms and conditions of the Buy-Out Offer, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof, and (vi) in the event that such Buy-Out Offer is part of a broader transaction between ABG and the Buy-Out Offeror and no specific value has been allocated to the Units by the Buy-Out Offeror, a reasonable allocation to the Units of the consideration to be received by ABG in the broader transaction under the Buy-Out Offer, as determined by ABG in good faith. All consideration from a Buy-Out Offer allocated to the Units shall be distributed to the Members in accordance with Section 8.3.

(b)　Each Tag-Along Member shall have a period of ten (10) Business Days following issuance of a Tag-Along Notice to exercise the Tag-Along Right with respect to such Buy-Out Offer. If any Tag-Along Member has not provided notice to ABG of the exercise of the Tag-Along Right within such ten (10) Business Days period, then such Tag-Along Member's Tag-Along Right shall expire with regard to such Buy-Out Offer; provided, that if any Buy-Out Offer for which any Tag-Along Member did not exercise the Tag-Along Right should be thereafter revised in a manner that is more favorable to ABG in any material respect, then ABG shall be required to send another Tag-Along Notice with the revised Buy-Out Offer, and each Tag-Along Member shall have another ten (10) Business Days thereafter to exercise the Tag-Along Right with respect to such revised Buy-Out Offer.

(c)　If any Tag-Along Members should timely exercise the Tag-Along Right, then (i) ABG shall promptly provide written notice to such Tag-Along Members of all material updates or changes to the terms, timing or status of such Buy-Out Offer and (ii) ABG shall make arrangements for the Buy-Out Offeror to purchase or otherwise acquire such Tag-Along Members' Units that are to be included in the sale, and such Tag-Along Members shall be obligated (subject to Section 7.3.2(d)) to sell or otherwise Transfer their respective Units that are to be included in the sale to the Buy-Out Offeror, simultaneously with, and

13

upon the same terms (on a proportionate basis and in accordance with their respective Percentage Interests) and conditions as apply to, the sale or other transfer of ABG's Units to such Buy-Out Offeror.  If such Buy-Out Offeror refuses to purchase or otherwise acquire any Tag-Along Member's Units after a timely exercise of the Tag-Along Right, then ABG may not sell or otherwise Transfer its Units to such Buy-Out Offeror without the written consent of such Tag-Along Member.

(d)     If, after exercising the Tag-Along Right with respect to any Buy-Out Offer, such Buy-Out Offer should be revised in a manner that is less favorable to the Tag-Along Members in any material respect, then the Tag-Along Members shall have the right to withdraw the exercise of such Tag-Along Right by notice to ABG within ten (10) Business Days following notice to such Tag-Along Members of such change in the terms of such Buy-Out Offer.

(e)     Notwithstanding anything to the contrary herein, each Tag-Along Member shall receive the same form and amount of consideration to be received by ABG on a pro rata basis with respect to the Units being sold by such Member, after deduction of each Member's proportionate share of the related expenses in accordance with Section 7.3.2(f), and the terms and conditions of such sale shall be no less favorable than those upon which ABG sells its Units.   Each Tag-Along Member shall make or provide the same representations, warranties, covenants, indemnities and agreements as ABG makes or provides in connection with the Buy-Out Offer; provided, that each Tag-Along Member shall only be obligated to make individual representations and warranties with respect to his, her or its title to and ownership of the applicable Units, authorization, execution and delivery of relevant documents by the Tag-Along Member, enforceability of such documents against the Tag-Along Member, and other customary matters relating to such Tag-Along Member and to the Company or its business generally, but not with respect to any of the foregoing as to any other Members or their Units; provided, further, that all representations, warranties, covenants and indemnities shall be made by ABG and each Tag-Along Member severally and not jointly, and any indemnification obligation shall be pro rata, based on the consideration received by ABG and each Tag-Along Member, as applicable, at closing, in each case, in an amount not to exceed such Tag-Along Member's or ABG's pro rata portion of the proceeds received by such Tag-Along Member or ABG, respectively, in connection with the Buy-Out Offer.

(f)     The fees and expenses of ABG actually incurred in connection with a Buy-Out Offer to the extent for the benefit of ABG and all Tag-Along Members collectively, and to the extent not paid or reimbursed by the Company or the Buy-Out Offeror, shall be shared by ABG and all the participating Tag-Along Members on a pro rata basis, based on the consideration received by each such Member; provided, that no Tag-Along Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the Buy-Out Offer; provided, further, that each Tag-Along Member shall be responsible for its own fees and expenses incurred in connection with a Buy-Out Offer.

(g)     ABG shall have one hundred twenty (120) days following the date of the Tag-Along Notice in which to consummate the Buy-Out Offer, on the terms set forth in the Tag-Along Notice.  If at the end of such period ABG has not consummated such Buy-Out Offer, ABG may not then exercise his, her or its rights under this Section 7.3.2 without again fully complying with the provisions of this Section 7.3.2.

DocuSign Envelope ID: 7D2EE2D3-13CA-47F0-8F01-BFC547A80C7C

7.3.3     <u>Right to Revise Buy-Out Offer</u>.  Subject to compliance with its obligations in this <u>Section 7.3</u>, ABG reserves the right to revise and/or terminate any and all Buy-Out Offers that it may have previously accepted, and the rights of the other Members under this <u>Section 7.3</u> shall be subject to any decision by ABG to so revise or terminate any such Buy-Out Offer.

7.4     **Pre-emptive Right**.

7.4.1     <u>Issuance of New Units</u>.  The Company grants to each Member (each, a "**Pre-emptive Member**") the right to purchase such Member's pro rata portion (in proportion to their respective Percentage Interests) of any New Units that the Company or any subsidiary of the Company issues or sells after the Effective Date.

7.4.2     <u>Issuance Notices</u>.  The Company shall provide each Pre-emptive Member with written notice (an "**Issuance Notice**") of any proposed issuance or sale described in <u>Section 7.4.1</u> within ten (10) days following the date on which any such issuance or sale of New Units is approved in accordance with this Operating Agreement.  The Issuance Notice shall, if applicable, be accompanied by a written offer from any prospective purchaser seeking to purchase New Units (a "**Prospective Purchaser**") and shall set forth the material terms and conditions of the proposed issuance or sale, including: (a) the name of the Prospective Purchaser; (b) the proposed date, time and location of the closing of the issuance or sale, which shall be at least thirty (30) days from the date of the Issuance Notice; (c) the quantity of Units or other equity interests proposed to be issued and the percentage of the Company or subsidiary of the Company's equity interests then outstanding that such issuance would represent; and (d) the proposed purchase price per New Unit and the other material terms and conditions of the issuance, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof.  The Issuance Notice shall also be accompanied by a current copy of <u>Schedule 3.2</u> indicating each Pre-emptive Member's Units in a manner that enables each Pre-emptive Member to calculate such Pre-emptive Member's pro rata portion of any New Units (and the Company's calculation thereof).

