UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ABG INTERMEDIATE HOLDINGS 2, LLC and ABG-SPG
ES, LLC,

                                        Plaintiffs,

                    -against-

BOLT FINANCIAL, INC.,

                                        Defendant.

Case No. 22-cv-00473 (LAK)

**<u>FIRST AMENDED
COMPLAINT</u>**

Plaintiffs ABG Intermediate Holdings 2, LLC ("**ABG**") and ABG-SPG ES, LLC

("**ABG-SPG**") (together, "**Plaintiffs**"), through their undersigned counsel, as and for their First

Amended Complaint against Defendant Bolt Financial, Inc. ("**Bolt**" or "**Defendant**"), and upon

personal knowledge as to their own actions and upon information and belief as to the acts of

others, allege as follows:

**OVERVIEW**

1.      Plaintiffs bring this action against Defendant Bolt seeking damages and

declaratory and injunctive relief in response to Bolt's repeated disregard and breaches of the

parties' written agreements and subversion of the meaning and intent of those agreements,

thereby depriving Plaintiffs of the value of the parties' contracts.  As set forth herein, Plaintiff

ABG-SPG is a joint venture between Plaintiff ABG (short for Authentic Brands Group), on the

one hand, and a wholly owned subsidiary of Simon Property Group, Inc. ("**Simon**"), on the

other.

2.      Authentic Brands Group is a brand development, marketing, and

entertainment company, which owns a portfolio of global media, entertainment, and lifestyle

brands.  ABG elevates and builds the long-term value of more than thirty (30) consumer brands and properties by partnering with best-in-class manufacturers, wholesalers, and retailers.

3.  Simon is a real estate investment trust engaged in the ownership of premier shopping, dining, entertainment and mixed-use destinations and an S&P 100 company (NYSE: SPG).  Its properties across North America, Europe, and Asia provide community gathering and market places for millions of people every day and generate billions in annual sales.

4.  Together, Authentic Brands Group and Simon jointly own SPARC Group Holdings II LLC (together with its subsidiaries, "**SPARC**").  SPARC is ABG's largest licensee and a multi-brand operator of the Nautica, Forever 21, Aéropostale, Lucky Brand, and Brooks Brothers brands.

5.  ABG assigned certain of the contractual rights at issue in this suit to ABG-SPG.

6.  In October 2020, ABG entered into a series of integrated contracts with Bolt, pursuant to which Bolt, *inter alia*, represented and committed that it would develop and deliver a new online checkout and customer loyalty platform known as "AllPass" as soon as reasonably possible, and in any event, by a date certain—January 15, 2021.  ABG was induced to enter into these agreements largely as the result of Bolt's representations that it had experience and capability superior to others, including the technological expertise and know-how to launch AllPass on (or earlier than) the agreed timeline, and that integration of Bolt's software with the websites used by ABG's brand partners could be seamlessly and competently achieved in a matter of a few short weeks.

7.  This arrangement was designed and intended to be mutually beneficial to both parties to the agreements.  For its part, Bolt would gain access to ABG's extensive brand

network of over thirty (30) well-known retail brands that ABG either owns or to which it licenses valuable intellectual property, allowing Bolt to expand much faster (and with more desirable and well-known brands) than it otherwise could. Notably, this included access to the highly desirable and visible brands operated by ABG's licensee, SPARC. The beneficial impact of this partnership on Bolt's growth has already been substantial. As Bolt has repeatedly acknowledged, ABG and its brand partners have contributed hundreds of millions of dollars in Gross Merchandise Value ("**GMV**") to Bolt. GMV, which measures the financial volume of e-commerce transactions processed through a given platform (in this case, through Bolt's products), is a key metric used by Bolt in raising capital and building its brand.

8.　　In return for its substantial contributions to Bolt's growth, ABG was promised, among other things, a new and useful technology to deploy on the e-commerce platforms of its numerous brands, thus enhancing the brand customers' experience and satisfaction in the competitive e-commerce retail space, and thereby helping ABG's brand partners grow and succeed. In addition, a key aspect of the parties' agreements, which was designed to incentivize and reward ABG's efforts, was the promise by Bolt that ABG could exercise a Warrant (defined below) to purchase up to 5% of Bolt's equity in the event ABG was able to deliver substantial growth to Bolt through new retailer users of Bolt's products.

9.　　ABG has satisfied its obligations under the parties' agreements, but Bolt has utterly failed to deliver on the technological capabilities that it held itself out as possessing, including the ability to seamlessly integrate Bolt's products into brand partners' websites and the ability to deliver a viable AllPass product on a commercially reasonable timeline—and in any event, by January 15, 2021, the so-called "Target Subscription Launch Date."

10.　　To the contrary, and by way of example, the attempted rollout of Bolt's existing "Checkout" products on three of ABG's partner brands to date has been plagued by

Bolt's repeated failures to deliver on the technological expertise and ability that it had held itself out as possessing. As a result, Bolt's products are deployed on only two of ABG's partner brands—Forever 21 and Lucky Brand. Forever 21, in particular, has experienced significant and recurring technical problems caused by Bolt. A third ABG brand partner—Brooks Brothers— was forced to abandon, at least temporarily, its integration with Bolt in June 2021 due to Bolt's action or inaction which resulted, *inter alia*, in persistent technical product defects. Notably, the promised successful deployment of Bolt's checkout product on these brand partner websites was only the first step—necessary, but not sufficient—to achieving the launch of AllPass, the ultimate purpose of the parties' venture.

11. As to the new AllPass product that Bolt had promised to deliver, while Bolt claimed to ABG that it "delivered" and was ready to launch AllPass in February 2021, in addition to ABG's brand partners' ultimate unsatisfactory experiences, Bolt's own contemporaneous documents reveal something quite different. Bolt did not even project to have a functioning minimum viable product ("**MVP**") until mid-July 2021, with testing extending through September 2021 and a "launch" planned in October and November 2021 (which have come and gone), months after the contractual deadline. In reality, Bolt did not deliver even a MVP of AllPass until November 2021. Thus, Bolt failed to meet even the substantially delayed and contractually non-compliant mark that Bolt itself had projected (and later tried to deny).

12. Adding the proverbial "insult to injury," Bolt has violated the concrete and explicit confidentiality provisions of the parties' agreements, repeatedly, and to improperly advance its own interests to the detriment of ABG, disclosing to the public and potential investors details of ABG's business and the parties' business relationship that were confidential, and in some cases, materially false and misleading to investors. In addition to the misrepresentations it has made to ABG, over the course of its quest to raise hundreds of millions

of dollars from investors over the past two years (in the process touting increasingly stratospheric valuations, most recently reported to be approaching $11-14 *billion*), Bolt has consistently overstated the extent of its integration with ABG's brand partners in an effort to piggyback on the success of ABG. Bolt has persisted in this course of conduct, despite ABG's repeated demands that Bolt cease disseminating false information and despite Bolt's efforts to unjustly enrich itself and deprive ABG of the compensation which it is rightfully owed. In particular, Bolt has affirmatively misled investors by showcasing all of ABG's brands as customers in investor presentations (including, in one instance, a brand, Reebok, that ABG had not even acquired yet), despite the fact that most of ABG's brands were not using Bolt's products (and those which were experienced serious difficulties), thereby unjustly enriching itself by raising capital off ABG's (and its brands') good name while simultaneously deceiving investors. Bolt has also repeatedly represented to actual and potential investors that its products are actively deployed on the Brooks Brothers website—a representation which, as noted above, was materially false and misleading, particularly after June 2021. Bolt was on several occasions directed to remove ABG and its brands from Bolt's marketing materials but has failed to comply.

13.     Further, it has come to light that Bolt, while (i) publicly touting its connection with ABG in order to enhance its reputation and facilitate the raising of capital, including through false or misleading statements, and (ii) failing to deliver to ABG the technological ability and products that it represented and promised that it would, has gone behind ABG's back to develop a competing product for a third party in secret. Specifically, while never disclosed directly to ABG, Bolt revealed on a November 2021 call with potential investors that it had built "Bolt+"—a subscription product to be offered to retailers that use Bolt—which appears to be materially identical to the AllPass product that Bolt was supposed to be focused on, and committed to, developing for ABG. Bolt has taken no steps to inform ABG about its

development of Bolt+, despite the facts that (i) such notice is required under the parties' agreements, (ii) ABG is Bolt's partner in developing the underlying technology being deployed, and (iii) it appears to have diverted substantial time and resources from the development of AllPass.

14.     Bolt's secretive efforts to launch Bolt+ are yet another bad-faith tactic by Bolt designed to deprive ABG of the bargained-for benefit of the parties' agreements.  Indeed, based on the information available to ABG to date, Bolt, after missing critical deadlines under its agreements with ABG and failing to ever properly deploy AllPass for ABG's brand partners, effectively abandoned its obligations to timely enable the AllPass launch, and instead took the AllPass technology that it developed in partnership with ABG (with ABG's considerable patience, information, and support) and actively made plans to launch a competitor product with a third party without even notifying ABG (as is required under the parties' agreements), which it then touted to potential investors in yet another attempt to unjustly enrich itself and raise millions of dollars on the back of ABG.

15.     Perhaps most egregiously, Bolt has further breached the parties' agreements and demonstrated its bad faith by denying ABG its bargained-for right to exercise a Warrant to purchase up to 5% of Bolt's equity, a right currently valued at over $500 million. While ABG's right to exercise the Warrant is conditioned on attainting a certain threshold level of "Gross Merchandise Value Contribution" (or "**GMV Contribution**") through ABG's brand partners or other referrals within a two-year period after the contracts were signed (specifically, ABG must contribute $750 million in e-commerce transaction through Bolt products), Bolt has repeatedly represented to ABG, including in writing as recently as September 3, 2021, that it was making substantial progress towards that goal through Forever 21's and Lucky Brand's use of Bolt's products.  Those representations were consistent with the terms of the parties' written

agreements and, particularly given Bolt's abject failure to timely enable the launch of AllPass, ABG reasonably relied on Bolt's representations.

16.     Yet, in October 2021, Bolt inexplicably and abruptly changed its position—claiming for the first time that ABG's GMV Contribution was ***zero***.  Outrageously, the purported explanation offered by Bolt for its conclusion that none of the millions of dollars of e-commerce processed through Bolt's products by ABG brand partners "counted" towards the Warrant was that only e-commerce processed through *AllPass*—the very product that Bolt itself had promised but failed to deliver by January 2021—qualified under the parties' agreements. Later, recognizing that the parties' contracts clearly precluded its specious argument, Bolt tried to pivot—claiming that while *all* Bolt products counted towards GMV Contribution (as clearly stated in the parties' contracts), ABG's GMV Contribution was still zero because the ABG brands using Bolt's products purportedly had not "enrolled" in AllPass.

17.     Bolt's latest contrived position is again contrary to the terms and intent of the parties' agreements, which is further confirmed by the parties' course of dealing and performance, as well as Bolt's express, written admissions that ABG has already attained substantial GMV Contribution despite Bolt's failure to launch AllPass on the agreed-upon schedule (which failure itself constitutes a separate breach of the Project Agreement by Bolt, for which Plaintiffs are entitled to damages).  Any requirement that ABG's brand partners "enroll" in AllPass in order for ABG to receive credit for its GMV Contribution was clearly satisfied by the commitment of the SPARC brands—including Forever 21, Lucky Brand, and Brooks Brothers—to launch AllPass on their respective e-commerce platforms as soon as Bolt delivered a fully functional AllPass product.  Those brands are enrolled in AllPass.  The fact that they have not "launched" AllPass to date is a direct result of Bolt's failure to deliver a functioning AllPass product, not any failure to "enroll."  Moreover, Bolt is estopped by its own repeated statements

and actions confirming ABG's progress towards the GMV Contribution target from changing course now in a belated effort to deprive ABG of the value of the parties' relationship. Finally, and in any case, Bolt cannot rely on any purported failure by ABG to achieve the GMV Contribution condition set forth in the Warrant, as any failure to achieve that target is a direct result of the bad faith and breaching actions of Bolt.

18. Collectively and individually, Bolt's breaches of the parties' agreements and other bad-faith conduct have caused Plaintiffs significant harm and deprived them of the value of the parties' agreements. Bolt's breaches, and in particular its recent machinations with respect to the Warrant, appear calculated to squeeze every drop of value out of the ABG-Bolt relationship for Bolt's benefit—including in driving Bolt's ever increasing multi-billion-dollar valuations—while simultaneously depriving ABG of nearly all of the benefit of the parties' bargain, including the bargained-for right under the Warrant to purchase the stake in Bolt that ABG has earned through its direct contributions to Bolt's growth. In light of Bolt's recent and unexplained about-face with respect to calculating ABG's GMV Contribution, and the other material breaches of the parties' agreements set forth herein, ABG was left with no choice but to bring this action against Bolt for damages and declaratory and injunctive relief to enforce its contractual rights and preserve its right to exercise the Warrant.

## PARTIES

### A. Plaintiffs ABG and ABG-SPG, and Non-Parties Simon and SPARC

19. Plaintiff ABG, otherwise referred to as Authentic Brands Group, is a limited liability company organized under the laws of Delaware with its principal place of business at 1411 Broadway, 21st Floor, New York, NY 10018.

20.     Authentic Brands Group is a brand development, marketing, and entertainment company, which owns a portfolio of global media, entertainment, and lifestyle brands.  Authentic Brands Group elevates and builds the long-term value of more than thirty (30) consumer brands and properties by partnering with best-in-class manufacturers, wholesalers, and retailers.  Its brands have a global retail footprint in more than 100,000 points of sale across the luxury, specialty, department store, mid-tier, mass, and e-commerce channels, and more than 6,000 freestanding stores and shop-in-shops around the world.

21.     Authentic Brands Group's portfolio of iconic and world-renowned brands generates more than $14 billion in annual retail sales and includes Marilyn Monroe®, Elvis Presley®, Muhammad Ali®, Shaquille O'Neal®, Sports Illustrated®, Dr. J®, Greg Norman®, Neil Lane®, Thalia®, Nautica®, Aéropostale®, Forever 21®, Juicy Couture®, Vince Camuto®, Herve Leger®, Judith Leiber®, Barneys New York®, Brooks Brothers ®, Frye®, Lucky Brand®, Nine West®, Jones New York®, Frederick's of Hollywood®, Louise et Cie®, Sole Society®, Enzo Angiolini®, CC Corso Como®, Hickey Freeman®, Hart Schaffner Marx®, Adrienne Vittadini®, Taryn Rose®, Bandolino®, Misook®, Spyder®, Tretorn®, Tapout®, Prince®, Volcom®, Airwalk®, Vision Street Wear®, Above The Rim®, Hind®, Thomasville®, Drexel®, and Henredon®.

