UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ABG INTERMEDIATE HOLDINGS 2, LLC
and ABG-SPG ES, LLC,

                    Plaintiffs,

             -against-

BOLT FINANCIAL, INC.,

                  Defendant.

Case No. 22-CV-00473

**DEFENDANT BOLT FINANCIAL, INC.'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    Preliminary Statement ..................................................................................................1

II.   Relevant Allegations and Facts..........................................................................................6

      A.    The Parties .....................................................................................................6

      B.    Bolt and ABG: From a Referral Agreement to the AllPass Loyalty Program,
            the Latter of Which Could Net ABG Much More *If* It Delivered ..........................7

            1.    The Referral, Program, and Operating Agreements ...................................7

            2.    The October 2020 Warrant ......................................................................9

      C.    Bolt's Obligations: "AllPass *Checkout*" by January 15, 2021, and "Bolt
            Underlying Technology" as Soon as "Commercially Reasonable".....................10

      D.    Confidentiality Obligations Under the Program and Operating Agreements,
            and ABG's Public Statements About the AllPass Program and Scope ................13

      E.    Neither Plaintiff Owns Any of the Intellectual Property Plaintiffs Claim
            Bolt Misused in the First Amended Complaint ....................................................14

III.  Legal Standard ........................................................................................................15

IV.   Argument ...............................................................................................................16

      A.    Plaintiffs Urge a Plainly Incorrect Interpretation of the Warrant, and Seek
            to Modify the Contract Without a Plausible Legal or Factual Basis ...................16

            1.    GMV Contribution only comes from AllPass enrollees ...........................16

            2.    There is no written or other basis to rewrite the earnings window...........19

            3.    Section 10.4's "further assurances" provision is not some untapped
                  basis to force Bolt into an agreement the parties did not make ................20

            4.    ABG has not even met its requirements under its incorrect
                  interpretation of GMV Contribution.........................................................21

      B.    Plaintiffs Do Not Plausibly Allege Bolt Breached its Performance
            Obligations............................................................................................22

      C.    Plaintiffs Do Not Plausibly Allege Bolt Violated Any Confidentiality or
            Press-Related Obligations...................................................................................23

D.     The Unjust Enrichment and Quantum Meruit Claims Fail Because the Parties' Contracts Govern Their Relationship ........................................................25

E.     Plaintiffs' Good Faith and Fair Dealing Claim Duplicates the Contract Claims and Improperly Seeks to Manufacture New Contractual Obligations ......................................................................................................................26

F.     Plaintiffs Fail to Establish Standing for Their Trademark Infringement and False Advertising Claims ........................................................................27

     1.     Neither Plaintiff is within these statutes' "zone of interest".....................27

     2.     In any event, Plaintiffs do not plausibly allege harm of the type required for these claims..........................................................................28

G.     Plaintiffs Do Not Plausibly Allege Any False Advertisements ............................30

V.     Conclusion ......................................................................................................................32

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*97th St. Holdings, LLC v. E. Side Tenants Corp.*,
  82 A.D.3d 473 (1st Dept. 2011)...................................................................... 21

*All. Indus., Inc. v. Longyear Holdings, Inc.*,
  854 F. Supp. 2d 321 (W.D.N.Y. 2012) ........................................................... 21

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
  823 F.3d 51 (2d Cir. 2016)............................................................................... 31

*Art Cap. Grp., LLC v. Carlyle Inv. Mgmt. LLC*,
  151 A.D.3d 604 (1st Dept. 2017)..................................................................... 24

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S. Ct. 1937 (2009) ............................................................. 15

*Aviv Const., Inc. v. Antiquarium, Ltd.*,
  259 A.D.2d 445, 446 (1st Dept.1999).............................................................. 26

*Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*,
  No. 11-cv-505(CM), 2011 WL 2610661 (S.D.N.Y. June 27, 2011) .................. 7

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544, 127 S. Ct. 1955 (2007) ............................................................. 15

*Berger v. E\*Trade Grp., Inc.*,
  No. 600721/99, 2000 WL 360092 (N.Y. Sup. Ct. Mar. 28, 2000) ............. 30, 31

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*,
  448 F.3d 573 (2d Cir. 2006)........................................................................ 25, 26

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*,
  3 N.Y.3d 200 (N.Y. App. Div. 2004) ............................................................. 28

*Boule v. Hutton*,
  328 F.3d 84 (2d Cir. 2003).............................................................................. 31

*Casper Sleep, Inc. v. Derek Hales & Halesopolis LLC*,
  No. 16-cv-03223(CM), 2016 WL 6561386 (S.D.N.Y. Oct. 20, 2016).............. 28

*Cecere v. RJ Reynolds Tobacco Co.*,
  No. 98 Civ.2011(RPP), 1998 WL 665334 (S.D.N.Y. Sept. 28, 1998) .............. 28

*Clark–Fitzpatrick, Inc. v. Long Is. R.R. Co.*,
  70 N.Y.2d 382 (N.Y. App. Div. 1987) ............................................................ 26

*Cummings v. City of New York*,
  No. 19-cv-7723(OTW), 2020 WL 882335 (S.D.N.Y. Feb. 24, 2020).............. 15

*Drone Racing League, Inc. v. DR1, LLC*,
  18cv4093(DLC), 2018 WL 6173714 (S.D.N.Y. Nov. 26, 2018) ..................... 31

*Exxonmobil Inter-Am., Inc. v. Advanced Info. Eng'g Servs., Inc.*,
 328 F. Supp. 2d 443 (S.D.N.Y. 2004) ................................................................. 29

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
 314 F.3d 48 (2d Cir. 2002) ................................................................................... 30

*Fesseha v. TD Waterhouse Inv. Servs., Inc.*,
 761 N.Y.S.2d 22 (1st Dept. 2003) ....................................................................... 27

*Fitzpatrick, Inc. v. Long Is. R.R. Co.*,
 70 N.Y.2d 382 (N.Y. App. Div. 1987) ................................................................ 26

*Full Circle United, LLC v. Skee-Ball, Inc.*,
 11 CV 5476 (LB), 11 CV 6277 (LB), 2014 WL 12829195 (E.D.N.Y. May 13, 2014) .......... 24

*Garber v. Legg Mason, Inc.*,
 347 F. App'x 665 (2d Cir. 2009) .......................................................................... 25

*Goldman v. Metro. Life Ins. Co.*,
 5 N.Y.3d 561 (N.Y. App. Div. 2005) ................................................................... 25

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*,
 17 F. Supp. 2d 275 (S.D.N.Y. 1998) .................................................................... 27

*Helprin v. Harcourt, Inc.*,
 277 F. Supp. 2d 327 (S.D.N.Y. 2003) .................................................................. 16

*Himmelberger v. 40-50 Brighton First Rd. Apartments Corp.*,
 94 A.D.3d 817 (2d Dept. 2012) ............................................................................ 19

*In re Ampal-American Israel Corp.*,
 2016 WL 859352 (S.D.N.Y. Feb. 28, 2016) ........................................................ 21

*In re Eros Int'l Sec. Litig.*,
 2017 WL 6405846 (S.D.N.Y. Sept. 22, 2017) ..................................................... 25

*J. Kokolakis Contracting Corp. v. Evolution Piping Corp.*,
 46 Misc.3d 544, 998 N.Y.S.2d 788 (N.Y. Sup. 2014) ......................................... 26

*Koch v. Christie's Int'l PLC*,
 699 F.3d 141 (2d Cir. 2012) ................................................................................. 15

*Lexmark Int'l, Inc. v. Static Components, Inc.*,
 572 U.S. 118, 134 S. Ct. 1377 (2014) ............................................................. 27, 28

*Ludwig's Drug Store, Inc. v. Forest City Enterprises, Inc.*,
 15-cv-7949 (JSR), 2016 WL 915102 (E.D.N.Y. Mar. 4, 2016) ........................... 20

*Matter of Salvano v. Merrill Lynch, Pierce, Fenner & Smith*,
 85 N.Y.2d 173 (N.Y. App. Div. 1995) ................................................................ 19

*Mayes v. Summit Entm't Corp.*,
 287 F. Supp. 3d 200 (E.D.N.Y. 2018) ................................................................. 30

*Merck Eprova AG v. Gnosis S.p.A.*,
 760 F.3d 247 (2d Cir. 2014) ................................................................................. 30

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*,
43 F. Supp. 3d 309 (S.D.N.Y. 2014)..................................................................26

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Xerox Corp.*,
25 A.D.3d 309 (1st Dept. 2006)......................................................................27

*New World Sols., Inc. v. NameMedia Inc.*,
150 F. Supp. 3d 287 (S.D.N.Y. 2015)..............................................................29

*Olin Corp. v. Am. Home Assur. Co.*,
704 F.3d 89 (2d Cir. 2012)...............................................................................17

*PT Kaltim Prima Coal v. AES Barbers Point, Inc.*,
180 F. Supp. 2d 475 (S.D.N.Y. 2001)..............................................................26