7.4.3     **Exercise of Pre-emptive Rights**.  Each Pre-emptive Member shall for a period of twenty-five (25) days following the receipt of an Issuance Notice (the "**Exercise Period**") have the right to elect irrevocably to purchase all or any portion of its pro rata share of any New Units at the purchase price set forth in the Issuance Notice by delivering a written notice to the Company (an "**Acceptance Notice**") specifying the number of New Units that such Member desires to purchase. The delivery of an Acceptance Notice by a Pre-emptive Member shall be a binding and irrevocable offer by such Member to purchase the New Units described therein.  The failure of a Pre-emptive Member to deliver an Acceptance Notice by the end of the Exercise Period shall constitute a waiver of its rights under this <u>Section 7.4</u> with respect to the purchase of such New Units, but shall not affect its rights with respect to any future issuances or sales of New Units.

7.4.4     **Over-allotment**.  No later than five (5) days following the expiration of the Exercise Period, the Company shall notify each Pre-emptive Member in writing of the number of New Units that each Pre-emptive Member has agreed to purchase (even if such number is zero) (the "**Allotment Notice**").  Each Pre-emptive Member exercising its rights to purchase its pro rata portion of the New Units in full (an "**Exercising Member**") shall have a right of over-allotment such that if any other Pre-emptive Member has failed to exercise its right under this <u>Section 7.4</u> to purchase its full pro rata portion of the New Units (each, a "**Non-Exercising Member**"), such Exercising Member may purchase its applicable pro rata portion of such Non-Exercising Member's allotment by giving written notice to the Company within five (5) days of receipt of the Allotment Notice (the "**Over-allotment Exercise Period**").

DocuSign Envelope ID: 7D2EE2D3-13CA-47E0-8F01-BFC547A80C7C

7.4.5   **Sales to the Prospective Purchaser**.  Following the expiration of the Exercise Period and, if applicable, the Over-allotment Exercise Period, the Company or such subsidiary of the Company shall be free to complete the proposed issuance or sale of New Units described in the Issuance Notice with respect to which Pre-emptive Members declined to exercise the pre-emptive right set forth in this Section 7.4 on terms no less favorable to such Person than those set forth in the Issuance Notice (except that the amount of New Units to be issued or sold by such Person may be reduced); provided, that: (a) such issuance or sale is closed within ninety (90) days after the expiration of the Exercise Period and, if applicable, the Over-allotment Exercise Period (subject to the extension of such ninety (90) day period for a reasonable time not to exceed thirty (30) days to the extent reasonably necessary to obtain any Third Party approvals); and (b) the price at which the New Units are sold to the Prospective Purchaser is at least equal to or higher than the purchase price per Unit described in the Issuance Notice.  In the event the Company or such subsidiary of the Company has not sold such New Units within such time period, such Person shall not thereafter issue or sell any New Units without first again offering such securities to the Members in accordance with the procedures set forth in this Section 7.4.

7.4.6   **Closing of the Issuance**.  The closing of any purchase by any Pre-emptive Member shall be consummated concurrently with the consummation of the issuance or sale described in the Issuance Notice.  Upon the issuance or sale of any New Units in accordance with this Section 7.4, the Company or such subsidiary of the Company shall deliver the New Units free and clear of any liens (other than those arising under applicable securities laws or hereunder and those attributable to the actions of the purchasers thereof), and such Person shall so represent and warrant to the Exercising Members, and further represent and warrant to such Exercising Members that such New Units shall be, upon issuance thereof to the Exercising Members and after payment therefor, duly authorized, validly issued, and fully paid.  Each Exercising Member shall deliver to the Company or such subsidiary of the Company the purchase price for the New Units purchased by it by certified or bank check or wire transfer of immediately available funds.  Each party to the purchase and sale of New Units shall take all such other actions as may be reasonably necessary to consummate the purchase and sale including entering into such additional agreements as may be necessary or appropriate.

7.5   **Termination of AllPass Loyalty Program Agreement**.

7.5.1   Subject to Section 7.5.2, in the event that ABG terminates the AllPass Loyalty Program Agreement pursuant to the terms thereof, then Bolt shall automatically forfeit on the date of such termination, for no consideration, the following number of Bolt's Units: 300 Units *less* such number of Units equal to the product of (x) 18.75 Units (subject to appropriate adjustment in the event of any equity split, combination or other similar recapitalization) *multiplied by* (y) the number of three-month periods that have elapsed since the Effective Date, such that this forfeiture right will cease to apply with respect to any of Bolt's Units on the fourth (4th) anniversary of the Effective Date.

7.5.2   Section 7.5.1 will terminate and cease to apply to any of Bolt's Units once the Company books, receives or recognizes $100,000,000 or more in revenue cumulatively at any point following the Effective Date.

7.6   **Prohibitions on Transfer**.  Notwithstanding any contrary provision in this Operating Agreement, any otherwise permitted Transfer to any Person shall be null and void if such Transfer would cause the Company to cease to comply with at least one safe harbor under Treasury Regulations Section 1.7704-1.

511513.10
100620

DocuSign Envelope ID: 7D2EE2D3-13CA-47F0-8F04-BFC547A80C7C

7.7     **Bolt Right to COC Notice**.  So long as the Bolt Minimum Condition is satisfied, if the Company intends to make or accept a proposal with respect to a proposed transaction that will qualify as a Change of Control, or would result in all or substantially all of the Company's employees working for such third party or the license of all or substantially all of the Company's intellectual property to such third party, the Company shall notify Bolt promptly (and in any event, at least three (3) business days prior to entering into any legally binding agreement to effectuate such proposed transaction (the "**COC Notice**"). The COC Notice shall include, to the extent available, a description of the proposed transaction structure, proposed purchase price (including a description of any non-cash consideration in sufficient detail to permit the valuation thereof), payment terms and all other material terms and conditions related to such proposed transaction, as well as the identity of the third party (if known).  Notwithstanding the foregoing and for the avoidance of doubt, this Section 7.7 shall be disregarded following termination of the All Pass Loyalty Program Agreement.

ARTICLE 8
DISSOLUTION AND WINDING UP

8.1     **Dissolution**.  The Company will be dissolved, its assets will be disposed of, and its affairs wound up upon, and only upon, the first to occur of the following: (a) the entry of a decree of judicial dissolution pursuant to the Act; (b) the unanimous vote of the Board; (c) the sale or liquidation of all or substantially all of the assets of the Company conducted in accordance with the terms hereof or any similar transaction with similar effect; or (d) the happening of any other event that makes it unlawful or impossible to carry on the business of the Company.  The dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution in accordance with this Section 8.1, but the Company shall not terminate until it has been wound up and its assets have been distributed as provided in Section 8.3 and its existence has been terminated as provided in Section 8.4.