22.     Most recently, Authentic Brands Group announced on March 1, 2022 that it has completed the acquisition of Reebok from adidas.  And on February 24, 2022, Authentic Brands Group announced that it had entered into a strategic partnership with  athlete-turned-entrepreneur David Beckham to co-own and manage Beckham's global brand.

23.     Authentic Brands Group's largest licensee is SPARC, a multi-brand operator of the Nautica, Forever 21, Aéropostale, Lucky Brand, and Brooks Brothers brands.

24. Authentic Brands Group jointly owns SPARC with Simon, SPARC's largest landlord. Through this partnership, Authentic Brands Group owns 50% of SPARC, with Simon owning the remaining 50%.

25. Simon is a real estate investment trust engaged in the ownership of premier shopping, dining, entertainment, and mixed-use destinations and an S&P 100 company (Simon Property Group, NYSE: SPG). Its properties across North America, Europe, and Asia provide community gathering places for millions of people every day and generate billions in annual sales.

26. Subsequent to ABG's entry into the Program Agreement, the Warrant, and the Operating Agreement (each as defined below), ABG assigned all of its right, title, and interest in the Program Agreement and the Operating Agreement to ABG-SPG, a limited liability company organized under the laws of Delaware, which is a joint venture between ABG and a wholly owned subsidiary of Simon. ABG has also contributed the economics of the Warrant to ABG-SPG.

**B. Defendant Bolt**

27. Defendant Bolt is a Delaware corporation with its principal place of business at 77 Geary St., San Francisco, CA 94108.

28. Founded in 2014 by its founder and former CEO, non-party Ryan Breslow ("**Breslow**"), Bolt bills itself as "the world's first Checkout Experience Platform," promising that it "solves the complicated technological challenges involved in checkout, fraud detection, and digital wallets." By its own account, Bolt launched its first checkout product to "one tiny merchant" about five years ago.

29. Since then, Bolt has embarked on a number of back-to-back capital-raising efforts at rapidly increasing valuations, despite a lack, on information and belief, of significant

positive cash flow or profits. Most recently, Bolt reportedly raised a new $355 million Series E round of funding, which brought Bolt to an $11 billion valuation. This latest capital raising effort follows closely on the heels of Bolt's previous Series D funding round only a few months prior, in which the startup reportedly received up to $393 million at a valuation of approximately $6 billion—*18 times* the company's valuation only 18 months earlier. In only a few years, Bolt has raised hundreds of millions of dollars from investors.

30. By Bolt's own admission, ABG has been critical to Bolt's success to date in expanding its customer base and raising capital. As described below, ABG has, in addition to partnering with Bolt in connection with AllPass, assisted Bolt to clench key deals with third parties, including Casper and Shopify, that have been critical to its valuation. Indeed, up until when ABG facilitated a deal between Bolt and Shopify, Bolt had no way of integrating any of its products with Shopify, which is the largest e-commerce platform in the world. ABG used its influence and brand volume with Shopify to convince the company over many months to allow Bolt to take over Shopify checkout for ABG brands for the purpose of rolling out AllPass. This was a huge milestone for Bolt and one which Bolt featured prominently in its investor presentations. Bolt admitted in those presentations that Shopify only approved Bolt because of its relationship to ABG through AllPass. Yet Bolt has undercut ABG's extraordinary efforts by pushing for a broader relationship with Shopify beyond its appetite. Bolt's gambit has frustrated and delayed discussions with Shopify and further delayed the long-overdue launch of AllPass in breach of Bolt's contractual obligations to ABG.

### C. Non-Party ABG-AP, LLC

31. Non-party ABG-AP, LLC (the "**AllPass LLC**" or "**NewCo**") is a Delaware limited liability company with its principal address at 1411 Broadway, 21st Floor, New York, NY 10018.

32. As described below, pursuant to the Operating Agreement (defined below), the AllPass LLC was established to assist in offering AllPass to the public. The members of the AllPass LLC are ABG and Bolt.

## JURISDICTION AND VENUE

33. This action was originally filed in the Supreme Court of the State of New York, County of New York, on November 29, 2021. The state court had jurisdiction over this matter because Bolt, by agreement, has irrevocably consented to the jurisdiction of the Courts of the State of New York sitting in New York County with respect to any action brought by ABG concerning the subject matter of this lawsuit. Venue was proper in the state court pursuant to CPLR 501 based upon the written agreement between the parties.

34. On December 30, 2021, Bolt removed this action based on federal question jurisdiction, pursuant to 28 U.S.C. § 1441(a), as at least one of Plaintiffs' claims arises under the laws of the United States—specifically, the Lanham Act, codified at 15 U.S.C. § 1125. *See* 28 U.S.C. § 1331. Bolt further asserted that the Court has supplemental jurisdiction over the rest of the claims under 28 U.S.C. § 1367(a), as they "form part of the same case or controversy."

## FACTS

### I. ABG AND BOLT ENTER INTO THE PROGRAM AGREEMENT, THE WARRANT, AND THE OPERATING AGREEMENT

35. On or about October 9, 2020, ABG entered into a series of three integrated contracts: (1) the Program Agreement, (2) the Warrant, and (3) the Operating Agreement (each as defined below). Collectively, these agreements provided the framework for an ongoing relationship between ABG and Bolt that was intended to be mutually beneficial.

36.     As more specifically detailed below, ABG agreed, subject to the terms and conditions of the parties' agreements, to promote AllPass to its brand partners and third-party referrals.  In return, Bolt agreed, among other obligations, that it would develop AllPass on a commercially reasonable timeline, and in any event, in time to launch AllPass by January 15, 2021.  Bolt further agreed to grant ABG the Warrant to purchase up to approximately 5% of Bolt's equity.

37.     Finally, the parties also entered into the Operating Agreement, pursuant to which Bolt was admitted, along with ABG, as a member of the AllPass LLC, which in turn would collect AllPass subscription fees from AllPass Members (i.e., consumers), assist in providing customer support, and maintain an AllPass website.

38.     As set forth below, the parties' agreements also contained detailed provisions governing confidentiality and publicity, providing for injunctive relief to enforce those provisions, and designating New York as the forum for disputes arising out of the parties' contractual arrangement.

## A.     The Program Agreement

39.     On October 9, 2020, ABG, Bolt, and AllPass LLC entered into the AllPass Loyalty Program Agreement (the "**Program Agreement**").

### i.     Bolt's Obligations to Develop AllPass

40.     Section 3 of the Program Agreement sets forth the "Bolt Rights and Responsibilities."  As relevant here, Section 3.1 creates Bolt's core obligations concerning the development and launch of AllPass on an agreed-upon schedule:

> **Development of Bolt Underlying Technology.** Bolt will begin development of the Bolt Underlying Technology immediately upon execution of this Agreement and ***complete development as soon as commercially reasonable. Bolt will complete the development of AllPass Checkout to permit NewCo to achieve*** (i)

the AllPass Checkout Launch on or before the Target Checkout Launch Date [defined as October 20, 2020], and (ii) *the AllPass Subscription Launch on or before the Target Subscription Launch Date [defined as January 15, 2021]*.

(emphasis added)

41.     That provision of the Program Agreement imposes a number of independent but interrelated obligations on Bolt.

42.     *First*, Bolt must begin developing the Bolt Underlying Technology "immediately" upon execution of the Program Agreement, underscoring the importance of timing to the parties.  As further addressed below, the Program Agreement defines the Bolt Underlying Technology as "the technology necessary or otherwise used to enable the AllPass features, as such technology and features are described in Exhibit A" to the Program Agreement.

43.     *Second*, Bolt must "complete development" of the Bolt Underlying Technology "as soon as commercially reasonable."

44.     *Third*, Bolt must "complete the development of AllPass Checkout" in time "to permit NewCo to achieve (i) the AllPass Checkout Launch on or before the Target Checkout Launch Date," defined as October 20, 2020.  The Program Agreement defines "AllPass Checkout Launch" as "the date NewCo makes AllPass Checkout available to Participating ABG Brand Partners and their end users."

45.     *Fourth*, Bolt must "complete the development of AllPass Checkout" in time "to permit NewCo to achieve … (ii) the AllPass Subscription Launch on or before the Target Subscription Launch Date," defined as January 15, 2021.  The Program Agreement defines "AllPass Subscription Launch" as "*the date NewCo makes AllPass available to Participating ABG Brand Partners and their end users*" (emphasis added), Bolt's ultimate deliverable.

46.     Read together, those requirements establish a "belt and suspenders" approach to Bolt's obligations to launch AllPass on the agreed-upon schedule and reflect that all parties recognized the importance of timing under this venture.  On execution of the Agreement, Bolt was required to begin development of AllPass immediately, and to complete development as soon as commercially reasonable.  At the same time, the Program Agreement included highly negotiated launch dates that were intended to be firm deadlines.  Specifically, the Program Agreement required that Bolt provide the technology to permit the launch of AllPass Checkout by October 20, 2020, shortly after the Agreement's execution on October 9, 2020.  Having a fully functioning AllPass Checkout product working on the websites of ABG's brand partners was critical, as the checkout feature provides the foundation on which the additional features of the AllPass program are based.  Finally, the Program Agreement required Bolt to have AllPass fully operational by January 15, 2021, thereby permitting the launch of the full AllPass subscription service envisioned by the parties within the important timetable set by the parties.

47.     The relationship between "AllPass Checkout" and the full "AllPass" product is further clarified by reference to the definition of AllPass found in the Program Agreement.  As defined there, AllPass means "the loyalty and related program(s) offered by Newco, as the initial features are described in Exhibit A and as such program(s) may change from time to time."  As set forth in Exhibit A to the Program Agreement ("AllPass Loyalty Program Features"), those features include the following:

> a. ***AllPass-enabled and branded checkout, powered by Bolt, integrated directly into websites and/or ecommerce websites and/or mobile applications of Participating ABG Brand Partners*** and Merchant Referrals (in each case, who are participating and/or enrolled in AllPass) where technically practicable, and in each case, subject to the terms and conditions of the agreement(s) between ABG (including its affiliates) and each of the ABG Brand Partners, as applicable.

b. AllPass.com Portal for AllPass Members to view savings, manage their account, and search for Participating ABG Brand Partners and Merchant Referrals.

c. Ability for AllPass Members to apply AllPass discounts directly to purchases on the websites and/or mobile applications Participating ABG Brands Partners and Merchant Referrals.

d. Ability for shoppers to preview AllPass discounted prices on the websites and/or mobile applications of Participating ABG Brand Partners and Merchant Referrals.

e. Marketing of AllPass directly to shoppers on the websites and/or mobile applications of Participating ABG Brand Partners and Merchant Referrals.

f. A paid membership subscription, currently contemplated to be $60 per year, collected directly from AllPass Members by NewCo via Bolt checkout.

(emphasis added)

48.     As stated in the Program Agreement, the foundation for AllPass was a fully integrated and functioning checkout platform to be provided by Bolt, which would need to be integrated into the various platforms used by each brand partner to reach consumers— including websites and, critically, mobile applications.  As described herein, Bolt failed to deliver even this *first step* towards AllPass in a timely or competent manner, much less by the October 20, 2020 contractual deadline.  Nor has Bolt met its obligations to deliver the other AllPass features and a fully functioning AllPass platform on a commercially reasonable schedule, which required, at a minimum, that AllPass be ready by the agreed-upon January 15, 2021 launch date.

### ii.     Bolt's Confidentiality Obligations

49.     In addition to Bolt's obligations to develop AllPass, Bolt agreed in the Program Agreement to abide by strict confidentiality provisions and other contractual agreements regarding the use of ABG's intellectual property.

50.     Section 9.1.1 of the Program Agreement makes clear that ABG retains the rights to all of its intellectual property, including with respect to the use of the names and marks of its brand partners:

> As between Bolt on the one hand, and ABG and NewCo on the other, ABG (and its Affiliates, as applicable) shall own and retain all right, title and interest to: (a) the ABG Brands and all associated Intellectual Property and websites, (b) all Intellectual Property of ABG (and its Affiliates, as applicable), the ABG Brands, and the websites relating to the ABG Brands, and all derivations, improvements, and variations of all of the foregoing, (c) the AllPass Marks and all derivations, improvements, and variations thereof and (d) the domain names used for AllPass (e.g., allpass.com) and all derivations, improvements, and variations thereof (items 9.1.1(c) and 9.1.1(d) are the "ABG IP"). No provision of this Agreement effects any transfer to the other Parties of any ownership interest therein.

51.     Further, Section 9.1.2 of the Program Agreement provides that "ABG shall grant to NewCo a non-exclusive license to use the necessary rights to the ABG IP *for the sole purpose of operating AllPass and otherwise performing under this Agreement*" (emphasis added).   Thus, no license to use ABG's intellectual property was granted to Bolt, except as limited by and explicitly provided for in the Program Agreement.

52.     Section 9.7.3 of the Program Agreement further clarifies that, even to the extent authorized by the Program Agreement, the use by one party of another party's marks is subject to tight controls, stating in relevant part:

> **Standards for Use**. Each party's use of such other party's Marks shall be consistent with any reasonable instructions provided by the other party in writing.  In the case such instructions are silent as to or are inconsistent with a party's use of the other party's Mark, the use of the other party's Marks must be approved in writing prior to any such use.

53.     In addition to these provisions regarding intellectual property, the Program Agreement required strict confidentiality.  In Particular, Section 10.2 of the Program Agreement

provides in relevant part that "each of the Parties agrees: (a) to use and reproduce the Confidential Information of the other Parties only as permitted under this Agreement and as needed to perform its duties hereunder; and (b) not to disclose or otherwise permit access to the Confidential Information of the other Parties to any third party, without such Party's prior written consent."