*Sanders v. Grenadier Realty, Inc.*,
367 F. App'x 173 (2d Cir. 2010) ......................................................................20

*Securitron Magnalock Corp. v. Schnabolk*,
65 F.3d 256 (2d Cir. 1995)...............................................................................29

*Servedio v. Travelers Casualty Ins. Co. of Am.*,
No. 20-CV-3907-LTS-SDA, 2021 WL 5772148 (S.D.N.Y. Dec. 6, 2021) ..........19

*Siegel v. HSBC N. Am. Holdings, Inc.*,
933 F.3d 217 (2d Cir. 2019)..............................................................................31

*Wathen v. Ins. Info. Inst. by Moore*,
531 N.Y.S.2d 1002 (N.Y. Sup. Ct. 1988), *aff'd sub nom.*, 554 N.Y.S.2d 590 (1st
Dept. 1990) .....................................................................................................28

## Statutory Authorities

N.Y. Gen. Bus. Law § 349 ....................................................................27, 28, 29, 30

N.Y. Gen. Bus. Law § 350 ....................................................................27, 28, 29, 30

## Additional Authorities

*https://www.techopedia.com/definition/3878/software-development-kit-sdk.* .............12

Defendant Bolt Financial, Inc. ("Bolt") respectfully submits this memorandum of law in support of its motion to dismiss Plaintiffs ABG Intermediate Holdings 2, LLC ("ABG") and ABG-SPG ES, LLC's ("ABG-SPG") First Amended Complaint.

## I.    <u>PRELIMINARY STATEMENT</u>

This lawsuit is a transparent attempt to have this Court rewrite core terms of three contracts that were intensely negotiated by sophisticated parties, and Plaintiffs' First Amended Complaint does not resolve the defects Bolt identified in its first motion to dismiss. The First Amended Complaint (Dkt. No. 19, attached to the Declaration of Adam Wolfson as Ex. 9)[1] ("FAC") makes clear that Plaintiffs filed suit because they failed in their efforts to induce Bolt to renegotiate and amend those core terms in ways that would materially advantage Plaintiffs and fundamentally transform the bargain. FAC ¶¶ 1, 117. The law does not provide for this kind of relief.

At the core of this dispute is a Warrant to purchase stock representing a significant equity stake in Bolt. By its terms, "the Warrant provides that it will expire 'at 11.59 p.m. Pacific Time on the day before the Exercise Period Start Date if the GMV Contribution on the Exercise Period Start Date is less than $750,000,000.'" *Id.* ¶ 67; *see* Ex. 2 (the "Warrant"), § 2. "Exercise Period Start Date" is a defined term, tied among other things to "the second anniversary of the issue date of this Warrant." FAC ¶ 68; *see* Ex. 2, § 1.4. "GMV Contribution" is defined "to mean 'the total financial amount of ecommerce transactions that are processed through any of the Bolt products (which, for the avoidance of doubt, include AllPass Checkout) of those ABG Participating Brand Partners and Merchant Referrals who have enrolled in AllPass." FAC ¶ 64; Ex. 1 (the "Program Agreement"), § 1.23. To date, Plaintiffs have not enrolled any merchants in AllPass and so "GMV

---

[1]  "Ex. __" citations refer to the exhibits to the Declaration of Adam Wolfson in support of Defendant's Motion to Dismiss the First Amended Complaint, filed contemporaneously herewith.

Contribution" is zero, notwithstanding the fact that certain ABG Brand Partners and/or Merchant Referrals are processing ecommerce transactions through Bolt products.

In a tacit admission that their first proposed interpretation of the contracts was legally implausible, Plaintiffs' FAC mischaracterizes Bolt's consistent position throughout this process and asks the Court to apply an even more farfetched interpretation of the operative provisions governing GMV Contribution than before. Bolt does not, as Plaintiffs assert, contend that the agreements "only afforded ABG credit for GMV Contribution that was delivered 'through' AllPass." FAC ¶¶ 15-16, 123; *see id.* ¶ 130. Rather, consistent with the agreements' plain and unambiguous terms, Bolt's position is (and always has been) that ABG only receives GMV Contribution credit for the Warrant for ecommerce transactions associated with merchants "who have enrolled in AllPass." Enrollment does not simply mean "committ[ing]" to adopting AllPass at some unspecified point, as Plaintiffs now contend. *Id.* ¶¶ 125, 129. Rather, the full context of the agreements is clear that "enrollment" means officially agreeing to participate in AllPass, including by agreeing to pay subscription fees once AllPass is integrated into an AllPass Member's website and/or mobile application. Ex. 1 §§ 1.7, 1.8. Not a single customer has actually done so, by Plaintiffs' own implicit admission. ABG has thus, to date, received no credit for GMV Contribution (although it has, pursuant to the terms of the Program Agreement, received "Market Development Assistance" fees for transactions run through Bolt products for referrals that have not enrolled in AllPass).

The plain requirement that GMV Contribution only accrues from entities "who have enrolled in AllPass" is not surprising, given the centrality of the AllPass program to what the parties hoped to accomplish when they entered this set of agreements in late 2020. Notably, the "AllPass Loyalty Program Agreement"—the main document on which Plaintiffs rely—expressly

contemplated that "AllPass may prove unviable," in which case ABG would receive specified compensation from Bolt based on the business generated for Bolt by "Qualifying Merchants," but would not be entitled to exercise the Warrant and therefore to acquire a substantial ownership stake in Bolt. Ex. 1 § 6.4. This provision confirms that growing AllPass was and remains critical to ABG's opportunity to earn equity pursuant to the Warrant.[2]

Accordingly, a main focus of Plaintiffs' FAC is the "two-year earnings window" governing the Warrant. FAC ¶ 134. As Plaintiffs concede, that window, by its terms, expires on the second anniversary of the operative agreements—October 9, 2022—if ABG does not generate at least $750 million in GMV Contribution by then. *Id.* ¶¶ 67-68; *see* Ex. 2 § 2. Ignoring this plain and unambiguous language, Plaintiffs assert that, "[r]eading the agreements as a whole, the parties agreed that ABG would have at least twenty-one months from the date on which AllPass was up and running to earn the Warrant through GMV Contributions (*i.e.*, January 15, 2021 – October 9, 2022)." FAC ¶ 134. If these sophisticated parties had intended to tie the window of time during which the Warrant could be earned to "the date on which AllPass was up and running," it would have been a simple matter to draft that objective into the agreements. But that is not what the parties did. Instead, they chose to establish a "two-year earnings window" (*id.* ¶ 133) that began when the agreements were executed and ended exactly two calendar years later. The agreements are entirely unambiguous on this score, which is why Plaintiffs assert a smorgasbord of theories under which they assert that the Court ought to revise and amend the agreements, so as to extend the two-year earnings window.

---

[2] Plaintiffs' original Complaint acknowledged that, prior to entering into the AllPass-related agreements, ABG and Bolt entered into a Referral Agreement. ECF No. 16 ¶¶ 92-96. Plaintiffs removed any reference to the Referral Agreement in the FAC, as that agreement shows, by comparison, the centrality of growing the AllPass program to ABG's earning of the warrants, for the reasons discussed further, *infra*, Section II.B.1.

None of those theories passes muster and so the FAC must be dismissed. ***First***, Plaintiffs assert that the two-year earnings window should be extended indefinitely because Bolt breached one of the operative agreements—the Program Agreement—"by failing to deliver AllPass by the agreed-upon date." *Id.* ¶ 135. Plaintiffs' breach claim conflicts with the terms of the Program Agreement, and even if it did not, this claimed breach would provide no legal basis for rewriting the operative agreements to extend the two-year earnings window. ***Second***, Plaintiffs assert, on information and belief, that the GMV Contribution requirement "may already have been excused (or shortly will be) due to Bolt's entry into a 'Qualifying Transaction.'" *Id.* ¶ 140. This kind of vague and speculative pleading does not suffice to state a claim, and, in any event, the FAC does not allege that a Qualifying Transaction has in fact occurred, nor could it make such an allegation under Rule 11. ***Third***, Plaintiffs cite Section 10.4 of the Warrant—a boilerplate "further assurances" clause—as supposedly establishing a contractual requirement that "Bolt enter into an instrument acknowledging the resulting and contemplated expansion of the two-year earnings window, as such an expansion is necessary to 'carry out the purposes and intent' of the Warrant." *Id.* ¶ 138. As a matter of law, Section 10.4 has no such effect and imposes no such mandate on Bolt. ***Finally***, in a separate claim, Plaintiffs assert that the implied covenant of good faith and fair dealing requires an amendment of the unambiguous terms of the Warrant that would effectively toll the two-year earnings window for an indefinite period. *Id.* ¶ 139. But it is hornbook law that implied-covenant claims cannot simply duplicate ordinary contract claims, nor be used to rewrite contracts or add new terms—which is precisely what Plaintiffs ask the Court to do here.