8.2     **Winding Up**.  Upon the occurrence of any event specified in Section 8.1, the Company will continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors.  The Board or a Person designated thereby will be responsible for overseeing the winding up and liquidation of the Company, will take full account of the liabilities of the Company and its assets, will either cause its assets to be sold or distributed and, if sold, as promptly as is consistent with obtaining the fair market value thereof, will cause the proceeds therefrom to be applied and distributed as provided in Section 8.3 to the extent sufficient for such purpose.  The Person(s) winding up the affairs of the Company will give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company.  The Person(s) winding up the affairs of the Company will be entitled to reasonable compensation for such services.

8.3     **Payment of Liabilities and Liquidating Distributions Upon Dissolution**.  After determining that all known debts and liabilities of the Company, including any debts and liabilities to Members who are creditors of the Company, and expenses of liquidation have been paid or adequately provided for in the process of winding up the Company, the remaining assets will be distributed to the Members in accordance with Section 5.1.  If, at the time of any such liquidating distribution, the Company is a party to any contract pursuant to which the Company may in the future receive profits (or be obligated to fund any losses), the Members will enter into appropriate arrangements to ensure that any such profits or losses are paid to (or borne by) the Members in accordance with Section 5.1.

8.4     **Notice of Dissolution and Articles of Termination**.  The Company will cause to be filed in the office of, and on a form prescribed by, the Delaware Secretary of State, a certificate of cancellation upon the completion of the winding up of the affairs of the Company.

17

8.5     **Rights of Members**.  Except as otherwise provided in this Operating Agreement, (a) each Member will look solely to the assets of the Company for the return of its Capital Contributions and (b) no Member will have priority over any other Member as to the return of its Capital Contributions, distributions, or allocations.  If any Member has a deficit balance in its Capital Account (after giving effect to all contributions, distributions and allocations for all taxable years, including the year during which the liquidation occurs), then such Member shall have no obligation to make any Capital Contribution with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever.

### ARTICLE 9
### ACCOUNTING, RECORDS AND REPORTING

9.1     **Deposits, Checks, Drafts, etc**.  All funds of the Company will be deposited for the credit of the Company into one or more accounts with such banks or other depositories as the Board may select from time to time.  All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company will be signed by such officers as may be authorized to do so from time to time by the Board.

9.2     **Books and Records; Financial Reporting**.  The books and records of the Company will reflect all the Company transactions and will be kept in such manner as is appropriate and adequate for the Company's business.  The Company will maintain the Company's books and records at its principal office.  The Company shall prepare annual, quarterly and monthly reports in accordance with U.S. general accepted accounting principles showing actual results and updated forecasts (the "**Financials**") and provide such other financial information as the Board may reasonably require from time to time. The Company shall furnish to the Members in a timely manner all information reasonably necessary to enable each of the Members to prepare his, her or its federal income tax return for the preceding calendar year.  In addition, the Company shall deliver to each Member who owns ten percent (10%) or more of the issued and outstanding Units, (a) copies of the Financials to each Member, which shall be delivered (i) within 120 days of the end of each fiscal year with respect to the annual Financials, (ii) within 45 days of end of each fiscal quarter with respect to the quarterly Financials, and (iii) within 30 days of end of each month with respect to the monthly Financials, and which may be unaudited unless an audited equivalent is available, and (b) any other information requested in good faith to enable each of the Members to prepare such Member's own financial reports and respond to requests from such Member's financial auditors.

9.3     **Right of Inspection**.  Any Member who owns ten percent (10%) or more of the issued and outstanding Units will have the right, at any reasonable time, to (a) examine the Company's properties, offices, plants and other facilities, (b) examine the corporate, financial and similar records, reports and documents of the Company, including all books and records, minutes of proceedings, reports of operations, reports of adverse developments, and to permit each Member and his, her or its representatives to examine such documents and make copies thereof, and (c) discuss the affairs, finances and accounts of the Company with its officers, senior employees and public accountants (and the Company hereby authorizes said accountants to discuss with such Member and his, her or its representatives such affairs, finances and accounts).

### ARTICLE 10
### MISCELLANEOUS

10.1     **Complete Agreement**.  This Operating Agreement, together with the AllPass Loyalty Program Agreement and the other agreements contemplated thereby, constitutes the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members or

any of them.  Without limiting the foregoing, this Operating Agreement is a complete amendment and restatement of the Original Agreement and supersedes and replaces such Original Agreement in its entirety.

10.2   **Governing Law**.  This Operating Agreement (and any claim or controversy arising out of or relating to this Operating Agreement) shall be governed by and construed in accordance with the domestic laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Delaware.

10.3   **Consent to Jurisdiction**.  Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the courts located in New York, New York, to the extent such courts have subject matter jurisdiction, or of the federal court of the United States of America sitting in New York, New York and any appellate court thereof (collectively, the "**Applicable Courts**"), in any action or proceeding arising out of or relating to this Operating Agreement or for recognition or enforcement of any judgment relating thereto, and each party hereto hereby irrevocably and unconditionally (a) agrees not to commence any such action or proceeding except in an Applicable Court; (b) agrees that any claim in respect of any such action or proceeding may, to the extent permitted by law, be heard and determined in such an Applicable Court; (c) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any such action or proceeding in any Applicable Court; and (d) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in Applicable Court.  Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 10.9.

10.4   **Waiver of Jury Trial**.   EACH PARTY TO THIS OPERATING AGREEMENT ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS OPERATING AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS OPERATING AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.   EACH PARTY TO THIS OPERATING AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE EITHER OF SUCH WAIVERS; (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVERS; (C) IT MAKES SUCH WAIVERS VOLUNTARILY; AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS OPERATING AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.4.

10.5   **Successors**.  This Operating Agreement will bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

10.6   **Amendments**.  Subject to Section 3.2, this Operating Agreement may be modified, altered, waived, supplemented or amended only with the prior written consent of the Board; provided, that this Operating Agreement may not be amended or waived without the approval of each Member thereby affected if the amendment modifies the rights or obligations of such Member in a manner that is disproportionately adverse (including disproportionately adverse in actual effect) to such Member relative to the rights of other Members in respect of Units of the same class or series.  The Board shall cause to be prepared and filed any amendment to the Certificate that may be required to be filed under the Act as a consequence of any amendment to this Operating Agreement.  Any modification or amendment to this Operating Agreement pursuant to this Section 10.6 shall be binding upon all Members and shall bind, and inure to the benefit of, their respective successors and assigns.  The Company shall deliver a copy of any such modification,

19

DocuSign Envelope ID: 7D2EE2D3-13CA-47F0-8F91-BEC547A80C7C

alteration, waiver, supplement or amendment to this Operating Agreement to all Members promptly following the effectiveness thereof.