54.     "Confidential Information" is defined under the Program Agreement as including "*any non-public information about the disclosing Party's business or activities*, which shall include, without limitation, . . . all information which, by the nature of the circumstances surrounding the disclosure, should be reasonably considered to be confidential or proprietary by the receiving Party."   (Program Agreement § 10.1 (emphasis added).)   With respect to ABG in particular, the Program Agreement provides an expansive (but non-exhaustive) list of ABG's Confidential Information:

> ABG's Confidential Information shall, to the extent non-public, include, without limitation, the following: *any and all non-public or proprietary information related to ABG's or any of its Affiliate's business or operations*, which information may be written, oral or maintained in electronic or any other form, including, without limitation: (i) finances, technology or other technical data, trade secrets, inventions, processes, software, hardware, configurations, infrastructures, systems, processes, formulas and know-how, (ii) designs, drawings, services, products, product plans, product development, marketing, marketing plans and information, customers, business partners, potential business partners, market information, suppliers, vendors, retailers, manufacturers, factories, (iii) all documents, analyses, reports, research, business plans, studies, diagrams, marketing plans, marketing information, product development plans, and other materials that contain information, (iv) the terms of this Agreement, and (v) all other non-public business, financial, technical or other information relating to ABG or any of its parents, subsidiaries, Affiliates, partners, and vendors.

(Program Agreement § 10.1 (emphasis added).)

55.     The Program Agreement also regulates publicity regarding, *inter alia*, the agreement, stating in Section 11: "Any press release regarding this Agreement or the contents hereof will be mutually agreed to in advance by the Parties in writing with respect to content and timing."

56.     Section 18.10 of the Program Agreement provides that these Section 9 and 10 confidentiality provisions may be enforced through specific performance:

> **Equitable Relief**. Each Party hereby acknowledges and agrees that a breach or threatened breach by such Party of any of its obligations hereunder in Sections 9 or 10 would cause the other Party irreparable harm for which monetary damages would not be an adequate remedy and agrees that, in the event of such breach or threatened breach, the other Party will be entitled to seek equitable relief, including a restraining order, an injunction, specific performance and any other relief that may be available from any court, without any requirement to post a bond or other security, or to prove actual damages or that monetary damages are not an adequate remedy.  Such remedies are not exclusive and are in addition to all other remedies that may be available at law, in equity or otherwise.

57.     Finally, Section 16.2 of the Program Agreement provides that while ABG and AllPass LLC may, at their election, bring suit against Bolt in another forum with jurisdiction, any other action "which in any way involves the rights, duties and obligations of any Party hereto under this Agreement shall be brought in courts located in New York County, New York, and the Parties hereby submit to the personal jurisdiction of such courts."  Further, Section 16.2 provides that "[e]ach of the Parties waives any objection that it may have based on improper venue or forum non conveniens to the conduct of any such suit or action in any such court."

### iii.     Bolt's Obligations to Compensate ABG

58.     ABG agreed in Section 2 of the Program Agreement, subject to the terms and conditions of the parties' agreements, to promote AllPass to ABG's brand partners and third-

party referrals. In exchange, Bolt agreed that ABG would be entitled to several forms of compensation.

59. By far the most significant inducement for ABG's entry into the Program Agreement was the Warrant, which, as discussed below, entitles ABG to purchase a roughly 5% stake in Bolt upon achieving the required GMV Contribution. Without the inducement of the Warrant, ABG would not have entered into the Program Agreement. ABG's relationship with Bolt has boosted Bolt's valuation—a substantial benefit that ABG would not have agreed to confer without receiving its fair share of the upside potential created through ABG's own efforts. The Warrant entitles ABG to purchase a stake in Bolt valued at more than $500 million, due in part to ABG's contributions.

60. By comparison, the other forms of potential compensation available to ABG were relatively insignificant and insufficient to induce ABG's entry into a relationship with Bolt on the other terms contained in the Program Agreement. One such form of compensation is the "Market Development Assistance" described in Section 6.3 of the Program Agreement and Exhibit D thereto. As set forth in the Program Agreement, Bolt is required to pay ABG, on a quarterly basis, a percentage of revenues generated from all ABG Brand Partners and Merchant Referrals using Bolt Products. In the context of the overall transaction, the Market Development Assistance is relatively modest. During the Q1 and Q2 of 2021, Bolt's Market Development Assistance payments to ABG totaled approximately $432,537, which is attributable to the use of Bolt products (despite the ongoing difficulties in implementation) on the e-commerce platforms of Forever 21 and Lucky Brand. (As discussed herein, Bolt's products have not been successfully deployed on any of the numerous other ABG brands due to Bolt's breaches of the Program Agreement.) Despite repeated requests by ABG's finance team, Bolt has failed to pay

the Market Development Assistance for Q3 and Q4 of 2021. In fact, Bolt has failed to provide even the data necessary to calculate the payments due.

61. ABG is also entitled to receive certain income generated by the AllPass program through its ownership stake in NewCo. To date, however, ABG has not received any income from NewCo, as NewCo has been unable to collect any fees from the AllPass program due to Bolt's failure to meet its contractual obligations to deliver a functioning AllPass product for launch.

## B.   The Warrant

62. The Program Agreement expressly incorporates a separate agreement, also dated October 9, 2020, titled "Bolt Financial, Inc. Warrant to Purchase Class A Common Stock" (the "**Warrant**").

63. Pursuant to the Warrant, ABG (defined under the Warrant as the "Holder") is entitled, subject to certain conditions and potential adjustments stated therein, to purchase at least 3,720,030 shares of Bolt Stock at an exercise price of $3.86423 per share. In addition, ABG has the right to purchase, for the same price per share, an additional 248,002 shares for each $50,000,000 of "GMV Contribution" accrued pursuant to the terms of the Program Agreement, subject to a total cap of 7,440,060 shares (the "**Shares**"). Given the current valuation of Bolt, these Shares, which ABG is entitled to acquire at an aggregate purchase price of approximately $29 million, are estimated to be worth in excess of $500 million.

64. "GMV Contribution" (short for "Gross Merchandise Value Contribution") is defined in Section 1.23 of the Program Agreement to mean "the total financial amount of ecommerce transactions that are processed through any of the Bolt Products (which, for the avoidance of doubt, for purposes hereof, include AllPass Checkout) of those ABG Participating Brand Partners and Merchant Referrals who have enrolled in AllPass."

65.     "Bolt Products," in turn, is defined in Section 1.10 of the Program Agreement as "all current and future Bolt products and services other than the Bolt Underlying Technology, including without limitation those certain products and services known as of the Effective Date as Bolt Checkout/Bolt Convert, Bolt Fraud Scoring, Bolt Fraud Protection/Bolt Approve, and Bolt Payments/Bolt Collect, as well as upsell features such as sales tax estimation, post-purchase services, delivery estimation, and shipping notifications."

66.     The term "enrolled in AllPass" is not defined in the Program Agreement.

67.     Section 2(d) of the Warrant provides that it will expire "at 11.59 p.m. Pacific Time on the day before the Exercise Period Start Date if the GMV Contribution on the Exercise Period Start Date is less than $750,000,000." Section 2(a) the Warrant states that if the Warrant is not exercised, it expires "at 5.00 p.m. Pacific Time on the third anniversary of the date this Warrant is issued."

68.     Under Section 1.4 of the Warrant, "Exercise Period Start Date" is defined as "either (i) the earlier of (a) the second anniversary of the issue date of this Warrant, and (b) such time as the GMV Contribution equals or exceeds $750,000,000 or (ii) in accordance with Section 5.3 of the Program Agreement, the effective date of a Qualifying Transaction (as defined in the Program Agreement)."

69.     The provision calling for expiration of the Warrant if the $750 million GMV Contribution threshold is not achieved within two years is expressly "subject to Section 5.3 of the Program Agreement." (Warrant § 2(d).) Section 5.3 of the Program Agreement, in turn, states that if Bolt enters into a "Qualifying Transaction" then, among other consequences, "item (d) in Section 2 of the Warrant shall automatically be deleted and shall be deemed to not apply" and "the 'Exercise Period Start Date' (as such term is used and defined in [the Warrant]) shall be deemed to be the effective date of the Qualifying Transaction." In other words, if a

Qualifying Transaction occurs, ABG is permitted to exercise the Warrant regardless of the level of GMV Contribution it has attained.

70.     A Qualifying Transaction is defined in Section 5.3 of the Program Agreement as occurring "if Bolt enters into"

> any agreement or arrangement whereby it develops a bespoke technology platform similar to the AllPass Portal for any one or more third party(ies) who offers a loyalty, membership, or subscription program with, for, or to any unaffiliated third party retailers, brand owners (including, without limitation, any brand portfolio company), or brand licensees, in which consumers pay a fee in exchange for discounts, special offers, or perks relating to any retailers, brand owners, or brand licensees (including on any participating brands, goods, or services).

71.     Section 5.3 of the Program Agreement further provides that "Bolt will inform ABG in writing of the Qualifying Transaction and the effective date of the Qualifying Transaction as soon as is commercially reasonable."

72.     The Warrant does not expressly address the circumstance in which the requisite GMV Contribution of $750 million is not achieved by the two-year anniversary of the Warrant as a result of Bolt's actions or inactions, including Bolt's substantial and continuing delays in delivering a launch-ready AllPass product and other material breaches of the Program Agreement.

73.     Section 10.4 of the Warrant (Further Assurances) provides: "The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Warrant."

### C.     The Operating Agreement

74.     In connection with the Program Agreement and the Warrant, ABG, Bolt, and the AllPass LLC also entered into the Amended and Restated Operating Agreement of ABG-AP, LLC, dated October 9, 2020 (the "**Operating Agreement**").

75.     Like the Program Agreement, the Operating Agreement binds the parties to strict confidentiality obligations.  In particular, Section 10.12 of the Operating Agreement states:

> **Publicity**. Neither Bolt nor the Company shall, either itself or through any agents or representatives, make, issue, distribute or disseminate any information or statements, whether written or verbal, to the press regarding ABG, the Company, and/or any other matters pertaining to or arising out of this Operating Agreement (each, a "**Press Release**") unless and until ABG has approved such Press Release.

76.     Further, Section 10.13 of the Operating Agreement states:

> **Confidentiality**. Each Member agrees that such Member shall keep confidential, and shall not disclose to any third party or use for its own benefit, without the consent of the Company, any non-public information with respect to the Company . . .  that is in such Member's possession on the Effective Date or thereafter disclosed to such Member by or on behalf of the Company; provided, that a Member may (subject to any other confidentiality agreements or arrangements agreed to by such Member with the Company or any of its Affiliates) disclose any such information (a) as has become generally available to the public other than by virtue of a breach of any obligation of confidentiality owed to the Company by such Member or its Affiliates or other related parties, (b) to its owners, lenders under contractual confidentiality obligations, directors, employees, and professional advisers who need to know such information and agree to keep it confidential and not use it for any purpose other than to advise such Member, (c) in connection with any bona fide financing for, or acquisition of, such Member, to its future investors, lenders, acquirors or underwriters, in each case, who are under confidentiality obligations to such Member; provided, that ABG must be provided with prior written notice and the opportunity to reject such disclosure before such Member may make any such disclosure contemplated by this clause (c) to an ABG Competitor, (d) to the extent required in order to comply with reporting obligations to its investors who have agreed to keep such information confidential, (e) to any proposed purchaser of such Member's Membership Interests if such purchase would be permitted under this Operating Agreement so long as such proposed purchaser agrees in writing to keep any information received confidential on the terms set forth herein . . . .

77.     Section 10.15 of the Operating Agreement, like the Program Agreement,

provides for injunctive relief to enforce Bolt's obligations thereunder:

> **Specific Performance**. Each party recognizes and acknowledges that a breach of Section 10.13 [Confidentiality] will cause irreparable damage, the exact amount of which will be difficult or impossible to ascertain, and that remedies at law for any such breach will be inadequate. Accordingly, each party agrees that in the event of a breach or threatened breach of Section 10.13, in addition to any other remedy which may be available at law or in equity, the non-breaching parties may apply to a court of competent jurisdiction for injunctive relief and specific performance to prevent or prohibit such breach.  Each party agrees not to raise as a defense or objection to the request or granting of such relief that any breach of Section 10.13 is or would be compensable by an award of money damages, and each party agrees to waive any requirements for the securing or posting of any bond in connection with such remedy.

78.     Finally, Section 10.3 of the Operating Agreement contains an exclusive

New York forum provision, which states in relevant part:

> **Consent to Jurisdiction.**  Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the courts located in New York, New York, to the extent such courts have subject matter jurisdiction, or of the federal court of the United States of America sitting in New York, New York and any appellate court thereof (collectively, the "Applicable Courts"), in any action or proceeding arising out of or relating to this Operating Agreement or for recognition or enforcement of any judgment relating thereto, and each party hereto hereby irrevocably and unconditionally (a) agrees not to commence any such action or proceeding except in an Applicable Court; (b) agrees that any claim in respect of any such action or proceeding may, to the extent permitted by law, be heard and determined in such an Applicable Court; (c) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any such action or proceeding in any Applicable Court; and (d) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in Applicable Court.

## II.   BOLT BREACHES ITS OBLIGATIONS UNDER THE PROGRAM AGREEMENT TO DEVELOP AND LAUNCH ALLPASS

79.     As set forth above, the Program Agreement imposed at least four distinct but related obligations on Bolt with respect to the development and launch of AllPass.   In summary, Bolt was required to (i) begin developing the Bolt Underlying Technology "immediately" upon execution of the contract, (ii) "complete development" of the Bolt Underlying Technology "as soon as commercially reasonable," and (iii) "complete the development of AllPass Checkout" in time "to permit" the AllPass Checkout Launch by October 20, 2020 and (iv) the AllPass Subscription Launch by January 15, 2021.   Bolt breached at least three of these obligations.

80.     *First*, while it is unclear when, if ever, Bolt began working on the Bolt Underlying Technology in earnest, it is clear that Bolt failed to deliver that technology "as soon as commercially reasonable."   To the contrary, as set forth herein, Bolt consistently fell short of the objective standards of reasonableness in the industry.   Indeed, Bolt's failure to meet its obligations to ABG to develop AllPass is underscored by the recent revelation that Bolt was instead secretly devoting its time and resources to a competing product, Bolt+, in further breach of the Program Agreement.   Moreover, it has become clear that Bolt has intentionally delayed the integration of AllPass with Shopify, a critical step in launching the multi-brand membership service that is central to AllPass.