Plaintiffs' main factual assertion purportedly justifying these re-writes of the parties' agreements is that "it would make no sense for the parties to make ABG's ability to exercise the Warrant contingent upon Bolt's delivery of the AllPass technology—an event which was

exclusively in Bolt's control." *Id.* ¶ 139. To the extent the reasons why the parties made such an agreement are important (and Bolt submits that they are not in light of the unambiguous language of the Program Agreement), the January 15, 2021 date repeatedly referenced in the FAC (*see*, *e.g.*, *id.* ¶¶ 6, 36, 40, 79) is actually a date by which **ABG and the Newco entity controlled by ABG**— not Bolt—were to have achieved the "AllPass Checkout Launch" and the "AllPass Subscription Launch." Ex. 1 §§ 2.4, 3.1, *see id.* §§ 1.20, 1.21. The AllPass program is contractually controlled by ABG and Newco, *e.g.*, *id.* §§ 2.1, 2.4, 4.5; Bolt is just "the exclusive technology provider," *id.* § 5.1. What Bolt was required to deliver by January 15, 2021 was "AllPass Checkout"—*i.e.*, "Bolt Checkout, white-labeled as AllPass Checkout." *Id.* § 3.1, *see id.* § 1.4. Notably, the FAC does not allege that Bolt failed to provide AllPass Checkout (as defined) on a timely basis and therefore does not allege that Bolt breached any contractual obligation tied to January 15, 2021.

Bolt was to also deliver "Bolt Underlying Technology"—*i.e.*, "the technology necessary or otherwise used to enable the AllPass features, as such technology and features are described in Exhibit A." *Id.* § 3.1, *see id.* § 1.11. But the deadline for that additional technology was not January 15, 2021; instead, Bolt was to "begin development" of that additional technology "immediately" and "complete development as soon as commercially reasonable." *Id.* § 3.1. In an attempt to correct the deficiencies of its original Complaint, the FAC states, in conclusory fashion, that Bolt failed to meet this contractual obligation, but fails to identify any specific facts supporting this statement. In fact, it does not allege that Bolt failed to develop any item in the enumerated list of discrete elements of Bolt Underlying Technology (identified in Exhibit A to the Program Agreement) on a commercially reasonable timeframe. Plaintiffs thus cannot sustain a breach of contract claim based on alleged breaches of non-existent obligations.

Plaintiffs' remaining claims are a hodgepodge of diversionary accusations largely designed to cast aspersion on Bolt and to interfere with Bolt's ongoing business activities and the financing of Bolt's growth plan. They too should be dismissed for the reasons discussed below.

## II.     RELEVANT ALLEGATIONS AND FACTS

### A.     The Parties

Bolt is a fintech company focused on improving the e-commerce experience by, *inter alia*, "solv[ing] the complicated technological challenges involved in checkout, fraud detection, and digital wallets." FAC ¶ 28. Starting with "one tiny merchant" about five years ago, Bolt has grown substantially since then, with a current multi-billion dollar valuation. *Id.* ¶¶ 28-29.

In contrast, the ABG Plaintiffs are not technology companies. Plaintiff ABG is a holding company whose subsidiaries own the intellectual property for various commerce brands and license that intellectual property to companies that then actually run the brands. *Id.* ¶¶ 2, 4, 19-25. One such licensee is SPARC, a joint venture between ABG and a real estate investment company called Simon Property Group, Inc. ("Simon"), which operates the Nautica, Forever 21, Aéropostale, Lucky Brand, and Brooks Brothers brands. *Id.* ¶¶ 3-4.

Plaintiff ABG-SPG, a joint venture between ABG and Simon, alleges it is ABG's assignee of the Program and Operating Agreements, and is the recipient of "the economics" of the Warrant. *Id.* ¶ 26. Plaintiffs do not allege that, as ABG's supposed assignee, ABG-SPG has performed in any way under the contracts, nor that it owns any of the intellectual property underlying any of the claims. *See generally id.* ¶¶ 157-246 (causes of action, mentioning only "ABG"); *see also id.* at Preamble (defining ABG-SPG separately from ABG, and referring to them in the collective as "Plaintiffs").

**B.** **Bolt and ABG: From a Referral Agreement to the AllPass Loyalty Program, the Latter of Which Could Net ABG Much More *If* It Delivered**

**1.** **The Referral, Program, and Operating Agreements**

As Plaintiffs' original Complaint briefly acknowledged (ECF No. 16 ¶¶ 92-94), Bolt and ABG's first agreement was a "Referral Agreement" (which Plaintiffs quoted but did not attach to the original Complaint, and is therefore filed herewith as Ex. 4).[3] Recognizing that the terms of the Referral Agreement prove detrimental to Plaintiffs' claims regarding the interpretation of the agreements at issue, Plaintiffs' FAC now omits any reference to that Referral Agreement.

In that December 2019 contract, Bolt agreed to provide ABG with warrants for up to 400,000 Bolt shares in exchange for merchant business that ABG "identif[ied], source[d] and refer[red]" to Bolt for any of its products or services. Ex. 4 §§ 1, 3, 4. This was a simple structure in which ABG sourced business for Bolt and, in exchange, received some compensation, as well as the right to purchase a limited amount of Bolt shares.

As the following year progressed, however, ABG saw a much bigger opportunity with Bolt. It entered "a series of integrated contracts" with Bolt to "deliver a new online checkout and customer loyalty program known as 'AllPass'" *across* "ABG's extensive brand network of over thirty (30) well-known retail brands," to "enhanc[e] the brand customers' experience and satisfaction in the competitive e-commerce retail space, and thereby helping ABG's brand partners grow and succeed" (and make ABG more money as a result). FAC ¶¶ 7, 8. The key substantive agreements for that relationship were the "AllPass Loyalty Program Agreement" (Ex. 1) and an Operating Agreement (Ex. 3) for a joint venture, ABG-AP, LLC (known as "NewCo" in the

---

[3]  The Court may take notice of allegations in Plaintiffs' prior Complaint, as "Plaintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim—and that they apparently most wanted to avoid—may not serve as a means of forestalling the district court's decision on the motion [to dismiss]." *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*, No. 11-cv-505 (CM), 2011 WL 2610661, at *3 (S.D.N.Y. June 27, 2011).

Program Agreement), that ABG and Bolt established to operate the AllPass program. These agreements: set forth the parties' obligations for the AllPass program and the benefits each was to receive from the program; gave ABG effective control of AllPass due to its control of NewCo; and expressly superseded the Referral Agreement (among others). Ex. 1 § 18.1.

Under the Program Agreement, "ABG Brand Partners" are "third-party licensees and partners who are contractually authorized by ABG (or its affiliates) to use ABG Brands for the sale of products on ecommerce websites and/or mobile applications." *Id.* at Recitals. ABG was obligated to make commercially reasonable efforts "to induce a group of ABG Brand Partners representing at least 75% of ABG Brand Partners' collective online gross merchandise volume for the ABG Brands ***to enroll in AllPass*** within eighteen (18) months of the date" NewCo made AllPass available to Participating ABG Brand Partners and their end users. *Id.* § 2.1 (emphasis added). ABG similarly needed to ***promote AllPass*** with Bolt to ABG's top 3 Brand Partners. *Id.* § 2.2 ABG was also required to use commercially reasonable efforts to source ordinary "Merchant Referrals" (*i.e.*, referrals for non-ABG Brand Partners) for Bolt. *Id.* § 2.3.

In exchange for these efforts, the Program Agreement established only one form of compensation for ABG—never once mentioned in the original Complaint (but which ABG begrudgingly acknowledges in the FAC, at Paragraph 60). Defined as "Market Development Assistance," Bolt agreed to pay (and has consistently paid) ABG a defined percentage of revenues generated from all ABG Brand Partners and Merchant Referrals using Bolt Products, regardless of whether they enrolled in AllPass. *Id.* § 6.3, Ex. D. Under the Operating Agreement, ABG and Bolt respectively own ABG-AP (*i.e.*, NewCo), 70%-30%. Ex. 3, Sched. 3.2. Each entity is to receive a *pro rata* portion of all income generated by the AllPass program, which will grow with each enrollee. *Id.*, Ex. B. It thus benefits both companies to grow AllPass.

## 2. __The October 2020 Warrant__

In addition to the payments set forth in the Program and Operating Agreements, ABG also obtained potentially much more valuable warrants for Bolt shares than what it originally had in the now-superseded Referral Agreement. However, the new warrants issued only if ABG delivered on enrolling ABG Brand Partners or Merchant Referrals in AllPass.

The October 9, 2020 Warrant allows ABG to purchase up to 7,440,060 Bolt shares if it satisfies the Warrant's terms—*i.e.*, 17x as many shares as in the original Referral Agreement. Ex. 2 § 1.15.[4] The key trigger for the Warrant is $750 million worth of "GMV Contribution," which "has the meaning ascribed to such term in the Program Agreement." That definition is:

> "Gross Merchandise Value Contribution" or "GMV Contribution" means the total financial amount of ecommerce transactions that are processed through any of the Bolt Products (which, for the avoidance of doubt, for purposes hereof, include AllPass Checkout) of those ABG Participating Brand Partners and Merchant Referrals __*who have enrolled in AllPass*__.