10.7    **Severability**.  The provisions of this Operating Agreement are severable.  The invalidity, in whole or in part, of any provision of this Operating Agreement will not affect the validity or enforceability of any other of its provisions.  If one or more provisions hereof will be declared invalid or unenforceable, the remaining provisions will remain in full force and effect and will be construed in the broadest possible manner to effectuate the purposes hereof.  The parties further agree to replace such void or unenforceable provisions of this Operating Agreement with valid and enforceable provisions which will achieve, to the extent possible, the economic, business and other purposes of the void or unenforceable provisions.

10.8    **Additional Documents and Acts**.  Each Member agrees to cooperate with the other Members, to execute and deliver such additional documents and instruments, to give such further written assurances and to perform such additional acts as may be reasonably necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Operating Agreement and the transactions contemplated hereby.

10.9    **Notices**.  All notices, elections or other communications required or permitted hereunder will be in writing and will be delivered in person, by facsimile, electronic mail or equivalent form of written telecommunication (with confirmation of delivery), or sent by certified or registered mail via the U.S. Postal Service, return receipt requested, postage prepaid or by Federal Express, DHL or UPS, to the address for each party set forth on Schedule 10.9 or such other address as any party may designate in a written notice served upon the other parties in the manner provided for herein.  All notices required or permitted hereunder will be deemed duly given and received (i) on the date received, if personally delivered or sent by facsimile or electronic mail, (ii) two (2) Business Days after being sent by Federal Express, DHL or UPS and (iii) five (5) Business Days after deposit with the U.S. Postal Service, if sent by registered or certified mail.

10.10    **Multiple Counterparts and Electronic Delivery**.  This Operating Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which will constitute one and the same instrument.  Delivery of signed copies hereof by facsimile, PDF or other electronic format shall be deemed to be effective delivery of an original counterpart.

10.11    **Costs**.  Except as expressly set forth in this Operating Agreement, each party hereto will be solely responsible for and bear all of its respective expenses, including expenses of lenders, legal counsel, consultants, accountants and other advisors, incurred at any time in connection with the transactions contemplated by this Operating Agreement.

10.12    **Publicity**.    Neither Bolt nor the Company shall, either itself or through any agents or representatives, make, issue, distribute or disseminate any information or statements, whether written or verbal, to the press regarding ABG, the Company, and/or any other matters pertaining to or arising out of this Operating Agreement (each, a "**Press Release**") unless and until ABG has approved such Press Release.

10.13    **Confidentiality**.  Each Member agrees that such Member shall keep confidential, and shall not disclose to any third party or use for its own benefit, without the consent of the Company, any non-public information with respect to the Company (including any Person in which the Company holds, or contemplates acquiring, an investment) that is in such Member's possession on the Effective Date or thereafter disclosed to such Member by or on behalf of the Company; provided, that a Member may (subject to any other confidentiality agreements or arrangements agreed to by such Member with the Company or any of its Affiliates) disclose any such information (a) as has become generally available to the public other than by virtue of a breach of any obligation of confidentiality owed to the Company by such Member or its Affiliates or other related parties, (b) to its owners, lenders under contractual confidentiality obligations,

20

DocuSign Envelope ID: 7D2EE2D3-13CA-47F0-8F91-BFC547A80C7C

directors, employees, and professional advisers who need to know such information and agree to keep it confidential and not use it for any purpose other than to advise such Member, (c) in connection with any bona fide financing for, or acquisition of, such Member, to its future investors, lenders, acquirors or underwriters, in each case, who are under confidentiality obligations to such Member; provided, that ABG must be provided with prior written notice and the opportunity to reject such disclosure before such Member may make any such disclosure contemplated by this clause (c) to an ABG Competitor, (d) to the extent required in order to comply with reporting obligations to its investors who have agreed to keep such information confidential, (e) to any proposed purchaser of such Member's Membership Interests if such purchase would be permitted under this Operating Agreement so long as such proposed purchaser agrees in writing to keep any information received confidential on the terms set forth herein and (f) to the extent necessary in order to comply with any law, rules, order, regulation, stock exchange rules or ruling applicable to such Member or as may be required in response to any summons or subpoena or in connection with any litigation; provided, that, in the case of clause (f), (i) the Member shall, to the extent legally permitted, give the Company notice of such request and shall cooperate with the Company at the Company's request so that the Company may, in its discretion and at its cost and expense, seek a protective order or other appropriate remedy, if available, and (ii) in the event that such protective order is not obtained (or sought by the Company after notice), the Member (x) shall furnish only that portion of the information which, in accordance with the advice of counsel, is legally required to be furnished and (y) will exercise its reasonable efforts to obtain assurances that confidential treatment will be accorded such information.  Nothing in this Operating Agreement shall be construed to give any employee of any Member any right to receive confidential information or financial information regarding the Company.

10.14   **Survival**.  Notwithstanding anything to the contrary contained herein, the provisions of Article 6 (Exculpation and Indemnification; Other Matters) and Article 10 (Miscellaneous) shall survive any (a) amendment or termination of this Operating Agreement, (b) any Transfer by a Member, and (c) the dissolution or termination of the Company.

10.15   **Specific Performance**.  Each party recognizes and acknowledges that a breach of Section 10.13 will cause irreparable damage, the exact amount of which will be difficult or impossible to ascertain, and that remedies at law for any such breach will be inadequate.  Accordingly, each party agrees that in the event of a breach or threatened breach of Section 10.13, in addition to any other remedy which may be available at law or in equity, the non-breaching parties may apply to a court of competent jurisdiction for injunctive relief and specific performance to prevent or prohibit such breach.  Each party agrees not to raise as a defense or objection to the request or granting of such relief that any breach of Section 10.13 is or would be compensable by an award of money damages, and each party agrees to waive any requirements for the securing or posting of any bond in connection with such remedy.

*[Signature Pages Follow]*

21

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Operating Agreement on the date first above written.

MEMBERS:

ABG INTERMEDIATE HOLDINGS 2 LLC, a Delaware
limited liability company

By: _____
Name: _____
Title: _____


BOLT FINANCIAL, INC., a Delaware corporation

By: *Ryan Breslow*
Name: Ryan Breslow
Title: CEO

22

**EXHIBIT A**

DEFINITIONS

10.16    **Defined Terms**.  When used in this Operating Agreement, the following capitalized terms will have the meanings set forth below.

10.16.1 "**ABG**" means Authentic Brands Group, LLC.