81.     *Second*, Bolt failed to complete development of AllPass Checkout in time to permit the AllPass Checkout Launch by October 20, 2020.   To the contrary, the ABG brands that have attempted to implement Bolt's checkout products on their websites and mobile apps have encountered persistent technical issues caused by Bolt.   Bolt's breaches have delayed and frustrated the successful launch of Bolt's checkout products on Forever 21's e-commerce

platforms for months and, to date, have prevented the rollout entirely for Brooks Brothers (although at ABG's insistence, Brooks Brothers has remained committed to deploying AllPass Checkout and AllPass once Bolt rectifies the technological deficiencies it has caused).

82.     *Third*, and most critically, Bolt breached the Program Agreement by failing to deliver a fully functional AllPass platform by January 15, 2021.  In fact, Bolt did not deliver even an AllPass MVP until November 2021.  While Bolt initially claimed that it had delivered this MVP for AllPass by February 2021, contemporaneous documents created by Bolt, including development timelines, directly contradict Bolt's claim and demonstrate that Bolt failed to meet even its unilaterally extended MVP deadline of July 2021, months after the contractual deadline.  Even today, the AllPass product that Bolt has delivered is not fully deployed due to Bolt's breaches.

83.     Bolt's breaches of the parties' agreements are summarized below with respect to each of the three ABG brand partners that have attempted to integrate Bolt products to date (Forever 21, Brooks Brothers, and Lucky Brand), as well as in connection with Bolt's secretive development of Bolt+ and its efforts to hinder the rollout of AllPass on Shopify.

**A.      Forever 21**

84.     Bolt's efforts to integrate its products into the e-commerce platforms of ABG brand partner Forever 21 were plagued from the outset with major critical issues.  Indeed, Despite launching Bolt's products on Forever 21 starting in Q4 of 2020, Forever 21 was still suffering from material deficiencies in Bolt's products in Q3 of 2021, nearly a year later.  These deficiencies evidence a failure by Bolt to comply with industry standards with respect to software development and delivery.

85.     As one notable example, Bolt failed to deliver a "cartridge" that would permit Bolt's products to interact with the Salesforce Order Management Software ("**OMS**")

used by Forever 21.  Salesforce is the e-commerce platform that Forever 21 uses to operate.  In order for Bolt Checkout to integrate into Forever21.com, Bolt must develop a "cartridge," which is essentially an integration for Bolt to plugin.[1]  This is an industry-standard step in software implementation with which Bolt has failed to comply in a timely fashion.

86.     Additionally, Bolt led a disastrous integration of Bolt checkout onto the Forever 21 mobile app, which drives approximately 23% of sales.  As a result, the app saw a significant drop in "conversion" (i.e., the rate at which traffic leads to actual sales), resulting in the loss of millions of dollars.  Even now, as of the start of 2022, Bolt is *still* developing a mobile software development kit ("**SDK**") to allow Bolt Checkout to work for the Forever 21 app.  The failure to provide an SDK in a timely manner is yet another example of Bolt's failure to comply with industry standards.

87.     Some of the deficiencies with Bolt's Forever 21 launch were summarized in an October 11, 2021 email from Forever 21, which detailed the "blockers" that needed "immediate attention to get to All Pass."  Forever 21 provided the following chart, summarizing some of the issues encountered with Bolt that prevented an AllPass launch:

---

[1] Generally, an order management system or OMS is a platform that allows sellers to track sales, process orders, manage inventory, and streamline fulfillment.  A "cartridge" is a mechanism for packaging and deploying program code and data.  A cartridge can be used to extend business functionality or integrate with external systems—in this case, allowing interaction with Salesforce OMS.

|  | **Q4, 2020** | **Q1, 2021** | **Q2, 2021** | **Q3, 2021** |
|---|---|---|---|---|
| **Issues** | 1) Unable to capture alternate payment method<br><br>2) Unable to do "round up for charity" – Trevor Project<br><br>3) Order Confirmation Page would not load for approx. 10% of orders<br><br>4) Bolt input fields allowed emojis for Name, Address, etc. | 1) Missing Quantum Metric replay code[2]<br><br>2) Ship to home products delivered to store<br><br>3) Customers with over 30 items in their cart could not check out<br><br>4) Bolt unable to send device information associated with order | 1) Bolt siphoning customer account information from F21. We did not get almost a million customer records and our CRM [short for "customer relationship management"] / Marketing suffered significantly<br><br>2) Forever 21 Marketing Opt-in never displayed at checkout | 1) Bolt Team unable to deliver Salesforce Commerce Cloud Cartridge that can interact with Salesforce OMS<br><br>2) Bolt cartridge could not perform successful BOPIS [short for "buy online, pick up in store"] order placement at checkout – took 8 weeks to fix |
| **Impact** | 1) Did not go live with Amazon Pay/PayPal which 15% of digital payments for our customer base<br><br>2) Could not meet legal obligation with Trevor Project to delivery by November 2020<br><br>3) Could not get accurate analytics on conversion<br><br>4) Customer orders were delayed due to invalid address or names | 1) Could not measure cart abandonment<br><br>2) Enraged customers who were charged for delivery but never received package at home<br><br>3) Customers abandoned high AOV ["average order value"] carts<br><br>4) Analytics unable to distinguish orders from iOS vs. Android vs. Mobile Web Browser | 1) F21 saw a drastic drop in newly registered accounts on website which in-turn prevented marketing efforts to our customers<br><br>2) F21 prevented from sending promotional materials to customers | 1) Delays in code delivery resulted in $200k in T&M[3] charges from Born Group and almost 8 weeks in timelines<br><br>2) BOPIS launch was delayed to 2022, significant revenue impact |

88.     The AllPass launch has yet to occur and the problems summarized above are ongoing.  Collectively and individually, the technical failures identified by Forever 21 reflect Bolt's failure to comply with industry standards, including with respect to reasonably prompt delivery and implementation of software products.

---

[2] Quantum Metric is a company that provides a "replay" feature that allows for the reproduction of a user's interactions on web or mobile applications.  Session replay captures things like mouse movements, clicks, typing, scrolling, swiping, and tapping.

[3] Born Group was the third-party Systems Integration company that Forever 21 was using to help with site migration.  Because of delays in Bolt delivering needed code, Born Group charged Forever 21 an additional $200,000 in time and man hours (T&M).

89.     The botched Forever 21 integration made SPARC extremely cautious about rolling Bolt out across additional brands.   Indeed, Forever 21's online business experienced material diminution in gross sales estimated to be in excess of $150 million during the period of Bolt integration and immediately thereafter.   ABG—in the name of being a good partner to Bolt—obtained an accommodation from SPARC to forbear on pursuing termination of the Bolt contract with the Forever 21 brand.

## B.     Brooks Brothers

90.     In addition to Forever 21, Bolt failed to deliver the key components required to integrate Bolt Checkout with the website for Brooks Brothers, another ABG brand partner.  In fact, the problems encountered with Bolt Checkout to date have made it necessary for Brooks Brokers to temporarily abandon its launch of Bolt products entirely, due to persistent technical defects caused by Bolt, which threatened to materially harm Brooks Brothers during the critical holiday shopping season.   Issues encountered with the Brooks Brothers website included user authentication, single sign on, and buy-now-pay-later integrations.   As with Forever 21, these issues reflect Bolt's failure to comply with industry standards.

91.     Accordingly, on June 9, 2021, SPARC informed ABG that SPARC had been forced to pause any work being done to further the Bolt integration for Brooks Brothers due to a series of material deficiencies in Bolt's performance.   In particular, SPARC noted the following deficiencies:

- "Existing user authentication – ensuring a smooth transition for existing Brooks Brothers customers once we transition to SFRA/Bolt[4] has been a core requirement[] from the beginning (especially in light of our experiences of F21 [i.e., Forever 21])

---

[4] SFRA is short for Storefront Reference Architecture, which provides an out-of-the-box blueprint for merchants to build e-commerce sites.

- Single Sign-on – ensuring users are not confused by site registration/login, loyalty registration/login, Bolt registration/login

- Klarna[5] – recently uncovered that – in order to move to 'full' Klarna integration (which we're obligated to do) will now require significant additional work and likely a direct Manhattan[6] → Bolt integration that we had NOT counted on"

92. According to SPARC, "[t]hese factors, combined with our ongoing struggles with Bolt on F21 (omni channel pilot delays, Klarna challenges) lead [SPARC] to recommend the pause/timeout while we assess our options moving forward." Nonetheless, SPARC (like ABG) continued to operate in good faith, noting that SPARC was "continuing to move forward with troubleshooting on F21, and we're (as of now) proceeding with the Lucky [Brand] launch (including Bolt integration)." Bolt was advised the same day of the pause in the Brooks Brothers launch.

93. The necessity of obtaining replacement third-party products which possess some of the functionality of Bolt's products just before the 2021 holiday shopping season has already cost SPARC damages of, at minimum, hundreds of thousands of dollars, if not more, because SPARC had to pay its third-party system integrations partner to find a new checkout solution. Bolt—recognizing its failures—agreed in May and June of 2021 to amend certain commercial terms to mitigate some of the damages to SPARC due to the issues and delays that Bolt had caused. Still, it was only because of ABG's efforts that SPARC tentatively agreed to attempt integration with Bolt again after the busy holiday shopping season was complete.

---

[5] Klarna is a company whose offerings to consumers and retailers include payments, social shopping and personal finances. ABG partners with enterprise solutions such as Klarna to offer customers convenient, efficient, and flexible payment options.

[6] "Manhattan" refers to Manhattan Associates and that company's OMS (Order Management System) product.

### C. Lucky Brand

94. The only ABG brand that may come close to a successful AllPass launch is Lucky Brand, but that is speculative at this time. Even as to Lucky Brand, Bolt's own documents acknowledge that AllPass was not ready to launch on a commercially reasonable timeline, and certainly not by the January 15, 2021 contractual launch date.

95. For example, an email sent to ABG from Greg Greiner, Bolt's Head of Product, on July 20, 2021—six months *after* the January 2021 contractual deadline—attached a timeline showing that Bolt anticipated that an AllPass MVP would not be available until mid-July 2021, with testing extending through September 2021 and a "launch" in October and November 2021.

96. Thus, months after it failed to honor its contractual obligations under the Program Agreement, Bolt admitted this failure in writing, and further predicted that it would be unable to provide a viable product until roughly eleven months after the contractual deadline.

97. Bolt failed to meet even this substantially extended development timeline. Indeed, a September 23, 2021 email from Mr. Greiner at Bolt similarly admits that testing was not completed in September 2021, and was anticipated to continue into October 2021. Mr. Greiner's September 23 email provided a link to "a ***first draft*** of the user flows for AllPass and SSO [single sign-on[7] on Lucky Brand," noting that the draft "doesn't cover all edge cases and the checkout flow won't be fully customized to Lucky [Brand]'s existing checkout as these are just designs" (emphasis added).

98. Mr. Greiner's September 23, 2021 email also attached "an initial set of Allpass [sic] test cases." As shown in the attachment, Bolt had failed, even as of September

---

[7] Generally, Single Sign-On (or SSO) refers to an authentication method that allows users to access multiple applications with a single set of credentials, like a username and password.

2021, to run at least nineteen separate tests. These included such basic items as confirming that a Bolt user or AllPass member would be able to successfully log in to use the service. He further noted that Bolt's "current testing plans" would extend through at least October 4, 2021.

| User Type | Action | Expected Result | Status |
|---|---|---|---|
| Non Bolt Account User | Clicks Checkout | Shows Registration Option | Untested |
| Non Bolt Account User | Clicks Add AllPass button (Shipping Info Screen) | 1.) Hides Registration Option2.) Adds 10% discount3.) Adds membership item to Cart | Untested |
| Non Bolt Account User | After the above step, Shopper proceeds to Payment Screen | 1.) Hides Registration2.) Adds Shipping discount on top of 10% discount3.) Adds membership item to Cart | Untested |
| Non Bolt Account User | Clicks Add AllPass button | 1.) Hides Registration Option2.) Adds BOTH discounts3.) Adds membership item to Cart | Untested |
| Bolt Account User | Enters Email/Phone | Hides Registration Option | Untested |
| Bolt Account User | Enters OTP code to login | Shows Registration Option | Untested |
| Bolt Account User | Clicks Add AllPass button | 1.) Hides Registration Option2.) Adds BOTH discounts3.) Adds membership item to Cart | Untested |
| Bolt Account User | Decides to Guest Checkout | Hides Registration Option | Untested |
| AllPass Member | Enters Email/Phone | 1.) Hides Registration Option2.) Shows Verification OTP view with custom AllPass text | Untested |
| AllPass Member | Enters OTP to login | 1.) Hides Registration Option2.) Adds BOTH discounts | Untested |
| AllPass Member | Decides to Guest Checkout | 1.) Removes BOTH discounts2.) Hides Registration | Untested |
| AllPass Member | Device logged in user clicks checkout | 1.) Hides Registration Option2.) Adds BOTH discounts | Untested |
| Non-creatable Bolt Account | Enters Email/Phone | Hides Registration Option | Untested |
| Non Bolt Account User/Bolt Account User | Clicks on "Full Program Details" Button | Displays Full Program Details SideSection | Untested |
| Registered Shopper | Deletes AllPassMembership item from Cart | Removes BOTH discounts | Untested |
| Registered Shopper / AllPass Member | Clicks on any APM[8] option on Payment Screen | Displays APM Selection Screen | Untested |
| Registered Shopper / AllPass Member | After the above step, if the click on "Use <APM.>" | Removes BOTH discounts | Untested |

---

[8] As used here, "APM" refers to Alternative Payment Method, which describes to how AllPass would integrate with Shopify.

| Any user | Enters "secret" discount code (Use ALLPASS10 discount code) within Bolt checkout | Fails discount validation | Untested |
|---|---|---|---|
| Any user | Enters "secret" discount code (Use ALLPASS10 discount code) within Cart Page | Fails authorization | Untested |

99.     As the foregoing list demonstrates, Bolt's failure to deliver AllPass in a timely manner was the direct result of its failure to take industry-standard steps, such as testing the basic functionality needed to use the product.

100.     Bolt's failure to develop AllPass in a timely manner has made it impossible to launch AllPass for Lucky Brand or any of ABG's other brand partners.