Ex. 1 § 1.23 (emphasis added). This language is clear that ecommerce transactions processed through Bolt Products count for GMV Contribution, __*only if*__ the ABG Participating Brand Partners or Merchant Referral in question is enrolled in AllPass.

If ABG does not generate $750 million worth of GMV Contribution by 11:59 p.m. Pacific on October 9, 2022, then the Warrant expires. Ex. 2 § 2(d). There are no extensions allowed and, in fact, the Warrant expires three years after its issuance, no matter what. Id. §§ 2(a), 2(d).

---

[4] Although Plaintiffs now allege that the Warrant was "the most significant inducement" for ABG's entry into the Program, FAC ¶ 59, discovery will show (if the case proceeds that far) that this statement is entirely false. The Warrant was, in fact, negotiated relatively late in the process, as is evidenced by the fact that there is only a single mention of GMV Contribution (the metric by which the warrant is earned) in the Program Agreement, and never mentioned in any part of the Program Agreement's substantive provisions. *See* Ex. 1 § 1.23.

Notably, Plaintiffs concede ABG is nowhere near the $750 million needed to exercise the Warrant, regardless of how one defines GMV Contribution; Plaintiffs allege ABG has only generated $392 million in GMV well over a year into the relationship—and that allegation explicitly disregards the plain meaning of the phrase "who have enrolled in AllPass" in the context of the operative agreements. FAC ¶¶ 126, 130.

## C. Bolt's Obligations: "AllPass *Checkout*" by January 15, 2021, and "Bolt Underlying Technology" as Soon as "Commercially Reasonable"

As relevant to ABG's allegations, the Program Agreement establishes two key development timelines for Bolt—one regarding "AllPass Checkout" and one regarding "Bolt Underlying Technology." This distinction is critical, because ABG vaguely alleges that Bolt needed to develop "AllPass" by January 15, 2021 in an obvious attempt to confuse that general term with the defined terms that actually govern Bolt's obligations. *E.g.*, *id.* ¶¶ 6, 11.

AllPass Checkout is "Bolt Checkout, white-labeled as AllPass Checkout." Ex. 1 § 1.4. As Plaintiffs acknowledged in their original Complaint (but which they conspicuously deleted from the FAC): "In other words, [AllPass Checkout was] just a Bolt Product under a different name." ECF No. 16 ¶ 86. While it is true the Program Agreement required Bolt to develop AllPass Checkout by January 15, 2021, *see* Ex. 1 § 3.1 (noting that Bolt is obligated to "complete the development of AllPass Checkout" in time to permit NewCo to make the AllPass loyalty program available for subscription by the Target Subscription Launch Date (defined as January 15, 2021, *id.* at § 1.21)), the FAC does not allege Bolt failed to meet this deadline—and could not without violating Rule 11.

Instead, the FAC attempts to confuse the different obligations of Bolt, ABG, and NewCo under the Program Agreement. Section 3.1 provides that Bolt must "complete the development of AllPass Checkout to permit *NewCo* to achieve (i) the AllPass Checkout Launch on or before the

Target Checkout Launch Date, and (ii) the AllPass Subscription Launch on or before the Target Subscription Launch Date." *Id.* § 3.1 (emphasis added). The "Target Checkout Launch Date" is defined as October 20, 2020, *id.* § 1.20, and the "Target Subscription Launch Date" is defined as January 15, 2020, *id.* § 1.21. Although Plaintiffs now contend that AllPass Checkout was not developed "in time to permit the AllPass Checkout Launch by October 20, 2020," FAC ¶ 81, they make this statement based only on (a) the idea that, despite the Program Agreement's express language, AllPass Checkout *really* means "AllPass Checkout + Bolt Underlying Technology"; and (b) alleged technical issues that arose as Bolt implemented its products on client sites. The first contention is so obviously incorrect under the contract's express terms, *see supra*, that it bears little mention. The latter ignores that any **implementation** issues have nothing to do with the **development** of the technology for the AllPass Checkout, which, again, is just "Bolt Checkout, white-labeled as AllPass Checkout." Ex. 1 § 1.4. Nor do such alleged implementation issues relate to NewCo's obligation to make AllPass Checkout *available to* (not implemented by) Participating ABG Brand Partners. *Id.* § 1.5. In fact, ABG expressly acknowledged that any integration requirements were distinct from Bolt's obligations to provide AllPass Checkout and ABG's obligations to enroll ABG Brand Partners in AllPass. *See id.* § 2.1 ("ABG acknowledges that the ABG Brand Partners will be responsible, with Bolt's assistance, for integrating AllPass and Bolt into their websites and/or mobile applications at their respective own expense.").

**Bolt Underlying Technology**, however, has a different timing obligation. The technology and features under that defined term are set forth in Exhibit A to the Program Agreement. *Id.* § 1.11, Ex. A. Bolt's obligation was to "complete development [of Bolt Underlying Technology] as soon as commercially reasonable." *Id.* § 3.1. The FAC does not anywhere allege what specific elements of Bolt Underlying Technology were purportedly developed on a commercially

unreasonable timeframe. Instead, Plaintiffs claim that Bolt's work on an entirely unrelated project—Bolt+—somehow "underscore[s]" ABG's claim. FAC ¶¶ 79-80. It does not. Indeed, the Program Agreement explicitly contemplated that Bolt would develop "future Bolt products and services." Ex. 1 § 1.10.

Nor are Bolt's alleged implementation issues plausibly evidence of any failure to develop Bolt Underlying Technology. To the extent Bolt Underlying Technology involved implementation at all, it did so only "where technically practicable." *Id.*, Ex. A. Plaintiffs do not allege how any of the implementation issues and fixes they identify are anything more than typical technical issues that arise while implementing a product like this, let alone that Bolt failed to solve them where technically practicable. Moreover, nowhere do Plaintiffs explain how or why Exhibit A covered the other technological features they identify in the FAC, such as a "cartridge" for the SalesForce OMS system, FAC ¶ 85, or a "software development kit" for implementation with Forever 21, *id.* ¶ 86.[5] Rather, Plaintiffs imply these are required under Exhibit A, but cannot actually say that because Rule 11 prohibits them from alleging these are anything but additional technical features that Bolt agreed to provide to specific clients, precisely because Bolt has been operating in good faith to service its customers.

Finally, Plaintiffs' allegations that Bolt has made "intentional efforts to delay the launch of AllPass on Shopify," FAC ¶ 101-111, completely ignore that Shopify is not an ABG Brand Partner or Merchant Referral. Rather, it is a software and payments company that services merchants, not a retail brand itself. Bolt has no obligation to enter into an agreement with a third party platform

---

[5]   A software development kit ("SDK") is a kit to allow third parties to develop apps for a certain product. *See* https://www.techopedia.com/definition/3878/software-development-kit-sdk. Exhibit A to the Program Agreement plainly does not require Bolt to make it so third parties can develop apps for Bolt products or for AllPass, and Plaintiffs do not allege anywhere in the FAC how an SDK could fall under Exhibit A's provisions.

such as Shopify, and ABG does not allege otherwise. Even if Shopify could possibly be an ABG Brand Partner or Merchant Referral—which it could not—"***Bolt has sole reasonable discretion to determine whether or not to enter in an agreement with an ABG Brand Partner or Merchant Referral, and the terms and conditions of each such agreement***." *See* Ex. 1 § 3.5 (emphasis added). Plaintiffs do not—again, because they cannot—allege that Bolt was unreasonable in how it tried to negotiate its deal with Shopify, which is further underscored by the Tweets from Bolt's former CEO that Plaintiffs cite, which make clear that the deal Shopify proposed was not in Bolt's best financial interest. FAC ¶ 110 (citing and quoting https://twitter.com/theryanking/status/1497732288452431874). Nothing requires Bolt to accept a bad deal with a third party platform company in order to help NewCo enroll additional companies in AllPass. *See* Ex. 1 § 6.2 ("Newco will meet and confer in good faith to determine how best to enroll such party in AllPass ***but also afford each Party the benefits contemplated by this Agreement***.") (emphasis added).

### D.     Confidentiality Obligations Under the Program and Operating Agreements, and ABG's Public Statements About the AllPass Program and Scope

The Program and Operating Agreements establish confidentiality regimes for, respectively, the parties' use of each other's confidential information (Program Agreement) and the parties' use of NewCo's confidential information (Operating Agreement).

In the Program Agreement, Confidential Information is defined as "non-public information about the disclosing Party's business or activities." *Id.* §10.1. ABG's Confidential Information includes "non-public or proprietary information related to ABG's or any of its Affiliate's business or operations," and the Section defines a number of different types of such information (none of which includes the fact of Bolt's customer relationship with any ABG Brand Partners). *Id.*

The Operating Agreement provides similar protections for "non-public information with respect to [ABG-AP]." Ex. 3 § 10.13.