10.16.2 "**ABG Competitor**" means any Person that engages in a business, the principal purpose of which is acquiring, owning, developing, managing, financing, licensing, selling or otherwise exploiting consumer brands, names, likenesses, images or voices of characters or other personalities, whether fictional or non-fictional and whether living or dead, or any other indicia identifying the foregoing and all publicity rights in connection therewith, in each case including any related service marks or trademarks, trade names, trade dress, logos, domain names, copyrights or other intellectual property rights.

10.16.3 "**ABG Minimum Condition**" means ABG beneficially owning at least 350 Units (subject to appropriate adjustment in the event of any equity split, combination or other similar recapitalization).

10.16.4 "**ABG Parties**" means ABG and its Affiliates.

10.16.5 "**Acceptance Notice**" has the meaning stated in Section 7.4.3.

10.16.6 "**Act**" shall mean the Delaware Limited Liability Company Act as the same may be amended from time to time.  All references herein to sections of the Act shall include any corresponding provisions of succeeding law.

10.16.7 "**Adjusted Taxable Income**" shall mean, with respect to any Member and for any Fiscal Year (or portion thereof) and with respect to Units held by such Member, the federal taxable income allocated by the Company to the Member with respect to such Units (as adjusted by any final determination in connection with any tax audit or other proceeding) for such Fiscal Year (or portion thereof); provided, that such taxable income shall be computed (i) minus any excess taxable loss or excess taxable credits of the Company for any prior period allocable to such Member with respect to such Units that were not previously taken into account for purposes of determining such Member's Adjusted Taxable Income in a prior Fiscal Year to the extent such loss or credit would be available under the Code to offset income of the Member (or, as appropriate, the direct or indirect members of the Member) determined as if the income, loss, and credits from the Company were the only income, loss, and credits of the Member (or, as appropriate, the direct or indirect members of the Member) in such Fiscal Year and all prior Fiscal Years, (ii) taking into account any special basis adjustment with respect to such Member resulting from an election by the Company under Code Section 754, and (iii) taking into account any deduction, credit or other amount relating to, and that would reduce the Member's aggregate tax liability attributable to, such Member's ownership of Units, including deductions for which the Member may be entitled under Code Section 199A.

10.16.8 "**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, such Person.  Notwithstanding the foregoing, no Member shall be considered an Affiliate of the Company or vice versa.

10.16.9 "**Agent**" has the meaning stated in Section 6.3.

10.16.10        "**AllPass Loyalty Program Agreement**" has the meaning stated in Recital B.

DocuSign Envelope ID: 7D2EE2D3-13CA-47F0-8F04-BEC547A80C7C

10.16.11    "**Annual Budget**" has the meaning stated in <u>Section 4.4</u>.

10.16.12    "**Applicable Courts**" has the meaning stated in <u>Section 8.3</u>.

10.16.13    "**Bolt Competitor**" means any Person who (i) is in the business of selling or licensing (outbound) decentralized stand-alone checkout or fraud protection products (i.e. decentralized checkout or fraud protection products that are able to integrate and be used with multiple separate e-commerce technology stacks, e.g., Magento, Salesforce Commerce Cloud, BigCommerce, etc.) to e-commerce merchants (such business, "**Bolt Competitor Business**"), <u>and</u> (ii) earns over fifty percent (50%) of such Person's annual revenue from such Person's Bolt Competitor Business.  For the avoidance of doubt, a Person will not be considered a Bolt Competitor solely by virtue of offering, selling, or licensing checkout or fraud protection products to e-commerce merchants.

10.16.14    "**Bolt Minimum Condition**" means Bolt beneficially owning at least 150 Units (subject to appropriate adjustment in the event of any equity split, combination or other similar recapitalization).  For the avoidance of doubt, any action, event or other provision that requires Bolt's and/or the Bolt Manager's approval shall only require such approval if the Bolt Minimum Condition is satisfied at such time.

10.16.15    "**Bolt Parties**" means Bolt and its Affiliates.

10.16.16    "**Business**" has the meaning stated in <u>Section 1.3</u>.

10.16.17    "**Business Day**" means a day other than a Saturday, Sunday, or other day on which the commercial banks in New York, New York are authorized, permitted or directed by Governmental Authority or Applicable Law to not open.

10.16.18    "**Capital Account**" has the meaning stated in <u>Section 1.1(a)</u> of <u>Exhibit B</u> hereto.

10.16.19    "**Capital Contribution**" means the total amount of cash and the initial Gross Asset Value (as defined in <u>Article 2</u> of <u>Exhibit B</u> hereto) of other assets contributed (or deemed contributed) to the capital of the Company by a Member.

10.16.20    "**Certificate**" has the meaning stated in <u>Section 1.1</u>.

10.16.21    "**Change of Control**" means (a) a merger, consolidation or other reorganization of a Person, if the individuals and entities who were stockholders (or partners or members or others that hold an ownership interest) of the Person immediately prior to the effective date of the transaction have "beneficial ownership" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) of less than  fifty percent (50%) of the total combined voting power for election of directors (or their equivalent) of the surviving entity following the effective date of the transaction, (b) the acquisition by any individual, entity or group of direct or indirect beneficial ownership in the aggregate of then issued and outstanding securities (or other ownership interests) of a Person in a single transaction or a series of transactions representing in the aggregate  fifty percent (50%) or more of the total combined voting power of  a Person, or (c) a sale of all or substantially all of a Person's assets.

10.16.22    "**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

10.16.23    "**Company**" has the meaning stated in the Preamble to this Operating Agreement.

10.16.24    "**Control**" means, when used with respect to any Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.  The terms "Controlling" and "Controlled" will be given correlative meanings.

511513.10
100620

10.16.25 "**Customer Acquisition Costs**" means the amounts that ABG or any of its current or future parents, subsidiaries, or affiliates pays, credits, forgives, or otherwise provides, directly or indirectly, to any ABG Brand Partner or Merchant Referral to subsidize, off-set, or otherwise compensate for any discounts, fees, costs, expenses, or other amounts that such ABG Brand Partner or Merchant Referral incurs to enroll or otherwise participate in AllPass (including, by way of example and not limitation, by extending discounts to AllPass Members), as part of a written agreement, to incentivize such ABG Brand Partner or Merchant Referral to enroll or otherwise participate in AllPass; provided, that the Company and ABG will use commercially reasonable efforts to consult with Bolt prior to extending any such offer to any ABG Brand Partner or Merchant Referral; provided, however, that it shall not be a breach of this Agreement if such parties do not consult with Bolt on such matters. For the purpose of this Section 10.16.24, "AllPass" "ABG Brand Partner", "AllPass Members", and "Merchant Referral" have the meanings set forth in the AllPass Loyalty Program Agreement.

10.16.26 "**Economic Interest**" means a Member's right to distributions hereunder and excluding all other rights hereunder.