## D.     Shopify

101.     By Bolt's own admission, ABG has been critical in allowing Bolt to gain a relationship with Shopify, the world's largest e-commerce platform. Despite these extraordinary efforts by ABG, Bolt attempted to use the Shopify opportunity secured by ABG as a "Trojan horse" for a wider Bolt-Shopify relationship, in the process further delaying the launch of AllPass, in breach of Bolt's contractual obligations to ABG. Even worse, once rebuffed by Shopify—which was amenable to launching AllPass, but not a broader Bolt-Shopify integration at this time—Bolt's founder, Ryan Breslow, recently launched a public attack on Shopify and its Chief Operating Officer on Twitter, thereby affirmatively harming the AllPass venture and its chances of launching on Shopify.

102.     Prior to ABG's involvement and efforts on behalf of Bolt, Shopify had excluded Bolt from integrating its technology with Shopify Checkout. That left Bolt materially hamstrung, as it could only integrate with other platforms such as Salesforce, Magento, and BigCommerce. Over many months, ABG used its relationship and influence with Shopify to convince Shopify to allow a light integration of Bolt's product for the express purpose of

enabling AllPass to function within ABG's Shopify e-commerce websites (e.g., Frye, Spyder, Volcom, Nine West, and Juicy Couture). This was a major achievement for AllPass and the ABG-Bolt partnership, as it would allow for the launch of AllPass on multiple brands without relying on a full Bolt integration (which, as noted above, had proven to be highly problematic with Forever 21).

103. ABG has recently learned from Shopify that it signed the agreement with Bolt providing for the launch of AllPass for ABG's Shopify checkouts more than two months ago, in late November 2021, yet Bolt has further delayed the launch of AllPass by refusing to sign the finalized Shopify-AllPass agreement. Instead, Bolt has been attempting to leverage the Shopify opportunity secured by ABG to gain a broader Bolt-Shopify agreement that greatly exceeds the contemplated scope.

104. Beginning in December 2021, upon learning of Bolt's efforts to hold up the Shopify launch of AllPass, ABG repeatedly insisted that Bolt move forward with the agreed-upon Shopify agreement—limited to AllPass—consistent with Bolt's obligations to ABG under the Program Agreement.

105. As ABG has emphasized throughout these discussions with Bolt, the purpose of the Shopify agreement was to make sure that AllPass can function within the Shopify environment. Nevertheless, while strongly insisting that Bolt focus on executing the AllPass agreement with Shopify to permit the launch of AllPass, ABG also offered to do everything it reasonably could to help Bolt achieve a deeper partnership with Shopify for non-AllPass products.

106. As Bolt knows, the Shopify agreement is critical to achieving the launch of AllPass. Currently, only two of ABG's brands are using Bolt Checkout—Forever 21 and Lucky Brand. Moreover, as noted above, since Bolt is still developing a mobile SDK for the

Forever 21 app, AllPass cannot be launched on Forever 21 at this time. As the app represents roughly 20% of sales, a launch without that functionality would lead to a poor membership experience for end-users (consumers). The purpose of AllPass is to be a *multi-brand* membership program. A purported "launch" of AllPass on a single brand (even if technologically feasible in light of Bolt's breaches of the Program Agreement, which it is not), would not accomplish any of the core AllPass goals.

107. Against this backdrop, AllPass-Shopify integration was mission-critical to the AllPass program: it represented the parties' path to launching AllPass with multiple brands.

108. On January 25, 2022, Bolt's Head of Product stated during a Zoom call with ABG that there were no outstanding issues related to AllPass in the Shopify agreement under discussion. He went on to admit that Shopify wanted to leave the agreement specific to AllPass, but Bolt's executive team wanted to use the agreement to create a broader relationship between Bolt and Shopify. "That is where the discussion has been held up," Bolt admitted.

109. The following day, Shopify confirmed again that all of the AllPass terms of the agreement had been agreed-upon and finalized for several weeks, and that the launch was being delayed by Bolt because it was attempting to negotiate a broader agreement for non-AllPass Bolt products.

110. Apparently frustrated with Shopify's lack of interest in a broader Bolt-Shopify agreement at this time, Bolt's founder, Ryan Breslow, recently took to Twitter to air his grievances. Beginning on February 26, 2022, Breslow issued a tirade consisting of dozens of Tweets under the heading "Shopify is Eating their Ecosystem (thread)," in which he attacked Shopify—a highly valuable potential AllPass partner secured through ABG's good will and efforts—as a "behemoth" that had duplicitously sought to "[c]lone the most profitable apps," thereby "putting those partners either out of business or at a significant disadvantage," all the

while "publicly commit[ing] to being open: thus incentivizing more partners to build" on its platform. Breslow even went so far as to attack the personal integrity of Shopify's Chief Operating Officer, thus further damaging the parties' venture and undermining ABG's efforts to secure the launch of AllPass on Shopify.

111. Bolt's intentional efforts to delay the launch of AllPass on Shopify constitute a further material breach of the Program Agreement.

**E.     Bolt+**

112. ABG recently learned that Bolt, contrary to its obligation to devote time and resources to the development of AllPass in order to meet the mutually expected and agreed-upon launch schedule set forth in the Program Agreement, has instead devoted its energies to developing a competing project—hardly a commercially reasonable move and inconsistent with Bolt's contractual responsibilities to ABG. Specifically, Bolt revealed on a November 2021 call with potential investors that it had built "Bolt+"—a subscription product to be offered to retailers that use Bolt. Bolt+ appears to be materially identical to AllPass. Bolt stated during the investor call, for example, that customers would pay $5 per month in exchange for discounts and free shipping, similar to AllPass.

113. Bolt has kept ABG in the dark about its development of Bolt+, even though ABG is Bolt's partner in developing the underlying technology being deployed. Indeed, Bolt's failure to notify ABG of this development appears to be yet another bad-faith tactic by Bolt intended to deprive ABG of the benefit of the parties' agreements.

114. Based on the information available to ABG to date, it appears that Bolt, after missing critical deadlines under the Program Agreement and failing to ever properly deploy AllPass for ABG's brand partners, effectively abandoned the AllPass launch, and instead used the AllPass technology that it developed in partnership with ABG (with ABG's considerable

patience and support) to launch a competing product with a third party without so much as notifying ABG (as it was also required to do under the Program Agreement).

115.     Perhaps most egregiously, Bolt is now attempting to use its own failure to launch AllPass for ABG's brand partners as an excuse for denying ABG its contractual right to exercise the Warrant, all the while siphoning Bolt's efforts into a secret competing side project.

116.     Bolt's devotion of its time and efforts, in secret, to the completion of a competing product further demonstrates that it has breached the Program Agreement by, *inter alia*, failing to complete and deliver a functioning AllPass product on a timeline that is commercially reasonable.

## III.     BOLT ATTEMPTS TO DEPRIVE ABG OF THE OPPORTUNITY TO EXERCISE THE WARRANT

### A.     For Months, Bolt Acknowledged That ABG Was Earning Credit Towards Its GMV Contribution

117.     For months following the parties' execution of the Program Agreement and Warrant in October 2020, Bolt repeatedly acknowledged—explicitly and in writing—that ABG was earning credit towards the $750 million GMV Contribution needed to exercise the Warrant.  Indeed, Bolt continuously commented, in a congratulatory tone in writing and over the phone, that ABG was earning GMV Contribution towards the Warrant based on the existing e-commerce volume through Bolt products and that, despite Bolt's failure to deliver AllPass in a timely manner, there was no need to confirm an expansion of the two-year earnings window under the Warrant because ABG was going to meet the required $750 million in GMV Contribution regardless of Bolt's delays.  Nonetheless, in recognition of Bolt's failure to meet the contractual timeline for delivery of AllPass, Justin Grooms, the Bolt VP and senior account executive working on the ABG account (who also led the negotiations with ABG for the original deal), and ABG's Chief Digital Officer, Adam Kronengold, agreed to put together an amendment

clarifying and confirming an extension of the earnings window. As discussed below, it was only later that Bolt abruptly changed its position and put the parties on the course towards litigation by repudiating its contractual obligations.

118. On December 10, 2020, shortly after execution of the agreements, Mr. Grooms sent a text message to Mr. Kronengold regarding Bolt's then-current valuation of $825 million in connection with its latest fundraising effort. In light of this news, Mr. Grooms commented, "Your warrant play was a good move it seems." Mr. Grooms did not caveat this statement with any suggestion that ABG's ability to exercise the Warrant was subject to Bolt's ability to deliver AllPass on time, nor that ABG's ability to exercise the Warrant was otherwise in doubt.

119. Later that month, on December 21, 2020, Mr. Grooms texted Mr. Kronengold with an update regarding Bolt's plans for integration with Shopify, commenting that Shopify may view Bolt as an "emerging competitor," "[w]hich is great for your warrants and my equity, but not great for Shopify cooperating w/us on ABG brands." Again, the clear implication of Mr. Grooms' statement was that ABG was well on its way to earning the right to exercise the Warrant and purchase up to a 5% stake in Bolt.

120. Similarly, on January 21, 2021, Mr. Grooms sent a text message acknowledging that ABG would earn credit towards its GMV Contribution if it was able to onboard JC Penny. Notably, this message was sent a week after the contractual deadline for Bolt to deliver AllPass (January 15, 2021) had come and gone without Bolt's delivery of a viable product. Nonetheless, Mr. Grooms stated:

> A big concern that keeps surfacing on our side is that you folks are going to focus on JC Penny and lose focus on other GMV. We think JC Penny pricing might require very aggressive pricing, so you might crush your GMV target, but our revenue per $ of GMV will be a lot lower than expected.

One idea I have is that we exclude JC Penny from **the warrant calculation** in exchange for modifying the MDA[9] stuff for F21 [Forever 21]. This lets me put the JC Penney [sic] worry to bed and resolves your 2021 revenue question.

(emphasis added)

121.     Roughly seven months later, on August 23, 2021, Mr. Grooms reaffirmed privately by text message to Mr. Kronengold that ABG was making progress towards its GMV Contribution, notwithstanding Bolt's continuing failure to deliver AllPass. Specifically, Mr. Grooms stated to Mr. Kronengold that Bolt's "accounting group is pulling a GMV-to-date report together for you," consistent with the parties' mutual understanding that ABG had been earning credit towards its GMV Contribution for months.

122.     Despite Mr. Grooms' August 23, 2021 message, Bolt failed to deliver the promised report in a timely manner. On September 3, 2021, however, Mr. Kronengold asked Mr. Grooms again to send him a calculation of "**warrants earned so far**" (emphasis added). In response, Mr. Grooms stated, "I think we were at $245.4m at the end of July, which was before Lucky [Brand] launched." Thus, Bolt has acknowledged that, as of July 2021, ABG had accrued at least $245.4 million in GMV Contribution. That number has ballooned in the months since; on information and belief, ABG's GMV Contribution, if properly calculated, currently exceeds $392 million. Notably, this amount does not include nearly $80 million in revenue from the Forever 21 mobile app, which could not be captured by Bolt due to Bolt's disastrous integration on that platform, as discussed above.

---

[9] "MDA" is likely a reference to the Market Development Assistance under the Program Agreement.

**B. Bolt Abruptly Repudiates Its Obligations under the Program Agreement and the Warrant, Asserting That ABG's GMV Contribution Is "Zero"**

123. Despite these repeated and explicit representations and admissions, Bolt has recently attempted an abrupt about-face, contending for the first time that ABG's GMV Contribution to date is *zero* dollars. In support of this highly specious, self-serving claim, Bolt initially asserted that the Program Agreement and Warrant only afforded ABG credit for GMV Contribution that was delivered "through" AllPass. Later, apparently realizing that this argument was unsupportable under the parties' agreements, Bolt pivoted to a new theory—that ABG's GMV Contribution does not count because the brands in question are not "enrolled" in AllPass, the product that Bolt promised to, but so far as failed, to deliver.

124. Besides being inconsistent with Bolt's own written admissions (including the examples detailed above), Bolt's latest argument is squarely foreclosed by the plain terms of the parties' agreements, as well as the parties' intent and applicable law.

**i. To the Extent Required under the Program Agreement and the Warrant, Forever 21 and Lucky Brand Have "Enrolled" in AllPass**

125. As described above, the SPARC brands—including Forever 21, Lucky Brand, and Brooks Brothers—have committed to launching AllPass on their e-commerce websites and mobile applications. To date, however, they have been prevented from doing so by Bolt's material breaches of the Program Agreement, including its failure to (i) develop the Bolt Underlying Technology as soon as commercially reasonable, (ii) deliver a properly functioning AllPass Checkout to permit the AllPass Checkout Launch by October 20, 2020, and (iii) deliver a functioning AllPass product by January 15, 2021.

126. Notwithstanding Bolt's breaches of the Program Agreement, both Forever 21 and Lucky Brand constitute Participating ABG Brand Partners that have managed to make

significant GMV Contributions through Bolt products. To date, despite Bolt's failure to deliver a viable AllPass product on the contractual timeline, the total GMV Contributions for Forever 21 and Lucky Brand total approximately $348 million and $44 million, respectively.

127.    Bolt's contention that the GMV Contribution for Forever 21 and Lucky Brand is "zero" because those brands purportedly have not "enrolled" in AllPass is baseless.

128.    As a threshold matter, while the Program Agreement's definition of GMV Contribution contains language referring to "ABG Participating Brand Partners and Merchant Referrals who have enrolled in AllPass," neither the Program Agreement nor the Warrant defines the term "enrolled."[10]

129.    Reading the Program Agreement and the Warrant as a whole and giving the term "enrolled" its common meaning, the intent of the parties was that the GMV Contribution of brands which had committed to deploying AllPass would count toward the Warrant. Here, that requirement is met for both Forever 21 and Lucky Brand, each of which has committed to integrate AllPass into their e-commerce platforms but has been prevented from doing so by Bolt's failure to develop and deliver AllPass on the contractually agreed timeline (or indeed, at all).

130.    To the extent this scenario is not expressly contemplated by the parties' agreements, the commercially reasonable interpretation, and the one most consistent with the parties' overall intent in entering into the Program Agreement and the Warrant, is that the GMV Contributions by those brand partners "count" towards ABG's ability to exercise the Warrant.

---

[10] GMV Contribution is defined in Section 1.23 of the Program Agreement to mean "the total financial amount of ecommerce transactions that are processed through any of the Bolt Products (which, for the avoidance of doubt, for purposes hereof, include AllPass Checkout) of those ABG Participating Brand Partners and Merchant Referrals who have enrolled in AllPass."