Both the Program and Operating Agreements specifically state that information is ***not*** confidential if it becomes generally known through no fault of the receiving party. Ex. 1 § 10.3; Ex. 3 § 10.13. That is exactly what happened here. In November 2020, Bolt and ABG issued a joint press release regarding the AllPass program, in which ABG provided several quotes talking about the extent and scope of the parties' relationship, including that "[w]e are excited to introduce Bolt's checkout platform to our brand customers." Ex. 5. That joint release further stated, "ABG's massive global portfolio includes Lucky Brand, Brooks Brothers, Aéropostale, Juicy Couture, Nautica, and Sports Illustrated. Through the partnership, Bolt's seamless checkout, payments, and fraud protection technology will be available to ABG's global ecommerce network, starting with Forever 21's website and app." *Id.* Similarly, in early July 2021, ABG's parent corporation stated in a public SEC filing:

> We are building a loyalty membership program that spans our entire portfolio of brands and offers customers discounts and perks for a monthly subscription. We are also planning to launch a decentralized subscription platform, AllPass, and have partnered with checkout technology provider, Bolt, to build a subscription program that lives natively within checkout, eliminating the friction of signing up for membership and redeeming points for discounts and rewards.

Ex. 6.

### E. Neither Plaintiff Owns Any of the Intellectual Property Plaintiffs Claim Bolt Misused in the First Amended Complaint

Although Plaintiffs make a number of broad-brush allegations that Bolt misused ABG's intellectual property, the only specific examples they identify are at Paragraphs 143-155 of the FAC. A simple trademark search, however, indicates that ABG does not own any marks for those brands—indeed, directly owns almost no marks at all—and that ABG-SPG does not own any trademarks at all. *See* Exs. 7-8. Presumably, certain ABG subsidiaries or affiliated companies

actually own the various relevant marks. But the judicially noticeable facts indicate that neither **Plaintiff** owns these marks. *See* Request for Judicial Notice, filed concurrently herewith.

III.   **LEGAL STANDARD**

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558, 127 S. Ct. at 1966. The Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965.

"In reviewing a motion to dismiss, a court may consider, *inter alia*, documents that are incorporated by reference into the complaint." *Cummings v. City of New York*, No. 19-cv-7723 (CM)(OTW), 2020 WL 882335, at *3 n.2 (S.D.N.Y. Feb. 24, 2020). For a document to be incorporated by reference, the complaint must make a "clear, definite and substantial reference to the document[ ]." *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330–31 (S.D.N.Y. 2003).

## IV.  ARGUMENT

### A.  Plaintiffs Urge a Plainly Incorrect Interpretation of the Warrant, and Seek to Modify the Contract Without a Plausible Legal or Factual Basis

Plaintiffs' requested declaratory judgment regarding the Warrant rests on three demonstrably incorrect premises, including that: (1) the precondition for "GMV Contribution" that an entity "have enrolled in AllPass" means only that the entity have unofficially "committed" to trying AllPass at some unspecified future date (a position flatly at odds with Plaintiffs' original Complaint); (2) there is some basis to rewrite the two-year earnings window, or jettison it entirely based on a Qualifying Transaction that Plaintiffs do not identify (and which does not exist); and (3) the boilerplate "further assurances" provision in Section 10.4 of the Warrant somehow requires Bolt to draft and enter into an extension to the earnings window. All of these assertions crumble under even minimal scrutiny.

### 1.  GMV Contribution only comes from AllPass enrollees

In their original Complaint, Plaintiffs attempted to read out the phrase "who have enrolled in AllPass" from the definition of GMV Contribution in the Program Agreement. *See, e.g.*, ECF No. 16 ¶¶ 52, 83, 87; Ex. 1 § 1.23. Recognizing that this reading of the contract was plainly incorrect (after Bolt filed a motion to dismiss on the issue), Plaintiffs' FAC offers a new interpretation of GMV Contribution. Now, Plaintiffs agree that GMV Contribution may only be earned from ABG Brand Partners and Merchant Referrals "who have enrolled in AllPass"; however, Plaintiffs now contend that "enrolled" means only that an entity needs to informally "commit[]" to trying AllPass in the future. FAC ¶¶ 17, 125, 129. This new interpretation lacks support in the operative agreements, and in fact contradicts all reasonable readings of how the Program Agreement uses and applies the terms "enroll" or "enrollment," and how it defines those entities that are part of the "AllPass Program."

Officially enrolling potential customers in AllPass—*i.e.*, officially subscribing them—is a defining feature of the Program Agreement. To this point, ABG explicitly committed to "ABG Brand Enrollment," meaning that "ABG would use its commercially reasonable efforts to induce a group of ABG Brand Partners . . . ***to enroll in AllPass*** within eighteen (18) months of the date of the AllPass Subscription Launch." Ex. 1 § 2.1 (emphasis added). Brand enrollment is thus tied to subscriptions from the outset. That enrollment requires the execution of an agreement to pay subscription fees is further confirmed by several other provisions in the Program Agreement. AllPass Members are defined as "end-users (e.g., consumers) who enroll in AllPass ***and pay AllPass Subscription Fees.***" Ex. 1 § 1.7 (emphasis added). AllPass Subscription Fees are, in turn, defined as "fees paid by AllPass Members to participate in AllPass." *Id.* § 1.8. Reading out the requirement that being "enrolled" in AllPass means explicitly agreeing to pay fees to AllPass fails to read the contract provisions as a whole, in the context in which they appear. *See Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) ("[T]he words and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions.") (internal quotation marks omitted).

Furthermore, Plaintiffs' proposed reading of "enrollment" would gut the purpose of the Program Agreement, which was to build and grow the AllPass program. The Program Agreement is clear that ABG was to "launch" (*i.e.*, make available) the AllPass program on January 15, 2021. Ex. 1 §§ 1.5, 1.21. Thereafter, ABG was to attempt to "induce" its Brand Partners to "enroll" in AllPass. *Id.* § 2.1.[6] In return for these enrollments, which, through subscription fees, would accrete

---

[6]    Again, Shopify is not a Merchant Referral or ABG Brand Partner, but rather a third party software platform. Regardless, Bolt reasonably cooperated during negotiations with Shopify. That Bolt was ultimately unable to reach agreement with an independent third party has no bearing on ABG's claims under the Program Agreement.

value to NewCo (and therefore ABG and Bolt), ABG could earn warrants in Bolt. *Id.* § 1.23; Ex. 2 §§ 1.4, 1.5. If ABG simply "facilitate[d] introductions" to "Merchant Referrals"—which are entities that used Bolt Products but did ***not*** enroll in AllPass—Bolt already agreed to pay ABG Market Development Assistance fees. Ex. 1 §§ 2.2, 2.3, 6.3, Ex. D. Significantly, these obligations did *not* use the term "enroll" (and thus do not count for ABG's GMV Contribution) because a mere referral or introduction does *not* require the execution of an agreement to pay a subscription, and does not, by itself, accomplish the goal of growing AllPass.

Confirming the requirement that GMV Contribution only comes from AllPass enrollees who actually agree to pay subscription fees to AllPass is that the Program Agreement already compensates ABG for basic referrals to Bolt. ABG earns Market Development Assistance fees for every ABG Brand Partner and Merchant Referral transaction run through Bolt Products, regardless of AllPass enrollment. Ex. 1 § 6.3, Ex. D. The idea that ABG ***also*** gets the right to purchase up to 5% of Bolt's equity for basic referrals that do not build the AllPass program is thus belied by the contract's express language, as well as the obvious purpose in distinguishing between GMV Contribution and Market Development Assistance in the same document. *Compare id.* § 1.23, *with id.* § 6.3. Indeed, the focus on growing the AllPass program is further confirmed by the core difference between the now-superseded Referral Agreement and the operative Program and Operating Agreements, which focus on building out the AllPass Loyalty Program and providing outsized financial incentives to ABG ***if*** it contributes to growing that program.

Plaintiffs' citations to various texts from Bolt employee, Justin Grooms, do not change this conclusion. As an initial matter, none of those texts indicate that Mr. Grooms was talking about GMV ***Contribution*** as opposed to the more general gross merchandise value (GMV) concept, which counts for ABG's Market Development Assistance fees. *See* FAC ¶¶ 117-122. But, even if

Mr. Grooms did believe ABG was earning GMV Contribution, his mistaken impression does not change the unambiguous language and legal meaning of the contract. *See Servedio v. Travelers Casualty Ins. Co. of Am.*, No. 20-CV-3907-LTS-SDA, 2021 WL 5772148, at *2 (S.D.N.Y. Dec. 6, 2021) (contract interpretation "is a matter of law for the court to decide"). The Grooms texts thus have no bearing on this four-corners analysis (and interpretation) of the contract.