10.16.27 "**Fiscal Year**" has the meaning stated in <u>Section 1.5</u>.

10.16.28 "**Formation Date**" has the meaning stated in <u>Recital A</u>.

10.16.29 "**Gross Asset Value**" has the meaning stated in <u>Article 2</u> of <u>Exhibit B</u>.

10.16.30 "**Involuntary Transfer**" means, with respect to any Units, any Transfer of such Units that is effected either involuntarily or by operation of law. Examples of Involuntary Transfers include (a) any Transfer occurring by reason of an individual's death, disability or divorce, (b) any Transfer resulting from the filing of a petition in bankruptcy and (c) a Transfer occurring as a result of the foreclosure of any judgment.

10.16.31 "**Minimum Tax Amount**" shall mean, with respect to any Member for any Fiscal Year, the product of (i) such Member's Adjusted Taxable Income for such Fiscal Year, multiplied by (ii) that percentage, as determined by the Board, equal to the highest marginal U.S. federal, state and local effective taxable rate applicable to any Member for such Fiscal Year.

10.16.32 "**Member**" means ABG, Bolt and any other Person admitted to the Company as a "Member" from time to time in accordance with the terms of this Operating Agreement, in each case, for so long as such Person continues to hold Units or any other interest in the Company, and shall, notwithstanding any implication to the contrary, exclude any Person who ceases to hold any Units or other equity interest in the Company pursuant to the terms of this Operating Agreement.

10.16.33 "**Membership Interest**" means an equity interest in the Company owned by a Member, including such Member's right, as applicable, (a) to allocations of items of income, gain, loss and deduction of the Company; (b) to a share of distribution of cash of the Company in accordance with the terms hereof and a share of distribution of assets upon liquidation or termination of the Company in accordance with the terms hereof; (c) to vote on, consent to or otherwise participate in any decision of the Members as provided in this Operating Agreement; and (d) to any and all other benefits to which such Member may be entitled as provided in this Operating Agreement or the Act.

10.16.34 "**Net Income**" has the meaning stated in <u>Article 2</u> of <u>Exhibit B</u>.

10.16.35 "**Net Losses**" has the meaning stated in <u>Article 2</u> of <u>Exhibit B</u>.

10.16.36 "**New Units**" means additional Units or other equity interests of the Company or any other subsidiary of the Company that the Board may from time to time propose to issue and

sell; provided, that the term "New Units" shall not include equity interests issued or sold by the Company or any subsidiary of the Company to a Third Party: (a) as acquisition consideration in connection with (i) any acquisition by the Company or any subsidiary of the Company of any equity interests, assets, properties or business of any Third Party or (ii) any purchase, acquisition, merger, amalgamation, consolidation or other business combination involving the Company or any subsidiary of the Company, on one hand, and any Third Party, on the other hand; (b) in connection with a joint venture, strategic alliance or other commercial relationship with any Third Party relating to the operation of the Company or any subsidiary of the Company's business and not for the primary purpose of raising equity capital; (c) in the case of the Company or any wholly-owned subsidiary thereof, any equity interests thereof issued to the Company or another wholly-owned subsidiary; or (d) any equity interests issued to employees of the Company pursuant to an employee incentive plan approved by the Board.

10.16.37      "**Operating Agreement**" means this Amended and Restated Operating Agreement, as originally executed and as the same may be amended or otherwise modified from time to time.

10.16.38      "**Original Agreement**" has the meaning stated in Recital A.

10.16.39      "**Partnership Audit Rules**" shall mean, as enacted pursuant to the Bipartisan Budget Act of 2015, Code Sections 6221 through 6241, including any amendments thereto or other Code provisions with respect to the same subject matter as Code Sections 6221 through 6241, any Treasury Regulations promulgated or proposed under any such Sections, any administrative guidance with respect thereto, and any similar provisions of state or local laws.

10.16.40      "**Partnership Representative**" has the meaning stated in Section 5.3.1.

10.16.41      "**Percentage Interest**" means, with respect to a Member, the percentage ownership interest of such Member in the Company, determined by dividing the number of Units held by such Member as of any date of determination by the number of all then outstanding Units. The initial Percentage Interest of each Member as of the Effective Date is set forth on Schedule 3.2.

10.16.42      "**Permitted Acquiror**" means, with respect to any Member, any successor in interest to or acquiror of all or substantially all of the assets of or outstanding capital stock of such Member solely in connection with a Change of Control of such Member, other than an ABG Competitor (in the case of a Change of Control of Bolt).  For the avoidance of doubt, a Person shall only be deemed to be a Permitted Acquiror upon and following the consummation of a transaction contemplated by the previous sentence.

10.16.43      "**Person**" means an individual, partnership, limited liability company, corporation, trust, estate, real estate investment trust, association, unincorporated organization, government or any department, agency or authority thereof, or any other entity or organization.

10.16.44      "**Press Release**" has the meaning stated in Section 10.12.

10.16.45      "**Regulatory Allocations**" has the meaning stated in Section 1.4(e) of Exhibit B hereto.

10.16.46      "**Tax Liability Distributions**" has the meaning stated in Section 5.1.2.

10.16.47      "**Third Party**" means any Person other than the Members, the Company or their respective Affiliates.

10.16.48      "**Transfer**" means, with respect to any Units, any direct or indirect, voluntary or involuntary, sale, assignment, conveyance, mortgage, hypothecation, pledge or other transfer of

DocuSign Envelope ID: 7D2EE2D3-13CA-47F0-8F94-BFC547A80C7C

such Units, whether occurring by operation of law or otherwise.  The term "Transfer" shall include a change of beneficial ownership of any Units resulting from (a) the death or the divorce of the owner of such Units, (b) the death of the spouse of the owner of such Units, (c) any distribution of such Units from an estate or trust, (d) the filing of a voluntary or involuntary bankruptcy proceeding by or against the owner of such Units, (e) a sale of such Units to a purchaser for full and adequate consideration, (f) a gift or other transfer of such Units for less than full and adequate consideration made outright, into trust or otherwise and (g) a pledge, hypothecation, mortgage or similar type of assignment of such Units (or a foreclosure sale or transfer in lieu of foreclosure pursuant to any such pledge, hypothecation, mortgage or similar type of assignment of such Units).

10.16.49        "**Treasury Regulations**" has the meaning stated in Article 2 of Exhibit B.

10.16.50        "**Units**" means the units representing Membership Interests of the Members.

10.16.51        "**Unreturned Invested Capital**" means, with respect to each Member, the aggregate amount of Capital Contributions made by such Member to the Company, as reduced (not below zero) by any distributions previously made to such Member pursuant to Section 5.1.1.