131.     Moreover, as a result of Bolt's actions and statements communicating to ABG that it was actively earning credit towards the GMV requirement through Forever 21's and Lucky Brand's use of Bolt products—statements on which ABG reasonably relied in continuing to help Bolt profit through GMV—Bolt has waived the enrollment requirement and is equitably estopped from changing its position to assert that these brands were not "enrolled."

          **ii.     The GMV Contribution Requirement, Including Any Enrollment Requirement, Is Excused By Bolt's Actions and Inactions, Including Bolt's Material Breaches of the Program Agreement**

132.     As set forth above, Forever 21 and Lucky Brand are clearly "enrolled" in AllPass to the extent required under the Program Agreement.  Thus the GMV Contributions of those brands count towards ABG's GMV Contribution with respect to the Warrant.  But regardless of whether ABG's brand partners are considered to be "enrolled" in AllPass, Bolt cannot rely upon the purported failure to reach the $750 GMV Contribution threshold stated in the Warrant because any such failure was the direct result of Bolt's own material breaches of the Program Agreement.

133.     As explained above, absent a Qualifying Transaction, Section 2(d) of the Warrant provides that it will expire on the second anniversary of the Warrant (i.e., October 9, 2022) if the GMV Contribution is less than $750,000,000.  At the same time, Section 3.1 of the Program Agreement—which forms part of the same integrated series of contracts—provided that Bolt was required to develop the technology underlying AllPass as soon as commercially reasonable and to have AllPass fully operational by January 15, 2021.

134.     Reading the agreements as a whole, the parties agreed that ABG would have at least twenty-one months from the date on which AllPass was up and running to earn the Warrant through GMV Contributions (i.e., January 15, 2021 – October 9, 2022).

135. But, as shown above, Bolt has breached the Program Agreement by, *inter alia*, failing to develop AllPass as soon as commercially reasonable and failing to deliver AllPass by the agreed-upon date. Indeed, it was only in November 2021 that Bolt delivered what could plausibly be considered an MVP for AllPass.

136. Under basic principles of contract law and the clear terms of the parties' agreements, Bolt's material breaches of the Program Agreement cannot deprive ABG of the benefit of its bargain—including its bargained-for right to earn the right to exercise the Warrant through the building of GMV during at least the 21-month period following the date AllPass was up and running. To the extent that achieving the $750 million GMV Contribution threshold by a date certain constitutes a condition precedent to ABG's right to exercise (and Bolt's obligation to honor) the Warrant, that condition is excused under the "prevention doctrine" because the failure to obtain the requisite level of GMV Contribution was caused by Bolt's breaches of the Program Agreement and other bad-faith conduct alleged herein, including (without limitation) Bolt's breaches of Section 3.1 of the Program Agreement and its bad-faith efforts to delay the development and launch of AllPass in order to deprive ABG of the Warrant.

137. At a minimum, interpreting the parties' agreement as a whole, the two-year window to earn the Warrant must be equitably "tolled" to provide the contemplated 21-month window to grow GMV following the date Bolt makes AllPass fully available and properly functioning so that it can be successfully integrated into ABG's brand partner websites. Failure to adjust the two-year window would vitiate one of the primary benefits promised to ABG—the ability to exercise the Warrant—which served as a key inducement for ABG's entry into the Program Agreement and the Operating Agreement.

138. An adjustment of this type is expressly contemplated by the parties' agreement. Section 10.4 of the Warrant (Further Assurances) expressly provides: "The parties

agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to ***carry out the purposes and intent of this Warrant***" (emphasis added). As is plain from the text of the Program Agreement and the Warrant, the parties' purpose and intent in entering into these integrated contracts was that ABG would have a reasonably adequate period of time from the date on which AllPass was launched to earn the Warrant through GMV Contributions. Without limiting any of ABG's other claims, rights, or remedies, Bolt's failure to timely deliver a functioning AllPass product requires that Bolt enter into an instrument acknowledging the resulting and contemplated expansion of the two-year earnings window, as such an expansion is necessary to "carry out the purposes and intent" of the Warrant.

139. In addition to the express terms of the parties' agreements, the implied covenant of good faith and fair dealing requires that the two-year earnings window for the Warrant must be adjusted to account for Bolt's failure to deliver AllPass by the agreed upon date. Notably, during the negotiations for these three agreements, Bolt materially misrepresented the timeline and complexities involved in integrating Bolt's products into the websites utilized by ABG's brand partners, claiming that Bolt Checkout integration should take no longer than a few weeks, with the ability to work on multiple brands at once. Had ABG known that integrations and troubleshooting could take nearly a year (as has proven to be the case with Forever 21), it would not have agreed to the two-year earnings window. Certainly the parties never contemplated that the two-year earnings window under the Warrant could be manipulated by Bolt's failure to deliver AllPass on the agreed-upon schedule so as to deprive ABG of a right it was entitled to and had earned. Indeed, it would make no sense for the parties to make ABG's ability to exercise the Warrant contingent upon Bolt's delivery of the AllPass technology—an event which was exclusively in Bolt's control.

### iii. On Information and Belief, the GMV Contribution Requirement May Already Have Been Excused (or Shortly Will Be) Due to Bolt's Entry into a "Qualifying Transaction"

140. While Bolt has attempted to deprive ABG of the benefit of the Warrant through its bad-faith manipulation of the GMV Contribution requirement, ABG has also recently learned of facts indicating that the GMV Contribution requirement may already have been (or shortly will be) deemed satisfied in light of Bolt's entry into a "Qualifying Transaction" with a competitor.

141. As explained above, the parties agreed in the Program Agreement and Warrant that in the event that Bolt entered into an agreement with a third party to offer a product similar to AllPass—in other words, if Bolt were to offer the technological know-how developed in partnership with, and with the support of, ABG to a third party—then ABG would be appropriately compensated for its contributions to developing that underlying technology by deeming the Warrant to be immediately exercisable, regardless of ABG's GMV Contribution to date. (Program Agreement §§ 2(d), 5.3.)

142. While Bolt was contractually obligated under Section 5.3 of the Program Agreement to notify ABG of any such Qualifying Transaction, it now appears that Bolt has operated in secret in its further attempts to deny ABG the benefit of the Warrant. Specifically, Bolt revealed on a November 2021 call with potential investors that it had built "Bolt+"—a subscription product to be offered to retailers that use Bolt. On information and belief, Bolt has entered into a contract with respect to Bolt+ that constitutes a Qualifying Transaction, such that the GMV Contribution requirement is excused and/or deemed satisfied. In the alternative, to the extent that Bolt enters into such an agreement in the future, the GMV Contribution requirement will be excused and/or deemed satisfied. Moreover, to the extent that ABG has already entered

into such a contract and has failed to inform ABG of this fact, Bolt's conduct constitutes yet another material breach of the Program Agreement and the Warrant.

## IV. BOLT VIOLATES ABG'S INTELLECTUAL PROPERTY RIGHTS AND BREACHES BOLT'S CONFIDENTIALITY OBLIGATIONS UNDER THE PROGRAM AGREEMENT AND THE OPERATING AGREEMENT

143. In addition to Bolt's failure to deliver AllPass on the agreed-upon schedule and its bad-faith efforts to deprive ABG of the right to exercise the Warrant, Bolt has further breached the clear confidentiality provisions that it agreed to in both the Program Agreement and the Operating Agreement, despite ABG's repeated demands for compliance with those provisions. In particular, Bolt has repeatedly made reference to non-public aspects of its relationship with ABG, including by referencing a partnership with ABG before the parties had even announced AllPass to the public and by using the names of ABG brand partners to market Bolt's products and raise capital without ABG's authorization. Not only have these disclosures by Bolt breached the terms of the parties' agreements, they have also resulted in materially false and misleading statements to Bolt's potential and/or actual investors regarding the nature and extent of Bolt's relationship with ABG and ABG's brand partners, as well as the state of technological achievement that Bolt has actually attained in deploying its products on the websites of ABG's brand partners.

144. Perhaps most egregiously, Bolt has affirmatively misled investors by showcasing all of ABG's brands as customers in investor presentations (including, in one instance, a brand that ABG had not even acquired yet), despite the fact that ABG's brands were not using Bolt's products, thereby unjustly enriching itself by raising capital off ABG's (and its brands') good name while simultaneously deceiving investors. On several occasions, ABG demanded that Bolt remove ABG and its brands from Bolt's marketing materials but Bolt has ignored those demands and has failed to comply.

145. Bolt's improper exploitation of ABG's intellectual property and good will is part of a pattern of exploitation by Bolt that began even before the Program Agreement was signed in October 2020. For instance, in an April 2020 presentation to potential investors, Bolt heavily touted an anticipated "partnership" with a "Partner A" identified as a "private brand development and licensing company" that "owns and operate[s] 50 leading consumer brands," including "various apparel, athletics, and entertainment brands, for which it partners with other companies to license and merchandise."

146. In the event that this description was not sufficient to identify the "partner" as ABG, on page 5 of the presentation, Bolt explicitly identified "Forever 21"—well known publicly to be one of ABG's brand partners—as part of the presentation's "Key Partnership Milestones." Specifically, Bolt's April 2020 investor presentation stated that Bolt would "[l]aunch membership product pilot on Forever 21" in October 2020. Bolt also provided potential investors with a Summary Income Statement that explicitly identified ABG as "Partner A," under the heading "Big Wins," thus removing any doubt. These disclosures and use of ABG's intellectual property were not authorized by ABG and violated the terms of a then-existing mutual Non-Disclosure Agreement between ABG and Bolt dated August 27, 2019.

147. Bolt continued to misuse ABG's name, confidential information, and intellectual property after the parties' signed the Program Agreement. Specifically, Bolt's July 2021 investor presentation (the "**July 2021 Deck**") again heavily touted Bolt's relationship with ABG, and also with SPARC, without either company's permission. Not only did these disclosures violate ABG's contractual rights under the Program Agreement and Operating Agreement, they also disseminated materially false and misleading information to potential investors.

148.    In particular, the July 2021 Deck represented to investors that substantial revenue was "Booked & Coming Live," due in large part to the contributions of ABG and its brand partners, including Barney's New York, Brooks Brothers, Eddie Bauer, Frederick's of Hollywood, Hart Schaffner Marx, Herve Leger, Jones New York, Judith Leiber, Lucky Brand, Nautica, Nine West, Prince, Thomasville, Aéropostale, and Volcom.  Yet, many of these brands do not even use e-commerce or are on platforms that are not compatible with Bolt.  In fact, to date, the only two ABG brand partners that have used Bolt's products or AllPass are Forever 21 and Lucky Brand.  (As noted above, Brooks Brothers attempted to implement Bolt's products, but was forced to abandon the effort at least temporarily due to technical issues caused by Bolt.)  Bolt even went so far as to imply (through the use of protected marks) that Reebok—which ABG had not yet even entered into an agreement to acquire—was one of the brands that would be using Bolt's products.  Thus, Bolt's statement to potential investors that a dozen ABG brands were "Booked & Coming Live" was materially false and misleading.  Bolt's statement to investors also disclosed ABG's confidential information without authorization, in that it disclosed the anticipated acquisition of Reebok in July 2021, well before the Reebok deal was publicly announced on August 12, 2021.

149.    Bolt's November 2021 investor memorandum (the "**November 2021 Memo**") continued its pattern of breaching the parties' agreements and making material misrepresentations to investors.

150.    In the November 2021 Memo, Bolt stated: "Since March, Bolt sales has completely evolved our selling approach with eCommerce merchants," which had purportedly "dramatically accelerated the sales cycle and helped [Bolt] secure major wins in record time with name brands, such as Casper, Aeropostale, Nautica, Eddie Bauer, Brooks Brothers, Lucky [Brand], Playboy, RugsUSA, and many others."  Again, this statement by Bolt was materially

false and misleading to investors because the only ABG brand partners actually using Bolt as of November 2021 were Forever 21 and Lucky Brand. The integration attempt with Brooks Brothers was disastrous, and neither Aeropostale nor Nautica had integrated with Bolt.[11] This was another example of Bolt using ABG brand names improperly for Bolt's selfish purposes without permission from ABG.

151.    In addition to Bolt's improper disclosures and use of ABG's intellectual property in Bolt's investor presentations, Bolt has also issued press releases and made public disclosures to news outlets that directly violate the terms of the Program Agreement and the Operating Agreement.

152.    For instance, an October 12, 2021 Bloomberg article titled "Fintech Startup Bolt Sees Valuation Surge to $6 Billion" (the "**October 2021 Article**") stated the following:

> Bolt, which makes money by getting a 2% cut of purchases made through its one-click checkout, will use the funding to expand overseas, add more features and boost brand advertising. Some of the biggest retailers in Europe will be debuting Bolt in the first half of next year, ***Breslow said*** without providing the brands. ***Current customers include*** Forever 21 and ***Brooks Brothers.***

(emphasis added)

153.    As noted above, the reference in the October 2021 Article to Brooks Brothers was materially false and misleading, as the launch of Bolt products on the Brooks Brothers website had to be abandoned months earlier, in June 2021, due to technical issues caused by Bolt. Based on the October 2021 Article's attribution to Bolt founder Ryan Breslow, it appears that this false information came directly from Bolt. In addition to being inaccurate,

---

[11] The November 2021 Memo is also indicative of the extent to which Bolt has already benefited from ABG's good-faith efforts. For example, the November 2021 Memo highlights Bolt's partnerships with Casper and Shopify, which were both facilitated by ABG.

Bolt's statements to Bloomberg were unauthorized, as neither ABG nor the AllPass LLC had granted permission for such public statements.

154.    Similarly, a July 20, 2021 article titled "Online Checkout Startup bolt Valued at $4 Billion," which appeared on the website theinformation.com (the "**July 2021 Article**"), stated that "Six-year-old Bolt has six million registered users and next year expects 50 million people to use Bolt's one-click checkout service through merchants such as Forever 21 and Brooks Brothers, according to a person familiar with the business."  While the article did not identify the "person familiar with the business" who provided this information, the misleading disclosure did not come from ABG, and therefore, on information and belief, originated with Bolt.  Indeed, the article elsewhere quotes statements made by Mr. Breslow, Bolt's founder and then-current CEO, during an interview with the publication.