### 2. There is no written or other basis to rewrite the earnings window

Plaintiffs' primary argument for extending the Warrant's two-year earnings window is that Bolt supposedly breached Section 3.1 of the Program Agreement by not delivering "AllPass" in full by January 15, 2021. FAC ¶¶ 132-134, 183. Although that is incorrect for the reasons discussed in Section IV.B. below, it also flies in the face of the Warrant's express terms.

Section 2 of the Warrant explicitly identifies the circumstances under which the Warrant expires. As most relevant to Plaintiffs' claim, the Warrant expires two years after its effective date if ABG does not generate $750 million in GMV Contribution by that time. Ex. 2 § 2(d). This is a straightforward, unambiguous deadline, with only ***one*** enumerated exception; *i.e.*, if Bolt enters a Qualifying Transaction under Section 5.3 of the Program Agreement (discussed further below). With such unambiguous language, Plaintiffs cannot ask this Court to rewrite the earnings window into some longer period. *See Himmelberger v. 40-50 Brighton First Rd. Apartments Corp.*, 94 A.D.3d 817, 819 (2d Dept. 2012) ("A court cannot, under the guise of interpretation, rewrite the parties' contract to impose additional terms.") (citing *Matter of Salvano v. Merrill Lynch, Pierce, Fenner & Smith*, 85 N.Y.2d 173, 182 (N.Y. App. Div. 1995)).

Supporting Plaintiffs' inability to extend the earnings window is subsection 2(a) of the Warrant, which states that the Warrant expires three years after its issuance date, no matter what. If the parties intended some sort of extension based on any delays in AllPass, they would not have included such a black-and-white, unambiguous end date for the Warrant, which Plaintiffs ignore.

As noted above, the only exception to the two-year earnings window is if, during the Program Agreement's defined Term, Bolt enters a "Qualifying Transaction," defined as any arrangement where Bolt develops a "bespoke [*i.e.*, not off-the-shelf] technology platform similar to the AllPass Portal" for another company. Ex. 2 § 2(d); Ex. 1 § 5.3. Plaintiffs allege, on information and belief, that Bolt "may" have entered into such a transaction, because it recently discussed a new potential product, Bolt+, on an investor call. FAC ¶¶ 140-142.

To be clear, the speculative conclusion that Bolt entered a Qualifying Transaction is false; Bolt+ is still in its development phase. But, even if it were not, Plaintiffs' information and belief allegations do not rise to a plausible level. Initially, Plaintiffs do not explain how Bolt+ is a "bespoke technology platform" for a third party that could even qualify as part of a Qualifying Transaction. *Id.*; *see also id.* ¶¶ 112-116. But, just as importantly, Plaintiffs must allege facts establishing why they think a Qualifying Transaction actually occurred. *See*, *e.g.*, *Sanders v. Grenadier Realty, Inc.*, 367 F. App'x 173, 175 n.2 (2d Cir. 2010) (affirming dismissal where "plaintiffs allege[d] no basis for the 'information and belief' on which their assertion" was based). All Plaintiffs allege is that Bolt announced Bolt+; they do not allege an actual transaction involving Bolt+ took place, despite citing numerous investor materials that would presumably trumpet such a development. This renders these allegations implausible. *See Ludwig's Drug Store, Inc. v. Forest City Enterprises, Inc.*, 15-cv-7949 (JSR), 2016 WL 915102, at *14 (E.D.N.Y. Mar. 4, 2016) ("the Court has no basis from which to infer that Plaintiffs' belief regarding [key facts] is other than pure speculation").

### 3. Section 10.4's "further assurances" provision is not some untapped basis to force Bolt into an agreement the parties did not make

To the extent Plaintiffs allege that the "further assurances" provision in Section 10.4 of the Warrant acts as a basis to extend the two-year earnings window (FAC ¶ 138), that is incorrect as

a matter of law. Such language is a boilerplate term of art reflecting that complex deals often have a number of different documents that must be signed, and different steps that must be accomplished, in order to effectuate the deal. "Further assurances" clauses thus simply obligate the parties to make efforts to consummate the transaction if they inadvertently omit a step. *See In re Ampal-American Israel Corp.*, 2016 WL 859352, at *4 (S.D.N.Y. Feb. 28, 2016), *aff'd sub nom.*, 677 F. App'x 5 (2d Cir. 2017) ("The Further Assurances Provision required only that the parties make efforts 'to consummate and make effective the transactions' contemplated in the agreements, namely a loan with an optional conversion to equity."); *All. Indus., Inc. v. Longyear Holdings, Inc.*, 854 F. Supp. 2d 321, 333 (W.D.N.Y. 2012) (further assurances clause "essentially require[es] each party to execute the documents necessary to consummate the transaction"). What such a clause does *not* do is impose any additional obligations on the parties beyond a contract's express language. *See, e.g., 97th St. Holdings, LLC v. E. Side Tenants Corp.*, 82 A.D.3d 473, 474 (1st Dept. 2011) ("To impute such obligations from generalized language found in the contract's further assurances clause[,] would amount to a reformation of the contract without basis."). Plaintiffs cannot manufacture such a requirement with a boilerplate clause like this here.

4.  **ABG has not even met its requirements under its incorrect interpretation of GMV Contribution**

In addition to all of the above, it bears noting that the FAC itself undercuts Plaintiffs' request to extend the two-year earnings window. Even if one credits Plaintiffs' plainly incorrect interpretation of GMV Contribution, their allegations show they are far below the $750 million minimum to exercise the Warrant well over a year into the parties' relationship. FAC ¶ 125. Apparently recognizing this, Plaintiffs now allege that "to the extent that achieving the $750 million GMV Contribution threshold by a date certain constitutes a condition precedent" to ABG earning warrants in Bolt, that condition is "excused" due to Bolt's purported breaches. *Id.* ¶ 136.

For the reasons discussed below, Plaintiffs have not, and cannot, plausibly allege that Bolt breached its obligations. In any event (and as noted above), Plaintiffs do not identify a single contract provision that would extend the Warrant's earnings window based on any supposed breaches.

**B.** **Plaintiffs Do Not Plausibly Allege Bolt Breached its Performance Obligations**

Separate from any confidentiality or press-related obligations (discussed in the following Section), Plaintiffs allege only that Bolt breached its technology delivery obligations under Section 3.1 of the Program Agreement, and that it supposedly committed unauthorized use of ABG's intellectual property under Section 9.7.3 of the Program Agreement. *Id.* ¶¶ 163-64.[7] Neither allegation satisfies the plausibility test.

Regarding Section 3.1, as noted previously (*supra* at Section II.C.), Plaintiffs fail to distinguish between Bolt's obligation to deliver AllPass **Checkout** by January 15, 2021, and its obligation to deliver the broader set of technology and features constituting Bolt Underlying Technology "as soon as commercially reasonable." To reiterate, by Plaintiffs' own admission in their original complaint, AllPass Checkout was simply a "Bolt Product under a different name." ECF No. 16 ¶ 86. The Program Agreement established a January 15, 2021 deadline for this delivery because it was simple; Bolt just white-labeled a preexisting product as AllPass Checkout. The much more complex Bolt Underlying Technology that would power the broader AllPass program therefore had a "commercially reasonable" timeframe, to reflect that Bolt needed time to develop it from the October 2020 execution date and the point at which ABG was supposed to have started

---

[7] Plaintiffs also allege Bolt breached Sections 9.1.1 and 9.1.2 of the Program Agreement (FAC ¶ 163), but the former states only that ABG and its Affiliates retain the right, interest, and title in their intellectual property; and the latter requires ABG to license ABG IP to NewCo. Neither addresses the circumstances under which Bolt can contractually use ABG IP.

enrolling ABG Brand Partners into the program. Plaintiffs do not allege—because they cannot—that Bolt failed to meet the January 15, 2021 deadline for AllPass Checkout. Nor do they allege anywhere that Bolt's delivery of Bolt Underlying Technology was on a commercially unreasonable time frame. As discussed above, *see supra* at 12, Plaintiffs at best allege that Bolt developed *additional* technologies for customers that were not covered by the definition of Bolt Underlying Technology. Accordingly, the Section 3.1 breach allegations fail as a matter of law.[8]

Moving to Section 9.7.3, that governs "[e]ach ***party's*** use of such other ***party's*** Marks" (emphases added). The Program Agreement defines "Party" as "ABG, Bolt, and NewCo," and defines the three entities collectively as "Parties." Ex. 1 at 1. It also distinguishes between the parties and their "Affiliates," the latter of which has a separate definition. *Id.* § 1.1. A "party" is thus only one of the three singular entities the contract identifies.

The reason this definition matters is that none of the marks Plaintiffs allege Bolt misused are ***ABG's*** marks. *See supra* at Section II.E. As a matter of law, Plaintiffs thus do not allege a single plausible violation of Section 9.7.3; the marks are not a "party's Marks."