10.16.52        "**Voluntary Transfer**" means, with respect to any Units, any Transfer of such Units other than an Involuntary Transfer.  Examples of Voluntary Transfers include (a) a sale for reasonably adequate consideration, (b) a gift made for less than reasonably adequate consideration and (c) a pledge to secure a debt.

511513.10
100620

**EXHIBIT B**

ARTICLE 1

ALLOCATION OF NET INCOME, NET LOSSES
AND OTHER ITEMS AMONG THE MEMBERS

1.1     **Capital Accounts**.

(a)     A separate capital account will be maintained for each Member (a "**Capital Account**"). Such Member's Capital Account will from time to time be (i) increased by (A) the amount of all Capital Contributions made (or deemed made) by the Member to the Company, (B) the Net Income and any other items of income and gain allocated to the Member, and (C) the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member, and (ii) decreased by (A) the amount of cash and the Gross Asset Value of any property (other than money) distributed to the Member by the Company, (B) the Net Losses and any other items of deduction and loss allocated to the Member, and (C) liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(b)     In the event any Units are transferred in accordance with the terms of this Operating Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to such Units.

(c)     In determining the amount of any liability for purposes of subparagraph (a) above, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Treasury Regulations.

(d)     The foregoing provisions and the other provisions of this Operating Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  In the event that the Board shall determine that it is prudent to modify the manner in which the Capital Accounts, or any additions thereto or subtractions therefrom, are computed in order to comply with such Treasury Regulations, the Board may make such modification, provided, it is not likely to have a material effect on the amounts distributable to any Member upon the dissolution of the Company.

1.2     **Allocation of Net Losses**.  After giving effect to the special allocations set forth in Paragraph 1.4 below, Net Losses of the Company for each Fiscal Year (or portion thereof) will be allocated to the Members in accordance with the provisions of Section 5.2 of this Operating Agreement.

1.3     **Allocation of Net Income**.  After giving effect to the special allocations set forth in Paragraph 1.4 below, Net Income of the Company for each Fiscal Year (or portion thereof) will be allocated to the Members in accordance with the provisions of Section 5.2 of this Operating Agreement.

1.4     **Special Allocations**.  The following special allocations will be made in the following order:

(a)     Regulatory Allocations.  Allocations of individual items of income and gain will be made in accordance with the "minimum gain chargeback," "partner nonrecourse debt minimum gain chargeback" and "qualified income offset" provisions of the Treasury Regulations

promulgated under Section 704 of the Code.  This subparagraph (a) is intended to comply with the minimum gain chargeback requirement of Treasury Regulations Section 1.704-2(f) and the partner nonrecourse debt minimum gain chargeback requirement of Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith, and this subparagraph (a) is further intended to qualify and be construed as a "qualified income offset" within the meaning of Treasury Regulations Section 1.704-1-(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(b)      Certain Additional Adjustments.  To the extent that an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of its interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event that Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Members to whom such distribution was made in the event that Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

(c)      Nonrecourse Deductions.  Any Nonrecourse Deductions will be allocated to the Members in accordance with their Percentage Interests.

(d)      Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions will be allocated to the Member that bears the Economic Risk of Loss for the Member Nonrecourse Debt to which such deductions relate as provided in Treasury Regulations Section 1.704-2(i)(l).

(e)      Curative Allocations.  The allocations set forth in subparagraphs (a) through (d) hereof (the "**Regulatory Allocations**") are intended to comply with certain requirements of Treasury Regulations Sections 1.704-1(b) and 1.704-2(i).  The Regulatory Allocations shall be taken into account in allocating other items of income, gain, loss and deduction among the Members so that, to the extent possible, the net amount of such allocations of other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred.

(f)      Member Expenses.  To the extent any expenses paid by any Member that are not required to be reimbursed by the Company are nevertheless deemed to be Company expenses for tax purposes, any items of loss or deduction attributable to those expenses will be specially allocated to such Member; *provided,* the amount of the expenses and the special allocation of the loss or deduction attributable thereto will be ignored for purposes of such Member's Capital Account.

1.5      **Allocation of Certain Tax Items**.

(a)      Except as otherwise provided in this Paragraph 1.5, all items of income, gain, loss or deduction for federal, state and local income tax purposes will be allocated in the same manner as the corresponding "book" items are allocated under Paragraphs 1.2 and 1.3 of this Exhibit B (as a component of Net Income or Net Losses), or 1.4 of this Exhibit B.

(b)      In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company will, solely for tax purposes, be allocated among the Members so as to take account of

any variation between the adjusted basis of such property to the Company for federal income tax purposes and the initial Gross Asset Value thereof (computed in accordance with subparagraph (i) of the definition of the term Gross Asset Value herein using any method approved under Code Section 704(c) and the applicable Treasury Regulations as chosen by the Board).

(c)     In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) or (iv) of the definition of the term Gross Asset Value, subsequent allocations of income, gain, loss and deduction with respect to such asset will take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder using any method approved under Code Section 704(c) and the applicable Treasury Regulations as chosen by the Board.

(d)     To the extent the Company has in effect an election under Section 754, allocations of income, gain, loss or deduction to affected Members for federal, state and local tax purposes will take into account the effect of such election pursuant to applicable provisions of the Code.

(e)     Any elections or other decisions relating to such allocations will be made by the Board in any manner that reasonably reflects the purpose and intention of this Operating Agreement.  Allocations pursuant to this <u>Paragraph 1.5</u> are solely for federal, state and local tax purposes and will comprise the information furnished to such Members in their Schedule K-1s each year.  Except to the extent allocations under this <u>Paragraph 1.5</u> are reflected in the allocations of the corresponding "book" items pursuant to <u>Paragraphs 1.2</u> or <u>1.3</u> of this <u>Exhibit A</u> (as a component of Net Income or Net Losses), or <u>1.4</u> of this <u>Exhibit A</u>, allocations under this <u>Paragraph 1.5</u> will not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, other items or distributions pursuant to any provision of this Operating Agreement.

1.6     **Allocation between Assignor and Assignee**.  In the event of a Transfer of Units during any Fiscal Year made in compliance with the provisions of this Operating Agreement, Net Income, Net Losses and other items of income, gain, loss and deduction of the Company attributable to such Units for such Fiscal Year shall be determined using the interim closing of the books method.

1.7     **Tax Reporting**.  The Members are aware of the income tax consequences of the allocations made by this <u>Article 1</u> and hereby agree to be bound by the provisions of this <u>Article 1</u> in reporting their shares of Company income and loss for income tax purposes.

1.8     **Profit Shares**.  Solely for purposes of determining a Member's proportionate share of the Company's "excess nonrecourse liabilities," as defined in Treasury Regulations Section 1.752-3(a), the Members' interests in Company profits will be deemed to be in accordance with their Percentage Interests.