155.    Similar misstatements regarding Bolt's involvement with Brooks Brothers and other unauthorized and/or inaccurate disclosures regarding ABG and its brand partners have appeared on Bolt's website.  To take just one example, the Bolt website (bolt.com) has displayed the Brooks Brothers logo (along with marks for Forever 21 and Lucky Brand) adjacent to a discussion of why retailers should "Grow with Bolt," which asserted that "nine out of ten Bolt retailers have seen new customers come from across the [Bolt] network"—falsely implying, once again, that Brooks Brothers was one of those brands.

## V.    BOLT'S ACTIONS HAVE AND WILL CONTINUE TO IRREPARABLY HARM PLAINTIFFS ABSENT INJUNCTIVE RELIEF

156.    Due to Bolt's breaches of the Program Agreement, the Warrant, and the Operating Agreement, as well as Bolt's infringement of Plaintiffs' intellectual property rights, Plaintiffs have been, and will continue to be, irreparably harmed in the following respects, among others, absent injunctive relief:

(a)     Plaintiffs are being irreparably harmed because their confidential information, as well as confidential information regarding ABG's brand partners, the AllPass LLC, SPARC, and Simon, is being disseminated by Bolt to the public and to actual and potential investors in Bolt without authorization and in breach of the express terms of the Program Agreement and the Operating Agreement.

(b)     Plaintiffs are being irreparably harmed because Bolt, without authorization or consent, has used in commerce one or more of the ABG Marks (defined below), including but not limited to ABG, Authentic Brands Group, Forever 21, and Brooks Brothers, in such a manner as to be likely to cause confusion regarding (i) the affiliation, connection, or association between one or more of these ABG brands, ABG, and Bolt, and (ii) the sponsorship or approval of Bolt and Bolt's products and services by ABG.

(c)     Plaintiffs are being irreparably harmed because Bolt has used in interstate commerce materially false or misleading statements regarding its relationship with ABG and the brands owned by ABG.  Bolt's actions misrepresent the nature, characteristics, and quality of Bolt's goods and services because consumers are likely to confuse Bolt or Bolt's services with ABG or ABG's goods and services.  Plaintiffs will be irreparably harmed because consumers may be less likely to purchase goods associated with ABG or ABG's brands due to perceived association with Bolt's technical issues, and because third parties may be less likely to enter into agreements with ABG for ABG brands due to perceived association with Bolt's technical issues.

(d)     Plaintiffs will be irreparably harmed if they are deprived of the right to exercise the Warrant to purchase the Bolt Shares at the agreed exercise price.  The Shares are unique and are not publicly available for purchase.  Additionally, if Plaintiffs are deprived of the right to purchase the Shares under the Warrant, they will not be able to exercise any of the voting rights or other rights attendant to the Shares after exercise of the Warrant.

## FIRST CAUSE OF ACTION

### (Breach of Contract – Program Agreement)

157.    Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

158.    The Program Agreement constitutes a valid and enforceable contract between ABG and Bolt supported by consideration to both Bolt and ABG.

159.    ABG has performed its obligations under the Program Agreement.

160.    As set forth herein, Bolt has materially breached its obligation to perform core obligations under the Program Agreement.

161.    First, Bolt breached Section 3.1 of the Program Agreement by failing to deliver the Bolt Underlying Technology "as soon as commercially reasonable." To the contrary, as set forth herein, Bolt consistently fell short of the objective standards of reasonableness in the industry. Bolt's failure to meet its obligations to ABG to develop AllPass is underscored by the recent revelation that Bolt was instead secretly devoting its time and resources to a competing product, Bolt+, in further breach of the Program Agreement. Moreover, Bolt has intentionally delayed the launch of AllPass on Shopify, a critical step in launching the multi-brand membership service that is central to AllPass.

162.    Second, Bolt breached Section 3.1 of the Program Agreement by failing to complete development of AllPass Checkout in time to permit the AllPass Checkout Launch by October 20, 2020. In fact, to this day, the ABG brands that have attempted to implement Bolt's checkout products on their websites and mobile apps have encountered persistent technical issues caused by Bolt.

163.    Third, Bolt breached Section 3.1 of the Program Agreement by failing to deliver a fully functional AllPass platform by January 15, 2021. In fact, Bolt did not deliver

even a minimally functioning AllPass MVP until November 2021. Even today, the AllPass product that Bolt has delivered is not, and cannot be, fully deployed.

164.    Fourth, Bolt has breached Section 9 of the Program Agreement (including without limitation subsections 9.1.1, 9.1.2, and 9.7.3) by using the intellectual property of ABG and its brand partners without ABG's authorization.

165.    Fifth, Bolt has breached Section 10.2 of the Program Agreement by using and reproducing the Confidential Information of ABG and its brand partners in a manner not permitted under the Program Agreement, including by disclosing such Confidential Information to third parties, including actual and potential investors in Bolt, without the consent of ABG and/or its brand partners.

166.    Sixth, Bolt has breached Section 11 of the Program Agreement by issuing one or more press releases regarding the Program Agreement and/or the contents thereof that were not mutually agreed to in advance by the Parties in writing with respect to content and/or timing.

167.    Bolt's material breaches of the Program Agreement have caused harm to Plaintiffs, for which Plaintiffs are entitled to recover damages in an amount to be proven at trial.

168.    Additionally, Section 18.10 of the Program Agreement provides that the Program Agreement's intellectual property and confidentiality provisions may be enforced through equitable relief, and expresses the parties' acknowledgement and agreement that the breach of those provisions constitutes irreparable harm:

> **Equitable Relief**. Each Party hereby acknowledges and agrees that a breach or threatened breach by such Party of any of its obligations hereunder in Sections 9 or 10 would cause the other Party irreparable harm for which monetary damages would not be an adequate remedy and agrees that, in the event of such breach or threatened breach, the other Party will be entitled to seek equitable

relief, including a restraining order, an injunction, specific performance and any other relief that may be available from any court, without any requirement to post a bond or other security, or to prove actual damages or that monetary damages are not an adequate remedy. Such remedies are not exclusive and are in addition to all other remedies that may be available at law, in equity or otherwise.

169.     Further, separate and apart from Section 18.10 of the Program Agreement, Plaintiffs are being irreparably harmed because ABG's confidential information, as well as confidential information regarding ABG's brand partners, the AllPass LLC, SPARC, and Simon, is being disseminated by Bolt to the public and to actual and potential investors in Bolt without authorization and in breach of the express terms of the Program Agreement.

170.     Accordingly, under the terms of the Program Agreement, Plaintiffs are entitled to injunctive relief restraining Bolt from any further or continuing violations of the Program Agreement, including its provisions concerning intellectual property and confidentiality.

## SECOND CAUSE OF ACTION

### (Breach of Contract – Operating Agreement)

171.     Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

172.     The Operating Agreement constitutes a valid and enforceable contract between ABG and Bolt supported by consideration to each party thereto.

173.     ABG has performed its obligations under the Operating Agreement.

174.     As set forth herein, Bolt has materially breached its obligation to perform core obligations under the Operating Agreement.

175. First, Bolt has breached Section 10.12 of the Operating Agreement by disseminating information and statements to the press regarding ABG, NewCo, and other matters pertaining to or arising out of the Operating Agreement without ABG's approval.

176. Second, Bolt has breached Section 10.13 of the Operating Agreement by failing to keep confidential, disclosing to third parties, and using for its own benefit non-public information concerning NewCo without its consent.

177. Bolt's material breaches of the Operating Agreement have caused harm to Plaintiffs, for which Plaintiffs are entitled to recover damages in an amount to be proven at trial.

178. Additionally, Section 10.15 of the Operating Agreement provides for injunctive relief to enforce Bolt's obligations thereunder:

> **Specific Performance**. Each party recognizes and acknowledges that a breach of Section 10.13 [Confidentiality] will cause irreparable damage, the exact amount of which will be difficult or impossible to ascertain, and that remedies at law for any such breach will be inadequate. Accordingly, each party agrees that in the event of a breach or threatened breach of Section 10.13, in addition to any other remedy which may be available at law or in equity, the non-breaching parties may apply to a court of competent jurisdiction for injunctive relief and specific performance to prevent or prohibit such breach. Each party agrees not to raise as a defense or objection to the request or granting of such relief that any breach of Section 10.13 is or would be compensable by an award of money damages, and each party agrees to waive any requirements for the securing or posting of any bond in connection with such remedy.

179. Further, separate and apart from Section 10.15 of the Operating Agreement, Plaintiffs are being irreparably harmed because ABG's confidential information, as well as confidential information regarding ABG's brand partners, the AllPass LLC, SPARC, and Simon, is being disseminated by Bolt to the public and to actual and potential investors in Bolt without authorization and in breach of the express terms of the Operating Agreement.

180. Accordingly, under the terms of the Operating Agreement, Plaintiffs are entitled to injunctive relief restraining Bolt from any further or continuing violations of the Operating Agreement, including its provisions concerning confidentiality.

### THIRD CAUSE OF ACTION

**(Declaration of Right to Exercise Warrant and Specific Performance of the Warrant – or Alternatively Damages for Breach of the Warrant)**

181. Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

182. The Warrant is a valid and enforceable contract between ABG and Bolt supported by consideration to each party thereto.

183. Under the terms of Warrant and the Program Agreement, ABG is entitled to exercise the Warrant to purchase the Shares, provided it attains a threshold level of GMV Contribution within two years following execution of the Warrant. That timetable necessarily assumes completion of other existing contractual commitments by Bolt with respect to the delivery of a fully functioning AllPass product to allow ABG to properly grow GMV. ABG has in any event made substantial progress towards this GMV Contribution through the use of Bolt Products by certain Participating ABG Brand Partners and/or other referrals, regardless of Bolt's failure to enable a timely launch of AllPass, as the parties' agreements provide that all GMV related to Bolt products counts towards the Warrant's GMV Contribution threshold and the ABG brands and third-party referrals at issue have enrolled in AllPass to the extent required under the parties' agreements.

184. Moreover, as a result of Bolt's actions and statements communicating to ABG that it was actively earning credit towards the GMV requirement through Forever 21's and Lucky Brand's use of Bolt products—statements on which ABG reasonably relied in continuing

to help Bolt profit through GMV—Bolt has waived the enrollment requirement and is equitably estopped from changing its position to assert that these brands were not "enrolled."

185.    In any event, in light of Bolt's material breaches of the Program Agreement, including its failure to meet the January 15, 2021 contractual deadline under the Program Agreement for Bolt to deliver AllPass, the two-year earnings window under the Warrant must be excused under the "prevention doctrine."  At a minimum, the period must be adjusted to permit ABG the contractually contemplated period of time to achieve its GMV Contribution following the launch of AllPass.

186.    Finally, the GMV Contribution requirement may also be excused by Bolt's actual or imminent (but undisclosed) entry into a Qualifying Transaction.

187.    Bolt has rejected each of ABG's positions on these issues.  In particular, Bolt has taken the positions that (i) ABG has earned "zero" credit towards its GMV Contribution because ABG's brand partners are purportedly not "enrolled" in AllPass, (ii) the two-year period to achieve the necessary GMV Contribution is not (and cannot be) excused, tolled, or expanded, and (iii) no Qualifying Transaction has occurred.

188.    Thus, a live and justiciable controversy exists between the parties with respect to ABG's right to exercise the Warrant.

189.    Accordingly, Plaintiffs seek a declaration that (i) Participating ABG Brand Partners Forever 21 and Lucky Brand are "enrolled" in AllPass to the extent required by the definition of GMV Contribution under the Warrant; (ii) the two-year window for achieving the required GMV Contribution under the Warrant was effectively tolled for a period to be determined at trial, but at least lasting until twenty-one months after November 2021, the earliest date on which Bolt delivered an MVP, and/or (iii) any requirement under the Warrant with respect to GMV Contribution is excused and deemed satisfied due to (a) Bolt's breaches of the

Program Agreement and bad-faith conduct resulting in the failure to attain the requisite level of GMV Contribution, and/or (b) the existence of a Qualifying Transaction, and accordingly ABG may exercise the Warrant at any time.

190.     Additionally, ABG has been and remains ready, willing, and able to perform pursuant to each of the parties' agreements, including with respect to the purchase of the Shares under the Warrant.   In particular, ABG has the financial wherewithal to purchase the Shares pursuant to the Warrant.   Accordingly, Plaintiffs seek specific performance of Bolt's obligation to transfer the Shares under the Warrant.

191.     Alternatively, Section 10.4 of the Warrant (Further Assurances) expressly provides: "The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Warrant."   As is plain from the text of the Program Agreement and the Warrant, the parties' purpose and intent in entering into these integrated contracts was that ABG would have an adequate period of time from the date on which AllPass was launched to earn the Warrant through GMV Contributions.   In light of Bolt's failure to timely deliver a functioning AllPass product, Plaintiffs seek specific performance of Bolt's obligation to enter into an instrument acknowledging and confirming a resulting extension of the two-year earnings window, as such an extension is necessary to "carry out the purposes and intent" of the Warrant.

192.     Finally, as an alternative to declaratory relief and/or specific performance, Plaintiffs seek damages for Bolt's breach of the Warrant in an amount to be proven at trial, including but not limited to damages equal to the fair market value of the Shares that would be obtained by ABG pursuant to the Warrant.

# FOURTH CAUSE OF ACTION

## (In the Alternative, Breach of Covenant of Good Faith and Fair Dealing in the Program Agreement, the Warrant, and the Operating Agreement)

193.     Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

194.     In the alternative to Plaintiffs' claims for Bolt's breaches of the express terms of the Program Agreement, the Warrant, and the Operating Agreement, Plaintiffs seek damages and declaratory and injunctive relief based on Bolt's breach of the implied covenant of good faith and fair dealing implied in each of (i) the Program Agreement, (ii) the Warrant, and (iii) the Operating Agreement.

195.     At all times relevant to this action, ABG and Bolt were parties to the Program Agreement, the Warrant, and the Operating Agreement.

196.     At all times relevant to this action, ABG performed pursuant to the Program Agreement, the Warrant, and the Operating Agreement, as described above.

197.     At all times relevant to this action, Bolt was under an obligation of good faith and fair dealing in the performance of its obligations under the Program Agreement, the Warrant, and the Operating Agreement.