## C. Plaintiffs Do Not Plausibly Allege Bolt Violated Any Confidentiality or Press-Related Obligations

One of the most fundamental problems with Plaintiffs' allegations that Bolt breached the confidentiality provisions of the Program and Operating Agreements is that Plaintiffs never actually identify what supposedly confidential information Bolt disclosed. *See generally* FAC ¶¶

---

[8] To the extent Plaintiffs allege that Bolt "misrepresented" the time and resources it would take to integrate Bolt products into customers' systems (*see, e.g.*, FAC ¶¶ 11, 139), besides being wrong as a factual matter, it is not actionable as a legal matter. Section 12.5 of the Program Agreement expressly disclaims any representations or warranties, and Section 18.1 is a clear integration clause. Furthermore, Plaintiffs do not allege—again, because they cannot—that Bolt somehow fraudulently or negligently induced them to enter any of the Program or Operating Agreements, or the Warrant. *Id.*; *see also id.* ¶¶ 157-246.

143-155. Without such allegations, the confidentiality portions of Plaintiffs' breach claims fail as a matter of law. *See, e.g.*, *Full Circle United, LLC v. Skee-Ball, Inc.*, 11 CV 5476 (LB), 11 CV 6277 (LB), 2014 WL 12829195, at *7 (E.D.N.Y. May 13, 2014) (dismissing claim for breach of confidentiality agreement because, *inter alia*, the plaintiff failed to allege what information was confidential under the agreement); *Art Cap. Grp., LLC v. Carlyle Inv. Mgmt. LLC*, 151 A.D.3d 604, 605 (1st Dept. 2017) (similar).

To the extent Plaintiffs' allegations can be construed to argue that Bolt breached its confidentiality obligations by mentioning that it had partnered with ABG to develop the AllPass program, Section 10.1 of the Program Agreement is crystal clear that the existence of the parties' relationship is ***not*** confidential information. Talking about ABG and the AllPass program overall thus is not actionable by the contract's plain terms.

Next, to the extent Plaintiffs allege that information about Bolt's business with ABG brand partners is confidential, that argument similarly finds no basis in the contracts. Section 10.1 of the Program Agreement provides confidentiality protections for "non-public information about the disclosing ***Party's*** business or activities" (which includes "non-public or proprietary information related ABG's or any of its Affiliate's business or operations"), Ex. 1, and Section 10.13 of the Operating Agreement provides similar protections for "non-public information with respect to [ABG-AP]," Ex. 3. Plaintiffs do not explain how mentioning Bolt's customer relationships with various ABG brand partners is confidential to any company at all, nor do they identify what allegedly confidential information was "disclosed" regarding Reebok. FAC ¶¶ 143-155. This is particularly notable given that Section 10.1 of the Program Agreement includes a long list of ABG Confidential Information, none of which includes such demonstrable facts.

Third, both the Program and Operating Agreements contain exceptions for information that became public through other means than a party breaching its confidentiality obligations. *See* Ex. 1 § 10.1; Ex. 3 § 10.13. Here, judicially noticeable facts demonstrate that ABG itself made the AllPass program public with Bolt in November 2020, including by noting that Bolt would seek to establish customer relationships with all of ABG's brand partners. Ex. 5. Similarly, ABG has mentioned the existence and scope of the parties' relationship (*i.e.*, for all ABG brand partners) in SEC filings. Ex. 6. It is thus implausible for ABG to contend that Bolt somehow breached confidentiality obligations by mentioning that very same information. *Cf. Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (finding that information was public based on judicially noticeable articles and SEC filings); *In re Eros Int'l Sec. Litig.*, 2017 WL 6405846, at *5 n.1 (S.D.N.Y. Sept. 22, 2017), *aff'd sub nom.* 735 F. App'x 15 (2d Cir. 2018) (same, on Rule 12(b)(6) motion).

Finally, with respect to Plaintiffs' allegations that Bolt issued unauthorized press releases, the FAC does not identify a single such release. FAC ¶¶ 166, 175. In contrast, it is clear that ABG directly participated in and authorized the parties' November 2020 press release, belying their allegations to the contrary. Ex. 5 (press release directly quoting multiple ABG executives about the parties' relationship on AllPass).

### D. The Unjust Enrichment and Quantum Meruit Claims Fail Because the Parties' Contracts Govern Their Relationship

"The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates *in the absence of any agreement*." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586-87 (2d Cir. 2006) (quoting *Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572 (N.Y. App. Div. 2005)). "A plaintiff can plead unjust enrichment as an alternative to breach of contract, but only if there is a bona fide dispute concerning existence of a

contract or whether the contract covers the dispute." *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 43 F. Supp. 3d 309, 317 (S.D.N.Y. 2014) (quotations omitted). If there is no such bona fide dispute, a claim for unjust enrichment does not lie. *Beth Israel*, 448 F.3d at 587.

As for quantum meruit, "[t]he existence of a valid and enforceable written contract precludes a quantum meruit claim." *Aviv Const., Inc. v. Antiquarium, Ltd.*, 259 A.D.2d 445, 446, (1st Dep't 1999) (citing *Clark–Fitzpatrick, Inc. v. Long Is. R.R. Co.*, 70 N.Y.2d 382, 388 (N.Y. App. Div. 1987)).

Here, there are no allegations disputing the existence, validity, and applicability of the Program Agreement, Operating Agreement, and Warrant to this dispute, and the conduct underlying Plaintiffs' unjust enrichment and quantum meruit claims all explicitly relates to those contracts. *See* FAC ¶¶ 202-210. Counts 5 and 6 therefore fail as a matter of law.

### E. Plaintiffs' Good Faith and Fair Dealing Claim Duplicates the Contract Claims and Improperly Seeks to Manufacture New Contractual Obligations

Moving to Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing, such a claim is generally actionable only where the plaintiff alleges wrongs independent of the express terms of the contract and seeks separate damages not intertwined with damages resulting from breach of the contract's terms. *See J. Kokolakis Contracting Corp. v. Evolution Piping Corp.*, 46 Misc. 3d 544, 547–48, 998 N.Y.S.2d 788 (N.Y. Sup. 2014) (collecting cases). "Where a contractual party is merely seeking to reap the benefits of its contractual bargain, the implied covenant breach claim will not lie." *Id.*

Although a duty of good faith and fair dealing is implicit in every contract, it cannot be used to create independent obligations beyond those stated in the express language of the contract. *PT Kaltim Prima Coal v. AES Barbers Point, Inc.*, 180 F. Supp. 2d 475, 483 (S.D.N.Y. 2001);

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 306 (S.D.N.Y. 1998). Moreover, the covenant of good faith and fair dealing cannot be construed so broadly as to effectively nullify other express terms of the contract, nor to create independent contractual rights. *Fesseha v. TD Waterhouse Inv. Servs., Inc.*, 761 N.Y.S.2d 22, 23 (1st Dep't 2003).

In support of their good faith and fair dealing claim, Plaintiffs allege only that Bolt supposedly breached its obligations under the various contracts (FAC ¶ 198(a), (c), (g)-(l)); made unspecified misrepresentations **before** the parties entered the contracts (*id.* ¶ 198(b)); prevented Plaintiffs from exercising their contractual rights under the Warrant (*id.* ¶ 198(d)); and cited different interpretations of GMV Contribution at different times (*id.* ¶ 198(f)). Although Bolt disputes these allegations, none describe harms separate from the contracts' express terms, nor any damages separate from those Plaintiffs seek for their non-viable contract claims.[9] Accordingly, this claim (Count 4) fails. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Xerox Corp.*, 25 A.D.3d 309, 310 (1st Dept. 2006) (dismissing claim for breach of defendants' duty of good faith and fair dealing "since it is merely a substitute for plaintiff's nonviable contract claims.").

### F. Plaintiffs Fail to Establish Standing for Their Trademark Infringement and False Advertising Claims

#### 1. Neither Plaintiff is within these statutes' "zone of interest"

If (as here) a plaintiff does not directly own the mark(s) underlying a Lanham Act § 43(a) and/or GBL §§ 349, 350 claim, that plaintiff must establish they are within the statutes' "zone of interest," or else they fail to establish their standing to sue. *See Lexmark Int'l, Inc. v. Static*

---

[9] Plaintiffs' allegations regarding Bolt+ (*e.g.*, FAC ¶¶ 198(i)-(j), 203(f)) notably do not identify a single contract provision that would have prevented Bolt from continuing to develop products other than AllPass, especially when the Program Agreement's definition of "Bolt Products" means "all current **and future** Bolt products and services other than the Bolt Underlying Technology." Ex. 1 § 1.10 (emphasis added).

*Components, Inc.*, 572 U.S. 118, 131-32, 134 S. Ct. 1377, 1389-90 (2014) (Lanham Act); *New*

*York Pub. Int. Rsch. Grp., Inc. by Wathen v. Ins. Info. Inst. by Moore*, 531 N.Y.S.2d 1002, 1008

(N.Y. Sup. Ct. 1988), *aff'd sub nom.*, 554 N.Y.S.2d 590 (1st Dep't 1990) (GBL §§ 349, 350).