1.9     **Compliance with Treasury Regulations**.  If the Board reasonably determines that the manner in which the Members' Capital Accounts are maintained should be modified, or that any particular item of income, gain, loss, deduction or credit should be allocated in a manner other than as provided above, in order to comply with the Treasury Regulations, the Board may make the modification or the allocation.

ARTICLE 2

DEFINITIONS

As used in this <u>Exhibit A</u>, the following terms will have the following meaning:

"**Capital Accounts**" has the meaning stated in Section 1.1 of this Exhibit A.

"**Depreciation**" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such year or other period, except that if the Gross Asset Value of any asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation will be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis, *provided,* if the federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation will be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

"**Economic Risk of Loss**" will have the meaning provided by Sections 1.704-2(b)(4) and 1.752-2 of the Treasury Regulations.

"**Gross Asset Value**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i) the initial Gross Asset Value of any asset contributed by a Member to the Company will be the gross fair market value of such asset, as determined by the contributing Member and the Company;

(ii) the Gross Asset Value of all Company assets will be adjusted to equal their respective gross fair market values (taking Section 7701(g) of the Code into account), as determined by the Board, as of the following times: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* capital contribution; (b) the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an interest in the Company; (c) the grant of an interest in the Company, other than a *de minimis* interest, as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a member capacity, or by a new Member acting in a member capacity or in anticipation of becoming a Member of the Company, in the case of any of (a), (b) or (c), if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; (d) the liquidation or dissolution of the Company within the meaning of Section 1.704-1 (b)(2)(ii)(g) of the Treasury Regulations; and (e) at such other times as the Board shall reasonably determine necessary or advisable in order to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2;

(iii) the Gross Asset Value of any Company asset distributed to any Member will be the gross fair market value (taking Section 7701(g) of the Code into account) of such asset on the date of distribution;

(iv) the Gross Asset Values of Company assets will be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Section 732(d), Section 734(b) or Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m) and Paragraph 1.5(d) of this Exhibit A, *provided,* Gross Asset Values will not be adjusted pursuant to this subparagraph (iv) to the extent that the Board determines that an adjustment pursuant to subparagraph (ii) of this definition is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv); and

      (v)     if the Gross Asset Value of any asset has been determined or adjusted pursuant to subparagraphs (i), (ii) or (iv) hereof, such Gross Asset Value will thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Income and Net Losses.

"**Member Nonrecourse Debt**" will have the meaning set forth in Treasury Regulations Section 1.704-2(b)(4) for the phrase "partner nonrecourse debt."

"**Member Nonrecourse Deductions**" in any year means the Company deductions that are characterized as "partner nonrecourse deductions" under Sections 1.704-2(i)(l) and 1.704-2(i)(2) of the Treasury Regulations.

"**Net Income**" and "**Net Losses**" mean, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss, as the case may be for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss and deduction required to be stated separately pursuant to Section 703(a)(1) of the Code will be included in taxable income or loss), with the following adjustments: (i) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Income or Net Losses pursuant to this paragraph will be added to such taxable income and/or subtracted from such loss; (ii) any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Income or Net Losses pursuant to this paragraph will be subtracted from such taxable income and/or added to such loss; (iii) in the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) or (iii) of the definition thereof, the amount of such adjustment will be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Income or Net Losses; (iv) gain or loss resulting from the disposition of any Company asset with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value; (v) in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there will be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition thereof; and (vi) notwithstanding any other provision of this paragraph, any items which are specially allocated pursuant to Paragraphs 1.4 and 1.9 of this Exhibit A will not be taken into account in computing Net Income and Net Losses.  The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Paragraphs 1.4 and 1.9 of this Exhibit A shall be determined by applying rules analogous to those set forth in this definition of Net Income and Net Losses.

"**Nonrecourse Deductions**" in any year means the Company deductions that are characterized as "nonrecourse deductions" under Sections 1.704-2(b)(1) and 1.704-2(c) of the Treasury Regulations.

"**Regulatory Allocations**" has the meaning stated in Section 1.4(e) of this Exhibit A hereto.

"**Target Capital Account Balance**" means, with respect to a Member, the respective net amount, positive or negative, which would be distributed to such Member or for which such Member would be liable to the Company under this Operating Agreement, determined as if the Company were to (a) sell all of the assets of the Company for cash in an amount equal to the Gross Asset Value of such assets, and (b) distribute the net proceeds of such sale, after providing for the claims of creditors, pursuant to Section 8.3 of this Operating Agreement.  In addition, the Target Capital Account Balance of a Member as determined above shall be adjusted by debiting it in an amount equal to the sum of the Member's share of the Company's "partnership minimum gain" (as determined according to Regulations Section 1.704-2(g)) and such

DocuSign Envelope ID: 7D2EE2D3-13CA-47F0-8F01-BFC547A80C7C

Member's "partner nonrecourse debt minimum gain" (as determined according to Regulations Section 1.704-2(i)(3)).  The Target Capital Account Balance shall be calculated for each Member as of the end of each period for which an allocation of Net Income or Net Losses is to be made.

"**Treasury Regulations**" means the income tax regulations (including temporary) promulgated under the Code.

All other capitalized terms used in this <u>Exhibit A</u> will have the same meaning as in the Operating Agreement.

511513.10
100620

DocuSign Envelope ID: 7D2EE2D3-13CA-47F0-8F04-BFC547A80C7C

## SCHEDULE 3.2

<u>MEMBERSHIP INTERESTS</u>

| Member | Units | Percentage Interest | Capital Contributions | Capital Account |
|---|---|---|---|---|
| ABG Intermediate Holdings 2 LLC | 700 | 70.00% | $0.0 | $0.0 |
| Bolt Financial, Inc. | 300 | 30.00% | $0.0 | $0.0 |
| TOTALS | 1,000 | 100.00% | $0.0 | $0.0 |

**SCHEDULE 10.9**

<u>NOTICE ADDRESSES</u>

<u>If to Bolt:</u>

      Bolt Financial, Inc.
      77 Geary Street, 4th Floor
      San Francisco, CA  94108
      Attn: Chief Executive Officer

      <u>And with mandatory copy (which shall not constitute notice) to</u>:

      Fenwick & West LLP
      555 California Street, 12th Floor
      San Francisco, CA 94104
      Attention: Michael A. Brown

<u>If to ABG:</u>

      1411 Broadway, 21st Floor
      New York, NY 10018
      Attention: Finance Department
      Email: finance@abg-nyc.com

      <u>And with mandatory copy (which shall not constitute notice) to</u>:

      Grubman Shire Meiselas Sacks, P.C.
      152 W. 57th Street
      New York, NY 10019
      Attention: Lawrence Shire and Eric Sacks
      Email: lshire@gispc.com and esacks@gispc.com