198.     Bolt breached its obligation of good faith and fair dealing to ABG by, among other things:

(a)     Intentionally delaying the delivery of a fully functional AllPass product;

(b)     Misrepresenting to ABG the time and resources needed to develop and deliver AllPass and the status of those efforts at various points throughout the project;

(c)     Failing to devote adequate time, personnel, and other resources to the development of AllPass;

(d)　　Attempting to deprive ABG of the benefits of the parties' contractual relationship by denying ABG the right to exercise the Warrant;

(e)　　Taking the position, contrary to the text and the intent of the parties' agreements, and demonstrating an absence of good faith, that ABG's GMV Contribution is "zero" because ABG Participating Brand Partners supposedly have not "enrolled" in AllPass;

(f)　　Inducing ABG to continue its performance under the Program Agreement by representing to ABG that it was making progress towards ABG's GMV Contribution, only to later deny that ABG had made any progress towards its GMV Contribution;

(g)　　Disseminating confidential information regarding ABG, its brand partners, AllPass, and the partnership between ABG and Bolt to third parties in order to enrich itself without ABG's consent;

(h)　　Disseminating materially false and/or misleading information regarding ABG, its brand partners, AllPass, and the partnership between ABG and Bolt to third parties in order to enrich itself and without ABG's consent;

(i)　　Devoting its time, personnel, and other resources to the development of Bolt+ instead of AllPass;

(j)　　Failing to disclose to ABG (and instead concealing) the development or existence of Bolt+;

(k)　　Attempting to conceal from ABG Bolt's actual or potential entry into a Qualifying Transaction under the Warrant and Program Agreement; and

(l)　　Intentionally delaying and hindering the launch of AllPass on Shopify in an effort to secure a broader Bolt-Shopify agreement (not desired by Shopify), to the detriment of the parties' venture and the launch of AllPass.

199. By reason of the foregoing, Plaintiffs have been harmed by Bolt's breaches of the implied covenant of good faith and fair dealing, for which Plaintiffs are entitled to recover damages in an amount to be proven at trial.

200. By reason of the foregoing, Plaintiffs have also suffered irreparable injury as a result of Bolt's breaches of the implied covenant of good faith and fair dealing.

201. Additionally, Plaintiffs are entitled to declaratory and injunctive relief restraining Bolt from any further or continuing breaches of the implied covenant of good faith and fair dealing and permitting Plaintiffs to exercise the Warrant.

## FIFTH CAUSE OF ACTION

### (In the Alternative, Unjust Enrichment)

202. Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

203. Bolt unjustly enriched itself at Plaintiffs' expense by, among other things:

(a) Accepting the benefits conferred by ABG's performance of the Program Agreement and Operating Agreement, including ABG's successful efforts to gain Bolt additional business with (for example) its brand partners (such as Lucky Brand and Forever 21) and third parties (such as Casper and Shopify), while delaying the delivery of a fully functional AllPass product and attempting subsequently to deny ABG the right to exercise the Warrant;

(b) Misrepresenting to ABG the time and resources needed to develop and deliver AllPass and the status of those efforts at various points throughout the project in order to induce ABG to enter into and continue to perform its obligations under the parties' agreements;

(c)     Inducing ABG to continue its performance under the Program Agreement by representing to ABG that it was making progress towards ABG's GMV Contribution, only to later deny that ABG had made any progress towards its GMV Contribution;

(d)     Disseminating confidential information regarding ABG, its brand partners, AllPass, and the partnership between ABG and Bolt to third parties without ABG's consent, in order to induce third parties to invest in Bolt;

(e)     Disseminating materially false and/or misleading information regarding ABG, its brand partners, AllPass, and the partnership between ABG and Bolt to third parties, in order to induce third parties to invest in Bolt and to unjustly enrich Bolt without ABG's consent;

(f)     Applying the technical know-how and other resources developed pursuant to the Program Agreement and the Operating Agreement to the development of Bolt+ and related agreements with third parties, instead of to AllPass; and

(g)     Attempting to conceal from ABG Bolt's actual or potential entry into a Qualifying Transaction under the Warrant and Program Agreement in order to retain the benefits provided by ABG under the Program Agreement and Operating Agreement without paying ABG the agreed compensation, including under the Warrant.

204.    It is against equity and good conscience to permit Bolt to retain these benefits.

205.    By reason of the foregoing, Bolt is liable to Plaintiffs in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### (In the Alternative, Quantum Meruit)

206. Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

207. As alleged above, ABG performed its obligations under the parties' agreements in good faith, including under the Program Agreement, the Warrant, and the Operating Agreement, and Bolt accepted ABG's services.

208. Among other services, ABG has used its reasonable efforts to induce its brand partners (such as Lucky Brand and Forever 21) and other third parties (such as Casper and Shopify) to purchase, integrate, or enroll in Bolt's products and services.

209. In performing its services under the parties' agreements, ABG acted with the expectation of compensation therefor.

210. Accordingly, Plaintiffs are entitled to the reasonable value of the services they have rendered to Bolt, in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

### (Trademark Infringement/Unfair Competition Under 15 U.S. § 1125)

211. Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

212. Plaintiff is the owner of common-law trademarks including ABG, AUTHENTIC BRANDS GROUP, and similar marks.

213. ABG's portfolio of iconic and world-renowned brands includes ABG, Authentic Brands Group, Marilyn Monroe®, Elvis Presley®, Muhammad Ali®, Shaquille O'Neal®, Sports Illustrated®, Dr. J®, Greg Norman®, Neil Lane®, Thalia®, Nautica®, Aéropostale®, Forever 21®, Juicy Couture®, Vince Camuto®, Herve Leger®, Judith Leiber®,

Barneys New York®, Brooks Brothers ®, Frye®, Lucky Brand®, Nine West®, Jones New York®, Frederick's of Hollywood®, Louise et Cie®, Sole Society®, Enzo Angiolini®, CC Corso Como®, Hickey Freeman®, Hart Schaffner Marx®, Adrienne Vittadini®, Taryn Rose®, Bandolino®, Misook®, Spyder®, Tretorn®, Tapout®, Prince®, Volcom®, Airwalk®, Vision Street Wear®, Above The Rim®, Hind®, Thomasville®, Drexel®, and Henredon® (collectively, the "**ABG Marks**").

214.   The ABG Marks are valid and are used in interstate commerce.

215.   ABG derives a direct economic, commercial, and business interest from the sales of goods and services offered under the ABG Marks.

216.   Without authorization or consent, Bolt has used in commerce one or more of the ABG Marks, including but not limited to ABG, Authentic Brands Group, Forever 21, and Brooks Brothers in such a manner as to be likely to cause confusion regarding the affiliation, connection, or association between one or more of these ABG brands, ABG, and Bolt.

217.   Without authorization or consent, Bolt has used in commerce one or more of the ABG Marks, including but not limited to ABG, Authentic Brands Group, Forever 21, and Brooks Brothers in such a manner as to be likely to cause confusion regarding the sponsorship or approval of Bolt and Bolt's services by ABG.

218.   Bolt's use of the ABG Marks in commerce is likely to confuse consumers as to the actual relationship between ABG and Bolt.

219.   ABG's damages, include, at a minimum, the lost sales and direct reputational damage to ABG and to the businesses associated with the ABG Brands.

220.   ABG is likely to lose sales as a result of the unlawful actions by Defendant.

221.     Consumers of goods relating to ABG or the ABG brands will be damaged by the confusion they will experience regarding the association between ABG and Bolt, and because of technical failures with the Bolt service that will drive consumers away from the ABG brands they would otherwise purchase.

222.     ABG has been and is likely to continue to be damaged by Bolt's infringing and unlawful acts.

223.     Bolt's improper use of the ABG Marks has been intentional, willful, and in bad faith, and is intended to use the goodwill accumulated by ABG to enrich Bolt.

224.     The acts of Bolt complained of herein have caused irreparable harm to ABG, and are likely to continue to cause such irreparable harm unless enjoined by this Court.

225.     ABG has no adequate remedy at law and is entitled to and seeks injunctive relief as a result thereof.

## EIGHTH CAUSE OF ACTION

### (False Advertising)

226.     Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

227.     Bolt has used in interstate commerce false or misleading statements regarding its relationship with ABG and the brands owned by ABG.

228.     For example, Bolt falsely represented to investors that GMV was "Booked & Coming Live" from ABG brand partners, including Barney's New York, Brooks Brothers, Eddie Bauer, Frederick's of Hollywood, Hart Schaffner Marx, Herve Leger, Jones New York, Judith Leiber, Lucky Brand, Nautica, Nine West, Prince, Thomasville, Aéropostale, and Volcom.

229.     Yet, many of these brands do not even use e-commerce or are on platforms that are not compatible with Bolt.  In fact, the only two ABG brand partners that have agreed to use Bolt's products or AllPass are Forever 21 and Lucky Brand.  These other brands were not "booked" and were not "coming live."

230.     As a result, the above statements are literally false or implicitly false.

231.     Similarly, Bolt represented that it had "secure[d] major wins" with brands including Casper, Reebok, Aeropostale, Nautica, Eddie Bauer, Brooks Brothers, and Lucky Brand.   Again, this statement by Bolt was materially false and misleading to investors, as Aéropostale, Nautica, Eddie Bauer, Brooks Brothers, and Lucky Brand are all ABG brands, but the only ABG brand partners actually using Bolt as of November 2021 were Forever 21 and Lucky Brand.

232.     Bolt further asserted in a Bloomberg article that its "current customers include Forever 21 and Brooks Brothers," when in fact Brooks Brothers had ceased its integration with Bolt due to Bolt's technical deficiencies.

233.     Bolt's statements in the Bloomberg article were made for the express purpose of driving consumers to Bolt's site, relying on the goodwill associated with the ABG Marks.

234.     Bolt's statements in the Bloomberg article were intended to induce consumers to purchase and use Bolt's services because of the relationship between Bolt and the ABG Marks.

235.     Bolt repeatedly made the assertion that it was associated with Brooks Brothers, despite Brooks Brothers being unable to successfully integrate Bolt due to Bolt's technical issues.

236.     The above statements are literally false or implicitly false.

237. The above statements include statements made directly to the relevant consuming public.

238. Bolt's actions described herein misrepresent the nature, characteristics, and quality of Bolt's goods and services because consumers are likely to confuse Bolt or Bolt's services with ABG or ABG's services.

239. Bolt's actions described herein misrepresent the nature, characteristics, and quality of ABG's goods and services because consumers are likely to confuse Bolt or Bolt's services with ABG or ABG's services.

240. Bolt's misrepresentation of its relationship with ABG and ABG's brands is literally false and is therefore material.

241. Moreover, the misrepresentation is material because consumers may be less likely to purchase goods associated with ABG or ABG's brands due to Bolt's technical issues.

242. ABG has been and will continue to be damaged by Bolt's misrepresentations and unlawful acts. In particular, Plaintiffs are being irreparably harmed because Bolt has used in interstate commerce materially false or misleading statements regarding its relationship with ABG and the brands owned by ABG. Bolt's actions misrepresent the nature, characteristics, and quality of Bolt's goods and services because consumers are likely to confuse Bolt or Bolt's services with ABG or ABG's goods and services. Plaintiffs will be irreparably harmed because consumers may be less likely to purchase goods associated with ABG or ABG's brands due to perceived association with Bolt's technical issues, and because third parties may be less likely to enter into agreements with ABG for ABG brands due to perceived association with Bolt's technical issues.

243. ABG is entitled to recover from Bolt all damages it has sustained from Bolt's unlawful conduct, as well as the profits Bolt has obtained from such conduct, in an amount to be proven at trial and trebled pursuant to 15 U.S.C. § 1117.

244. Bolt's willful, deliberate, and malicious conduct amounts to exceptional circumstances, justifying an award of reasonable attorneys' fees and costs to ABG pursuant to 15 U.S.C. § 1117.

245. The acts of Bolt complained of herein have caused irreparable harm to ABG, and are likely to continue to cause such irreparable harm unless enjoined by this Court.

246. ABG has no adequate remedy at law and is entitled to and seeks injunctive relief as a result thereof.

WHEREFORE, Plaintiffs demand judgment in their favor against Defendant:

a)  Awarding Plaintiffs damages in amounts to be determined at trial;

b)  Awarding Plaintiffs pre-judgment and post-judgment interest;

c)  Declaring that (i) Participating ABG Brand Partners Forever 21 and Lucky Brand are "enrolled" in AllPass to the extent required by the definition of GMV Contribution under the Warrant; and/or alternatively, (ii) the two-year window for achieving the required GMV Contribution under the Warrant was effectively tolled for a period to be determined at trial, but at least lasting until 21 months following November 2021, the earliest date on which Bolt delivered an MVP, and/or alternatively, (iii) any requirement under the Warrant with respect to GMV Contribution is excused and deemed satisfied due to (i) Bolt's breaches of the Program Agreement and bad-faith conduct resulting in the failure to attain the

requisite level of GMV Contribution, and/or (ii) the existence of a Qualifying Transaction, and accordingly ABG may exercise the Warrant at any time;

d) Awarding Plaintiffs specific performance of Defendant's obligation to transfer shares to Plaintiffs under the Warrant;

e) Awarding Plaintiffs injunctive relief restraining Bolt from further or continuing breaches of the Program Agreement, the Operating Agreement, and the Warrant, including with respect to the confidentiality, intellectual property, and publicity provisions of those agreements;

f) Awarding Plaintiffs injunctive relief restraining Bolt from further or continuing unauthorized use or exploitation of intellectual property belonging to Plaintiffs;

g) Awarding Plaintiffs the costs of this action, including attorneys' fees; and

h) Awarding Plaintiffs such other and further relief as the Court deems just and proper.

Dated:    March 4, 2022          Respectfully submitted,
            New York, New York

**CADWALADER, WICKERSHAM & TAFT LLP**

By: _/s/ Nicholas A. Gravante, Jr._
     Nicholas A. Gravante, Jr.
     William J. Natbony
     Aaron C. Lang
     Matthew M. Karlan

200 Liberty Street
New York, NY 10281
Tel.:  (212) 504-6000
Fax:  (212) 504-6666

nicholas.gravante@cwt.com
bill.natbony@cwt.com
aaron.lang@cwt.com
matthew.karlan@cwt.com

*Counsel for Plaintiffs ABG Intermediate Holdings 2,*
*LLC and ABG-SPG ES, LLC*