The Lanham Act's purpose as applied to nearly every private plaintiff is to "protect persons

engaged in [interstate or foreign] commerce against unfair competition." *Lexmark*, 572 U.S. at

131-32, 134 S. Ct. at 1389. As such, a plaintiff is within the Act's "zone of interest" if it can allege

an injury to its own "commercial interest in reputation or sales." *Id.*

New York law is similar. A plaintiff lacks standing to sue for false advertising when the

claimed loss "arises solely as a result of injuries sustained by another party." *Blue Cross & Blue*

*Shield of N.J., Inc. v. Philip Morris USA Inc.,* 3 N.Y.3d 200, 207 (N.Y. App. Div. 2004).

By their own admission, neither Plaintiff is a commercial entity. FAC ¶¶ 19-26. And

judicially noticeable facts demonstrate that neither directly owns the marks at issue in this case.

*See supra* at Section II.E. Accordingly, neither Plaintiff can establish statutory standing, because

they have no direct commercial interest in their own reputation or sales from the alleged misuse of

the marks, and any alleged damages arise solely from injuries sustained by another party (*i.e.*, the

entities that actually own the marks and/or the licensees that actually use the marks).

### 2.    In any event, Plaintiffs do not plausibly allege harm of the type required for these claims

***Lanham Act.*** In order to state a claim under Section 43(a), a plaintiff must plausibly allege

one or both of two forms of injury: (1) reputational damage, and/or (2) loss of sales. *Lexmark*, 572

U.S. at 132, 139, 134 S. Ct. at 1390, 1394. Failure to do so requires dismissal. *See, e.g.*, *Casper*

*Sleep, Inc. v. Derek Hales & Halesopolis LLC*, No. 16-cv-03223 (CM), 2016 WL 6561386, at *7

(S.D.N.Y. Oct. 20, 2016) (plaintiff failed to plead that any consumer's mistaken belief led to either

of these types of damages); *Cecere v. RJ Reynolds Tobacco Co.*, No. 98 Civ.2011(RPP), 1998 WL

665334, at *2 (S.D.N.Y. Sept. 28, 1998) (similar, where plaintiff alleged only that "plaintiffs have been severely damaged and injured and have suffered economic loss").

Despite having had weeks to further investigate their claims for damages, Plaintiffs state only in conclusory fashion that "ABG's damages, include, at a minimum, the lost sales and direct reputational damage to ABG and to businesses associated with the ABG Brands," without alleging a single fact to support this claim for damages. *See* FAC ¶¶ 219. Given that neither entity actually sells anything (both are holding companies) and ABG itself has advertised the AllPass program and its relationship with Bolt (as has its parent corporation), even if this were not a wholly conclusory allegation, it is certainly implausible. Accordingly, the Lanham Act claim fails.

*GBL §§ 349, 350.* "To state a cause of action under [GBL] § 349, a plaintiff must allege (1) a deceptive consumer-oriented act or practice which is misleading in a material respect, and (2) injury resulting from such act." *Exxonmobil Inter-Am., Inc. v. Advanced Info. Eng'g Servs., Inc.*, 328 F. Supp. 2d 443, 447 (S.D.N.Y. 2004). "The standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to section 349." *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 330 (S.D.N.Y. 2015).

As an initial matter, Plaintiffs fail to allege personal injury under these statutes for the same reasons as under the Lanham Act. The GBL claim thus fails on this basis alone.

However, an additional failure is that, although entities other than consumers may bring a claim under these statutes, they can do so only "so long as some harm to the public at large is at issue." *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) (citation omitted). "For nearly three decades, the overwhelming majority of—if not all—federal courts to address the question … have recognized that the injury to consumers or the public interest in a Section 349 case must be more than the general variety of consumer confusion that is the gravamen

of such a claim." *Mayes v. Summit Entm't Corp.*, 287 F. Supp. 3d 200, 208 (E.D.N.Y. 2018) (citation omitted). Accordingly, a plaintiff "need[s] to allege harm to consumers beyond mere confusion." *Id.* at 209.

The FAC contains no allegations of consumer harm. At best, Plaintiffs allege that sophisticated companies—*i.e.*, Bolt's potential clients for its e-commerce checkout solutions— might be confused about the scope of its current customer base. But that is not enough under applicable law. This therefore stands as a separate basis to dismiss the GBL claim.

### G.     Plaintiffs Do Not Plausibly Allege Any False Advertisements

Even if Plaintiffs had plausibly established their standing, their Lanham Act and GBL Sections 349 & 350 false advertising claims still fail because Plaintiffs identify no actionable false advertising, as they must under the law. *See* FAC ¶¶ 145-155.

The "touchstone of whether a defendant's actions may be considered 'commercial advertising or promotion' under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002). A false advertising claim under Section 43(a) must also allege that: (1) "the statement in the challenged advertisement is false"; (2) the defendant "misrepresented an inherent quality or characteristic of the product"; (3) the defendant "placed the false or misleading statement in interstate commerce"; and (4) "the plaintiff has been … injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products." *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014) (internal quotation marks and citations omitted). Under GBL Sections 349 & 350, the test similarly focuses on whether the plaintiff alleges "consumer-oriented conduct" that involves "advertising of a commodity that is misleading in a material respect and that was made 'in the conduct of any business, trade or commerce or in the furnishing of any service in this state.'" *Berger v. E*Trade*

*Grp., Inc.*, No. 600721/99, 2000 WL 360092, at *4 (N.Y. Sup. Ct. Mar. 28, 2000) (quoting GBL § 350).

Presentations to investors, given their extremely limited and non-consumer-oriented distribution, by law cannot be advertisements under these tests. *See*, *e.g.*, *Drone Racing League, Inc. v. DR1, LLC*, 18cv4093(DLC), 2018 WL 6173714, at *5-6 (S.D.N.Y. Nov. 26, 2018) (Lanham Act § 43(a)); *Berger*, 2000 WL 360092, at *4 (New York law). Accordingly, the statements Plaintiffs identify in Paragraphs 117-122 of the FAC by law cannot give rise to a false advertising claim, because, by Plaintiffs' own admissions, they were exclusively from investor presentations.

Statements in articles similarly are not actionable if, on their face, they are not meant to induce consumers to buy the defendant's services. *See*, *e.g.*, *Boule v. Hutton*, 328 F.3d 84, 90-91 (2d Cir. 2003) (false statements in article about art fraud by law were not advertisements). The *Bloomberg* article Plaintiffs quote in Paragraph 152 of the FAC is about Bolt's valuation, and therefore not an advertisement. *Id.*[10] Moreover, and in any event, the only statement *Bloomberg* attributed to **Bolt** was that Bolt would debut new retailers in Europe. The alleged false statement about Bolt's current customers quoted in Paragraph 152 has no attribution, so again is not actionable.

Next, the article mentioned in Paragraph 154 similarly has no specific attribution to Bolt and, more importantly, is not an advertisement under the above precedent. *Boule*, 328 F.3d at 90–91. Additionally, Plaintiffs allege that Brooks Brothers only "temporarily" stopped integrating

---

[10] Plaintiffs' claims that "Bolt's statements in the Bloomberg article were made for the express purpose of driving consumers to Bolt's site" and that "Bolt's statements in the Bloomberg article were intended to induce consumers to purchase and use Bolt's services" are made without support or attribution to anyone at Bolt. FAC ¶¶ 233-234. Such assertions are merely "conclusory allegations or legal conclusions masquerading as factual conclusions" and the Court is not bound to accept them on a motion to dismiss. *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 222 (2d Cir. 2019) (internal quotation and citation omitted).

Bolt's products into its sites. *See* FAC ¶¶ 10, 90, 148. That means Brooks Brothers certainly is still a customer of Bolt's and further that the statement is not false, and thus not actionable. *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 63 (2d Cir. 2016).

The only potential "advertisement" is Bolt's website (which Plaintiffs describe at Paragraph 155), but it (a) contains no falsehoods about Bolt's relationship with the companies in question, and (b) contains a literally true statement (*i.e.*, "nine out of ten Bolt retailers…"). Plaintiffs do not allege that the statement is false in anyway; they just claim that having Brooks Brothers' logo near the statement suggests Brooks Brothers is one of those nine. But Bolt makes no such assertion, meaning not even this statement could not plausibly support Plaintiffs' claims.

## V.    CONCLUSION

For the foregoing reasons, Bolt respectfully requests that the Court dismiss the First Amended Complaint.

DATED: March 18, 2022

QUINN EMANUEL URQUHART &
    SULLIVAN, LLP


By: _/s/ Adam Wolfson_
    Richard I. Werder, Jr.
    Adam Wolfson
    Victoria Parker (*pro hac vice forthcoming*)
    Phillip B. Jobe

51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000

*Attorneys for Defendant Bolt Financial, Inc.*